# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DANIEL HUMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

vs.

FISHER INVESTMENTS, INC.,

Defendant.

Case No. 4:24-cv-01177-MTS

THE DEPOSITION OF DANIEL HUMAN

Taken on behalf of Defendant

June 4, 2025

CERTIFIED TRANSCRIPT

I N D E X

WITNESS: DANIEL HUMAN

Examination By Mr. Terepka ....................5

* * * * *

E X H I B I T S

Exhibit 1 ....................................21
Email/Attachment

Exhibit 2 ....................................26
Settlement Agreements

Exhibit 3 ....................................39
Emails

Exhibit 4 ....................................80
Daniel Human Settlements

Exhibit 5 ....................................82
Agreed Stipulation of Dismissal

Exhibit 6 ....................................89
Bankruptcy Documents

Exhibit 7 ...................................121
Fisher Investments, Inc.'s First Set of Interrogatories and Requests for Production to Mr. Human Related to Fisher's Damages

Exhibit 8 ...................................134
Emails

Exhibit 9 ...................................141
Notice of Electronic Filing

All exhibits attached hereto.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DANIEL HUMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

vs.

FISHER INVESTMENTS, INC.,

Defendant.

Case No. 4:24-cv-01177-MTS

THE DEPOSITION OF DANIEL HUMAN, on the 4th day of June, 2025, between 8:00 a.m. and 5:00 p.m. of that day, at the Thomas F. Eagleton U.S. Courthouse, 111 South 10th Street, 14th Floor, St. Louis, Missouri 63102, before Rebecca L. Tuggle, a Certified Court Reporter within and for the State of Missouri, in the above-styled certain cause now pending In The United States District Court for the Eastern District of Missouri, Eastern Division; on behalf of the Defendant.

APPEARANCES OF COUNSEL:

The Plaintiff was represented by:

Mr. Edwin V. Butler, Esq.
Butler Law Group LLC
1650 Des Peres Road, Suite 200
Des Peres, MO 63131
(314) 208-0318

edbutler@butlerlawstl.com

The Defendant was represented by:

Mr. Alexander D. Terepka, Esq.
Watstein Terepka LLP
1055 Howell Mill Road, 8th Floor
Atlanta, GA 30318
(213) 839-3317

alex@wtlaw.com

ALSO PRESENT: FRED HARRING, IN-HOUSE COUNSEL FOR FISHER

DANIEL HUMAN,

of lawful age, being first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendant, as follows:

EXAMINATION

QUESTIONS BY MR. TEREPKA:

**Q. Good morning, Mr. Human.**
**Is there any reason at all that you cannot testify truthfully and accurately today?**
A. No.
**Q. What's your full name?**
A. Daniel Angelo Human.
**Q. Was that your name at birth?**
A. It was not.
**Q. What was your name at birth?**
A. Daniel Angelo Sturdivant.
**Q. When did you change your name to Human?**
A. I was a kid. I don't know the year. I was technically not adopted, but our last names were changed when my mother married Robert J. Human. I don't know what year it was. Probably I was seven, maybe.
**Q. Okay. So you were a young child?**
A. Yeah, I was a kid. Yeah, I was just a kid

in school. I think I was in second grade, in fact.
**Q. Understood. Do you go by any other names than the two you just mentioned?**
A. No.
**Q. What are your phone numbers?**
A. Upon the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination; so I respectfully decline to answer the question.
**Q. In this case, you've alleged that one of your phone numbers is (208) 390-1355; is that correct?**
A. Upon the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer the question.
**Q. I'm asking you about a phone number you've alleged in this case. Do you understand?**
A. Upon the advice of counsel, invoking my Fifth Amendment privilege and self-incrimination, and I respectfully decline to answer.
**Q. Is it your position that you won't answer any questions about the cell phone number you've alleged is yours in this case?**
A. Again, upon the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer.

**Q. Let's try a different phone number. Phone number (314) 915-2988, is that your phone number?**

A. Upon the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer.

**Q. Are you aware of any criminal proceedings against you related to either of those two phone numbers?**

A. Again, upon the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer.

**Q. Okay. Well, I think we may need to get a ruling from Judge Schelp on this; so let me consider whether we should do that now or proceed. There's a few other topics I think I can cover.**

**So shifting gears, where do you live?**

A. My residence is 10423 Conway Road.

**Q. How long have you lived there?**

A. I don't know the exact month, but for the past -- I'd say near a year for sure. I don't remember the exact month I moved in.

**Q. Okay. Who else lives with you there?**

A. That is owned by my sister, Melody Human.

**Q. How long has she lived there?**

A. I have no idea.
**Q. Has she lived there the entire time that you have?**
A. That I've been there?
**Q. Yes.**
A. Yes.
**Q. Does anyone else live there?**
A. No.
**Q. Just you and Melody?**
A. That's correct.
**Q. What does your sister Melody do for a living?**
A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I decline to answer the question.
**Q. I'm asking about what Melody does for a living.**
A. You have to ask Melody.
**Q. Do you know what your sister does for a living?**
A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer the question.
**Q. Does she own a floral shop?**
A. On the advice of counsel, invoking my Fifth

Amendment privilege against self-incrimination, and I respectfully decline to answer.

**Q. Are you aware of any criminal investigation relating to what Melody Human does for a living?**

A. On the advice of counsel, invoking my Fifth Amendment privilege against self-incrimination, I respectfully decline to answer the question.

**Q. Before you lived at 10423 Conway Road, where did you live.**

A. Briefly -- well, I lived in Ballwin. I don't remember the name, the exact address. It was on Pinecrest.

**Q. Was it 1245 Pinecrest Lane?**

A. Very well may be.

**Q. How --**

A. I don't recall the exact address.

**Q. How long did you live in Pinecrest?**

A. I don't honestly remember the months.

**Q. Was it for about a year that you lived there?**

A. It's very possible.

**Q. Who else lived with you at 1245 Pinecrest Lane?**

A. My now ex-wife, Cindy Human.

**Q. How long were you married to Cindy?**

A. I don't remember the exact date.
**Q. Was it more than a year?**
A. Yes.
**Q. More than five years?**
A. Yes.
**Q. More than 10 years?**
A. I don't -- I don't know the exact dates.
**Q. What does Cindy Human do for a living?**
A. She collects Social Security. She's retired. She doesn't -- she doesn't work. She doesn't have a job.
**Q. Did anyone else live with you --**
A. No.
**Q. -- at Pinecrest. Why did you move from Pinecrest to your current residence?**
A. On advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer the question.
**Q. Are you aware of a criminal investigation related to your move from Pinecrest to Conway Road?**
A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.
**Q. What company is -- well, have you been married to anyone else other than Cindy Human?**

A. Yes.
**Q. Who?**
A. My ex-wife died sometime in '08. Flori Chervitz. The mother of my two children, Robin Connelly.
**Q. The first name you mentioned, can you repeat that for the record again?**
A. Flori Chervitz.
**Q. How do you spell her last name?**
A. I think it's C-h-e-r-v-i-t-z.
**Q. Did you have any children with her?**
A. I did not.
**Q. Are you still --**
A. I have no children with anyone other than Robin.
**Q. Understood. Are you still in touch with Flori?**
A. No, she passed away in '08.
**Q. Understood. Robin Connelly, you -- when did you marry her?**
A. I don't remember the date.
**Q. Was it --**
A. I don't recall the date.
**Q. More than 10 years ago?**
A. Oh, yeah.

**Q. More than 20 years ago?**
A. Yes.
**Q. And when did you divorce Robin Connelly?**
A. Again, I don't remember what year it was.
**Q. You had two children with her. What are their names?**
A. Danielle Christine Human and Joshua Daniel Human.
**Q. Where do they live?**
A. I don't have their exact addresses off the top of my head.
**Q. Do they live in the St. Louis area?**
A. I think my son Joshua does. My daughter is in the Chicago area.
**Q. And how old are those children?**
A. Wow. I don't remember the exact age. I think Danielle's 41 or '2. And Joshua is 39 -- 38 or 39.
**Q. Understood. What company is the internet service provider at your current home, 10423 Conway?**
A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer the question.
**Q. Who pays the bill for the ISP?**
A. On the advice of counsel, I invoke my Fifth

Amendment privilege against self-incrimination, and I respectfully decline to answer the question.

**Q. Do you connect your devices to the internet at your home?**

A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer the question.

**Q. Do you have a cell phone?**

A. Yes.

**Q. What kind of cell phone is that?**

A. On advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, I respectfully decline to answer the question.

**Q. You're invoking the privilege against self-incrimination as to the --**

A. Yes.

**Q. -- type of cell phone that you have?**

A. Yes.

**Q. Do you have a Samsung Galaxy phone?**

A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, I respectfully decline to answer.

**Q. Do you have an iPhone?**

A. On advice of counsel, invoke my Fifth Amendment privilege and respectfully decline to

answer.

**Q. Have you been convicted of a crime before?**

A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, and respectfully decline to answer.

**Q. So I'm asking about past crimes for which there's already been a conviction on anything that would be under current criminal investigation. In the past, have you been convicted of a crime?**

A. You know well that I have. You brought this up to the judge in this case numerous times when it has nothing to do with this case whatsoever. But you brought it up repeatedly, I assume, hoping to sway the judge, I don't know. It has nothing to do with Human versus Fisher Investments. It's more than 30 years ago.

**Q. So I don't know what crimes, other than what may be publicly disclosed, you have been convicted of. So I'm asking you what crimes you've been convicted of in the past.**

A. It's all public record. You know that very well.

**Q. Okay. I'm aware of a public record that you were convicted of a sodomy offense. Are there any other criminal offenses that you've been convicted of?**

A. Those offenses are matter of public record.

**Q. And I'm asking what offenses those are.**

A. It's public record. You can obtain that information.

**Q. Are you declining --**

A. I'm sure you have.

**Q. Are you declining to answer the question?**

A. I've answered the question.

**Q. Well, I'm asking for the identities of the crimes you were convicted of, and you have not answered that.**

A. Well, on the advice the counsel, then I'm invoking my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.

**Q. Have you been to prison?**

A. Yes, I have.

**Q. How many times?**

A. Once.

**Q. When did you go to prison?**

A. I don't remember the exact date.

**Q. Was it more than 20 years ago?**

A. Yes.

**Q. Why did you go to prison?**

A. I was convicted of crimes which you're well

aware.

**Q. And, again, I'm asking what those crimes were.**

A. I've answered.

**Q. Did a jury convict you of those crimes?**

A. They did not.

**Q. Did you plead to those crimes?**

A. I did.

**Q. How did you plead?**

A. I pled guilty.

**Q. How long were you in prison?**

A. I don't recall.

**Q. When were you released from prison?**

A. 2020.

**Q. Other than the crimes for which you went to prison, have you been convicted of any other crimes?**

A. Not that I'm aware of.

**Q. Are you aware that you're under investigation for any other criminal offenses?**

A. Not that I'm aware of.

**Q. What jobs have you had since you were released from prison in 2020?**

A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.

**Q. So I'm asking about employment since 2020.**
A. I answered the question.
**Q. Are you aware of a criminal investigation related to employment that you've had since 2020?**
A. On the advice of counsel, I am invoking my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.
**Q. Were you formerly employed at Timeshare Help Source?**
A. I've answered that question.
**Q. I haven't mentioned Timeshare Help Source before.**
A. On the advice of counsel, invoking my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer.
**Q. How did you decide to start bringing TCPA lawsuits?**
A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer.
**Q. How did you learn about the TCPA?**
A. On the advice of counsel, invoking my Fifth Amendment privilege. Respectfully decline to answer.
**Q. Did you ever speak with the plaintiff's lawyer in the TCPA case against Timeshare Help Source?**

A. On the advice of counsel, invoking my Fifth Amendment privilege and respectfully decline to answer.

**Q. What was the first TCPA lawsuit that you filed?**

A. On the advice of counsel, invoking my Fifth Amendment privilege. I respectfully decline to answer.

**Q. So I'm asking about a lawsuit that you would have filed publicly.**

A. I answered. You obviously have the record of that. I answered the question.

**Q. Well, you declined to answer the question.**

A. Correct.

MR. TEREPKA: Is it your advice, Mr. Butler, that he can claim the Fifth Amendment privilege against self-incrimination about when he filed a public TCPA lawsuit?

MR. BUTLER: No.

**Q. (By Mr. Terepka) So that's not the advice of your counsel. What was the first TCPA lawsuit that you filed?**

A. I invoke my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer.

**Q. How many TCPA lawsuits have you filed?**
A. It's public record. I respectfully decline to answer. Invoking my Fifth Amendment privilege.
**Q. Who has your counsel been in TCPA cases?**
A. Invoke my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer.
**Q. Mr. Butler, sitting next to you --**
A. I said I invoke my Fifth Amendment privilege. I did not say upon his advice. Invoking my Fifth Amendment privilege, and I respectfully decline to answer the question.
**Q. Understood. Please allow me to finish the question before answering it.**
A. Sure.
**Q. The question is, Mr. Butler, sitting next to you here today, was your counsel in this case, Human versus Fisher Investments, as your TCPA counsel; correct?**
A. Well, you wouldn't need to ask me that question, would you? You've already answered it.
**Q. I'm asking you to answer it because you're under oath to answer questions truthfully today. Do you understand that?**
A. I certainly do.
**Q. So I'm asking who your counsel has been in**

**TCPA cases, and Mr. Butler is one of them; correct?**
A. I answered the question, sir.
**Q. What is the answer?**
A. I invoke my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.
**Q. Has James Marks been your counsel in TCPA cases?**
A. I invoke my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.
**Q. When did you first meet Chris Prosser?**
A. I invoke my Fifth Amendment privilege against self-incrimination and I respectfully decline to answer the question.
**Q. How many times have you settled a TCPA claim?**
THE WITNESS: Thank you.
MR. TEREPKA: No, thank you. For the record, Mr. Butler is offering mints to everyone at the table.
**Q. (By Mr. Terepka) How many TCPA lawsuits have you filed?**
A. I invoke my Fifth Amendment privilege against self-incrimination. Respectfully, I decline

to answer the question.

**Q. How many letters threatening TCPA claims have you sent without filing a lawsuit?**

A. On the advice of counsel, I respectfully invoke my Fifth Amendment privilege and decline to answer.

**Q. How many times have you settled a TCPA claim?**

A. On the advice of counsel, invoke my Fifth Amendment privilege and respectfully refuse to answer.

**Q. How much money have you obtained from TCPA settlements?**

A. On the advice of counsel, I invoke my Fifth Amendment privilege and respectfully decline to answer.

**Q. Okay.**

MR. TEREPKA: I'm going to mark our first exhibit. I have a copy for you --

MR. BUTLER: Thank you.

MR. TEREPKA: -- Mr. Butler.

(Exhibit 1, Email/Attachment, was marked for identification.)

**Q. (By Mr. Terepka) Okay, Mr. Human. In front of you is Exhibit 1. This is an email from you, email address danh11polo@gmail.com, sent July 17, 2024, to**

inquiry@fi.com. Do you see that?
A. I see that, yes.
Q. Subject line, Human versus Fisher Investments, Inc. Do you see that?
A. I do.
Q. And it says, please find attached the lawsuit filed in St. Louis County, Missouri. Dan Human. Do you see that?
A. Yes.
Q. You attached to this email, turning to the next page, a letter addressed to Fisher Investments, Inc. Do you see that?
A. I do.
Q. And the letter says in the second paragraph, in lieu of the 39,000 in total damages, 6,500 per call, I am willing to discuss settling the case for $20,000, half of the expected damages. Do you see that?
A. I do.
Q. How did you arrive at that number $20,000?
A. Well, it reads half of the expected damages.
Q. How did you arrive at $39,000 in expected damages?
A. It says right there, $6,500 per call.
Q. What's the basis for claiming $6,500 per

**call?**

A. My understanding is that the federal damages can reach 1,500 a call and the Missouri Do Not Call list can reach 5,000 a call. So added together, it would be $6,500 per call.

**Q. The letter continues, the second sentence of paragraph three 3, the suit is filed as a class action and we will also need to provide the information for other putative class members. Do you see that?**

A. I do.

**Q. You filed this as a class action so you could tell defendants, in this case, Fisher Investments, that they would face class discovery; correct?**

A. I didn't say anything like that at all. I just simply said it's filed as a class action. And, if necessary, if at some point it got certified, it never was.

**Q. You said that we will also need to provide the information for other putative class members. Do you see that?**

A. I see what -- I see it says that, yes.

**Q. That refers to class discovery; correct?**

A. Well, if it was certified as a class. It was never -- I never -- there was never a motion to

certify it. Obviously, you know that.
**Q. You've never moved to certify a class action in any of your cases; correct?**
A. That's -- well, on the advice of counsel, I'm going to invoke the Fifth Amendment against self-incrimination, and I respectfully decline to answer that question.
MR. TEREPKA: Is that your advice as counsel, Mr. Butler?
MR. BUTLER: Can you repeat the question? I was finishing up the letter.
MR. TEREPKA: Could you please read it back, Court Reporter?
(The requested portion of testimony was read back by the court reporter.)
MR. BUTLER: I would have no objection to Mr. Human's answer to that.
**Q. (By Mr. Terepka) Similar question. You've never had a class actually certified in one of your cases. Isn't that true?**
A. Upon the advice of counsel, invoke my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer.
**Q. In the third paragraph of this letter, you wrote, please preserve any call log records, phone**

**contact with employees, vendors, or telemarketers or ESI for discovery, as this will need to be provided. Do you see that?**

A. I do.

**Q. You wrote that because you know that someone involved in a lawsuit is required to preserve records about the lawsuit; correct?**

A. I'm assuming that in the letter, yes.

**Q. That's why you wrote that; correct?**

A. I have no idea why back in, whatever the date is of this, I said -- used that exact language. But obviously, you know, I would have wanted any record of calls made or contact to be kept, yes.

**Q. How many times have you sent a letter like this?**

A. On the advice of counsel, I invoke my Fifth Amendment privilege.

**Q. Did all the letters you sent like this include language about preserving documents?**

A. I've just answered previously that upon the advice of counsel, I invoke my Fifth Amendment privilege; so . . .

**Q. What email addresses do you use?**

A. On the advice of counsel, invoke my Fifth Amendment privilege and self-incrimination.

**Q. What social media accounts do you use?**
A. On the advice of counsel, I invoke my Fifth Amendment privilege and decline to answer the question.
**Q. Other than this case, have you testified under oath before?**
A. I invoke my Fifth Amendment privilege against self . . .
**Q. Okay. We're going to try another exhibit.**
(Exhibit 2, Settlement Agreements, were marked for identification.)
MR. TEREPKA: Okay. We're marking Exhibit 2. Mr. Butler, copy for you.
MR. BUTLER: Thank you.
**Q. (By Mr. Terepka) Okay. In front of you, Mr. Human, is what's been marked as Exhibit 2. This exhibit is settlement agreements and other documents that you've produced in this case. Do you see that?**
A. Yeah. Obviously without reading through a hundred-plus pages, yeah, I think we produced this.
**Q. Starting with the first page in front of you, this is a settlement agreement between you and Alleviate. Do you see that? Alleviate Tax, LLC?**
A. Yes, I do.
**Q. To resolve a TCPA lawsuit. Do you see that?**

A. I do.
**Q. Did Alleviate tell you in response to this lawsuit that it had consent to call your phone number?**
A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination. I respectfully decline to answer the question.
**Q. Section 1 of the settlement agreement on page 1, which has been Bates-stamped Human Settlements 002, the settlement amount that Alleviate Tax agreed to pay you is $5,000. Do you see that?**
A. I see it.
**Q. To be paid to your counsel, Butler Law Group. Do you see that?**
A. I do.
**Q. Via ACH instructions to your counsel's account. Do you see that?**
A. I do.
**Q. What portion of the settlement funds did you receive?**
A. On the advice of counsel, I invoke my Fifth Amendment privilege to self-incrimination, and I respectfully decline to answer.
**Q. Your counsel told the court that you paid him a one-third contingency arrangement for your cases with him. Is that true?**

A. On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination, and I respectfully decline to answer.

MR. TEREPKA: Is that your advice as counsel, Mr. Butler?

MR. BUTLER: Dan, I don't think that that answer to the question that's been asked of you is something that you need to protect.

**Q. (By Mr. Terepka) Does that change whether you're going to invoke your Fifth Amendment privilege?**

A. No, it doesn't.

**Q. After Mr. Butler received the settlement funds, how did he pay you your portion?**

A. I will invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.

**Q. Would your bank record show how you received the funds?**

A. I would invoke my Fifth Amendment privilege and respectfully decline to answer the question.

**Q. Would Mr. Butler's or his law firm's bank records show how you received the funds?**

A. I can't answer for Mr. Butler.

**Q. Did you receive the funds from one of Mr. Butler's law firm's accounts?**

A. I respectfully invoke the Fifth Amendment privilege and decline to answer.

**Q. Turning to what's been marked at the bottom as Human Settlements 009. It's the Bates stamp in the bottom right. That's your signature at the bottom of this page; correct?**

A. It appears to be, yes.

**Q. Okay.**

MR. TEREPKA: So I think at this point, we need to break and get Judge Schelp involved on the Fifth Amendment privilege issue. So with that, I think we can go off the record, and I'm going to call chambers.

(Whereupon, a short break was taken.)

MR. TEREPKA: Okay. Go back on the record for a few minutes.

**Q. (By Mr. Terepka) Back on -- we're back on the record.**

**Mr. Human, during our break, I saw you take a phone out of your pocket; is that right?**

A. Yes.

**Q. That's an iPhone; correct?**

A. It is an iPhone.

**Q. What other phones do you have?**

A. This is currently the only phone that I pay

service for.
**Q. What phone numbers do you use on that phone?**
A. On this phone?
**Q. Yes.**
A. This phone number is (314) 707-1892.
MR. TEREPKA: Could you read that back, please?
(The requested portion of testimony was read back by the court reporter.)
THE WITNESS: Yes, ma'am.
**Q. (By Mr. Terepka) When did you get that phone number?**
A. A month or two ago.
**Q. Who's your cell provider for that number?**
A. Verizon.
**Q. Is it Straight Talk Wireless or Verizon?**
A. Verizon, I think. I think they're owned by the same company; so . . .
**Q. When did you get the iPhone?**
A. I just said I don't -- couple months ago.
**Q. Was it more than three months ago?**
A. I don't know.
**Q. Was it this year?**
A. Yes.
**Q. What other phones do you have, whether or**

**not they're connected to a cell service?**
A. Currently?
**Q. Yes.**
A. This is the only phone I have. I don't use any other phone number.
**Q. What about the phone you produced at the device inspection in this case?**
A. Yeah, I stopped paying for that service.
**Q. Do you still have the phone --**
A. No.
**Q. -- you produced? Do you have any other phone physically?**
A. Physically? No.
**Q. Do you have any other phone numbers connected to service?**
A. Just this one.
**Q. Why did you stop getting service for your other phone numbers?**
A. I just need one phone.
**Q. Why did you want a new phone number?**
A. Well, the only reason I got a new phone number was because my previous iPhone had been actually stolen from a courtroom in St. Louis County. And in order to keep that number, I was going to have to pay a huge sum to get a phone when Verizon was

offering -- they'd just give me a phone if I just signed up for their service.

**Q. How many iPhones have you had?**

A. In the past?

**Q. Ever.**

A. Just two, to the best of my recollection.

**Q. The one you have now and the one you lost previously?**

A. Correct. Those are the only ones that I'm aware of.

**Q. Did you produce an iPhone at the device inspection in this case?**

A. I didn't have one at the time.

**Q. How did you pay for the iPhone you have now?**

A. I don't -- I think I just used my debit card. Well, I didn't pay for the phone. The phone was free. That's why I went to Verizon because they'd give you the phone if you just paid for their service.

**Q. Okay. So -- check the time -- okay. So just to be clear, what phones did you have at the time of the device inspection in this case?**

A. The phone that I gave you.

**Q. Which was not an iPhone; correct?**

A. Correct.

**Q. And at that time, you had no iPhone at all.**

**Is that your testimony?**
A. I -- yeah, I don't recall. I'm pretty sure that it was a week previous to that that my other phone had been taken. I hadn't gotten the new phone yet. I don't remember the exact dates on it, but . . .
**Q. What about the -- well, yeah, I'm just trying to get a sense of the timing, Mr. Human. So is it your testimony that you produced at the device inspection all the phones you had at the time of the inspection?**
A. At the time. That's my recollection. That's my recollection.
**Q. Okay.**
A. To the best of my recollection, yeah.
**Q. All right. Well, let's turn back to Exhibit 2 and turning your attention to what's been Bates-stamped Human Settlements 0011. This is a settlement agreement between you and Frubbel LLC. Do you see that?**
A. I do.
**Q. To resolve a TCPA lawsuit. Do you see that?**
A. Yes, I do.
**Q. Did Frubbel tell you in response to your lawsuit that it had consent to call your number?**

A. I don't recall. I don't know what they said. This was some time ago.

**Q. Do you have records of what Frubbel said?**

A. No, I don't have any. I do not.

**Q. Did you ever have records of what Frubbel said in response to your claim against them?**

A. No. I don't recall. I mean . . .

**Q. If they emailed you, what email account would that have gone to?**

A. I don't -- I don't recall.

**Q. But you had an email account that they could respond to your claims --**

A. Yes.

**Q. -- for?**

A. I don't recall what it was at the time.

**Q. Do you still have those emails?**

A. On the advice of counsel, I'm going to invoke the Fifth Amendment privilege and decline to answer that.

**Q. This settlement agreement was for a total payment to you of $3,000. Do you see that on page Bates-stamped 11? I think you're on --**

A. I do.

**Q. I think you're on page 16; so if you want to turn to page 11.**

A. Sorry. I see, yes.
**Q. Okay. On page 11 now in front of you, the agreement with Frubbel shows a $3,000 payment to you. Do you see that?**
A. I do.
**Q. With a payment to your then lawyer, Butler Law Group. Do you see that?**
A. I do.
**Q. Via ACH. Do you see that?**
A. I do.
MR. TEREPKA: And we should go off the record because the district judge has entered the room.
(Whereupon, a short break was taken.)
**Q. (By Mr. Terepka) So, Mr. Human, you previously testified that you live with your sister Melody -- Melody Human; correct?**
A. Correct.
**Q. What does she do for a living?**
A. She owns MAH Designs. It's a floral company.
**Q. How long has she done that?**
A. I have no idea.
**Q. Did Melody ask Fisher Investments to send her information about its services?**

A. I have no idea.
**Q. Did you ask Fisher to send Melody information about its services?**
A. I have no idea.
**Q. You don't know whether you did that or not?**
A. I don't.
**Q. Did you receive information about Fisher's services in the mail at your current address?**
A. Not that I recall.
**Q. What company is the internet service provider at your home?**
A. I don't know.
**Q. You previously produced documents indicating that Charter is your -- Charter Spectrum is your internet service provider at your home. Is that your internet service provider?**
A. It very well could be. I don't -- I don't pay for it; so I don't know.
**Q. Who pays?**
A. Well, my sister owns the house; so she would pay.
**Q. Do you connect your devices to the internet at your home?**
A. Yes.
**Q. What devices do you connect to the internet**

**at your home?**

A. I don't know if my cell phone is connected to it or not. I guess I have an older computer that's -- I think uses that service.

**Q. What computer is that?**

A. It's one I purchased in March, I think, or April.

**Q. Of this year?**

A. Yes. Correct.

**Q. So just a few months ago?**

A. Yes.

**Q. What kind of computer is that?**

A. I -- I don't even recall the name, but I'm not an IT guy.

**Q. Is it a Mac computer?**

A. No, I don't think it's a Mac.

**Q. Well, does it use Windows?**

A. Yeah, it does use Windows.

**Q. The laptop that you produced at the device inspection, do you still have that?**

A. No, I think I gave it away.

**Q. Who'd you give it to?**

A. I didn't use it; so I gave it away.

**Q. Who'd you give it to?**

A. I don't remember who I gave it to.

Someone -- a younger guy that needed some help, and I wasn't using it anyway.

**Q. What other devices do you have right now?**

A. Just the ones I mentioned.

**Q. One computer and one phone.**

A. My phone -- yeah, my computer and my phone. Yes.

**Q. Do you use a VPN on your computer?**

A. I don't -- what's a VPN?

**Q. A virtual private network. Have you ever used a VPN?**

A. I don't know what one is; so I don't -- I don't know.

**Q. You previously testified that you -- excuse me, I have to find an exhibit. You previously testified that you produced all of the phones that you had in your possession at the time of the device inspection?**

A. Yes.

**Q. And that was not an iPhone?**

A. The phone I produced to you?

**Q. At the device inspection, correct.**

A. Yeah. No, that's -- that's an older TracFone, I think. Android.

**Q. And the device inspection occurred on**

January 27; correct?
A. I think so. I believe that's the date.
Q. Okay. So I want to show you what we'll be marking as Exhibit 3.
(Exhibit 3, Emails, were marked for identification.)
Q. (By Mr. Terepka) Okay. Exhibit 3 is an email from you from email address danialahuman@icloud.com with Daniel spelled d-a-n-i-a-l ahuman@cloud.com. Do you see that?
A. I do.
Q. The date sent is December 10, 2024. Do you see that?
A. I do.
Q. It's addressed to your lawyer, edbutler@butlerlawstl.com. Do you see that?
A. I do.
Q. The subject is Human versus Fisher Investments. Do you see that?
A. Yes.
Q. At the bottom of the page -- well, before we get to that, this is an email you sent your counsel in this case; correct?
A. That's correct.
Q. At the bottom of the page it says sent from

**my iPhone. Do you see that?**
A. I do.
**Q. So in December 2024, you had an iPhone; correct?**
A. Yes.
**Q. And you didn't produce that at the device inspection in this case, did you?**
A. What was the date of the device inspection?
**Q. January 27th of this year.**
A. Yes, I -- correct. I didn't. I think I previously -- you asked me about the iPhone, and I believe I told you that I had been in Judge Stewart's chambers in St. Louis County and that that iPhone had been stolen. And I reported it there to the security and to the bailiff, and that was prior to January 27th.
**Q. When did you buy the new iPhone that's in your pocket right now?**
A. I don't know the date, but I'm going to say it was -- so this is June -- April. March or April. End of March, first of April, I think.
**Q. Do you have records that will show when you bought it?**
A. I don't have them, but I'm sure it's available.

**Q. We discussed earlier that you were released from prison in 2020?**

A. Yes, sir.

**Q. What jobs have you had since you were released from prison?**

A. On the advice of counsel, going to invoke my Fifth Amendment privilege and decline to answer the question.

JUDGE SCHELP: What's the -- you have to answer the question.

THE WITNESS: I beg your pardon?

JUDGE SCHELP: You have to answer the question.

A. I worked for a company called Square One.

**Q. (By Mr. Terepka) When did you start working for Square One?**

A. March of '20.

**Q. So right after you got out of prison?**

A. Correct.

**Q. What did you do at Square One?**

A. I worked various -- in various departments there.

**Q. Such as?**

A. Client relations, fulfillment.

**Q. What was Square One's business?**

A. It was a timeshare exit company.
**Q. Who did you work with there?**
A. Work with? Chris Carroll, George Reed. I don't know, 40-some employees, I don't remember all their names.
**Q. Who did you work with most often other than those two?**
A. Amy -- I can't remember her last name. It's been a couple years.
**Q. What was Amy's role at the company?**
A. She was -- she was originally director of operations, and then she took on another role. I don't remember what it was.
JUDGE SCHELP: All right. So you guys -- we can take us off the record.
(Whereupon, a short break was taken.)
**Q. (By Mr. Terepka) Square One was sued for TCPA violations; correct?**
A. I think they were. I don't -- I don't recall the specifics, I don't think, but I think that they were, yes.
**Q. The named plaintiff was Andrew Perrong; correct?**
A. To the best of my recollection, yeah.
**Q. Were you involved in that at all while you**

**were at the company?**
A. Directly, no, but indirectly.
**Q. You knew that the lawsuit had occurred when --**
A. Yes.
**Q. -- you were at the company?**
A. Yes.
**Q. Did you give testimony in the case?**
A. I don't think I ever testified in it, no. I don't remember testifying in it.
**Q. Did you produce documents in the case?**
A. Did I personally produce them or were they produced?
**Q. Did you provide documents to Square One for the purpose of producing them in that case?**
A. I don't recall.
**Q. Do you know how it ended?**
A. I don't -- I don't know how it ended.
**Q. Did you speak to the plaintiff's lawyer in the TCPA case against Square One?**
A. Not that -- not that I recall. Not that I recall.
**Q. Did you tell the plaintiff's lawyer in that case that you wanted to get into TCPA lawsuits because it seemed lucrative?**

A. Did I tell the plaintiff's lawyer that?
**Q. In the Square One TCPA case?**
A. Certainly not that I recall.
**Q. What was the first TCPA lawsuit that you filed?**
A. I don't recall.
**Q. What year was it?**
A. I don't recall.
**Q. Was it in 2023?**
A. It could have been. I don't -- again, I don't recall.
**Q. About how many TCPA lawsuits have you filed?**
A. I don't know the exact number.
**Q. Is it more than a hundred?**
A. No, I don't think it's more than a hundred. No.
**Q. More than 50?**
A. I don't know.
**Q. How many letters have you sent claiming that someone violated the TCPA?**
A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I decline to answer the question.
**Q. Do you have in your possession the letters that you sent claiming TCPA violations?**

A. On the advice of counsel, I'm invoking my Fifth Amendment privilege, decline to answer the question.

MR. BUTLER: Alex, can I interrupt for a second just on a housekeeping matter?

MR. TEREPKA: Yes.

MR. BUTLER: This -- this new set of things that you might take to the judge, maybe we should both keep notes on them so that we present them to him or --

MR. TEREPKA: That's fine. So I'm hoping to avoid doing that too much because we might be here multiple days if we need to do that.

MR. BUTLER: I think we're moving along a little bit more than we were before.

MR. TEREPKA: Yeah, we are.

**Q. (By Mr. Terepka) In any event, I'm going to move on to the topic of who your counsel has been in your TCPA cases. So we've already discussed Mr. Butler. What about James Marks, has he been your counsel in TCPA cases?**

A. Yes.

**Q. When did you start working with him?**

A. I don't recall.

**Q. How did you first meet James Marks?**

A. By phone.
**Q. Did you reach out to him for purposes of representing you in a TCPA case?**
A. I don't recall why I reached out to him, but he eventually took some of the TCPA cases.
**Q. Did you know him before reaching out to him --**
A. I did not.
**Q. -- about TCPA representation?**
A. Did not.
**Q. What about Mr. Butler, did you know him before he represented you in TCPA case- --**
A. I knew of Mr. Butler.
**Q. How did you know of him?**
A. I had heard his name through -- I think he may have for a very short period of time represented the company I worked for.
**Q. Is that Square One?**
A. Yeah, I think he may have represented them. I think that's where I heard his name.
**Q. When did you first reach out to Mr. Butler?**
A. I don't -- I don't recall.
**Q. Did you reach out to him or did he reach out to you?**
A. I'm pretty sure I reached out to him.

**Q. For the purpose of TCPA representation?**
A. At that time, yes.
**Q. Mr. Butler previously indicated to the court that you pay him a one-third contingency for TCPA settlements; is that correct?**
A. That sounds accurate.
**Q. Is that the same arrangement you have with James Marks?**
A. That sounds accurate.
**Q. Is James Marks representing you right now?**
A. He is not.
**Q. When did he last represent you?**
A. I don't recall.
**Q. Did he stop representing you this year?**
A. I don't recall if it was last year or this year.
**Q. Was it within the past 12 months that he stopped representing you?**
A. I think so.
**Q. Is Mr. Butler representing you in any other TCPA cases right now?**
A. Not that I'm aware of. There may be a default judgment in a case. I don't know if that constitutes still representing me or not.
**Q. Understood. I want to move on to Chris**

**Prosser. How do you know him?**
A. He is a paralegal that worked with Mr. Butler on some of the TCPA cases.
**Q. When did you first meet him?**
A. I first met him years ago. We met briefly in prison.
**Q. You met -- how did you meet him in prison?**
A. Just happened to be the same place I was.
**Q. Is -- did you stay in touch with him after you were released from prison?**
A. No.
**Q. How did you reconnect with him after prison?**
A. He was eventually employed also by the Square One group.
**Q. What did he do at Square One?**
A. Have to ask him. I think he was part of their legal team or something.
**Q. Well, did Square One's business involve telemarketing?**
A. I don't know if it did or not. I -- I -- I wasn't involved in that part if it did involve telemarketing.
**Q. What were you involved in at Square One?**
A. I believe I answered previously that I was in client relations and fulfillment.

Q. What was your fulfillment job responsibility?
A. To assist employees in helping people obtain exits from their timeshares.
Q. To assist employees of Square One?
A. Correct.
Q. So my understanding of Square One's business is that it would help its clients and consumers exit timeshares. Your testimony seems to be that Square One would help its own employees exit timeshares?
A. No, no, no. I assisted employees in obtaining exits for clients.
Q. You helped Square One employees get timeshare exits for clients?
A. Correct.
Q. Okay. And the client relations piece of your work, what was that?
A. Just communicating with clients about the progress of their exit.
Q. Did you call any prospective clients?
A. Prospective clients? No.
Q. Only existing clients?
A. Correct.
Q. How many times have you settled a TCPA claim?

A. I don't recall.
**Q. Would it be at least 30?**
A. I don't recall.
**Q. Would it be at least 40?**
A. I don't recall.
**Q. The settlement agreements you reached in TCPA cases are in writing; correct?**
A. I believe they are, yes.
**Q. Your counsel, Mr. Butler, has some of those settlement agreements; correct?**
A. Correct.
**Q. Your counsel, Mr. Marks, has some of those settlement agreements; correct?**
A. I assume.
**Q. You have some of those settlement agreements; correct?**
A. No, I don't.
**Q. Why not?**
A. I never kept copies of anything. You know, once it was settled, I assumed it was over. I didn't keep copies.
**Q. What did you do with them then?**
A. Well, digitally either deleted them, or if I -- if I had a hard copy, which, you know, sometimes I did, I would throw them away. I mean, the case was

over, what was the point in keeping any copy of it.

**Q. So for all the settlement agreements you reached in 2025, you threw away paper copies or deleted digital copies; correct?**

A. To the best of my knowledge, yes.

**Q. For all the settlement agreements that you had in 2024, you either threw away paper copies or deleted digital copies; correct?**

A. Once the settlement was over, yes. Same thing in 2025. If there was a settlement agreement reached, and there was either a settlement made or the case ended in a dismissal, then I would have either deleted or gotten rid of any hard copies. There's no point, in my opinion, of keeping them once it was over.

**Q. Same in 2023, you deleted --**

A. I'm assuming --

**Q. -- or destroyed any settlement agreements?**

A. -- I'm assuming -- I'm assuming that's the case, yes.

**Q. And just please wait until I finish the question --**

A. Sure.

**Q. -- so the court reporter has an easier time taking down what we're saying. Thank you.**

**Q. How much money have you obtained from TCPA settlements?**

A. I don't recall.

**Q. Is it more than $200,000?**

A. I don't believe so. I -- I don't recall. I don't know what the total is. You referenced earlier the bankruptcy. They have information regarding that. I'm sure you have copies of it; so . . .

**Q. So the reason I'm asking is that you've only produced a small number of settlements -- settlement agreements in this case. And you have not produced many other settlement agreements. So the documents we have don't tell us the total amount that you've made from TCPA settlements. That's why I'm asking you, to the best of your knowledge, about how much money have you made from TCPA settlements?**

A. Well, again, I -- I don't recall. I don't -- I don't keep the number in my head. I don't write it down somewhere. As I stated previously, once the case is finished and it's dismissed, I saw no point in keeping any record of it.

**Q. Is it more than $50,000 that you've made from TCPA settlements?**

A. I would think yes. Yes.

**Q. How much more approximately?**

A. I don't know. I'm not going to speculate and allow you to trap me in some number that I don't recall. And that's why I'm telling you I don't recall. I don't know how much it is.

**Q. Other than the settlement agreements themselves, what other documents would show how much money you made from TCPA settlements?**

A. Well, certainly some of it would be reflected in a bank statement where I would have deposited, you know, funds or funds would have been transferred through ACH or something.

**Q. Which bank account are you referring to?**

A. My First Community Credit Union bank account.

**Q. Do you have any other bank accounts other than the First Community Credit Union?**

A. I do not.

**Q. That's your only bank account?**

A. That's correct.

**Q. So your bank statements for those accounts would show at least some of the money you got from TCPA settlements?**

A. Sure. Yes, sir.

**Q. You have not produced those in this case; correct?**

A. I don't -- I don't know if we have or not. I don't recall.
**Q. Have you provided those bank statements to your counsel for production?**
A. The bank statements?
**Q. Correct.**
A. Not that I'm aware of.
**Q. Have you provided any records from that First Community Credit Union bank account to your counsel for production?**
A. To my bankruptcy counsel, yes.
**Q. To -- to your counsel, Mr. Butler?**
A. I don't think we actually -- I actually provided actual statements from the bank, no.
**Q. But you did provide them to your bankruptcy counsel, David Gunn; correct?**
A. That's correct.
**Q. So you could send Mr. Butler a copy of those, too, couldn't you?**
A. Well, yeah, I'm sure I could.
**Q. If we turn back to Exhibit 1, why don't we cover this briefly again with Judge Schelp's guidance.**
**The third paragraph saying please preserve any call logs -- call log -- let me start over.**
**The third paragraph saying, please preserve**

**any call log records, phone contact with employees, vendors or telemarketers, or ESI for discovery, as this will be -- will need to be provided. Do you see that?**

A. I do.

**Q. Did you include similar language in the other letters you sent to other defendants?**

A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination, and I decline to answer the question.

**Q. We can look at another exhibit later on that.**

**So Exhibit 3 and 1, we've covered two email addresses that you use. In addition to those two email addresses, what other email addresses have you used?**

A. I don't recall.

**Q. How about danlovestopolo@gmail.com, is that one of your email addresses?**

MR. BUTLER: Can I just inject here for a second, Counsel, and just ask you to repeat the name of the address you just gave? I missed that.

MR. TEREPKA: Danlovestopolo@gmail.com.

MR. BUTLER: Thank you.

**Q. (By Mr. Terepka) Is that one of your email**

**addresses?**
A. I think that's my current email address, yes.
**Q. Okay. And we previously covered one of your other email addresses, danh11polo@gmail.com. So two of your addresses have the language "polo" in it. What does that mean?**
A. It's a sport.
**Q. Why do you have polo in your email addresses?**
A. It's a game once upon a time I played when I was younger.
**Q. You used to play polo?**
A. I did.
**Q. Where'd you do that?**
A. Counselor, I -- what does that have to do with this?
**Q. It's in your --**
A. What does that have to do with this?
**Q. -- it's in your email addresses so I'm asking you.**
A. I used to play.
**Q. And where'd you do that?**
A. Played all over the place.
**Q. Such as?**

A. I played in St. Louis. I played in Kansas. I played in Arkansas.
**Q. Who'd you play with?**
A. Other polo players.
**Q. Such as?**
A. I don't recall their names.
**Q. Dh68litigation@yahoo.com, is that another of your email addresses?**
A. It may have been, yes.
**Q. Any other email addresses that you've used?**
A. I don't recall.
**Q. What social media accounts do you use?**
A. I don't think I'm on any, but how do you define social media accounts?
**Q. Facebook, Insta- --**
A. No, I'm not. I'm not on any of those. Facebook or Instagram, I'm not on any of those.
**Q. TikTok?**
A. No.
**Q. Reddit?**
A. Who?
**Q. Reddit?**
A. Never heard of it. I'm not an IT guy as I told you before; so I don't really get into doing any of those.

Q. Okay. So we can turn back to Exhibit 2. So starting with the first page of this, which is Human Settlements Bates-stamped 002, back to the settlement amount of $5,000. Do you see that?
A. I do.
Q. That's the amount Alleviate Tax agreed to pay you; correct?
A. It appears to be the case.
Q. Via ACH first to your counsel, Butler Law Group; correct?
A. Correct.
Q. So, $5,000, your arrangement with Mr. Butler is that he takes a third. Mr. Butler then paid you two-thirds of that amount; correct?
A. Yes.
Q. Via ACH into your first -- your -- what was the name of your account again? First Credit Union?
A. First Community.
Q. So let me rephrase that question so the record is clear.
Okay. So your counsel, Mr. Butler, paid you two-thirds of that settlement amount via ACH to your First Community Credit Union account; correct?
A. I don't believe via ACH.
Q. How did he pay you?

A. I'm not certain, but I believe it was a check.

**Q. Did Mr. Butler pay you via ACH or check depending on the settlement?**

A. If I recall, primarily a check. I don't recall if he paid me by ACH or not.

**Q. Understood. Did you deposit the checks he gave you into your First Community Credit Union account?**

A. I would have, yes.

**Q. Okay. We can move on to the next settlement, which is the Frubbel settlement on page Bates-stamped Human Settlement 0011.**

A. Okay.

**Q. This is your settlement with Frubbel which agreed to pay you $3,000. Your counsel was Butler Law Group, and the payment was supposed to be to your counsel via ACH. Do you see that?**

A. I do.

**Q. Mr. Butler paid you two-thirds of that amount; correct?**

A. Correct. I'm saying correct because I'm assuming that's the case. You know, this was in September of '24; so I don't -- I don't have specific recollection at the time. But, yeah, I -- the

agreement was one-third and two-thirds; so yes.
**Q. Got it. So do you have any reason to doubt that Mr. Butler's law office paid you two-thirds --**
A. I don't.
**Q. -- of the settlement amount?**
A. No, I don't.
**Q. And, again, I'm sorry, but please let me finish the question for the benefit of the court reporter.**
**Okay. Human Settlements page 0015. That's your signature on the bottom right; correct?**
A. Yes.
**Q. Okay. Turning to 0016, this is your settlement agreement with American Financial Network for a TCPA claim for a settlement amount of 3,750. Do you see that?**
A. I do.
**Q. Mr. Butler paid you two-thirds of that; correct?**
A. Correct.
**Q. The settlement says in paragraph 1, the settlement payment, that an IRS Form 1099-miscellaneous shall issue. Do you see that?**
A. I do.
**Q. Have you received such a form for any of**

your settlement payments?
A. No.
Q. Do you know whether Mr. Butler has received such a form?
A. I do not know.
Q. On Bates-stamp 0018 of this exhibit, bottom right is your signature; correct?
A. Yes.
Q. And turning to 009, the next page.
A. 0019?
Q. 0019. Correct. That's your counsel's, Ed Butler's, signature; correct?
A. I'm going to assume that's his signature.
Q. Does it look like his signature to you?
A. I didn't sign it. You'd have to ask Mr. Butler.
Q. Understood. Just asking --
A. Yeah, I --
Q. -- what it looks like to you. Does it look like his signature to you?
A. It appears that's his signature.
Q. Okay. Next one is page 0022. This is a settlement agreement between you and PolicyScout?
A. Yes.
Q. Do you see that?

A. Yes.
**Q. There's no settlement payment to you agreed in this settlement; correct?**
A. I believe so.
**Q. In other words, the parties agreed to settle the case without paying each other. Do you see that?**
A. Yes.
**Q. Why did you agree to a settlement without a payment in this case?**
A. I don't recall.
**Q. Did PolicyScout claim it had consent to call you in response to the -- in connection with these lawsuits?**
A. I don't recall.
**Q. Did PolicyScout send you a recording of a call that it claimed showed you consented?**
A. I don't recall.
**Q. If PolicyScout had sent to you such a recording by email, would you have deleted that email?**
A. If, you know, today was Friday, it wouldn't be Wednesday. I don't know. You know, how do you want me to answer "if"?
**Q. Do you have --**
A. You're asking me to speculate about something, and I've answered I don't know.

**Q. Do you have any emails that PolicyScout sent you?**

A. I don't -- I don't believe I have.

**Q. Because you deleted emails about your cases after settlements; correct?**

A. I don't know specifically in this case, but, yes, I did delete things after the settlement. So it would stand to reason that I would have deleted everything regarding PolicyScout.

**Q. Have you looked to see whether you still have any documents from PolicyScout?**

A. Yes.

**Q. Did you find any?**

A. No.

**Q. Turning to page -- let me make sure I have the Bates number right. 0035.**

A. Yes.

**Q. This is a settlement agreement between you and Priority Automotive, Inc. Do you see that?**

A. I do.

**Q. For TCPA claims. Do you see that?**

A. I do.

**Q. And in paragraph 2, it's a settlement amount of 8,500 via ACH to plaintiff's counsel. Do you see that?**

A. Yes.
**Q. Mr. Marks was your counsel in this case; correct?**
A. I don't recall, but -- I don't recall if he was in this case or not.
**Q. Whether it was Mr. Marks or Mr. Butler, they would have paid you two-thirds of the settlement amount; correct?**
A. That's correct.
**Q. How did Mr. Marks pay you two-thirds for the settlements he was involved in?**
A. I don't specifically recall, but I believe he also wrote a check.
**Q. And you deposited those checks in your First Community --**
A. I believe I would have deposited them in my account, yes.
**Q. -- Credit Union account? Okay. And, again, please let me finish the question. Not trying to give you a hard time. Just makes the court reporter's life much easier.**
**Next one is 0039. This is a settlement agreement between you and General Motors, GM, related to a TCPA lawsuit. Do you see that?**
A. I do.

Q. GM did not agree to pay you any money in connection with the settlement; correct?
A. I believe that's the case.
Q. The settlement date is March 24, 2025. Do you see that at the top?
A. Yes, I do.
Q. So a couple months ago. Do you see that?
A. I do.
Q. Why did you agree to a settlement that didn't require GM to pay you any money?
A. I don't recall.
Q. Did GM tell you in response to your lawsuit that it had consent to call your number?
A. I don't recall.
Q. Mr. Butler was your counsel in this case; correct?
A. Yes.
Q. Okay. Turning to page 049 of this exhibit. Excuse me, 0 -- yes, 049. This is a letter that you sent Facet Wealth, Inc.
A. Yes.
Q. Do you see that?
A. I do.
Q. Paragraph 3 says, please preserve any call log records, phone contact with employees, vendors or

**telemarketers, or ESI for discovery as this will need to be provided. Do you see that?**
A. I do.
**Q. This is the same language about preservation that you had in your letter to Fisher; correct?**
A. Appears to be similar, yes.
**Q. You included similar language in all the letters like this you sent; correct?**
A. I don't recall that -- that I did. I did in this letter.
**Q. Did you copy/paste your letters from a template?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and respectfully decline to answer the question.
**Q. We can move on to Exhibit 2, Bates-stamp -- same exhibit, we're just on Bates-stamp 050.**
A. Yes.
**Q. This is your settlement with Dillon Automotive Group. Do you see that?**
A. I do.
**Q. For a TCPA case. Do you see that?**
A. I do.
**Q. The settlement amount in paragraph 1 is**

7,500. Do you see that?
A. I do.
Q. Turning to the next page, it's to plaintiff's counsel via ACH transfer. Do you see that?
A. I do.
Q. Then if you turn to paragraph 14 of this briefly on page 056.
A. Yes.
Q. That shows that James Marks was your counsel in this one; correct?
A. Correct.
Q. Back to paragraph 1 on page 051.
A. Yes.
Q. Plaintiff's counsel shall be solely responsible for allocating the payment between plaintiff and his attorneys. Do you see that?
A. Yes, I do.
Q. And in this settlement, like the others, your counsel paid you two-thirds of the settlement amount?
A. Correct.
Q. Paragraph 2, plaintiff's consideration. About two-thirds of the way down is a sentence that says, as part of his consideration to defendant,

**plaintiff agrees to provide all of his business and personal telephone numbers. Do you see that?**

A. I do.

**Q. And then below that it says, plaintiff's disclosed numbers. Do you see that?**

A. I do.

**Q. And it discloses two phone numbers, one ending in 2988 and one ending in 1355. Do you see that?**

A. I do.

**Q. Those were your phone numbers at the time of the settlement agreement; correct?**

A. I believe they were.

**Q. Did you have any other phone numbers at the time of the settlement agreement?**

A. Not that I recall.

**Q. When did you stop using those two phone numbers?**

A. I believe I've answered already that the phone 915-2988 was lost -- actually stolen while I was in Judge Stewart's chambers, and I stopped the service for (208) 390-1355 the last couple of months.

**Q. When were you in Judge Stewart's chambers?**

A. I don't recall the date.

**Q. What case were you there for?**

A. I don't remember the case.
**Q. What -- where is Judge Stewart's chambers located?**
A. St. Louis County Courthouse.
**Q. Do you know his first name?**
A. I do not.
MR. BUTLER: Richard.
**Q. (By Mr. Terepka) Was it a TCPA case that you were before him for?**
A. I believe -- I believe it was.
**Q. Who was the defendant?**
A. I don't know. No idea.
**Q. Turning to page 059 of this exhibit. Looks like you're already there. This is a settlement agreement between you and NORC at the University of Chicago. Do you see that?**
A. I do.
**Q. To settle a TCPA case. Do you see that?**
A. I do.
**Q. With James Marks as your attorney. Do you see that?**
A. I do.
**Q. And the next page, the settlement payment amount is $5,000. Do you see that?**
A. I do.

**Q. Mr. Marks paid you two-thirds of that; correct?**
A. Correct.
**Q. Did the defendant in this case tell you that it had consent to call your number in response to the lawsuit?**
A. I don't recall.
**Q. Other than Fisher and PolicyScout, how many defendants have told you that they had consent to call your number?**
A. I'm going to invoke the Fifth Amendment and decline to answer that.
**Q. Okay. Moving on to page 087.**
A. 87?
**Q. Yes. Skipping ahead a bit. This is a settlement agreement between you and Benepath -- excuse me -- this is a settlement agreement between you and Benepath, Inc., to resolve a TCPA lawsuit. Do you see that?**
A. I do.
**Q. With a settlement amount of $12,000. Do you see that?**
A. I do.
**Q. Your counsel was Butler Law Group. Do you see that?**

A. I do.
**Q. Mr. Butler paid you two-thirds of that settlement amount; correct?**
A. Correct.
**Q. Turning to the next page. And the next one -- to 093.**
A. Yes.
**Q. That's your signature on the settlement; correct?**
A. Yes.
**Q. All right. Back to 088, paragraph 1.6. Do you see that?**
A. Yes.
**Q. It says, plaintiff is aware that certain state and federal income tax consequences may be incurred as a result of the consummation of this agreement. Do you see that?**
A. I do see that.
**Q. What state and federal income tax consequences are you aware of from a settlement agreement like this?**
A. None.
**Q. Have you ever reported the settlement income you make from settlements like this to the IRS?**
A. No.

Q. Have you ever reported settlement income from settlements like this to the Missouri Department of Revenue?
A. Not that I'm aware of.
Q. Have you paid any income tax on the settlement payments you've received from TCPA lawsuits?
A. It was my understanding that as a personal injury tort, it was not taxable.
Q. And so you didn't pay any taxes on the settlement amounts you received from TCPA settlements; is that correct?
A. That's correct.
Q. Going to move on to page 094.
A. Yes.
Q. This is a settlement agreement between you and Facet Wealth to resolve a TCPA case. Do you see that?
A. I do.
Q. Turning to paragraph 1 on page 095.
A. Yes.
Q. It says that Facet agreed to pay you a $12,000 settlement; correct?
A. That's correct.
Q. To you directly without counsel; correct?

A. That's correct.
**Q. To your First Community Credit Union bank account; correct?**
A. Yes.
**Q. And that's the bank account you testified you had earlier?**
A. Yes. Yes, sir.
**Q. So you received a hundred percent of this settlement amount; correct?**
A. Yes.
**Q. Did Facet Wealth tell you in response to this lawsuit that it had consent to call your number?**
A. Not that I recall.
**Q. Turning to page 098.**
A. They don't -- may I ask? They don't state that anywhere in the agreement, do they? I don't see -- I don't believe they say anywhere in the agreement they had consent to call me.
**Q. I don't know, Mr. Human, but just turning your attention to --**
A. Well, I'm just -- I'm just looking because you asked me a question, if they had said they had consent to call me. And I'm saying I don't see that anywhere in the agreement.
**Q. Other than --**

A. They don't state that in the agreement anywhere.

**Q. Other than this agreement, did Facet Wealth by email or any other medium tell you that it had consent to call?**

A. I don't recall. I would assume if they did, they would have it in here somewhere.

**Q. Did Facet Wealth tell -- well, you didn't have counsel for this one; so strike that.**

**So if Facet Wealth had told you that by email like we discussed before, you would have deleted those emails after the --**

A. I wouldn't have them, right.

**Q. -- conclusion of the settlement?**

A. Correct. I wouldn't have them.

**Q. Because you deleted them; correct?**

A. Well, yeah.

**Q. Okay. Moving on to page 098, that's your signature on this page; correct?**

A. Yes.

**Q. All right. Moving on to 099. This is your settlement agreement between you and International Union of Police Associations to resolve a TCPA claim. Do you see that?**

A. I do.

Q. Your counsel was Mr. Butler in this case; correct?
A. Yes.
Q. Settlement amount is $1,500. Do you see that?
A. I do.
Q. Mr. Butler paid you two-thirds of that; correct?
A. Correct.
Q. Moving on to 0106.
A. 06, yes.
Q. This is a settlement agreement between you and Dreamstyle Remodeling; correct?
A. Yes.
Q. For a TCPA case; correct?
A. Yes.
Q. Turning to paragraph 2, the settlement amount here is 7,500. Do you see that?
A. I do.
Q. With Butler as your counsel?
A. I do, yes.
Q. And Mr. Butler paid you two-thirds of the settlement amount; correct?
A. Correct.
Q. 0116. This is a settlement agreement

between you and Great Day Improvements. Do you see that?
A. I do.
Q. With James Marks as your counsel. Do you see that?
A. I do.
Q. Settlement amount of $5,000; right?
A. Yes.
Q. Mr. Marks paid you two-thirds of that; correct?
A. Yes, sir.
Q. Moving on to 0122.
A. Yes.
Q. This is a settlement agreement between you and New American Funding, LLC. Do you see that?
A. I do.
Q. Turning to the next page, 0123. It shows a settlement amount of $11,000. Do you see that?
A. I do.
Q. With Butler as your counsel?
A. Yes.
Q. Mr. Butler paid you two-thirds of that settlement amount; correct?
A. Yes.
Q. Moving on to 0136.

A. Yes.
Q. This is a settlement agreement between Great Resort Vacations, LLP, and you. Do you see that?
A. I do.
Q. To resolve a TCPA case; correct?
A. Yes.
Q. Your counsel was James Marks; correct?
A. Yes.
Q. The settlement amount is $5,000?
A. No.
Q. Correct?
A. No.
Q. Excuse me. The settlement amount is $9,000; correct?
A. Yes.
Q. And Mr. Marks paid you two-thirds of that settlement amount; correct?
A. Yes.
Q. Okay. Now to 0142.
A. 142. Okay.
Q. This is a settlement agreement between DiCarlo Insurance, LLC, and you; correct?
A. Yes.
Q. But it's not about -- well, let me start over.

**This settlement relates to alleged violations of the TCPA, but it does not refer to an actually filed lawsuit. Do you see that in the second whereas clause?**

A. Yes, I do.

**Q. On paragraph 2, consideration, it has $6,000 as the settlement amount. Do you see that?**

A. I do.

**Q. With James Marks as your counsel?**

A. Correct.

**Q. He paid you two-thirds of that; correct?**

A. Yes, sir.

**Q. How many other settlements did you reach without a filed lawsuit?**

A. On the advice of counsel, I'm invoking my Fifth Amendment privilege against self-incrimination. I decline to answer the question.

**Q. Is this the only settlement you reached without filing a lawsuit in a TCPA case?**

A. On the advice of counsel, I'm invoking my Fifth Amendment privilege.

**Q. On page 0145, that's your signature at the bottom of the page; correct?**

A. It is.

**Q. Moving on to 0151. This is your settlement**

agreement with HealthMarkets Insurance Agency and US Health Advisors to resolve a TCPA lawsuit. Do you see that?
A. Yes.
Q. Next. Page 0152. Paragraph 2, payment, settlement amount is $10,000; correct?
A. Yes.
Q. Your counsel was Butler Law Group for this one?
A. Yes.
Q. And Mr. Butler paid you two-thirds of the settlement amount; correct?
A. Yes.
Q. 0159. This is your settlement agreement with Call Trader, LLC, to resolve a TCPA lawsuit. Do you see that?
A. I do.
Q. Settlement amount, $6,000. Do you see that?
A. I do.
Q. With Mr. Butler as your counsel?
A. I do.
Q. And he paid you two-thirds of that settlement amount; correct?
A. Yes, sir.
Q. Next we have 0163. This is your settlement

agreement with STL Design Build, LLC, to resolve a TCPA case. Do you see that?
A. I do.
Q. Settlement amount is 7,500. Do you see that?
A. Yes.
Q. With Butler Law Group as your counsel. Do you see that?
A. I do.
Q. Mr. Butler paid you two-thirds of that settlement amount; correct?
A. Yes.
Q. Okay. So we've gotten through this very large exhibit. Thank you. We can move on to another exhibit.
(Exhibit 4, Daniel Human Settlements, was marked for identification.)
Q. (By Mr. Terepka) So this will be Exhibit 4. Exhibit 4 is -- well, excuse me, Mr. Human. Were you just on your iPhone?
A. No, I just turned it off so I make sure I don't interrupt.
Q. Understood. And I see you have it out. Would you mind putting it in your pocket?
A. Oh, sure.

Q. Okay. Exhibit 4 in front of you is a summary of all the settlements we just covered. Could you please take a moment to review it?

A. Yes, sir.

Q. Is there anything about this that looks inaccurate?

A. Nothing looks inaccurate.

Q. The total amount of settlement dollars at the bottom from the settlements we just reviewed in Exhibit 2 is 120,250. Do you see that?

A. I do.

Q. And you received two-thirds of that; correct?

A. Yes.

Q. Well, in fact, if you look at the attorney column, there's Mr. Butler or Mr. Marks?

A. Yes.

Q. And then for the Facet Wealth case, the $12,000 settlement, you didn't have counsel; correct?

A. Correct.

Q. So, in fact, because you didn't have to pay one-third to your counsel in that matter, you received more than two-thirds of the 120,250 indicated in this document; correct?

A. Correct.

**Q. And that's just from the 20 settlements summarized in this document; correct?**

A. Correct.

**Q. How much more did you make from other settlements?**

A. On the advice of counsel, invoking my Fifth Amendment privilege against self-incrimination, and I decline to answer the question.

(Exhibit 5, Agreed Stipulation of Dismissal, was marked for identification.)

**Q. (By Mr. Terepka) I'm going to turn to another exhibit which we'll be marking as Exhibit 5.**

MR. BUTLER: Thanks.

**Q. (By Mr. Terepka) The first page of this document is an agreed stipulation of dismissal between you and Viking Steel Structures, LLC?**

A. Yes.

**Q. And at the top, it was filed on January 17, 2025. Do you see that?**

A. I do.

**Q. The document says that you were pro se, meaning unrepresented in this case; correct?**

A. That's correct.

**Q. Because you didn't have counsel in this case; correct?**

A. Yes.
**Q. How much did Viking Steel agree to pay you in its settlement agreement?**
A. I don't recall.
**Q. The settlement agreement would answer that question; right?**
A. I would think.
**Q. You haven't produced that settlement in this case, have you?**
A. I have not.
**Q. Have you provided it to counsel to be produced?**
A. I don't have it to provide.
**Q. Why not?**
A. Well, as you can see, it's dismissed. So once it's dismissed, as I previously mentioned, I don't keep any records of it.
**Q. You deleted it; correct?**
A. Yes.
**Q. The next page of this exhibit is a notice of settlement between you and David Ramirez & Associates, again, pro se. Do you see that?**
A. I do.
**Q. How much did David Ramirez & Associates agree to pay you to settle?**

A. I don't recall.
**Q. The settlement agreement would answer that question; correct?**
A. Yes.
**Q. But you deleted that, too; correct?**
A. Once there was a notice of settlement and it was settled, yes.
**Q. When did you last settle a TCPA claim?**
A. I don't recall.
**Q. Was it in the past month?**
A. No.
**Q. More than a month ago was the last time you settled a TCPA claim?**
A. Yes.
**Q. Are you trying to settle any TCPA claims right now?**
A. No. There are those that are in default, but I haven't pursued those. So, no, I'm not trying to settle one currently.
**Q. When did you last try to settle a TCPA claim?**
A. I don't recall.
**Q. When did you last file a TCPA lawsuit?**
A. I don't recall.
**Q. When did you last send a letter threatening**

**to bring a TCPA lawsuit?**
A. I don't recall.
**Q. Was it more than a month ago?**
A. It would have to be.
**Q. Why? Why would it have to be more than a month ago?**
A. Because I just answered that I haven't done one in the last month.
**Q. Why did you stop sending letters threatening to bring TCPA claims?**
A. Well, I haven't stopped. I just haven't recently.
**Q. Do you intend to send more letters threatening TCPA claims?**
A. If people continue to call me illegally at some point, sure.
**Q. Do you intend to continue bringing TCPA lawsuits?**
A. If I continue to be contacted illegally in violation of the TCPA, yes.
**Q. $120,000 of settlement funds is a lot of money, Mr. Human. What have you done with that money?**
A. On the advice of counsel, invoking my Fifth Amendment privilege. I decline to answer the question.

**Q. How much of the TCPA settlement dollars that you've obtained do you still have?**
A. On the advice of counsel, invoking my Fifth Amendment privilege, and I decline to answer the question.
**Q. Okay. I'm going to switch gears to your bankruptcy filing. When did you decide to file for bankruptcy most recently?**
A. On the advice of counsel, I am invoking my Fifth Amendment privilege and decline to answer the question. My bankruptcy counsel obviously is not present.
**Q. Who's your bankruptcy counsel?**
A. David Gunn.
**Q. When did you -- did you approach him or did he approach you about filing for bankruptcy?**
A. I approached him.
**Q. When did you approach him?**
A. I don't recall.
**Q. You filed for bankruptcy on April 29. About how long before your filing did you first contact David Gunn?**
A. I don't recall.
**Q. Was it weeks?**
A. I don't recall.

**Q. Was it near in time to your bankruptcy filing?**
A. I don't recall.
**Q. How did you reach out to David Gunn?**
A. I think I saw him listed as a bankruptcy attorney somewhere.
**Q. Where did you see him listed as a bankruptcy attorney.**
A. I don't recall.
**Q. Did you call or email him?**
A. I believe I called him, but I may have emailed him. I think I called him, but I don't know.
**Q. Why did you file for bankruptcy?**
A. I don't have any money.
**Q. When did you run out of money?**
A. Sometime in the last couple of months.
**Q. How did you run out of money?**
A. I don't have any income other than my Social Security.
**Q. What about all the settlement money from TCPA cases?**
A. That was spent.
**Q. On what?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against

self-incrimination and decline to answer the question.
**Q. After you filed for bankruptcy on April 29, you did not tell this court in this proceeding that you filed for bankruptcy; correct?**
A. I don't know how Mr. Gunn approached it.
**Q. So you and Mr. Butler didn't file anything in this case, Human versus Fisher, to tell this court that you had filed for bankruptcy; correct?**
A. To the best of my knowledge, no, we did not.
**Q. Why not?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege. Decline to answer the question.
**Q. You were waiting until the morning of your deposition scheduled on May 9 to inform Fisher and the court of your bankruptcy filing. Isn't that true?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer the question.
**Q. We're going to mark the bankruptcy filing as the next exhibit.**
THE WITNESS: Ed, could we get five minutes?
MR. TEREPKA: Five-minute break? That's fine.
THE WITNESS: Yeah. Just five minutes.

Thanks.

(Whereupon, a short break was taken.)

**Q. (By Mr. Terepka) Ready to go back on the record?**

A. Yes. Yes.

**Q. Okay. All right. We're marking Exhibit 4 --**

COURT REPORTER: I think we're on six.

MR. TEREPKA: Excuse me. We're marking as Exhibit 6.

MR. BUTLER: Did we have a five?

MR. TEREPKA: Yep.

(Exhibit 6, Bankruptcy Documents, were marked for identification.)

**Q. (By Mr. Terepka) Exhibit 6 is a copy of your bankruptcy petition filed April 29, 2025. Do you see that?**

A. I do.

**Q. At the top, it indicates a Chapter 13 filing. Do you see that?**

A. I do.

**Q. Why did you file for Chapter 13 bankruptcy instead of another type of bankruptcy?**

A. On the advice of counsel, I am invoking my Fifth Amendment privilege and declining to answer the

question. I'm not prepared to answer any questions about the bankruptcy. My bankruptcy attorney is not here; so --

**Q. So --**

A. Mr. Butler doesn't represent me in the bankruptcy; so --

**Q. The bankruptcy petition and the statements in the -- are relevant to the case and the prior issues we discussed. There's no requirement for your bankruptcy counsel to be here. We may need Judge Schelp's guidance on this point, but let me just try to ask a few questions about it.**

**Turning to page 3, looking at the blue text at the top.**

A. Yes.

**Q. It says page 3 of 55. Do you see that?**

A. Yes.

**Q. Item 9 on this page --**

A. Yes.

**Q. -- shows that you had two prior bankruptcy filings. Do you see that?**

A. I do.

**Q. Both were Chapter 7 filings?**

A. Yes.

**Q. One of them was in August 1987. Do you see**

that?
A. I do.
Q. Why did you file for bankruptcy then?
A. I don't recall.
Q. Why did you file for bankruptcy on August 4, 1987?
A. I don't recall.
Q. What about the filing in November 1994, why did --
A. I don't recall.
Q. -- you file for bankruptcy then?
A. I don't recall.
Q. And please wait for the question.
A. Yeah.
Q. The 1987 case listed as another debtor Robin Leigh Dean Human. Who's that?
A. That would have been my ex-wife.
Q. Did you mention her before when we covered your prior spouses?
A. I did.
Q. Understood. Okay. Turning to page 6 of 55 at the top.
A. Yes.
Q. Item 19 indicates your assets to be worth between 0 and 50,000. Do you see that?

A. I do.
**Q. Then on part 7, the signature, it says, I have examined this petition and I declare under penalty of perjury that the information provided is true and correct. Do you see that?**
A. I do.
**Q. And then there's your signature, /S/ Daniel** A. Human. Do you see that?
A. I do.
**Q. And you signed on April 28, 2025; correct?**
A. Correct.
**Q. All right. Turning to page 8 of 55 at the top.**
A. Eight, yes.
**Q. And item 4 and 5 under part 3.**
A. Yes.
**Q. The income listed is 1,627. Do you see that?**
A. I do.
**Q. What's the source of that income?**
A. That is my Social Security income.
**Q. How often do you get that income?**
A. Each month.
**Q. Item 5 has your expenses at 1,280. Is that your monthly expenses?**

A. That's what it says.

**Q. What are those expenses?**

A. I think they're listed somewhere on here. I think they're broken down somewhere.

**Q. Do you pay rent?**

A. I do.

**Q. How much?**

A. $600.

**Q. What other regular monthly expenses do you have?**

A. My cell phone service, my car insurance, food, gas.

**Q. Anything else?**

A. Not off the top of my head. Those are the prim- -- I mean, I have copays for medical procedures. I just paid one the other day. I have -- I have to renew my license. I have to renew my car tags. There are a number of expenses. I have to pay personal property tax. You know, there are a lot of expenses that I have.

**Q. And the total of those expenses is about $1,280 per month; correct?**

A. Well, that's what it says. I don't know that we included things like personal property taxes and all. But, yeah, it says $1,280, yes.

**Q. Do you pay personal property taxes?**
A. Yeah.
**Q. On what?**
A. My car. It's listed as an asset. It's an older Nissan Rogue.
**Q. Turning to the next page, which is actually 9 of 55.**
A. Yes.
**Q. It says taxes and certain other debts you owe the government, $5,557. Do you see that?**
A. I do.
**Q. Why do you owe that?**
A. In 2023, the employer that I left didn't take out withholding tax for January through June, which something I did not know about until I got my W-2. So obviously, on whatever income I'd had between January and June, I owed withholding tax in the amount of $5,570.
**Q. Are you on a payment plan with the IRS for that?**
A. Yeah, I'm paying them 200 a month. I don't know how that's affected now by the bankruptcy, if it has to go through the trustee or what, but, yeah, I was on a payment plan.
**Q. Turning to page 11.**

A. That was listed, by the way, as an expense. Sorry to interrupt. When I originally gave my expenses to Mr. Gunn, I listed the debt to the IRS as a monthly payment.

**Q. Understood. Turning to page 11 of 55.**

A. Yes.

**Q. Electronics, item 7.**

A. Yes.

**Q. It lists one computer and one cell phone?**

A. Correct.

**Q. What's the cell phone?**

A. The cell phone I currently have.

**Q. How about the computer?**

A. It's an older, very -- like I don't know if they call them stages or levels. Like it's a level 5. Your cell phone probably has more information stored on it than my computer has.

**Q. Is it a laptop or a desktop?**

A. No, it's a desktop.

**Q. How much did you pay for it?**

A. I think I paid $270.

**Q. Where'd you buy it?**

A. It was used at Micro Center.

**Q. Where's that?**

A. Somewhere in Brentwood, Missouri, on

Brentwood Promenade.
**Q. How did you pay for it?**
A. I don't remember.
**Q. Was it credit card?**
A. Could have been.
**Q. How do you normally pay for expenses like that?**
A. Depends. I mean, generally with a debit card, but it could have been a credit card. I don't remember.
**Q. So you generally pay for your expenses with debit or credit?**
A. Yes. Or sometimes cash. In this case, because I -- you know, in case I needed to take it back, I think I either put it on my debit card or my credit card.
**Q. Turning to page 13 of 55.**
A. Yes.
**Q. Item 16, cash, $86?**
A. Yes.
**Q. Is that -- how much cash do you have now?**
A. Oh, I don't know. At the time, it was 86 bucks. I don't know how much cash I have right now.
MR. BUTLER: Alex, do you mean like in his pocket today or --

**Q. (By Mr. Terepka) How much cash total do you own now?**

A. Well, the document speaks for itself. I don't own any cash, I mean, to speak of.

**Q. So this indicated the amount of cash you had --**

A. At the time.

**Q. -- in April of 2025.**

A. That's correct. Correct.

**Q. And I'm asking now, sitting here today, how much cash do you have?**

A. I don't -- I don't -- I mean, I have -- there's money in my checking account. Is that cash? It's a debit card. I assume it's cash.

**Q. So I'll clarify the question. Thank you.**

**Speaking of cash, like dollar bills not in any financial account, how much cash do you have now?**

A. I'm going to say roughly $86. I mean, I don't know how much -- you want me to take my wallet out and check, is that what you're asking me to do? I don't understand what you need --

**Q. No need to do that. Just asking your best estimate for how much cash you have now.**

A. Not much.

**Q. Item 17, your checkings and savings**

accounts?
A. Correct.
Q. Indicated as the First Community Credit Union. Do you see that?
A. That's correct.
Q. Same accounts you were talking about before?
A. Yes.
Q. In April, it lists $421 is the amount in those accounts; correct?
A. Yes.
Q. How much is in those accounts now?
A. I believe less than that.
Q. Turning to page 14, item 30 lists three default judgments against Idaho Roofing Contractors, Vacation Ownership Brokerage, and Health HQ. Do you see that?
A. I do.
Q. Those are for TCPA cases; correct?
A. That's correct.
Q. Are you doing anything to pursue those default judgments?
A. I don't have the money. They're all out of town. I don't have the money to pursue them.
Q. So you're not pursuing them; correct?
A. No. No.

**Q. Page 21 of 55. This is a list of debts. Check Systems LLC, what's that debt?**

A. No idea.

**Q. Why did you list it on your bankruptcy filing if you have no idea?**

A. Because obviously I owe them. Some creditor that I owe something for. I don't know. I don't recognize the address. That's why I'm kind of thrown by it.

**Q. You don't know what this debt is?**

A. I think it's -- I think this might be -- when I left the apartment in Ballwin, I think the lease had been automatically renewed or something and there was some money owed on it. I think that's what that -- I believe that's what that debt is. I'm not certain.

**Q. The next item is Fisher Investments, Inc., with -- indicated as unknown. What's your understanding of that debt?**

A. $102,000 plus and you're adding to it today.

**Q. Why do you say that?**

A. Well, I don't think you're doing this for free.

MR. BUTLER: What he means is that number, have you heard it?

THE WITNESS: I've read it.
MR. BUTLER: Have you read it?
THE WITNESS: That's what they asked for.
MR. BUTLER: Okay.
THE WITNESS: They said that they had accumulated --
MR. BUTLER: Answer the question.
THE WITNESS: -- I believe that the information that I received was in writing that you had accumulated -- you submitted to the court that you'd accumulated some $102,000 in attorney's fees and costs at that point. I don't know what's happened since.
**Q. (By Mr. Terepka) And your assumption is that the court is going to award Fisher those fees?**
A. Well, the court all but said they were going to.
**Q. The next one is Mercury/FBT, $700 for a credit card?**
A. Correct.
**Q. What's that?**
A. It's a credit card.
**Q. And have you paid it since the filing?**
A. No.
**Q. Item 4.4 is RDAC, $1,747.97. What's that**

**for?**
A. I don't know. I think -- I think that might be that rent thing and the Check Systems, I don't know what that is. Check Systems. But it says debt is zero; so I don't know why it's even listed. This debt is 1,747, that's the rent debt.
**Q. 4.5 is Receivable Solutions?**
A. Yes.
**Q. About $7,300. What's that for?**
A. So in 2020 through 2021, I was hospitalized with long-term COVID for about seven months and then on hospice for another two months and the bill was staggering. I was in intensive care for like 90 days. It was 1.4 million or something. And that's the residual that they -- that the government didn't pay from the CARES Act.
**Q. Have you paid this amount since the bankruptcy filing?**
A. Since the bankruptcy filing? No.
**Q. 4.6, TeleCheck Services?**
A. Yeah. Again, it says zero; so I don't know why it's even listed.
**Q. Did you review this filing before your bankruptcy counsel filed it?**
A. Yeah.

**Q. All right.**
A. We made some significant changes, which have subsequently been submitted to the court.
**Q. Moving on to page 31 of 55.**
A. Yes.
**Q. This is the statement of financial affairs for individuals filing for bankruptcy. Do you see that?**
A. I do.
**Q. Item 2 has 1245 Pinecrest Lane, Apartment B, Ballwin, Missouri, as a prior address of yours. Do you see that?**
A. Yes.
**Q. And that's the Pinecrest address you referred to earlier; correct?**
A. That's correct.
**Q. Okay. So part 2, item 4, asks do you have any income from employment or from operating a business during this year or the two previous calendar years? Do you see that?**
A. I do.
**Q. And it lists on the next page sources of income. For employment, it lists zero for January 1 of the current year until the date you filed for bankruptcy and zero for the calendar year of 2024. Do**

you see that?
A. I do.
Q. And that's because you had no income from employment in those time periods; correct?
A. That's correct, yes.
Q. Okay. Next, for the calendar year before that, January 1 to December 31, 2023, it has 37,500. Do you see that?
A. I do.
Q. What was that income from?
A. That was the income from the last six months that I worked for Square One.
Q. Anything else?
A. There's nothing else listed there, but I did give to my bankruptcy attorney the settlement. He had asked me how much settlement money I had acquired in the last six months; so I gave him that. And he subsequently told me that he should have included that. He didn't. And the amended one does include all of it.
Q. When was the amended one filed?
A. I don't know. You'd have to ask him.
Q. When did you review a copy of it before it was filed?
A. Yesterday or the day before yesterday. I

think it was yesterday. I think the day before yesterday, actually. So, yeah, he -- he called me and he said, I see that you submitted that you had this income from TCPA settlement. And while -- and he said, well, I know you don't consider that actual income because you don't believe it's taxable, we still have to report it to the court. And I -- I directed him to the sheet of paper that I had given him, and I said, well, I gave you the -- you asked me to go back six months. I gave you the list for monthly. And he said, yes, you did, my fault. I should have included it. We will amend it and we will include it.

**Q. Okay. So a couple things.**

A. Could I finish before you cut me off?

**Q. Yes.**

A. Okay. So I wanted to make sure that he noticed the court that I had submitted those numbers to him. I don't want to be accused of saying, you know, hey, I didn't provide this because I did provide it. He said that it had been his fault, that he had not included it as other income, even though I don't know how you call it income. But he said he should have included it, he didn't, and that he would explain that to the bankruptcy court. And then he would amend

this to include, not just the last six months, but then he asked me to go back two years; so I gave him all of that information.

**Q. Okay. Are you finished?**

A. Yeah.

**Q. So one thing is, I'm not asking about your communications with counsel.**

A. Okay.

**Q. Because you don't have to share those.**

A. All right.

**Q. But that's why I tried to interrupt. In any event, it sounds like you prepared a list of settlement dollars that you've received in the past two years; is that correct?**

A. Yes.

**Q. And you provided that to your bankruptcy counsel; correct?**

A. Because he's not here, I'm going to go ahead and invoke the Fifth Amendment because I'd rather he be here to be a party to the conversation. So I'm not going to answer that question because that's privilege between he and I.

**Q. I'm just asking about what you just testified about. And let me ask it this way. The list of settlements that you prepared for your**

**bankruptcy counsel, did you provide that to Mr. Butler for production in this case?**
A. I have not yet, no.
**Q. Do you intend to?**
A. If Mr. Butler asks, I certainly will.
**Q. Okay. Moving to item 5.**
A. Item --
**Q. Page -- that's okay. Page 32 --**
A. Yes.
**Q. -- of 55. It asks for, did you receive any other income during this year or the two previous calendar years? Do you see that?**
A. Yes.
**Q. And then from January 1 of the current year until the date you filed for bankruptcy, it lists $6,508?**
A. Correct.
**Q. And the source of that income is Social Security. Do you see that?**
A. Yes, sir.
**Q. Then for the calendar year 2024, it lists 19,300. Again, source, Social Security. Do you see that?**
A. Yes.
**Q. And for calendar year 2023, it lists 17,537?**

A. Yes.
**Q. Again, source, Social Security. Do you see that?**
A. Yes.
**Q. So the only income in item 5 that's reported here is Social Security income; correct?**
A. In item 5, yes. But obviously item 4 shows the $37,500 I received from Square One.
**Q. Right. Item 5 is just Social Security; correct?**
A. Yes. Correct. Correct.
**Q. If you go back up to item 5.**
A. Yes.
**Q. Did you receive any other income during this year or the two prior calendar years? Do you see that?**
A. Item 5? Yes. Yes. Yes. Yes.
**Q. The instruction right after that says include income regardless of whether that income is taxable.**
A. Correct.
**Q. Do you see that?**
A. Yes.
**Q. Examples of other income are, and then it goes through a list. One item on that list is money**

**collected from lawsuits.**
A. Yes.
**Q. Do you see that?**
A. I do.
**Q. In item 5, you did not report any of the money you collected from TCPA lawsuits; correct?**
A. Well, it's not on this -- this sheet. However, as I just explained, I provided that to Mr. Gunn. He has subsequently said he should have included it. He had the numbers. I had given him the actual month-by-month numbers. He said he should have included it in this. And because he did not include it, he would amend this to include, not just the last six months, but the last two years, which he has subsequently done.
**Q. When did you give your bankruptcy counsel that list of settlement money?**
A. The six months prior when he asked for it.
**Q. When was that?**
A. Before he filed this.
**Q. Before April 29, 2025?**
A. Yes. As I said, in a conversation we had subsequent, he said he should have included that and that it was his error and he would correct that by amending this and making sure that the numbers were

correct. He acknowledged that I had given it to him, which I had, and that's why he amended this to include it.

**Q. So I'm just asking about this document in front of you.**

A. Yes. Yes. Yes.

**Q. Page 32 of 55.**

A. Yes.

**Q. That does not list any --**

A. It does not.

**Q. -- money collected from lawsuits; correct?**

A. That's correct. This one does not.

**Q. Okay. And I'm just going to ask it again so we're not speaking over each other because the court reporter is writing everything down and it's impossible if we're speaking over each other.**

**So, again, I'm asking about page 32 of 55 in front of you. Item 5 does not list any money collected from lawsuits; correct?**

A. It does not.

**Q. Okay. Turning to page 45 of 55.**

A. Forty-five?

**Q. Of 55.**

A. Yes.

**Q. Correct. Part 12.**

A. Yes.
Q. It says, I have read the answers on this statement of financial affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct. Do you see that?
A. Yes.
Q. And then it has your signature dated April 28, 2025. Do you see that?
A. I do.
Q. Turning to page 33 of 55.
A. Thirty-three, yes.
Q. This lists various credit cards that you have.
A. Yes.
Q. And amounts that you owed within the 90 days prior to your filing and amounts you still owe on those credit cards. Do you see that?
A. Yes. Yes.
Q. The amount you still owe for all of these credit cards is zero. Do you see that?
A. I do.
Q. And the total amount paid, starting with American Express, is about $1,400?
A. Yes.
Q. For Discover, $1,300?

A. Yes.
**Q. For Wells Fargo, $657?**
A. Yes.
**Q. For JPMorgan Chase, $947?**
A. Yes.
**Q. For your Apple Card, $750?**
A. Yes.
**Q. For your First Community Credit Union card, $1,369?**
A. Yes.
**Q. And for your Wells Fargo auto, $4,156?**
A. Yes, sir.
**Q. Where did you get the money to pay all of these off?**
A. Well, obviously, that would have been some of the money that I received from settlement agreements, as well as Social Security.
**Q. The Apple Card on page 33 of 55.**
A. Yes.
**Q. What did you buy with that?**
A. I don't -- I don't recall.
**Q. Was it an Apple product?**
A. It could have been.
**Q. Page 34 of 55.**
A. Yes.

Q. Part 4.
A. Part 4, 35 -- you said page 35?
Q. Thirty-four of 55.
A. Yes.
Q. Part 4. This has a list of lawsuits.
A. Oh, yes. Yes.
Q. And these are TCPA suits that you filed against various companies; correct?
A. Yes.
Q. The list goes on until page 41 of 55. Do you see that?
A. I do.
Q. Have you settled any of these cases since filing for bankruptcy?
A. Since filing for bankruptcy?
Q. Correct.
A. No. No, sir.
Q. Have you filed any more lawsuits since filing for bankruptcy?
A. No, I have not.
Q. How did you create this list of lawsuits?
A. I didn't.
Q. Who did?
A. My bankruptcy attorney.
Q. Did you provide him a list of lawsuits for

**the purpose of this filing?**
A. I didn't. I told him I didn't have those records. Apparently it's public information.
**Q. Page 41 of 55.**
A. Yes.
**Q. Item 13. Within two years before you filed for bankruptcy, did you give any gifts with a total value of more than 600 per person? Do you see that?**
A. I do.
**Q. And the answer is no. Do you see that?**
A. Yes.
**Q. Is that true?**
A. That has been also revised.
**Q. How has it been revised?**
A. To include monies that I paid my ex-wife for her rent, her credit cards, monies that I gave my son, monies that I gave my daughter. Those are all listed in the amended version of this.
**Q. Other than money you paid your ex-wife, son, and daughter, are there any other gifts?**
A. If there are, I don't recall. You know --
MR. BUTLER: Alex, would it be all right with you if I asked a question to just clarify something for myself?
MR. TEREPKA: Sure. What are you looking

at?
MR. BUTLER: I just would like to know whether the modified document that's been referred to multiple times has been filed.
THE WITNESS: I'm sure it has been.
MR. BUTLER: Okay. All right.
**Q. (By Mr. Terepka) I'm not aware of that, but we're talking about this document right now.**
A. Right.
**Q. So the ex-wife you paid gifts to, who's that?**
A. Cindy Human.
**Q. How much did you pay her?**
A. I don't -- it's listed on the amended one. I don't -- I gave him receipts and all kinds of stuff for it.
**Q. About how much was it?**
A. I don't remember.
**Q. Was it more than a thousand?**
A. Oh, yeah.
**Q. How much more?**
A. Probably 20-some-thousand.
**Q. Your son that you paid gifts to, who's that?**
A. Joshua.
**Q. How much did you pay him?**

A. Probably over 20,000.
**Q. The daughter you paid gifts to, who's that?**
A. Danielle.
**Q. How much did you pay her in gifts?**
A. I think I said 2,500 total in Christmas and birthdays and . . .
**Q. Did you -- starting with your ex-wife, Cindy Human, did you pay her cash?**
A. Yes.
**Q. How?**
A. I handed it to her rent -- the guy who she rents from. I paid her rent.
**Q. Physical dollar bills?**
A. Yes.
**Q. Did you pay her by bank transfer or any electronic means?**
A. No. No.
**Q. Your son Joshua, how did you pay him the gifts that you --**
A. Cash.
**Q. Also physical cash?**
A. Could -- could some of it might be -- some of it might be Cash App.
**Q. You use Cash App to transfer money to your son?**

A. Yes.
**Q. Did you use Cash App and physical cash or just Cash App?**
A. Both.
**Q. What's the name on your Cash App account?**
A. I think it's $ Dan H.
**Q. How's that spelled?**
A. The dollar sign and then Dan H. I can't swear to that, but I -- I think that's what it is.
**Q. Did you pay your son Joshua in any other ways?**
A. I bought him food and things. He's a recovering addict living in a sober living house. So I'm sure I took him to the store and bought him groceries and things like that, too, yeah.
**Q. Your daughter Danielle --**
A. Yes.
**Q. -- how did you pay her the gifts you gave?**
A. Cash or maybe Cash App as well.
**Q. And you paid her about 2,500 is your estimate?**
A. Roughly, yeah. It's just an estimate, yeah.
**Q. Estimate. Okay. Mr. Butler indicated to the court that you paid your son's heroin dealers money. Is that true?**

A. My assumption was that that was a lot of the money went to, but I don't know that for a fact. He's an addict. He's been an addict for a long time. Finally and hopefully the end stages of recovery in this sober living house. Obviously, I was concerned for his safety and, you know, I didn't want him to -- I mean, could he have been playing, running game on me, telling me that he needed to pay, you know, dealers so that he wouldn't be harmed? Maybe. He's an addict. But obviously, he's my son and I don't want any harm to come to him; so . . .

**Q. Did you pay anyone other than your son directly who you thought was a heroin dealer?**

A. Not that I'm aware of. But they could have been. I mean, I don't know. I don't dabble in drugs; so I don't know.

**Q. Other than the $20,000 that you paid your son, how much did you pay to others for him?**

A. I don't know that I actually ever handed money to someone else for him. Mostly gave it to him to pay someone.

**Q. Turning to page 42 of 55.**

A. Yes.

**Q. This indicates gambling losses --**

A. Yes.

**Q. -- over the last 12 months?**
A. Yes.
**Q. And it indicates $15,000. Do you see that?**
A. I do.
**Q. How did you get that number?**
A. Could be well over that. I have an actual document from PENN Play, which is the owner of three of the local casinos, and they calculate your wins or losses over the period of a year. And so for the purpose of -- you know, I guess if you can use them for taxes, in my case, I couldn't, but they will give you a summary of your losses.
So the losses from just the PENN Play was in excess of 11,000. And then there are three other casinos that I also have lost money at; so I would say 15,000 was conservative.
**Q. The PENN Play record --**
A. Yes.
**Q. -- have you provided that to your counsel --**
A. I have.
**Q. -- for production in this case?**
A. I provided it to my bankruptcy attorney, yes.
**Q. Have you provided it to Mr. Butler?**
A. I have not.

Q. The other casinos you refer to, did they give you similar documents --
A. No, they didn't.
Q. -- about your losses?
A. I don't have like this membership thing there. Oh, sorry. I apologize for interrupting.
Q. Yeah, that's okay. Just for the court reporter.
Okay. Where -- where do you gamble?
A. All the casinos in St. Louis. Argosy. Out in St. Charles at Hollywood. There is Horseshoe downtown. There's Casino Queen in East St. Louis. There are a number, six or seven of them.
Q. Which ones are PENN Play casinos?
A. I know that River City and Hollywood, I believe, are the same membership. But I don't think that Ameristar or Horseshoe or Casino Queen, I don't have memberships at those; so . . .
Q. Where do you have memberships?
A. To PENN Play. To River City and Hollywood. And that's where the document came from.
Q. You still have that document?
A. Yeah. Yeah.
Q. Do you have it for other years?
A. I have it for '23 as well.

**Q. What about '24?**
A. Yeah, I have it for '23 and '24.
**Q. Have you provided all of those to your bankruptcy counsel?**
A. My bankruptcy counsel said he only needed the one in the past 12 months from '24. I offered the one from 2023, he said it wouldn't be necessary.
**Q. Understood. So, again, to be clear, I'm not asking what your bankruptcy counsel told you. Just asking what documents you gave him or not.**
A. Yes, I provided him the 2024 loss. Yes.
**Q. The 2023 and 2024 PENN Play documents, have you provided them to Mr. Butler for production in this case?**
A. No, I have not.
**Q. All right. I think we can move on to the next exhibit. We have a couple more.**
MR. TEREPKA: Are you good to continue or maybe we could take a five-minute break?
THE WITNESS: It's up to you, sir.
MR. BUTLER: Up to you.
MR. TEREPKA: All right. Let's take a five-minute break.
THE WITNESS: Okay.
MR. TEREPKA: Thank you. Off the record.

(Whereupon, a short break was taken.)
(Exhibit 7, Fisher Investments, Inc.'s First Set of Interrogatories and Requests for Production to Mr. Human Related to Fisher's Damages, was marked for identification.)

**Q. (By Mr. Terepka) All right. Back on the record. We're going to cover what will be marked as Exhibit 7.**
**Exhibit 7 in front of you, Mr. Human, are the requests for production and interrogatories that Fisher Investments served on you during the damages discovery phase of this case. Do you see that?**
A. I do.
**Q. I want to focus your attention to the document request starting on page 11 of this exhibit.**
A. Yes.
**Q. This request seeks all TCPA settlements you have entered with any party. Do you see that?**
A. Yes.
**Q. Have you provided any of those to your counsel for production in this case?**
A. Those that I have, yes.
**Q. And how many is that?**
A. I don't know.

**Q. You testified previously that you didn't have any because you deleted them?**
A. Correct.
**Q. So if you deleted them, you didn't have any to provide to counsel; correct?**
A. Counsel has copies of the ones that he has, which I believe is what we provided you.
**Q. Understood. I'm just asking about whether you personally gave your counsel any copies of settlement agreements for production in this case.**
A. I gave him what he has. He represented me; so obviously he has those documents. So I didn't have anything in addition to give him.
**Q. So understood that your counsel produced settlement agreements that your counsel separately had from you.**
A. Yes.
**Q. What I'm asking is, did you have any settlement agreements --**
A. No.
**Q. -- on your own that you gave to him?**
A. I did not.
**Q. And, again, please let me finish the question. We'll get through this faster.**
**Request 7. This request asks for all**

**retention, retainer, or other agreements between you and Mr. Butler. Do you see that?**

A. I do.

**Q. Do you have a retainer agreement with Mr. Mr. Butler?**

A. A signed written agreement? No.

**Q. Do you have any written agreement with Mr. Butler?**

A. Written agreement? No.

**Q. What type of agreement do you have with Mr. Butler?**

A. It's a verbal agreement that you referenced earlier that he would get 33 percent of the proceeds.

**Q. Request number 9. Oh, before we move on to number 9, did -- do you have a written agreement with Mr. Marks about his representation of you?**

A. I do not.

**Q. You have only a verbal agreement with him, just like with Mr. Butler; is that correct?**

A. That's correct.

**Q. Request for production 9 asks for all correspondence or demand letters you sent or were sent on your behalf alleging TCPA violations. Do you see that?**

A. I do.

Q. So separate from what your counsel may have, did you give to your counsel any of these documents for production in this case?
A. No.
Q. And that's because you deleted them; correct?
A. That's correct.
Q. Number 10, all communications you received in response to your correspondence or demand letters alleging violations of the TCPA. Do you see that?
A. I do.
Q. Separate from anything your counsel may have, did you provide to your counsel any of these documents for production in this case?
A. No.
Q. Because you deleted them; correct?
A. Correct.
Q. Request number 11, all documents in which a defendant or opposing party asserted in response to your pre-suit correspondence you sent or a complaint you filed that they had a consent or opt in to call your phone number. Do you see that?
A. I do.
Q. Separate from anything your counsel may have, did you provide to your counsel any of these

**documents for production in this case?**
A. No.
**Q. Because you deleted them; correct?**
A. Correct.
**Q. Number 12, all lead certificates, including from Jornaya or TrustedForm, you have received from anyone you claimed violated the TCPA. Do you see that?**
A. I do.
**Q. Separate from anything your counsel may have, have you provided your counsel any of these documents for production in this case?**
A. Not even sure I know what they are.
**Q. So has a defendant in any of your cases sent you a document that they say proves they had consent to call your phone number?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
**Q. Do you know what a Jornaya report is?**
A. I do not.
**Q. Have you heard the term "Jornaya"?**
A. I've heard the word. I don't know what it is, though.
**Q. Have you heard the term "TrustedForm"**

**before?**

A. No. I'm not familiar with it. If I've heard it, I don't recall it. I don't know what it is.

**Q. In cases in which you had counsel like Mr. Butler or Mr. Marks, if a defendant claimed consent with a lead certificate or anything else, your counsel would have those documents; right?**

A. Yes.

**Q. Request number 13, all documents showing your monthly income from any source in the past four years. Do you see that?**

A. I do.

**Q. Have you provided your counsel any of those documents for production in this case?**

A. Documents? I don't think so. I don't think so.

**Q. Have you provided Mr. Butler any bank statements from your First Community Credit Union account for production in this case?**

A. Bank statements? No.

**Q. Any bank records at all?**

A. I don't think I have.

**Q. Request number 14, similar questions. This one asks for all documents evidencing your receipt of settlement funds in TCPA cases since January 1, 2022.**

Do you see that?
A. I do.
Q. Have you provided your counsel any documents responsive to 14?
A. Beyond what he has, no.
Q. What do you think he has?
A. Whatever he's given you.
Q. What do you think he's given to Fisher?
A. I assume he's given you settlement agreements that would list this.
Q. Any bank records?
A. No.
Q. Request number 14 [sic], all documents evidencing your distribution of settlement funds to others since January 1, 2022. Do you see that?
A. I do.
Q. Have you provided any records showing that to your counsel, Mr. Butler --
A. No.
Q. -- in this case? Can you say your answer again, please?
A. No.
Q. We can move on from that exhibit.
You previously testified in this case that you threw away a desktop computer two days before the

**court ordered device inspection on January 27, 2025.**
**What kind of desktop computer was it?**
A. Old.
**Q. Was it a Windows desktop?**
A. I mean, it had Windows, the older Windows version on it.
**Q. Which version?**
A. I don't know. What's the newest one?
**Q. I don't know either.**
A. Yeah, I don't know.
**Q. Was it Windows XP?**
A. I'm just not a -- I'm not a tech guy; so I don't know which Windows version. I just know you could create a Windows doc, a Word document off of it.
**Q. Where did you get that desktop computer?**
A. It was -- I think it was left at Square One before they moved their office from Creve Coeur down to Bourbon, Missouri. So it would have been in early '22 -- early '23 or late '22. It was an older one that had been used and really wasn't of much value.
**Q. Did you buy it from Square One?**
A. Yeah. They had a little auction. You could buy some of the equipment they were getting rid of.
**Q. How much did it cost?**
A. Oh, I can't remember. I think I paid 50 or

a hundred bucks for it.
**Q. You paid that to Square One?**
A. Yeah.
**Q. At the auction; correct?**
A. Yes. Correct.
**Q. Did you keep it at your house?**
A. Yes.
**Q. What did you use it for?**
A. Just to have one at the house. I didn't really use it a lot until I left Square One; so . . .
**Q. And after you left Square One, you started using it more?**
A. Yes.
**Q. For what?**
A. To create Word documents. I was working on a -- I'm a recovering alcoholic, and I've written a program called SOAR to use to help other alcoholics that have been in prison and stuff. So I used it for personal stuff like that.
**Q. Did you use it to prepare Word documents for your TCPA cases?**
A. Yes.
**Q. Was it the primary device you used to create Word documents for your TCPA cases?**
A. Yes.

**Q. And you used it for that purpose until January of this year; correct?**
A. Yeah, I'm assuming that's about when. That sounds accurate, yeah.
**Q. How did you destroy it?**
A. Well, it was old. And, in fact, some of the emails that I actually tried to send Ed didn't go through. I wasn't getting emails on it. I had broken the on/off button. I had actually put a -- what's the fingernail file thing you call -- I'd actually had to put that in to turn it on and off because it was -- it had been bad for months.
**Q. And you used it for years to send emails about your TCPA cases?**
A. Years? Maybe a year.
**Q. At least a year?**
A. Yeah, I'd say about a year. Yeah.
**Q. How did you destroy it?**
A. I kicked it because I got mad at it because I couldn't retrieve the SOAR document.
**Q. How many times did you kick it?**
A. Just once because it hurt my foot.
**Q. What did you do with it after you kicked it?**
A. Threw it in the trash.
**Q. What trash?**

A. The trash that gets picked up at my sister's.
**Q. What's trash day at your sister's house?**
A. I don't know. I don't know.
**Q. It's a weekday; right?**
A. I'm sorry?
**Q. It's a weekday; right?**
A. Yeah, I think it's either Thursday or Friday.
**Q. So you threw it in the trash on January 25th this year; right? That's what you testified previously; correct?**
A. I don't know if that's the exact date, but around that date, yes.
**Q. Okay. Well, we can look --**
A. Around that date, I'm sure.
**Q. -- at your previous testimony to clarify. You previously testified that you threw the computer away on January 25th; correct?**
A. Well, if that's what I testified to, yes.
**Q. Let's just look at the testimony.**
A. Could have been one day before, one day after. If I testified to the 25th, that's what my recollection was at the time.
**Q. And that was Saturday; right?**

A. Yeah, 25th would have been Saturday. Yeah.
**Q. Like you previously testified?**
A. Could have been the 24th, which is Friday. I don't -- I'm not sure. It was one day or the other. It was one or the other.
**Q. Well, assuming -- well, tell me more about where exactly you put it.**
A. In the trash.
**Q. And what does that look like at your house?**
A. Like it's a trash recycle --
**Q. Is it a bin inside?**
A. -- a bin. It's like a bin outside that trash truck comes and picks up.
**Q. So you put it in the trash bin outside your house --**
A. Correct.
**Q. -- on Saturday, January 25th?**
A. Or Friday the 24th, one of them. If I testified to the 25th, maybe it was the 25th. It could have been the 24th. I don't know.
**Q. Okay. The device inspection was on January 27?**
A. Correct.
**Q. That Monday?**
A. Yes.

**Q. At the time of the device inspection, that desktop computer was still sitting in the trash at your house. Isn't that true?**
A. Well, or it was gone, one or the other.
**Q. If the trash hadn't been picked up, it was still sitting at your house in the trash; right?**
A. Again, I don't know exactly what day it was. I know I testified to the 25th. It could have been the 24th. The best of my recollection at the time -- I don't know, when did I testify? In March or something or -- when was the hearing?
**Q. March 28th or 29th.**
A. Yeah. So to the best of my recollection, it was the 24th or 25th. If I said the 25th, it may have been the 24th, but I know that I put it in -- I tossed it into the trash receptacle outside of the house.
**Q. Did anybody see you kick it?**
A. No.
**Q. Did anybody hear you kick it?**
A. No.
**Q. Did anybody see you throw it away?**
A. See me throw it away? If someone had been walking by the sidewalk, they might have. I don't recall seeing anybody. I didn't notice at the time.
**Q. You didn't take it out of the trash to bring**

**to the device inspection, did you?**
A. I don't know that it was still in the trash.
**Q. Did you look at all?**
A. Well, no, I -- it was useless. It wouldn't even turn on. Couldn't even turn it on.
**Q. Do you still have any part of it?**
A. No.
**Q. Do you still have any devices connected to it?**
A. No.
**Q. Did Melody use that computer?**
A. Never.
**Q. Did she know you threw it out?**
A. I think she did.
**Q. How's that? You tell her?**
A. I think I mentioned it to her, yeah.
**Q. When did you mention it to her?**
A. I don't remember.
(Exhibit 8, Emails, were marked for identification.)
**Q. (By Mr. Terepka) All right. I'm going to cover briefly one exhibit. We're on exhibit -- will be Exhibit 8. Okay. Exhibit 8 --**
A. Yes.
**Q. -- focusing first on the bottom of the first**

page. There's an email from you, email address danlovestopolo@gmail.com, to jruley@wtlaw.com, subject, Human versus Cox Automotive. Do you see that?

A. I do.

Q. And you wrote to Mr. Ruley, I apologize for this inconvenience. I had some terrible meltdown of my geriatric computer this weekend and had to replace it. Do you see that?

A. I do.

Q. And you're referring there to the desktop computer that you destroyed that weekend; correct?

A. Destroyed?

Q. That you threw in the trash --

A. That I threw in the -- yes.

Q. -- that weekend; is that right?

A. Correct. Yes.

Q. And let me cover that again so we don't speak over each other.

In this email, you're referring to the desktop computer that you threw in the trash the weekend before January 29; correct?

A. Correct.

Q. You also refer to a new email address. Do you see that?

A. I do.
**Q. Why did you get a new email address around this time?**
A. I don't remember why I didn't just keep danh11polo, I'm not sure.
**Q. Do you still have access to danh11polo@gmail.com?**
A. No, I don't use it. I don't use it at all.
**Q. Can you log in if you want to?**
A. I don't know, I never tried.
**Q. You haven't tried?**
A. No.
**Q. And you haven't --**
A. To danh11polo? I've used just danlovestopolo.
**Q. Since January 2025 --**
A. Yeah.
**Q. -- you use danlovestopolo@gmail.com; right?**
A. Well, it says February 4th; so sometime, yeah.
**Q. The next email says February 4th, but the first email --**
A. Yeah, January 29 --
**Q. -- in the thread is January 29th.**
A. -- correct.

**Q. So around the time of January 29, 2025, you started using danlovestopolo@gmail.com?**
A. That's correct.
**Q. Danh11 -- well, let me just get -- make sure I have the email correct. What's your other email address?**
A. Previously?
**Q. Yeah.**
A. It was danh11polo@gmail.
**Q. Have you accessed that email account to look for documents that Fisher has asked for in this case?**
A. I don't recall. I don't think so. Anytime after January 29th I would have.
**Q. Have you ever looked for documents stored on danh11polo@gmail.com for documents that Fisher has asked for in this case?**
A. Previously, if there was something I had sent to Ed, I may have.
**Q. Do you remember ever doing that?**
A. I don't recall. I'm sure I did. I don't recall. But, I mean, I -- you know, obviously, the discovery was before that; so there may have been some emails or something I sent to Ed. I don't know if it would include other information or not. I -- I don't recall.

**Q. Have you accessed danh11polo@gmail.com this month to look for documents Fisher has asked for in this case?**
A. No. No. No.
**Q. Have you accessed danlovestopolo@gmail.com this month to look for documents Fisher has asked for in the case?**
A. I'm not sure.
**Q. Have you ever accessed danlovestopolo@gmail.com to look for documents Fisher has asked for in this case?**
A. I may have.
**Q. But you don't know whether you did?**
A. I don't recall if I did under that email or not. I don't think I would have, but I may have.
**Q. Do you remember providing any documents from either of these Gmail accounts to your counsel for production in this case?**
A. I don't recall that I didn't.
**Q. Do you recall that you did?**
A. Either way, I'm not sure.
**Q. You haven't produced any emails from either of these Gmail accounts in this case, have you?**
A. Any emails from them? Well, obviously I've had emails back and forth to Ed.

**Q. I'm asking if you've produced to Fisher in this case any email from either account. You haven't, have you; correct?**

A. I would say based upon the advice of my counsel, I'm going to invoke the Fifth Amendment privilege against self-incrimination, and I'm going to decline to answer the question.

**Q. I'm just asking for your understanding of what you've produced in this case.**

A. I'm going to decline to answer the question. Taking the Fifth Amendment.

**Q. Okay. So moving on to the end of this. It says, please address any new emails to this address --**

A. Correct.

**Q. -- Exhibit 10 [sic]. Do you see that?**

A. I do. I saw it.

**Q. And that was your request to Mr. Ruley to send emails to danlovestopolo@gmail.com?**

A. That's correct.

**Q. Are you still using that email?**

A. Yes.

**Q. You still have access to it?**

A. Yes.

**Q. When was the last time you deleted emails in that email address?**

A. From that email address?
**Q. Yeah.**
A. I don't recall if I have. I don't -- I don't know.
**Q. Do you still have emails you've received in that account?**
A. I'm sure I do.
**Q. Okay. What is your understanding of the documents you have produced to Fisher in this case?**
A. My understanding? What do you mean my understanding?
**Q. What do you think you've produced to Fisher in this case?**
A. Well, over and above any of the objections that we listed to the request for the documents or discovery, I produced whatever is available that relates to the case.
**Q. I'm asking what do you think you have produced in terms of documents to Fisher in this case?**
A. I'm going to decline to answer based upon the Fourteenth Amendment against self-incrimination and on the advice of counsel, I'm not going to answer.
MR. BUTLER: Fifth Amendment.
THE WITNESS: Fifth Amendment, I'm sorry.
MR. TEREPKA: Is that your advice, Mr.

Butler?
MR. BUTLER: No.
**Q. (By Mr. Terepka) You don't know what you've produced to Fisher in this case; isn't that true?**
A. I don't know.
**Q. Okay. Just a few more exhibits here. Your counsel, Mr. Butler, told Fisher's counsel that you would comply with the device inspection at 10:00 a.m. Central Time on January 27, 2025; correct?**
A. I believe so, yeah.
**Q. And you knew that was the scheduled inspection time because that's what your counsel proposed; right?**
A. Yes.
**Q. But you waited until less than two hours before 10:00 a.m. Central on January 27 to try to voluntarily dismiss your case; isn't that true?**
A. Well, on the advice of counsel, I am going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
(Exhibit 9, Notice of Electronic Filing, was marked for identification.)
**Q. (By Mr. Terepka) I'm going to mark Exhibit 9. This exhibit is a notice of electronic filing from the U.S. District Court, Eastern District of Missouri.**

**Do you see that?**
A. I do.
**Q. And it says, the following transaction was entered by Butler, comma, Edwin on January 27, 2025, at 8:48 a.m. CST. Do you see that?**
A. I do.
**Q. The docket text of what he filed is notice of voluntary dismissal by Daniel Human. Do you see that?**
A. I do.
**Q. So this shows you filed the notice of voluntary dismissal at 8:48 a.m. CST on January 27; correct?**
A. Correct.
**Q. That was less than two hours before the 10:00 a.m. device inspection; correct?**
A. That's correct.
**Q. When did you first decide to file this notice of dismissal?**
A. Upon the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
**Q. Why did you file the notice of dismissal?**
A. Well, the court had given us the amended complaint which included another party, and we

voluntarily dismissed it because we considered -- having included a third party, obviously, it changed the landscape.

**Q. You filed it to try to avoid the 10:00 a.m. device inspection; isn't that true?**

A. Those are your words, sir, not mine. We certainly did not calculate this dismissal, this filing, in order to avoid anything.

**Q. Then why did you wait to file it --**

A. Well, I think that's -- that's unfair of you to characterize it like that, to say we did that in order to avoid -- there -- you have no proof of that. There's no proof that we did that. We filed it when we filed it. We could have filed it the Friday before.

**Q. But you didn't, did you?**

A. No, we didn't.

**Q. You waited until less than two hours before the device inspection to file it; isn't that right?**

A. You characterized it, sir, as that's why we did it. That's -- I take issue with that. I don't believe that's true. And anything beyond that, I'm going to invoke the Fifth Amendment against self-incrimination and refuse to answer the question any further.

**Q. Your counsel, Mr. Butler, stated at the hearing in this case in March that he was not in agreement with your filing the dismissal and filing the appeal and that he argued against those filings. Starting with your decision to file a dismissal, is it true that Mr. Butler argued against your filing dismissals in this case?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer the question.
**Q. Is it true that Mr. Butler argued against your filing an 8th Circuit appeal in this case?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer the question.
**Q. And you're doing that because you think answering the question would incriminate you; correct?**
A. I'm doing it because I'm entitled to under the Fifth Amendment.
**Q. When you believe, as Judge Schelp said, that the answer would be incriminating -- incriminating; correct?**
A. That it could -- could be. That it could be, yes.
**Q. So you think your answer could be**

**incriminating; correct?**
A. Possibly.
**Q. And that when you've been invoking the Fifth Amendment privilege, you're doing that because you think the answer could be incriminating; correct?**
A. Yes.
**Q. When did you decide to file an 8th Circuit appeal?**
A. I don't recall.
**Q. Why did you think you could file an 8th Circuit appeal?**
A. I don't recall.
**Q. How many different people do you receive communications for on your cell phone?**
A. I don't know. I don't recall.
**Q. Do you receive communications for people other than you?**
A. Other than me on my cell phone? No.
**Q. Yes. What about on the cell phone that you received the calls on from Fisher Investments, did you receive calls on that phone intended for other people?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer the question.
**Q. You received from Fisher on that phone calls**

**intended for someone named Veronica Moreno, didn't you?**

A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer the question.

**Q. How many people other than Veronica Moreno have you received communications for on your cell phones?**

A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.

**Q. Who is Veronica Moreno?**

A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer the question.

**Q. Do you know anyone by the last name of Moreno?**

A. Actually, I do.

**Q. Who?**

A. Her name is Misty Moreno. She used to work at Square One.

**Q. Did you work with her there?**

A. Yeah.

**Q. You still in touch with her?**

A. No.

**Q. Does she have any relationship with Veronica Moreno?**
A. Not that I'm aware of.
**Q. Do you know someone named Michael Liljenquist [as pronounced]?**
A. Who?
**Q. Michael Liljenquist?**
A. No. Michael Liljenquist?
**Q. Have you ever received communications on any of your phones addressed to a Michael Liljenquist?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
**Q. Do you know anyone by the name of Tawanda?**
A. No, I do not.
**Q. Have you received any communications on any of your phones addressed to Tawanda?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
**Q. Have you received any communications on your phones addressed to a Stacy?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege and decline to answer.

Q. Email address hazeleye43@yahoo.com, is that one of your email addresses?
A. No, it is not.
Q. Summertime8677@yahoo.com?
A. No, it is not.
Q. Stripes86@yahoo.com?
A. Is that one of my email address? No.
Q. Snowy12370@yahoo.com, is that one of your email addresses?
A. So you're asking me all of these -- are these email addresses that I use?
Q. Have you ever used them?
A. No.
Q. Wedon'tneedroads48@yahoo.com, is that an email address you've ever used?
A. No.
Q. Nevercrossstreams87@gmail.com, is that an email address --
A. No.
Q. -- you've ever used?
A. No.
Q. We've covered danh11polo, danlovestopolo. Do you still have access to dh68litigation@yahoo.com?
A. No.
Q. When did you last try to log into that email

address?
A. I don't -- I don't recall.
Q. Do you -- if you wanted to log in to that email address, do you have a password you could use to try?
A. I don't recall.
Q. You haven't tried, though?
A. No.
Q. Danialahuman@icloud.com from Exhibit 3, do you still have access to that email address?
A. No.
Q. You were using that email in December of last year and your testimony is you don't have access to it anymore.
A. No.
Q. Why not?
A. I don't use it; so I don't -- assume I don't have access. I wouldn't know what a password was or anything like that. I haven't used it.
Q. Well, you used it several months ago. Why did you stop using it?
A. Half a year ago, yeah.
Q. Why did you stop using it?
A. Because I use danlovestopolo@gmail.com.
Q. You've changed email addresses a lot, Mr.

**Human. Why do you do that?**
A. A lot? I've had three or four.
**Q. Why do you change email addresses?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and refuse to answer the question.
**Q. Have you ever completed a form on the internet asking to receive calls from a business?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
**Q. Have you ever asked someone else to complete a form on the internet asking to receive calls from a business?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination, decline to answer the question.
**Q. Are you aware of anyone else submitting your phone numbers on online forms to businesses?**
A. On the advice of counsel, I'm going to invoke my Fifth Amendment privilege against self-incrimination and decline to answer the question.
MR. TEREPKA: Can we take a five-minute break and then wrap up pretty soon.
THE WITNESS: Sure. Sure.

MR. TEREPKA: All right. Off the record.
(Whereupon, a short break was taken.)
**Q. (By Mr. Terepka) All right. Back on the record.**
**Mr. Human, I just looked at the bankruptcy docket in your bankruptcy case, and there is no amended filing.**
A. Have to talk to Mr. Gunn. I signed it.
**Q. When did you sign it?**
A. Today's Wednesday, I think Monday.
**Q. And all the amendments you discussed previously in your testimony, those are included in the document you signed on Monday. Is that your testimony?**
A. That's correct.
**Q. Other than Mr. Marks and Mr. Butler, have you used any other counsel in TCPA cases?**
A. No, I have not.
**Q. Have you used Andrew Heidarpour in TCPA cases?**
A. Who?
**Q. Andrew Heidarpour?**
A. Never heard the name.
**Q. You've never heard of him?**
A. Andrew Heidarpour?

**Q. Correct.**
A. Never heard the name. Who is he? I've never heard of him.
MR. TEREPKA: Sorry, I need to silence my phone.
I have no further questions.
THE WITNESS: Andrew Heidarpour? I don't even know who that is.
MR. TEREPKA: All right. Well, I think we're all done here.
MR. BUTLER: I don't have any questions. Thank you.
COURT REPORTER: Signature? Read or waive?
MR. TEREPKA: Well, a couple small things. Fisher's position is that it's going to hold open the deposition in light of documents that haven't been produced. Understand your position probably disagrees with that, but that's for another day.
And unless either of you have anything else, I think we're concluded for today.
MR. BUTLER: Nothing else, yeah.
THE WITNESS: And I'm not being asked to sign this until I see it; correct?
COURT REPORTER: So, Counsel, signature? Are you reading or waiving?

MR. BUTLER: Well, I would waive, but I think I was just told that he wants to read it.

THE WITNESS: Yeah, no, I'm going to read it before I waive any signature. I want to read everything that's -- that's been done.

COURT REPORTER: Okay. And then orders for the record. Transcript orders.

MR. TEREPKA: We'll take a rush.

COURT REPORTER: E-tran or PDF?

MR. TEREPKA: PDF.

COURT REPORTER: When do you want it rushed by?

MR. TEREPKA: End of week.

MR. BUTLER: What's your estimate on what that might cost?

COURT REPORTER: No idea.

MR. BUTLER: Okay. This is -- you know, can you -- do you think that you could take care of the cost of getting the transcript, or do you need a little bit of time or what?

THE WITNESS: I don't -- obviously, I don't have the money to pay for it.

MR. BUTLER: I have your card. After I talk to Mr. Human, I'll let you know if the firm is going to do something, but I think we're going to rely on

Mr. Human to do it.

COURT REPORTER: Okay.

(Thereupon, the deposition of DANIEL HUMAN was concluded at 1:57 p.m.)

SIGNATURE NOT WAIVED

- REPORTER'S CERTIFICATE -

I, REBECCA L. TUGGLE, a Certified Court Reporter within and for the State of Missouri, do hereby certify that the foregoing is a true and accurate transcription of my notes and is a true record of the testimony given by the foregoing witness.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of June, 2025.




Rebecca L. Tuggle, CCR-MO 1053, CSR, RPR
Certified Court Reporter within
and for the State of Missouri

- DEPOSITION ERRATA SHEET -

IN RE: Daniel Human, individually and on behalf of all others similarly situated, vs. Fisher Investments, Inc.

Upon reading the deposition transcript and before subscribing thereto, the witness indicated that:

Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:
Page Line should read:
Reason assigned for change:

______________________________
DANIEL HUMAN

- WITNESS SIGNATURE PAGE -

I, DANIEL HUMAN, hereby acknowledge that I have read the foregoing transcript of my deposition, given on the 4th day of June, 2025, by affixing my signature hereto.

__________________________________
(DANIEL HUMAN)

Subscribed and sworn to before me this _____ day of ____________________, 2025.

_____________________________________
Notary Public

My commission expires:________________________
Notary Public, within and for the State of Missouri

## $

**$1,280** 93:22,25
**$1,300** 110:25
**$1,369** 111:9
**$1,400** 110:23
**$1,500** 75:4
**$1,747.97** 100:25
**$10,000** 79:6
**$102,000** 99:20 100:11
**$11,000** 76:18
**$12,000** 70:21 72:23 81:19
**$120,000** 85:21
**$15,000** 118:3
**$20,000** 22:17,20 117:17
**$200,000** 52:4
**$270** 95:21
**$3,000** 34:21 35:3 59:16
**$37,500** 107:8
**$39,000** 22:22
**$4,156** 111:11
**$421** 98:8
**$5,000** 27:10 58:4,12 69:24 76:7 77:9
**$5,557** 94:10
**$5,570** 94:18
**$50,000** 52:22
**$6,000** 78:6 79:18
**$6,500** 22:24,25 23:5
**$6,508** 106:16
**$600** 93:8
**$657** 111:2
**$7,300** 101:9
**$700** 100:18
**$750** 111:6
**$86** 96:19 97:18
**$9,000** 77:13
**$947** 111:4

## 0

**0** 65:19 91:25
**0011** 33:18 59:13
**0015** 60:10
**0016** 60:13
**0018** 61:6
**0019** 61:10,11
**002** 27:9 58:3
**0022** 61:22
**0035** 63:16
**0039** 64:22
**009** 29:4 61:9
**0106** 75:10
**0116** 75:25
**0122** 76:12
**0123** 76:17
**0136** 76:25
**0142** 77:19
**0145** 78:22
**0151** 78:25
**0152** 79:5
**0159** 79:14
**0163** 79:25
**049** 65:18,19
**050** 66:18
**051** 67:13
**056** 67:8
**059** 69:13
**06** 75:11
**08** 11:3,18
**087** 70:13
**088** 71:11
**093** 71:6
**094** 72:14
**095** 72:20
**098** 73:14 74:18
**099** 74:21

## 1

**1** 21:21,24 27:7,8 54:21 55:13 60:21 66:25 67:13 72:20 102:23 103:7 106:14 126:25

127:15

**1,280** 92:24

**1,500** 23:3

**1,627** 92:17

**1,747** 101:6

**1.4** 101:14

**1.6** 71:11

**10** 10:6 11:24 39:12 124:8 139:15

**10423** 7:18 9:8 12:20

**1099-miscellaneous** 60:23

**10:00** 141:8, 16 142:16 143:4

**11** 34:22,25 35:2 94:25 95:5 121:16 124:18

**11,000** 118:14

**12** 47:17 109:25 118:1 120:6 125:5

**120,250** 81:10,23

**1245** 9:13, 22 102:10

**13** 89:19,22 96:17 113:6 126:9

**1355** 68:8

**14** 67:7 98:13 126:23 127:4,13

**142** 77:20

**15,000** 118:16

**16** 34:24 96:19

**17** 21:25 82:18 97:25

**17,537** 106:25

**19** 91:24

**19,300** 106:22

**1987** 90:25 91:6,15

**1994** 91:8

**1:57** 154:4

## 2

**2** 12:17 26:10,13, 16 33:17 58:1 63:23 66:17 67:23 75:17 78:6 79:5 81:10 102:10,17

**2,500** 115:5 116:20

**20** 12:1 15:22 41:17 82:1

**20,000** 115:1

**20-some-thousand** 114:22

**200** 94:21

**2020** 16:14, 22 17:1,4 41:2 101:10

**2021** 101:10

**2022** 126:25 127:15

**2023** 44:9 51:16 94:13 103:7 106:25 120:7,12

**2024** 21:25 39:12 40:3 51:7 102:25 106:21 120:11,12

**2025** 51:3, 10 65:4 82:19 89:16 92:10 97:8 108:21 110:8 128:1 136:16 137:1 141:9 142:4

**208 390-1355** 6:10 68:22

**21** 99:1

**22** 128:19

**23** 119:25 120:2 128:19

**24** 59:24 65:4 120:1,2,6

**24th** 132:3, 18,20 133:9,14, 15

**25th** 131:10,19, 23 132:1, 17,19 133:8,14

**27** 39:1 128:1

132:22 141:9,16 142:4,12

**27th** 40:9, 16

**28** 92:10 110:8

**28th** 133:12

**29** 86:20 88:2 89:16 108:21 135:22 136:23 137:1

**2988** 68:8

**29th** 133:12 136:24 137:13

### 3

**3** 23:7 39:4,5,7 55:13 65:24 90:13,16 92:15 149:9

**3,750** 60:15

**30** 14:15 50:2 98:13

**31** 102:4 103:7

**314 707-1892** 30:5

**314 915-2988** 7:2

**32** 106:8 109:7,17

**33** 110:10 111:18 123:13

**34** 111:24

**35** 112:2

**37,500** 103:7

**38** 12:17

**39** 12:17,18

**39,000** 22:15

### 4

**4** 80:16,18, 19 81:1 89:6 91:5 92:15 102:17 107:7 112:1,2,5

**4.4** 100:25

**4.5** 101:7

**4.6** 101:20

**40** 50:4

**40-some** 42:4

**41** 12:17 112:10 113:4

**42** 117:22

**45** 109:21

**4th** 136:19, 21

### 5

**5** 82:9,12 92:15,24 95:15 106:6 107:5,7,9, 12,17 108:5 109:18

**5,000** 23:4

**50** 44:17 128:25

**50,000** 91:25

**55** 90:16 91:21 92:12 94:7 95:5 96:17 99:1 102:4 106:10 109:7,17, 21,23 110:10 111:18,24 112:3,10 113:4 117:22

### 6

**6** 89:10,13, 15 91:21

**6,500** 22:15

**600** 113:8

### 7

**7** 90:23 92:2 95:7 121:2,9,10 122:25

**7,500** 67:1 75:18 80:4

### 8

**8** 92:12 134:19,23

**8,500** 63:24

**86** 96:22

**87** 70:14

**8:48** 142:5, 12

**8th** 144:12 145:7,10

### 9

**9** 88:15 90:18 94:7 123:14,15, 21 141:21, 24

**90** 101:13 110:15

**915-2988** 68:20

## A

**a.m.** 141:8, 16 142:5, 12,16 143:4

**access** 136:6 139:22 148:23 149:10,13, 18

**accessed** 137:10 138:1,5,9

**account** 27:16 34:8,11 53:12,14, 18 54:9 58:17,23 59:9 64:17,18 73:3,5 97:13,17 116:5 126:19 137:10 139:2 140:6

**accounts** 26:1 28:25 53:15,20 57:12,14 98:1,6,9, 11 138:17, 23

**accumulated** 100:6,10, 11

**accurate** 47:6,9 130:4

**accurately** 5:10

**accused** 104:19

**ACH** 27:15 35:9 53:11 58:9,16, 22,24 59:3,6,18 63:24 67:4

**acknowledged** 109:1

**acquired** 103:16

**Act** 101:16

**action** 23:7, 11,16 24:2

**actual** 54:14 104:5 108:11 118:6

**added** 23:4

**addict** 116:13 117:3,10

**adding** 99:20

**addition** 55:14 122:13

**address** 9:11,16 21:25 36:8 39:8 55:22 56:2 99:8 102:11,14 135:1,24 136:2 137:6 139:13,25 140:1 148:1,7, 15,18 149:1,4,10

**addressed** 22:11 39:15 147:10,17, 22

**addresses** 12:10 25:23 55:14,15, 19 56:1,5, 6,10,20 57:8,10 148:2,9,11 149:25 150:3

**adopted** 5:20

**advice** 6:6, 11,16,22 7:3,9 8:13,21,25 9:5 10:16, 21 12:21, 25 13:5, 11,20,24 14:3 15:12 16:23 17:5,13, 18,22 18:1,6,15, 20 19:9 21:4,9,13 24:4,8,21 25:16,21, 24 26:2 27:4,20 28:1,4 34:17 41:6 44:21 45:1 55:8 66:13 78:15,20 82:6 85:23 86:3,9 87:24 88:11,17 89:24 125:17 139:4 140:22,25 141:18 142:20 144:8,13 145:22 146:3,9,13 147:11,18, 23 150:4, 9,15,20

**Advisors** 79:2

**affairs** 102:6 110:3

**affected** 94:22

**age** 5:2 12:16

**Agency** 79:1

**agree** 62:8 65:1,9 83:2,25

**agreed** 27:9 58:6 59:16 62:2,5 72:22 82:9,15

**agreement** 26:22 27:7 33:19 34:20 35:3 51:10 60:1,14 61:23 63:18 64:23 68:12,15 69:15 70:16,17 71:17,21 72:16 73:16,18, 24 74:1,3, 22 75:12, 25 76:14 77:2,21 79:1,14 80:1 83:3, 5 84:2 123:4,6,7, 9,10,12, 15,18 144:3

**agreements** 26:10,17 50:6,10, 13,16 51:2,6,18 52:11,12 53:5 111:17 122:10,15, 19 123:1 127:10

**agrees** 68:1

**ahead** 70:15 105:18

**ahuman@cloud. com.** 39:10

**alcoholic** 129:16

**alcoholics** 129:17

**Alex** 45:4 96:24 113:22

**alleged** 6:9, 15,21 78:1

**alleging** 123:23 124:10

**Alleviate** 26:23 27:2,9 58:6

**allocating** 67:16

**amend** 104:12,25 108:13

**amended** 103:19,21 109:2 113:18 114:14 142:24 151:7

**amending** 108:25

**Amendment** 6:7,12,17, 23 7:4,10 8:14,22 9:1,6 10:17,22 12:22 13:1,6,12, 21,25 14:4 15:13 16:24 17:6,14, 19,23 18:2,7,16, 23 19:3,5, 8,10 20:4, 9,13,24 21:5,10,14 24:5,22 25:17,21, 25 26:3,7 27:5,21 28:2,10, 14,19 29:1,11 34:18 41:7 44:22 45:2 55:9 66:14 70:11 78:16,21 82:7 85:24 86:4,10 87:25 88:12,18 89:25 105:19 125:18 139:5,11 140:21,23, 24 141:19 142:21 143:23 144:9,14, 19 145:4, 23 146:4, 10,14 147:12,19, 24 150:5, 10,16,21

**amendments** 151:11

**American** 60:14 76:15 110:23

**Ameristar** 119:17

**amount** 27:9 52:13 58:4,6,14, 22 59:21 60:5,15 63:23 64:8 66:25 67:21 69:24 70:21 71:3 73:9 75:4, 18,23 76:7,18,23 77:9,13,17 78:7 79:6, 12,18,23 80:4,11 81:8 94:17 97:5 98:8 101:17 110:19,22

**amounts** 72:11 110:15,16

**Amy** 42:8

**Amy's** 42:10

**Andrew** 42:22 151:19,22, 25 152:7

**Android** 38:24

**Angelo** 5:13, 17

**answering** 19:13 144:17

**answers** 110:2,5

**anymore** 149:14

**Anytime** 137:12

**apartment** 99:12 102:10

**apologize** 119:6 135:6

**App** 115:23, 24 116:2, 3,5,19

**Apparently** 113:3

**appeal** 144:4,12 145:8,11

**appears** 29:7 58:8 61:21 66:6

**Apple** 111:6, 18,22

**approach** 86:15,16, 18

**approached** 86:17 88:5

**approximately** 52:25

**April** 37:7 40:20,21 86:20 88:2 89:16 92:10 97:8 98:8 108:21 110:7

**area** 12:12, 14

**Argosy** 119:10

**argued** 144:4,6,11

**Arkansas** 57:2

**arrangement** 27:24 47:7 58:12

**arrive** 22:20,22

**asks** 102:17 106:5,10 122:25 123:21 126:24

**asserted** 124:19

**asset** 94:4

**assets** 91:24

**assist** 49:3, 5

**assisted** 49:11

**Associates** 83:21,24

**Associations** 74:23

**assume** 14:13 50:14 61:13 74:6 97:14 127:9 149:17

**assumed** 50:20

**assuming** 25:8 51:17,19 59:23 130:3 132:6

**assumption** 100:14 117:1

**attached** 22:6,10

**attachments** 110:3

**attention** 33:17 73:20 121:15

**attorney** 69:20 81:15

87:6,8 90:2 103:15 112:24 118:22

**attorney's** 100:11

**attorneys** 67:17

**auction** 128:22 129:4

**August** 90:25 91:5

**auto** 111:11

**automatically** 99:13

**Automotive** 63:19 66:21 135:3

**avoid** 45:12 143:4,8,12

**award** 100:15

**aware** 7:6 9:3 10:19 14:23 16:1,17, 18,20 17:3 32:10 47:22 54:7 71:14,20 72:4 114:7 117:14 147:3 150:18

**B**

**back** 24:12, 15 25:10 29:15,17 30:6,9 33:16 54:21 58:1,3 67:13 71:11 89:3 96:15 104:10 105:2 107:12 121:7 138:25 151:3

**bad** 130:12

**bailiff** 40:15

**Ballwin** 9:10 99:12 102:11

**bank** 28:17, 21 53:9, 12,13,15, 18,20 54:3,5,9, 14 73:2,5 115:15 126:17,20, 21 127:11

**bankruptcy** 52:7 54:11,15 86:7,8,11, 13,16,20 87:1,5,7, 13 88:2,4, 8,16,20 89:13,16, 22,23 90:2,6,7, 10,20 91:3,5,11 94:22 99:4 101:18,19, 24 102:7, 25 103:15 104:25 105:16 106:1,15 108:16 112:14,15, 19,24 113:7 118:22 120:4,5,9 151:5,6

**based** 139:4 140:20

**basis** 22:25

**Bates** 29:4 63:16

**Bates-stamp** 61:6 66:17,18

**Bates-stamped** 27:8 33:18 34:22 58:3 59:13

**beg** 41:11

**behalf** 5:4 123:23

**benefit** 60:8

**Benepath** 70:16,18

**bill** 12:24 101:12

**bills** 97:16 115:13

**bin** 132:11, 12,14

**birth** 5:14, 16

**birthdays** 115:6

**bit** 45:15 70:15 153:20

**blue** 90:13

**bottom** 29:3, 5 39:21,25 60:11 61:6 78:23 81:9 134:25

**bought** 40:23 116:12,14

**Bourbon** 128:18

**break** 29:10, 14,19 35:14 42:16 88:23 89:2 120:19,23 121:1 150:24 151:2

**Brentwood** 95:25 96:1

**briefly** 9:10 48:5 54:22 67:8 134:22

**bring** 85:1, 10 133:25

**bringing** 17:16 85:17

**broken** 93:4 130:8

**Brokerage** 98:15

**brought** 14:10,13

**bucks** 96:23 129:1

**Build** 80:1

**business** 41:25 48:18 49:7 68:1 102:19 150:8,14

**businesses** 150:19

**Butler** 18:15,19 19:7,15 20:1,20 21:19,20 24:9,10,16 26:13,14 27:12 28:5,6,12, 23 35:6 45:4,7,14, 20 46:11, 13,21 47:3,20 48:3 50:9 54:12,18 55:20,24 58:9,12, 13,21 59:3,16,20 60:18 61:3,16 64:6 65:15 69:7 70:24 71:2 75:1, 7,20,22 76:20,22 79:8,11,20 80:7,10 81:16 82:13 88:6 89:11 90:5 96:24 99:24 100:2,4,7 106:1,5 113:22 114:2,6 116:23 118:24 120:13,21 123:2,5,8, 11,19 126:5,17 127:18 140:23 141:1,2,7 142:4 144:1,6,11 151:16 152:11,21 153:1,14, 17,23

**Butler's** 28:21,25 60:3 61:12

**button** 130:9

**buy** 40:17 95:22 111:20 128:21,23

## C

**C-H-E-R-V-I-T-Z** 11:10

**calculate** 118:8 143:7

**calendar** 102:19,25 103:6 106:12,21, 25 107:15

**call** 22:16, 24 23:1,3, 4,5 24:25 27:3 29:12 33:25 49:20 54:24 55:1 62:11,16 65:13,24 70:5,9 73:12,18, 23 74:5 79:15 85:15 87:10 95:15 104:23 124:21 125:16 130:10

**called** 41:14 87:11,12 104:2 129:17

**calls** 25:13 145:20,21, 25 150:8, 13

**car** 93:11, 17 94:4

**card** 32:16 96:4,9,15,

16 97:14 100:19,22 111:6,8,18 153:23

**cards** 110:12,17, 20 113:16

**care** 101:13 153:18

**CARES** 101:16

**Carroll** 42:3

**case** 6:9, 15,21 14:11,12 17:25 19:16 22:16 23:12 26:5,18 31:7 32:12,21 39:23 40:7 43:8,11, 15,20,24 44:2 46:3 47:23 50:25 51:12,20 52:11,20 53:24 58:8 59:23 62:6,9 63:6 64:2, 5 65:3,15 66:23 68:25 69:1,8,18 70:4 72:17 75:1,15 77:5 78:19 80:2 81:18 82:22,25 83:9 88:7 90:8 91:15 96:13,14 106:2 118:11,21 120:14 121:13,22 122:10 124:3,14 125:1,12 126:14,19 127:20,24 137:11,16 138:3,7, 11,18,23 139:2,9 140:9,13, 17,19 141:4,17 144:2,7,12 151:6

**case-** 46:12

**cases** 19:4 20:1,8 24:3,20 27:24 45:19,21 46:5 47:21 48:3 50:7 63:4 87:21 98:18 112:13 125:14 126:4,25 129:21,24 130:14 151:17,20

**cash** 96:13, 19,21,23 97:1,4,5, 11,13,14, 16,17,23 115:8,20, 21,23,24 116:2,3,5, 19

**Casino** 119:12,17

**casinos** 118:8,15 119:1,10, 14

**cell** 6:20 13:8,10,17 30:14 31:1 37:2 93:11 95:9,11, 12,16 145:14,18, 19 146:7

**Center** 95:23

**Central** 141:9,16

**certificate** 126:6

**certificates** 125:5

**certified** 23:17,24 24:19

**certify** 24:1,2

**chambers** 29:13 40:13 68:21,23 69:2

**change** 5:18 28:9 150:3

**changed** 5:21 143:2 149:25

**Chapter** 89:19,22 90:23

**characterize** 143:11

**characterized** 143:20

**Charles** 119:11

**Charter** 36:14

**Chase** 111:4

**check** 32:19 59:2,3,5 64:13 97:20 99:2 101:3,4

**checking** 97:13

**checkings** 97:25

**checks** 59:7 64:14

**Chervitz** 11:4,8

**Chicago** 12:14 69:16

**child** 5:24

**children** 11:4,11,14 12:5,15

**Chris** 20:12 42:3 47:25

**Christine** 12:7

**Christmas** 115:5

**Cindy** 9:24, 25 10:8,25 114:12 115:7

**Circuit** 144:12 145:7,11

**City** 119:15,20

**claim** 18:16 20:17 21:8 34:6 49:25 60:15 62:11 74:23 84:8,13,21

**claimed** 62:16 125:7 126:5

**claiming** 22:25 44:19,25

**claims** 21:2 34:12 63:21 84:15 85:10,14

**clarify** 97:15 113:23 131:17

**class** 23:7, 9,11,13, 16,20,23, 24 24:2,19

**clause** 78:4

**clear** 32:20 58:20 120:8

**client** 41:24 48:25 49:16

**clients** 49:8,12, 14,18,20, 21,22

**Coeur** 128:17

**collected** 108:1,6 109:11,19

**collects** 10:9

**column** 81:16

**comma** 142:4

**communicating** 49:18

**communications** 105:7 124:8 145:14,16 146:7 147:9,16, 21

**Community** 53:13,16 54:9 58:18,23 59:8 64:15 73:2 98:3 111:8 126:18

**companies** 112:8

**company** 10:24 12:19 30:18 35:21 36:10 41:14 42:1,10 43:1,6 46:17

**complaint** 124:20 142:25

**complete** 150:12

**completed** 150:7

**comply** 141:8

**computer** 37:3,5,12, 15 38:5,6, 8 95:9,13, 17 127:25 128:2,15 131:18 133:2 134:11 135:8,12, 21

**concerned** 117:5

**concluded** 152:20 154:4

**conclusion** 74:14

**connect** 13:3 36:22,25

**connected** 31:1,15 37:2 134:8

**connection**

62:12 65:2

**Connelly** 11:5,19 12:3

**consent** 27:3 33:25 62:11 65:13 70:5,9 73:12,18, 23 74:5 124:21 125:15 126:5

**consented** 62:16

**consequences** 71:15,20

**conservative** 118:16

**consideration** 67:23,25 78:6

**considered** 143:1

**constitutes** 47:24

**consumers** 49:8

**consummation** 71:16

**contact** 25:1,13 55:1 65:25 86:21

**contacted** 85:19

**contingency** 27:24 47:4

**continue** 85:15,17, 19 120:18

**continues** 23:6

**Contractors** 98:14

**conversation** 105:20 108:22

**convict** 16:5

**convicted** 14:2,9,18, 19,24,25 15:10,25 16:16

**conviction** 14:7

**Conway** 7:18 9:8 10:20 12:20

**copays** 93:15

**copies** 50:19,21 51:3,4,7, 8,13 52:8 122:6,9

**copy** 21:18 26:13 50:24 51:1 54:18 89:15 103:23

**copy/paste** 66:11

**correct** 6:10 8:10 18:14 19:18 20:1 23:14,23 24:3 25:7, 9 29:6,22 32:9,23,24 35:17,18 37:9 38:22 39:1,23,24 40:4,10 41:19 42:18,23 47:5 49:6, 15,23 50:7,10, 11,13,16 51:4,8 53:19,25 54:6,16,17 58:7,10, 11,14,23 59:21,22 60:11,19, 20 61:7, 11,12 62:3 63:5 64:3, 8,9 65:2, 16 66:5,8 67:11,12, 22 68:12 70:2,3 71:3,4,9 72:12,13, 23,24,25 73:1,3,9 74:15,16, 19 75:2,8, 9,13,15, 23,24 76:10,23 77:5,7,11, 14,17,22 78:10,11, 23 79:6, 12,23 80:11 81:13,19, 20,24,25 82:2,3,22, 23,25 83:18 84:3,5 88:4,8 92:5,10,11 93:22 95:10 97:9 98:2,5,9, 18,19,24 100:20 102:15,16 103:4,5 105:14,17 106:17 107:6,10, 11,21 108:6,24 109:1,11,

12,19,25 110:5 112:8,16 122:3,5 123:19,20 124:6,7, 16,17 125:3,4 129:4,5 130:2 131:12,19 132:16,23 135:12,17, 22,23 136:25 137:3,5 139:3,14, 19 141:9 142:13,14, 16,17 144:17,22 145:1,5 151:15 152:1,23

**correspondence** 123:22 124:9,20

**cost** 128:24 153:15,19

**costs** 100:12

**counsel** 6:6, 11,16,22 7:3,9 8:13,21,25 9:5 10:16, 21 12:21, 25 13:5, 11,20,24 14:3 15:12 16:23 17:5,13, 18,22 18:1,6,21 19:4,16, 17,25 20:7 21:4,9,13 24:4,9,21 25:16,21, 24 26:2 27:4,12, 20,23 28:1,5 34:17 39:22 41:6 44:21 45:1,18,21 50:9,12 54:4,10, 11,12,16 55:8,21 58:9,21 59:16,18 63:24 64:2 65:15 66:13 67:4,10, 15,20 70:24 72:25 74:9 75:1,20 76:4,20 77:7 78:9, 15,20 79:8,20 80:7 81:19,22 82:6,24 83:11 85:23 86:3,9,11, 13 87:24 88:11,17 89:24 90:10 101:24 105:7,17 106:1 108:16 118:19 120:4,5,9 121:22 122:5,6,9, 14,15 124:1,2, 12,13,24, 25 125:10, 11,17 126:4,6,13 127:3,18 138:17 139:5 140:22 141:7,12, 18 142:20 144:1,8,13 145:22 146:3,9,13 147:11,18, 23 150:4, 9,15,20 151:17 152:24

**counsel's** 27:15 61:11

**Counselor** 56:16

**County** 22:7 31:23 40:13 69:4

**couple** 30:20 42:9 65:7 68:22 87:16 104:14 120:17 152:14

**court** 24:13, 15 27:23 30:9 47:3 51:24 60:8 64:20 88:3,7,16 89:8 100:10,15, 16 102:3 104:7,18, 25 109:14 116:24 119:7 128:1 141:25 142:24 152:13,24 153:6,9, 11,16 154:2

**Courthouse**

69:4
**courtroom** 31:23
**cover** 7:16 54:22 121:8 134:22 135:18
**covered** 55:13 56:4 81:2 91:18 148:22
**COVID** 101:11
**Cox** 135:3
**create** 112:21 128:14 129:15,23
**credit** 53:13,16 54:9 58:17,23 59:8 64:18 73:2 96:4, 9,12,16 98:3 100:19,22 110:12,17, 20 111:8 113:16 126:18
**creditor** 99:6
**Creve** 128:17
**crime** 14:2,9
**crimes** 14:6, 17,19 15:10,25 16:2,5,7, 15,16
**criminal** 7:6 9:3 10:19 14:8,25 16:19 17:3
**CST** 142:5, 12
**current** 10:15 12:20 14:8 36:8 56:2 102:24 106:14
**cut** 104:15

**D**

**d-a-n-i-a-l** 39:10
**dabble** 117:15
**damages** 22:15,17, 21,23 23:2 121:5,12
**Dan** 22:7 28:6 116:6,8
**Danh11** 137:4
**danh11polo** 136:5,14 148:22
**danh11polo@ gmail** 137:9
**danh11polo@ gmail.com** 21:25 136:7 137:15 138:1
**danh11polo@ gmail.com.** 56:5
**danialahuman@ icloud.com** 39:9 149:9
**Daniel** 5:1, 13,17 12:7 39:9 80:16 92:7 142:8 154:3
**Danielle** 12:7 115:3 116:16
**Danielle's** 12:17
**danlovestopolo** 136:15 148:22
**danlovestopolo @gmail.com** 55:18 135:2 136:18 137:2 138:5,10 139:18
**danlovestopolo @gmail.com.** 55:23 149:24
**date** 10:1 11:21,23 15:21 25:11 39:2,12 40:8,19 65:4 68:24 102:24 106:15 131:13,14, 16
**dated** 110:7
**dates** 10:7 33:5
**daughter** 12:13 113:17,20 115:2 116:16
**David** 54:16 83:21,24 86:14,22 87:4
**day** 76:1 93:16 103:25 104:1 131:3,22 132:4

133:7 152:18

**days** 45:13 101:13 110:15 127:25

**dealer** 117:13

**dealers** 116:24 117:9

**Dean** 91:16

**debit** 32:15 96:8,12,15 97:14

**debt** 95:3 99:2,10, 15,19 101:4,5,6

**debtor** 91:15

**debts** 94:9 99:1

**December** 39:12 40:3 103:7 149:12

**decide** 17:16 86:7 142:18 145:7

**decision** 144:5

**declare** 92:3 110:4

**decline** 6:8, 13,18,24 7:5,11 8:15,23 9:2,7 10:18,23 12:23 13:2,7,13, 22,25 14:5 15:14 16:25 17:7,15, 20,23 18:2,7,24 19:2,6,11 20:5,10, 14,25 21:5,14 24:6,23 26:3 27:6, 22 28:3, 15,20 29:2 34:18 41:7 44:23 45:2 55:10 66:15 70:12 78:17 82:8 85:24 86:4,10 88:1,12,18 125:19 139:7,10 140:20 141:20 142:22 144:9,14 145:23 146:4,11, 14 147:13, 20,24 150:11,17, 22

**declined** 18:13

**declining** 15:5,7 89:25

**default** 47:23 84:17 98:14,21

**defendant** 5:4 67:25 69:11 70:4 124:19 125:14 126:5

**defendants** 23:12 55:7 70:9

**define** 57:14

**delete** 63:7

**deleted** 50:23 51:4,8,13, 16 62:19 63:4,8 74:11,16 83:18 84:5 122:2,4 124:5,16 125:3 139:24

**demand** 123:22 124:9

**Department** 72:2

**departments** 41:21

**depending** 59:4

**Depends** 96:8

**deposes** 5:4

**deposit** 59:7

**deposited** 53:10 64:14,16

**deposition** 88:15 152:16 154:3

**Design** 80:1

**Designs** 35:20

**desktop** 95:18,19 127:25 128:2,4,15 133:2 135:11,21

**destroy** 130:5,18

**destroyed** 51:18

135:12,13

**device** 31:7 32:11,21 33:9 37:19 38:17,22, 25 40:6,8 128:1 129:23 132:21 133:1 134:1 141:8 142:16 143:5,19

**devices** 13:3 36:22,25 38:3 134:8

**dh68litigation @yahoo.com** 57:7 148:23

**Dicarlo** 77:22

**died** 11:3

**digital** 51:4,8

**digitally** 50:23

**Dillon** 66:20

**directed** 104:8

**directly** 43:2 72:25 117:13

**director** 42:11

**disagrees** 152:17

**disclosed** 14:18 68:5

**discloses** 68:7

**Discover** 110:25

**discovery** 23:13,23 25:2 55:2 66:1 121:13 137:22 140:16

**discuss** 22:16

**discussed** 41:1 45:19 74:11 90:9 151:11

**dismiss** 141:17

**dismissal** 51:12 82:10,15 142:8,12, 19,23 143:7 144:3,5

**dismissals** 144:7

**dismissed** 52:20 83:15,16 143:1

**distribution** 127:14

**district** 35:12 141:25

**divorce** 12:3

**doc** 128:14

**docket** 142:7 151:6

**document** 81:24 82:2,15,21 97:3 109:4 114:3,8 118:7 119:21,22 121:16 125:15 128:14 130:20 151:13

**documents** 25:19 26:17 36:13 43:11,14 52:12 53:6 63:11 89:13 119:2 120:10,12 122:12 124:2,14, 18 125:1, 12 126:7, 9,14,15,24 127:3,13 129:15,20, 24 137:11, 14,15 138:2,6, 10,16 140:9,15, 19 152:16

**dollar** 97:16 115:13 116:8

**dollars** 81:8 86:1 105:13

**doubt** 60:2

**downtown** 119:12

**Dreamstyle** 75:13

**drugs** 117:15

**duly** 5:2

**E**

**E-TRAN** 153:9

**earlier** 41:1 52:6 73:6 102:15 123:13

**early**

128:18,19

**easier** 51:24 64:21

**East** 119:12

**Eastern** 141:25

**Ed** 61:11 88:22 130:7 137:18,23 138:25

**edbutler@butlerlawstl.com.** 39:16

**Edwin** 142:4

**electronic** 115:16 141:21,24

**Electronics** 95:7

**email** 21:24 22:10 25:23 34:8,11 39:8,22 55:13,15, 19,25 56:2,5,9, 20 57:8,10 62:19 74:4,11 87:10 135:1,20, 24 136:2, 21,22 137:5,10 138:14 139:2,20, 25 140:1 148:1,2,7, 9,11,15, 18,25 149:4,10, 12,25 150:3

**Email/attachment** 21:21

**emailed** 34:8 87:12

**emails** 34:16 39:5 63:1, 4 74:12 130:7,8,13 134:19 137:23 138:22,24, 25 139:13, 18,24 140:5

**employed** 17:8 48:13

**employees** 25:1 42:4 49:3,5,10, 11,13 55:1 65:25

**employer** 94:13

**employment** 17:1,4 102:18,23 103:4

**end** 40:21 117:4 139:12 153:13

**ended** 43:17, 18 51:12

**ending** 68:8

**entered** 35:12 121:19 142:4

**entire** 8:2

**entitled** 144:18

**equipment** 128:23

**error** 108:24

**ESI** 25:2 55:2 66:1

**estimate** 97:23 116:21,22, 23 153:14

**event** 45:17 105:12

**eventually** 46:5 48:13

**evidencing** 126:24 127:14

**ex-wife** 9:24 11:3 91:17 113:15,19 114:10 115:7

**exact** 7:20, 22 9:11,16 10:1,7 12:10,16 15:21 25:11 33:5 44:13 131:13

**EXAMINATION** 5:6

**examined** 92:3

**Examples** 107:24

**excess** 118:14

**excuse** 38:14 65:19 70:17 77:13 80:19 89:9

**exhibit** 21:18,21, 24 26:9, 10,12,16, 17 33:16 38:15 39:4,5,7 54:21 55:11,13 58:1 61:6

65:18 66:17,18 69:13 80:14,15, 16,18,19 81:1,10 82:9,12 83:20 88:21 89:6,10, 13,15 120:17 121:2,9, 10,16 127:23 134:19,22, 23 139:15 141:21,23, 24 149:9

**exhibits** 141:6

**existing** 49:22

**exit** 42:1 49:8,10,19

**exits** 49:4, 12,14

**expected** 22:17,21, 22

**expense** 95:1

**expenses** 92:24,25 93:2,9,18, 19,21 95:3 96:6,11

**explain** 104:24

**explained** 108:8

**Express** 110:23

**F**

**face** 23:13

**Facebook** 57:15,17

**Facet** 65:20 72:17,22 73:11 74:3,8,10 81:18

**fact** 6:1 81:15,21 117:2 130:6

**familiar** 126:2

**Fargo** 111:2, 11

**faster** 122:24

**fault** 104:11,21

**February** 136:19,21

**federal** 23:2 71:15,19

**fees** 100:11,15

**file** 84:23 86:7 87:13 88:6 89:22 91:3,5,11 130:10 142:18,23 143:9,19 144:5 145:7,10

**filed** 18:5, 10,17,22 19:1 20:23 22:7 23:7, 11,16 44:5,12 78:3,14 82:18 86:20 88:2,4,8 89:16 101:24 102:24 103:21,24 106:15 108:20 112:7,18 113:6 114:4 124:21 142:7,11 143:4,13, 14

**filing** 21:3 78:19 86:7,16,21 87:2 88:16,20 89:20 91:8 99:5 100:23 101:18,19, 23 102:7 110:16 112:14,15, 19 113:1 141:21,24 143:8 144:3,6,12 151:7

**filings** 90:21,23 144:4

**Finally** 117:4

**financial** 60:14 97:17 102:6 110:3

**find** 22:6 38:15 63:13

**fine** 45:11 88:24

**fingernail** 130:10

**finish** 19:12 51:21 60:8 64:19 104:15 122:23

**finished** 52:20 105:4

**finishing** 24:11

**firm** 153:24

**firm's** 28:21,25

**Fisher** 14:15 19:17 22:3,11 23:12 35:24 36:2 39:18 66:5 70:8 88:7, 15 99:17 100:15 121:2,12 127:8 137:11,15 138:2,6,10 139:1 140:9,12, 19 141:4 145:20,25

**Fisher's** 36:7 121:5 141:7 152:15

**five-minute** 88:23 120:19,23 150:23

**floral** 8:24 35:20

**Flori** 11:3, 8,17

**focus** 121:15

**focusing** 134:25

**food** 93:12 116:12

**foot** 130:22

**form** 60:22, 25 61:4 150:7,13

**forms** 150:19

**Forty-five** 109:22

**Fourteenth** 140:21

**free** 32:17 99:23

**Friday** 62:20 131:9 132:3,18 143:14

**front** 21:23 26:15,21 35:2 81:1 109:5,18 121:10

**Frubbel** 33:19,24 34:3,5 35:3 59:12,15

**fulfillment** 41:24 48:25 49:1

**full** 5:12

**Funding** 76:15

**funds** 27:18 28:13,18, 22,24 53:10 85:21 126:25 127:14

**G**

**Galaxy** 13:19

**gamble** 119:9

**gambling** 117:24

**game** 56:11 117:7

**gas** 93:12

**gave** 32:22 37:21,23, 25 55:22 59:8 95:2 103:17 104:9,10 105:2 113:16,17 114:15 116:18 117:20 120:10 122:9,11, 21

**gears** 7:17 86:6

**General** 64:23

**generally** 96:8,11

**George** 42:3

**geriatric** 135:8

**gifts** 113:7, 20 114:10, 23 115:2, 4,19 116:18

**give** 32:1, 18 37:22, 24 43:8 64:19 103:15 108:16 113:7 118:11 119:2 122:13 124:2

**GM** 64:23 65:1,10,12

**Gmail** 138:17,23

**good** 5:8 120:18

**government** 94:10

101:15

**grade** 6:1

**Great** 76:1 77:2

**groceries** 116:15

**group** 27:13 35:7 48:14 58:10 59:17 66:21 70:24 79:8 80:7

**guess** 37:3 118:10

**guidance** 54:22 90:11

**guilty** 16:10

**Gunn** 54:16 86:14,22 87:4 88:5 95:3 108:9 151:8

**guy** 37:14 38:1 57:23 115:11 128:12

**guys** 42:14

**H**

**half** 22:17, 21 149:22

**handed** 115:11 117:19

**happened** 48:8 100:12

**hard** 50:24 51:13 64:20

**harm** 117:11

**harmed** 117:9

**hazeleye43@yahoo.com** 148:1

**head** 12:11 52:18 93:14

**Health** 79:2 98:15

**Healthmarkets** 79:1

**hear** 133:19

**heard** 46:15, 20 57:23 99:25 125:22,23, 25 126:3 151:23,24 152:2,3

**hearing** 133:11 144:2

**Heidarpour** 151:19,22, 25 152:7

**helped** 49:13

**helping** 49:3

**heroin** 116:24 117:13

**hey** 104:20

**hold** 152:15

**Hollywood** 119:11,15, 20

**home** 12:20 13:4 36:11,15, 23 37:1

**honestly** 9:18

**hoping** 14:13 45:11

**Horseshoe** 119:11,17

**hospice** 101:12

**hospitalized** 101:10

**hours** 141:15 142:15 143:18

**house** 36:20 116:13 117:5 129:6,9 131:3 132:9,15 133:3,6,16

**housekeeping** 45:5

**How's** 116:7 134:15

**HQ** 98:15

**huge** 31:25

**Human** 5:1,8, 13,18,21 7:24 9:4, 24 10:8,25 12:7,8 14:14 19:16 21:23 22:3,8 26:16 27:8 29:4,19 33:8,18 35:15,17 39:18 58:2 59:13 60:10 73:19 80:16,19 85:22 88:7 91:16 92:8 114:12 115:8 121:4,10 135:3 142:8 150:1 151:5 153:24

154:1,3

**Human's** 24:17

**hundred** 44:14,15 73:8 129:1

**hundred-plus** 26:20

**hurt** 130:22

**I**

**Idaho** 98:14

**idea** 8:1 25:10 35:23 36:1,4 69:12 99:3,5 153:16

**identification** 21:22 26:11 39:6 80:17 82:10 89:14 121:6 134:20 141:22

**identities** 15:9

**illegally** 85:15,19

**impossible** 109:16

**Improvements** 76:1

**inaccurate** 81:6,7

**Inc.'s** 121:2

**include** 25:19 55:6 103:19 104:13 105:1 107:19 108:12,13 109:2 113:15 137:24

**included** 66:7 93:24 103:18 104:12,22, 24 108:10, 12,23 142:25 143:2 151:12

**including** 125:5

**income** 71:15,19, 23 72:1,5 87:18 92:17,20, 21,22 94:16 102:18,23 103:3,10, 11 104:4, 6,22,23 106:11,18 107:5,6, 14,19,24 126:10

**inconvenience** 135:7

**incriminate** 144:17

**incriminating** 144:21 145:1,5

**incurred** 71:16

**indicating** 36:13

**indirectly** 43:2

**individuals** 102:7

**inform** 88:15

**information** 15:4 23:8, 20 35:25 36:3,7 52:7 92:4 95:16 100:9 105:3 113:3 137:24

**inject** 55:20

**injury** 72:9

**inquiry@fi.com.** 22:1

**inside** 132:11

**inspection** 31:7 32:12,21 33:10,11 37:20 38:18,22, 25 40:7,8 128:1 132:21 133:1 134:1 141:8,12 142:16 143:5,19

**Insta-** 57:15

**Instagram** 57:17

**instruction** 107:18

**instructions** 27:15

**insurance** 77:22 79:1 93:11

**intend** 85:13,17 106:4

**intended** 145:21 146:1

**intensive** 101:13

**International** 74:22

**internet** 12:19 13:3 36:10,15, 16,22,25 150:8,13

**interrogatories** 121:3,11

**interrupt** 45:4 80:22 95:2 105:11

**interrupting** 119:6

**investigation** 9:3 10:19 14:8 16:19 17:3

**Investments** 14:15 19:17 22:4,11 23:13 35:24 39:19 99:17 121:2,12 145:20

**invoke** 7:3 10:16,21 12:21,25 13:5,11, 20,24 14:3 18:23 19:5,8 20:4,9,13, 24 21:5,9, 13 24:5,21 25:16,21, 24 26:2,7 27:4,20 28:1,10, 14,19 29:1 34:18 41:6 66:14 70:11 87:25 88:12,18 105:19 125:18 139:5 141:19 142:21 143:23 144:9,14 145:23 146:4,10, 14 147:12, 19,24 150:5,10, 16,21

**invoking** 6:6,11,16, 23 7:10 8:13,21,25 9:5 13:14 15:13 16:23 17:5,13, 18,22 18:1,6 19:3,9 44:21 45:1 55:8 78:15,20 82:6 85:23 86:3,9 89:24 145:3

**involve** 48:18,21

**involved** 25:6 29:10 42:25 48:21,23 64:11

**iphone** 13:23 29:22,23 30:19 31:22 32:11,14, 23,25 38:20 40:1,3,11, 13,17 80:20

**iphones** 32:3

**IRS** 60:22 71:24 94:19 95:3

**ISP** 12:24

**issue** 29:11 60:23 143:21

**issues** 90:9

**item** 90:18 91:24 92:15,24 95:7 96:19 97:25 98:13 99:17 100:25 102:10,17 106:6,7 107:5,7,9, 12,17,25 108:5 109:18 113:6

**J**

**James** 20:7 45:20,25 47:8,10 67:10 69:20 76:4 77:7 78:9

**January** 39:1 40:9,15 82:18 94:14,17 102:23 103:7 106:14 126:25 127:15 128:1 130:2 131:10,19 132:17,21 135:22

136:16,23, 24 137:1, 13 141:9, 16 142:4, 12

**job** 10:11 49:1

**jobs** 16:21 41:4

**Jornaya** 125:6,20, 22

**Joshua** 12:7, 13,17 114:24 115:18 116:10

**JPMORGAN** 111:4

**jruley@wtlaw.com** 135:2

**judge** 7:14 14:11,14 29:10 35:12 40:12 41:9,12 42:14 45:8 54:22 68:21,23 69:2 90:10 144:20

**judgment** 47:23

**judgments** 98:14,21

**July** 21:25

**June** 40:20 94:14,17

**jury** 16:5

**K**

**Kansas** 57:1

**keeping** 51:1,14 52:21

**kick** 130:21 133:17,19

**kicked** 130:19,23

**kid** 5:19,25

**kind** 13:10 37:12 99:8 128:2

**kinds** 114:15

**knew** 43:3 46:13 141:11

**knowledge** 51:5 52:15 88:9

**L**

**landscape** 143:3

**Lane** 9:13, 23 102:10

**language** 25:11,19 55:6 56:6 66:4,7

**laptop** 37:19 95:18

**large** 80:14

**late** 128:19

**law** 27:12 28:21,25 35:7 58:9 59:16 60:3 70:24 79:8 80:7

**lawful** 5:2

**lawsuit** 18:4,9,18, 21 21:3 22:7 25:6, 7 26:25 27:3 33:22,25 43:3 44:4 64:24 65:12 70:6,18 73:12 78:3,14,19 79:2,15 84:23 85:1

**lawsuits** 17:17 19:1 20:22 43:24 44:12 62:13 72:7 85:18 108:1,6 109:11,19 112:5,18, 21,25

**lawyer** 17:25 35:6 39:15 43:19,23 44:1

**lead** 125:5 126:6

**learn** 17:21

**lease** 99:13

**left** 94:13 99:12 128:16 129:10,11

**legal** 48:17

**Leigh** 91:16

**letter** 22:11,14 23:6 24:11,24 25:8,14 65:19 66:5,10 84:25

**letters** 21:2 25:18 44:19,24 55:7 66:8, 11 85:9,13 123:22 124:9

**level** 95:15
**levels** 95:15
**license** 93:17
**lieu** 22:15
**life** 64:20
**light** 152:16
**Liljenquist** 147:5,7,8, 10
**list** 23:4 99:1,4 104:10 105:12,25 107:25 108:17 109:9,18 112:5,10, 21,25 127:10
**listed** 87:5, 7 91:15 92:17 93:3 94:4 95:1, 3 101:5,22 103:14 113:17 114:14 140:15
**lists** 95:9 98:8,13 102:22,23 106:15,21, 25 110:12
**live** 7:17 8:7 9:9,17 10:12 12:9,12 35:16
**lived** 7:19, 25 8:2 9:8,10,19, 22
**lives** 7:23
**living** 8:12, 17,20 9:4 10:8 35:19 116:13 117:5
**LLC** 26:23 33:19 76:15 77:22 79:15 80:1 82:16 99:2
**LLP** 77:3
**local** 118:8
**located** 69:3
**log** 24:25 54:24 55:1 65:25 136:9 148:25 149:3
**logs** 54:24
**long** 7:19, 25 9:17,25 16:11 35:22 86:21 117:3
**long-term** 101:11
**looked** 63:10 137:14 151:5
**loss** 120:11
**losses** 117:24 118:9,12, 13 119:4
**lost** 32:7 68:20 118:15
**lot** 85:21 93:19 117:1 129:10 149:25 150:2
**Louis** 12:12 22:7 31:23 40:13 57:1 69:4 119:10,12
**lucrative** 43:25

**M**

**Mac** 37:15, 16
**mad** 130:19
**made** 25:13 51:11 52:13,16, 22 53:7 102:2
**MAH** 35:20
**mail** 36:8
**make** 63:15 71:24 80:21 82:4 104:17 137:4
**makes** 64:20
**making** 108:25
**March** 37:6 40:20,21 41:17 65:4 133:10,12 144:2
**mark** 21:17 88:20 141:23
**marked** 21:21 26:11,16 29:3 39:5 80:17 82:10 89:14 121:5,8 134:19 141:22
**marking** 26:12 39:4 82:12

89:6,9
**Marks** 20:7 45:20,25 47:8,10 50:12 64:2,6,10 67:10 69:20 70:1 76:4,9 77:7,16 78:9 81:16 123:16 126:5 151:16
**married** 5:21 9:25 10:25
**marry** 11:20
**matter** 15:1 45:5 81:22
**meaning** 82:22
**means** 99:24 115:16
**media** 26:1 57:12,14
**medical** 93:15
**medium** 74:4
**meet** 20:12 45:25 48:4,7
**Melody** 7:24 8:9,11,16, 18 9:4 35:17,24 36:2 134:11
**meltdown** 135:7
**members** 23:9,20
**membership** 119:5,16
**memberships** 119:18,19
**mention** 91:18 134:17
**mentioned** 6:3 11:6 17:11 38:4 83:16 134:16
**Mercury/fbt** 100:18
**met** 48:5,7
**Michael** 147:4,7,8, 10
**Micro** 95:23
**million** 101:14
**mind** 80:24
**mine** 143:6
**mints** 20:20
**minutes** 29:16 88:22,25
**missed** 55:22
**Missouri** 22:7 23:3 72:2 95:25 102:11 128:18 141:25
**Misty** 146:20
**modified** 114:3
**moment** 81:3
**Monday** 132:24 151:10,13
**money** 21:11 52:1,15 53:7,21 65:1,10 85:22 87:14,15, 17,20 97:13 98:22,23 99:14 103:16 107:25 108:6,17 109:11,18 111:13,16 113:19 115:24 116:25 117:2,20 118:15 153:22
**monies** 113:15,16, 17
**month** 7:20, 22 30:13 84:10,12 85:3,6,8 92:23 93:22 94:21 138:2,6
**month-by-month** 108:11
**monthly** 92:25 93:9 95:4 104:11 126:10
**months** 9:18 30:20,21 37:10 47:17 65:7 68:22 87:16 101:11,12 103:11,17 104:10 105:1 108:14,18 118:1 120:6 130:12 149:20
**Moreno** 146:1,6,

12,17,20 147:2

**morning** 5:8 88:14

**mother** 5:21 11:4

**motion** 23:25

**Motors** 64:23

**move** 10:14, 20 45:18 47:25 59:11 66:17 72:14 80:14 120:16 123:14 127:23

**moved** 7:22 24:2 128:17

**moving** 45:14 70:13 74:18,21 75:10 76:12,25 78:25 102:4 106:6 139:12

**multiple** 45:13 114:4

**N**

**named** 42:22 146:1 147:4

**names** 5:20 6:2 12:6 42:5 57:6

**needed** 38:1 96:14 117:8 120:5

**network** 38:10 60:14

**Nevercrossstreams87@gmail.com** 148:17

**newest** 128:8

**Nissan** 94:5

**NORC** 69:15

**notes** 45:9

**notice** 83:20 84:6 133:24 141:21,24 142:7,11, 19,23

**noticed** 104:18

**November** 91:8

**number** 6:14, 20 7:1,2 22:20 27:3 30:5,12,14 31:5,20, 22,24 33:25 44:13 52:10,18 53:2 63:16 65:13 70:5,10 73:12 93:18 99:24 118:5 119:13 123:14,15 124:8,18, 22 125:5, 16 126:9, 23 127:13

**numbers** 6:5, 10 7:8 30:2 31:14,18 68:2,5,7, 11,14,18 104:18 108:10,11, 25 150:19

**numerous** 14:11

**O**

**oath** 19:22 26:6

**objection** 24:16

**objections** 140:14

**obtain** 15:3 49:3

**obtained** 21:11 52:1 86:2

**obtaining** 49:12

**occurred** 38:25 43:3

**offense** 14:24

**offenses** 14:25 15:1,2 16:19

**offered** 120:6

**offering** 20:20 32:1

**office** 60:3 128:17

**older** 37:3 38:23 94:5 95:14 128:5,19

**on/off** 130:9

**One's** 41:25 48:18 49:7

**one-third**

27:24 47:4 60:1 81:22

**online** 150:19

**open** 152:15

**operating** 102:18

**operations** 42:12

**opinion** 51:14

**opposing** 124:19

**opt** 124:21

**order** 31:24 143:8,12

**ordered** 128:1

**orders** 153:6,7

**originally** 42:11 95:2

**owe** 94:10, 12 99:6,7 110:16,19

**owed** 94:17 99:14 110:15

**owned** 7:24 30:17

**owner** 118:7

**Ownership** 98:15

**owns** 35:20 36:20

**P**

**p.m.** 154:4

**pages** 26:20

**paid** 27:12, 23 32:18 58:13,21 59:6,20 60:3,18 64:7 67:20 70:1 71:2 72:5 75:7, 22 76:9,22 77:16 78:11 79:11,22 80:10 93:16 95:21 100:23 101:17 110:22 113:15,19 114:10,23 115:2,12 116:20,24 117:17 128:25 129:2

**paper** 51:3,7 104:8

**paragraph** 22:14 23:7 24:24 54:23,25 60:21 63:23 65:24 66:25 67:7,13,23 71:11 72:20 75:17 78:6 79:5

**paralegal** 48:2

**pardon** 41:11

**part** 48:16, 21 67:25 92:2,15 102:17 109:25 112:1,2,5 134:6

**parties** 62:5

**party** 105:20 121:19 124:19 142:25 143:2

**passed** 11:18

**password** 149:4,18

**past** 7:21 14:6,9,20 32:4 47:17 84:10 105:13 120:6 126:10

**pay** 27:10 28:13 29:25 31:25 32:14,16 36:18,21 47:4 58:7, 25 59:3,16 64:10 65:1,10 72:10,22 81:21 83:2,25 93:5,18 94:1 95:20 96:2,6,11 101:15 111:13 114:13,25 115:4,8, 15,18 116:10,18 117:8,12, 18,21 153:22

**paying** 31:8 62:6 94:21

**payment** 34:21 35:3,6 59:17 60:22 62:2,9 67:16

69:23 79:5 94:19,24 95:4

**payments** 61:1 72:6

**pays** 12:24 36:19

**PDF** 153:9, 10

**penalty** 92:4 110:4

**PENN** 118:7, 13,17 119:14,20 120:12

**people** 49:3 85:15 145:13,16, 21 146:6

**percent** 73:8 123:13

**period** 46:16 118:9

**periods** 103:4

**perjury** 92:4 110:4

**Perrong** 42:22

**person** 113:8

**personal** 68:2 72:8 93:18,24 94:1 129:19

**personally** 43:12 122:9

**petition** 89:16 90:7 92:3

**phase** 121:13

**phone** 6:5, 10,14,20 7:1,2,7 13:8,10, 17,19 24:25 27:3 29:20,25 30:2,3,5, 11 31:4,5, 6,9,12,14, 18,19,20, 21,25 32:1,16, 18,22 33:4 37:2 38:5, 6,21 46:1 55:1 65:25 68:7,11, 14,17,20 93:11 95:9,11, 12,16 124:22 125:16 145:14,18, 19,21,25 150:19 152:5

**phones** 29:24 30:25 32:20 33:10 38:16 146:8 147:10,17, 22

**physical** 115:13,21 116:2

**physically** 31:12,13

**picked** 131:1 133:5

**picks** 132:13

**piece** 49:16

**Pinecrest** 9:12,13, 17,22 10:14,15, 20 102:10, 14

**place** 48:8 56:24

**plaintiff** 42:22 67:17 68:1 71:14

**plaintiff's** 17:24 43:19,23 44:1 63:24 67:4,15,23 68:4

**plan** 94:19, 24

**play** 56:13, 22 57:3 118:7,13, 17 119:14, 20 120:12

**played** 56:11,24 57:1,2

**players** 57:4

**playing** 117:7

**plead** 16:7,9

**pled** 16:10

**pocket** 29:20 40:18 80:24 96:25

**point** 23:17 29:9 51:1, 14 52:21 85:16 90:11 100:12

**Police** 74:23

**Policyscout** 61:23 62:11,15, 18 63:1,9, 11 70:8

**polo** 56:6, 9,13 57:4

**portion** 24:14 27:18 28:13 30:8

**position** 6:19 152:15,17

**possession** 38:17 44:24

**Possibly** 145:2

**pre-suit** 124:20

**prepare** 129:20

**prepared** 90:1 105:12,25

**present** 45:9 86:12

**preservation** 66:4

**preserve** 24:25 25:6 54:23,25 65:24

**preserving** 25:19

**pretty** 33:2 46:25 150:24

**previous** 31:22 33:3 102:19 106:11 131:17

**previously** 25:20 32:8 35:16 36:13 38:14,15 40:11 47:3 48:24 52:19 56:4 83:16 122:1 127:24 131:12,18 132:2 137:7,17 151:12

**prim-** 93:15

**primarily** 59:5

**primary** 129:23

**prior** 40:15 90:8,20 91:19 102:11 107:15 108:18 110:16

**Priority** 63:19

**prison** 15:16,20, 24 16:11, 13,16,22 41:2,5,18 48:6,7,10, 12 129:18

**private** 38:10

**privilege** 6:7,12,17, 23 7:4,10 8:14,22 9:1,6 10:17,22 12:22 13:1,6,12, 14,21,25 14:4 15:13 16:24 17:6,14, 19,23 18:2,7,16, 23 19:3,5, 9,10 20:4, 9,13,24 21:5,10,14 24:22 25:17,22, 25 26:3,7 27:5,21 28:2,10, 14,19 29:2,11 34:18 41:7 44:22 45:2 55:9 66:14 78:16,21 82:7 85:24 86:4,10 87:25 88:12,18 89:25 105:21 125:18 139:6 141:19 142:21 144:9,14 145:4,23 146:4,10, 14 147:12, 19,24 150:5,10, 16,21

**pro** 82:21 83:22

**procedures** 93:15

**proceed** 7:15

**proceeding** 88:3

**proceedings** 7:6

**proceeds** 123:13

**produce** 32:11 40:6 43:11,12

**produced** 26:18,20 31:6,11 33:9 36:13 37:19 38:16,21

43:13 52:10,11 53:24 83:8,12 122:14 138:22 139:1,9 140:9,12, 16,19 141:4 152:17

**producing** 43:15

**product** 111:22

**production** 54:4,10 106:2 118:21 120:13 121:4,11, 22 122:10 123:21 124:3,14 125:1,12 126:14,19 138:18

**program** 129:17

**progress** 49:19

**Promenade** 96:1

**pronounced** 147:5

**proof** 143:12,13

**property** 93:19,24 94:1

**proposed** 141:13

**prospective** 49:20,21

**Prosser** 20:12 48:1

**protect** 28:8

**proves** 125:15

**provide** 23:8,19 43:14 54:15 68:1 83:13 104:20 106:1 112:25 122:5 124:13,25

**provided** 25:2 54:3, 8,14 55:3 66:2 83:11 92:4 105:16 108:8 118:19,22, 24 120:3, 11,13 121:21 122:7 125:11 126:13,17 127:3,17

**provider** 12:20 30:14 36:11,15, 16

**providing** 138:16

**public** 14:21,23 15:1,3 18:18 19:2 113:3

**publicly** 14:18 18:10

**purchased** 37:6

**purpose** 43:15 47:1 113:1 118:10 130:1

**purposes** 46:2

**pursue** 98:20,23

**pursued** 84:18

**pursuing** 98:24

**put** 96:15 130:9,11 132:7,14 133:15

**putative** 23:9,20

**putting** 80:24

**Q**

**Queen** 119:12,17

**question** 6:8,13 8:15,23 9:7 10:18, 23 12:23 13:2,7,13 15:7,8,15 16:25 17:2,7,10 18:12,13 19:11,13, 15,20 20:2,6,11, 15 21:1 24:7,10,18 26:4 27:6 28:7,16,20 41:8,10,13 44:23 45:3 51:22 55:10 58:19 60:8 64:19 66:16

73:22 78:17 82:8 83:6 84:3 85:25 86:5,11 88:1,13,19 90:1 91:13 97:15 100:7 105:21 113:23 122:24 125:19 139:7,10 141:20 142:22 143:24 144:10,15, 17 145:24 146:5,11, 15 147:13, 20 150:6, 11,17,22

**questions** 5:7 6:20 19:22 90:1,12 126:23 152:6,11

**R**

**Ramirez** 83:21,24

**RDAC** 100:25

**reach** 23:3,4 46:2,21,23 78:13 87:4

**reached** 46:4,25 50:6 51:3, 11 78:18

**reaching** 46:6

**read** 24:12, 15 30:6,9 100:1,2 110:2 152:13 153:2,3,4

**reading** 26:19 152:25

**reads** 22:21

**Ready** 89:3

**reason** 5:9 31:21 52:9 60:2 63:8

**recall** 9:16 11:23 16:12 33:2 34:1,7,10, 15 36:9 37:13 42:20 43:16,21, 22 44:3,6, 8,11 45:24 46:4,22 47:13,15 50:1,3,5 52:3,5,17 53:3,4 54:2 55:17 57:6,11 59:5,6 62:10,14, 17 64:4,12 65:11,14 66:9 68:16,24 70:7 73:13 74:6 83:4 84:1,9,22, 24 85:2 86:19,23, 25 87:3,9 91:4,7,10, 12 111:21 113:21 126:3 133:24 137:12,20, 21,25 138:14,19, 20 140:3 145:9,12, 15 149:2,6

**receipt** 126:24

**receipts** 114:15

**Receivable** 101:7

**receive** 27:19 28:24 36:7 106:10 107:14 145:13,16, 21 150:8, 13

**received** 28:12,17, 22 60:25 61:3 72:6, 11 73:8 81:12,22 100:9 105:13 107:8 111:16 124:8 125:6 140:5 145:20,25 146:7 147:9,16, 21

**recently** 85:12 86:8

**receptacle** 133:16

**recognize** 99:8

**recollection** 32:6 33:12,13, 15 42:24 59:25 131:24 133:9,13

**reconnect** 48:12

**record** 11:7 14:21,23 15:1,3 18:11 19:2 20:20 25:13 28:17 29:12,15, 18 35:12 42:15 52:21 58:20 89:4 118:17 120:25 121:8 151:1,4 153:7

**recording** 62:15,19

**records** 24:25 25:6 28:22 34:3,5 40:22 54:8 55:1 65:25 83:17 113:3 126:21 127:11,17

**recovering** 116:13 129:16

**recovery** 117:4

**recycle** 132:10

**Reddit** 57:20,22

**Reed** 42:3

**refer** 78:2 119:1 135:24

**referenced** 52:6 123:12

**referred** 102:15 114:3

**referring** 53:12 135:11,20

**refers** 23:23

**reflected** 53:9

**refuse** 21:10 143:24 150:6

**regular** 93:9

**related** 7:7 10:20 17:4 64:23 121:4

**relates** 78:1 140:17

**relating** 9:4

**relations** 41:24 48:25 49:16

**relationship** 147:1

**released** 16:13,22 41:1,5 48:10

**relevant** 90:8

**rely** 153:25

**remember** 7:22 9:11, 18 10:1 11:21 12:4,16 15:21 33:5 37:25 42:4,8,13 43:10 69:1 96:3,10 114:18 128:25 134:18 136:4 137:19 138:16

**Remodeling** 75:13

**renew** 93:17

**renewed** 99:13

**rent** 93:5 101:3,6 113:16 115:11,12

**rents** 115:12

**repeat** 11:6 24:10 55:21

**repeatedly** 14:13

**rephrase** 58:19

**replace** 135:8

**report** 104:7 108:5 125:20

**reported** 40:14 71:23 72:1 107:5

**reporter** 24:13,15 30:9 51:24 60:9 89:8 109:15 119:8 152:13,24 153:6,9, 11,16 154:2

**reporter's** 64:20

**represent** 47:12 90:5

**representation** 46:9 47:1 123:16

**represented**

46:12,16, 19 122:11
**representing** 46:3 47:10,14, 18,20,24
**request** 121:16,18 122:25 123:14,21 124:18 126:9,23 127:13 139:17 140:15
**requested** 24:14 30:8
**requests** 121:3,11
**require** 65:10
**required** 25:6
**requirement** 90:9
**residence** 7:18 10:15
**residual** 101:15
**resolve** 26:25 33:22 70:18 72:17
74:23 77:5 79:2,15 80:1
**Resort** 77:3
**respectfully** 6:8,13,18, 24 7:5,11 8:23 9:2,7 10:18,23 12:23 13:2,7,13, 22,25 14:5 15:14 16:25 17:7,15, 20,23 18:2,7,24 19:2,6,10 20:5,10, 14,25 21:4,10,14 24:6,23 27:6,22 28:3,20 29:1 66:15
**respond** 34:12
**response** 27:2 33:24 34:6 62:12 65:12 70:5 73:11 124:9,19
**responsibility** 49:2
**responsible** 67:16
**responsive** 127:4
**result** 71:16
**retainer** 123:1,4
**retention** 123:1
**retired** 10:10
**retrieve** 130:20
**Revenue** 72:3
**review** 81:3 101:23 103:23
**reviewed** 81:9
**revised** 113:13,14
**Richard** 69:7
**rid** 51:13 128:23
**River** 119:15,20
**Road** 7:18 9:8 10:20
**Robert** 5:21
**Robin** 11:4, 15,19 12:3 91:15
**Rogue** 94:5
**role** 42:10, 12
**Roofing** 98:14
**room** 35:13
**roughly** 97:18 116:22
**Ruley** 135:6 139:17
**ruling** 7:14
**run** 87:15, 17
**running** 117:7
**rush** 153:8
**rushed** 153:11

S

**safety** 117:6
**Samsung** 13:19
**Saturday** 131:25 132:1,17
**savings** 97:25
**scheduled** 88:15 141:11
**Schelp** 7:14

29:10 41:9,12 42:14 144:20

**Schelp's** 54:22 90:11

**school** 6:1

**Section** 27:7

**security** 10:9 40:14 87:19 92:21 106:19,22 107:2,6,9 111:17

**seeks** 121:18

**self-incrimination** 6:7,12,17, 24 7:4,11 8:14,22 9:1,6 10:17,22 12:22 13:1,6,12, 15,21 14:4 15:14 16:24 17:6,14,19 18:17,24 19:6 20:5, 10,14,25 24:6,22 25:25 27:5,21 28:2,15 44:22 55:9 66:15 78:16 82:7 88:1 125:19 139:6 140:21 141:20 142:22 143:24 146:11 147:13,20 150:6,11, 17,22

**send** 35:24 36:2 54:18 62:15 84:25 85:13 130:7,13 139:18

**sending** 85:9

**sense** 33:8

**sentence** 23:6 67:24

**separate** 124:1,12, 24 125:10

**separately** 122:15

**September** 59:24

**served** 121:12

**service** 12:20 30:1 31:1,8,15, 17 32:2,18 36:10,15, 16 37:4 68:21 93:11

**services** 35:25 36:3,8 101:20

**set** 45:7 121:3

**settle** 62:5 69:18 83:25 84:8,15, 19,20

**settled** 20:16 21:7 49:24 50:20 84:7,13 112:13

**settlement** 26:10,17, 22 27:7,9, 18 28:12 33:19 34:20 50:6,10, 13,15 51:2,6,9, 10,11,18 52:10,12 53:5 58:3, 22 59:4, 12,13,15 60:5,14, 15,21,22 61:1,23 62:2,3,8 63:7,18,23 64:7,22 65:2,4,9 66:20,25 67:19,20 68:12,15 69:14,23 70:16,17, 21 71:3,8, 20,23 72:1,6,11, 16,23 73:9 74:14,22 75:4,12, 17,23,25 76:7,14, 18,23 77:2,9,13, 17,21 78:1,7,18, 25 79:6, 12,14,18, 23,25 80:4,11 81:8,19 83:3,5,8, 21 84:2,6 85:21 86:1 87:20 103:15,16 104:4

105:13 108:17 111:16 122:10,15, 19 126:25 127:9,14

**settlements** 21:12 27:8 29:4 33:18 47:5 52:2, 10,14,16, 23 53:7,22 58:3 60:10 63:5 64:11 71:24 72:2,11 78:13 80:16 81:2,9 82:1,5 105:25 121:18

**settling** 22:16

**share** 105:9

**sheet** 104:8 108:7

**shifting** 7:17

**shop** 8:24

**short** 29:14 35:14 42:16 46:16 89:2 121:1 151:2

**show** 28:17, 22 39:3 40:22 53:6,21

**showed** 62:16

**showing** 126:9 127:17

**shows** 35:3 67:10 76:17 90:20 107:7 142:11

**sic** 127:13 139:15

**sidewalk** 133:23

**sign** 61:15 116:8 151:9 152:23

**signature** 29:5 60:11 61:7,12, 13,14,20, 21 71:8 74:19 78:22 92:2,7 110:7 152:13,24 153:4 154:5

**signed** 32:2 92:10 123:6 151:8,13

**significant** 102:2

**silence** 152:4

**similar** 24:18 55:6 66:6,7 119:2 126:23

**simply** 23:16

**sir** 20:2 41:3 53:23 73:7 76:11 78:12 79:24 81:4 106:20 111:12 112:17 120:20 143:6,20

**sister** 7:24 8:11,19 35:16 36:20

**sister's** 131:2,3

**sitting** 19:7,15 97:10 133:2,6

**Skipping** 70:15

**small** 52:10 152:14

**Snowy12370@ yahoo.com** 148:8

**SOAR** 129:17 130:20

**sober** 116:13 117:5

**social** 10:9 26:1 57:12,14 87:18 92:21 106:18,22 107:2,6,9 111:17

**sodomy** 14:24

**solely** 67:15

**Solutions** 101:7

**son** 12:13 113:16,19 114:23 115:18,25 116:10 117:10,12, 18

**son's** 116:24

**sounds** 47:6, 9 105:12 130:4

**source** 17:9, 11,25

92:20 106:18,22 107:2 126:10

**sources** 102:22

**speak** 17:24 43:19 97:4 135:19

**speaking** 97:16 109:14,16

**speaks** 97:3

**specific** 59:24

**specifically** 63:6 64:12

**specifics** 42:20

**Spectrum** 36:14

**speculate** 53:1 62:24

**spell** 11:9

**spelled** 39:9 116:7

**spent** 87:22

**sport** 56:8

**spouses** 91:19

**Square** 41:14,16, 20,25

42:17 43:14,20 44:2 46:18 48:14,15, 18,23 49:5,7,9, 13 103:12 107:8 128:16,21 129:2,10, 11 146:21

**St** 12:12 22:7 31:23 40:13 57:1 69:4 119:10,11, 12

**Stacy** 147:22

**stages** 95:15 117:4

**staggering** 101:13

**stamp** 29:4

**stand** 63:8

**start** 17:16 41:15 45:23 54:24 77:24

**started** 129:11 137:2

**starting** 26:21 58:2 110:22

115:7 121:16 144:5

**state** 71:15, 19 73:15 74:1

**stated** 52:19 144:1

**statement** 53:9 102:6 110:3

**statements** 53:20 54:3,5,14 90:7 126:18,20

**stay** 48:9

**Steel** 82:16 83:2

**Stewart's** 40:12 68:21,23 69:2

**stipulation** 82:9,15

**STL** 80:1

**stolen** 31:23 40:14 68:20

**stop** 31:17 47:14 68:17 85:9 149:21,23

**stopped** 31:8 47:18 68:21 85:11

**store** 116:14

**stored** 95:16 137:14

**Straight** 30:16

**strike** 74:9

**Stripes86@yahoo.com** 148:6

**Structures** 82:16

**stuff** 114:15 129:18,19

**Sturdivant** 5:17

**subject** 22:3 39:18 135:3

**submitted** 100:10 102:3 104:3,18

**submitting** 150:18

**subsequent** 108:23

**subsequently** 102:3 103:18

108:9,15

**sued** 42:17

**suit** 23:7

**suits** 112:7

**sum** 31:25

**summarized** 82:2

**summary** 81:2 118:12

**Summertime8677@yahoo.com** 148:4

**supposed** 59:17

**sway** 14:13

**swear** 116:9

**switch** 86:6

**sworn** 5:2

**Systems** 99:2 101:3,4

**T**

**table** 20:21

**tags** 93:17

**takes** 58:13

**taking** 51:25 139:11

**talk** 30:16 151:8 153:23

**talking** 98:6 114:8

**Tawanda** 147:14,17

**tax** 26:23 27:9 58:6 71:15,19 72:5 93:19 94:14,17

**taxable** 72:9 104:6 107:20

**taxes** 72:10 93:24 94:1,9 118:11

**TCPA** 17:16,21,25 18:4,18,21 19:1,4,17 20:1,7,16,22 21:2,7,11 26:25 33:22 42:18 43:20,24 44:2,4,12,20,25 45:19,21 46:3,5,9,12 47:1,4,21 48:3 49:24 50:7 52:1,14,16,23 53:7,22 60:15 63:21 64:24 66:23 69:8,18 70:18 72:6,11,17 74:23 75:15 77:5 78:2,19 79:2,15 80:2 84:8,13,15,20,23 85:1,10,14,17,20 86:1 87:21 98:18 104:4 108:6 112:7 121:18 123:23 124:10 125:7 126:25 129:21,24 130:14 151:17,19

**team** 48:17

**tech** 128:12

**technically** 5:20

**Telecheck** 101:20

**telemarketers** 25:1 55:2 66:1

**telemarketing** 48:19,22

**telephone** 68:2

**telling** 53:3 117:8

**template** 66:12

**Terepka** 5:7 18:15,20 20:19,22 21:17,20,23 24:8,12,18 26:12,15 28:4,9 29:9,15,17 30:6,11 35:11,15 39:7 41:15 42:17 45:6,11,16,17 55:23,25 69:8 80:18 82:11,14 88:23 89:3,9,12,15 97:1 100:14 113:25 114:7 120:18,22,25 121:7 134:21

140:25 141:3,23 150:23 151:1,3 152:4,9,14 153:8,10, 13

**term** 125:22,25

**terms** 140:19

**terrible** 135:7

**testified** 26:5 35:16 38:14,16 43:9 73:5 105:24 122:1 127:24 131:11,18, 20,23 132:2,19 133:8

**testify** 5:10 133:10

**testifying** 43:10

**testimony** 24:14 30:8 33:1,9 43:8 49:9 131:17,21 149:13 151:12,14

**text** 90:13

142:7

**thing** 51:10 101:3 105:6 119:5 130:10

**things** 45:7 63:7 93:24 104:14 116:12,15 152:14

**Thirty-four** 112:3

**Thirty-three** 110:11

**thought** 117:13

**thousand** 114:19

**thread** 136:24

**threatening** 21:2 84:25 85:9,14

**threw** 51:3,7 127:25 130:24 131:10,18 134:13 135:14,15, 21

**throw** 50:25 133:21,22

**thrown** 99:8

**Thursday** 131:8

**Tiktok** 57:18

**time** 8:2 32:13,19, 20,25 33:10,12 34:2,15 38:17 46:16 47:2 51:24 56:11 59:25 64:20 68:11,15 84:12 87:1 96:22 97:7 103:4 117:3 131:24 133:1,9,24 136:3 137:1 139:24 141:9,12 153:20

**times** 14:11 15:18 20:16 21:7 25:14 49:24 114:4 130:21

**timeshare** 17:8,11,25 42:1 49:14

**timeshares** 49:4,9,10

**timing** 33:8

**today** 5:10 19:16,22 62:20 96:25 97:10 99:20 152:20

**Today's** 151:10

**told** 27:23 40:12 57:24 70:9 74:10 103:18 113:2 120:9 141:7 153:2

**top** 12:11 65:5 82:18 89:19 90:14 91:22 92:13 93:14

**topic** 45:18

**topics** 7:16

**tort** 72:9

**tossed** 133:15

**total** 22:15

34:20 52:6,13 81:8 93:21 97:1 110:22 113:7 115:5

**touch** 11:16 48:9 146:24

**town** 98:23

**Tracfone** 38:24

**Trader** 79:15

**transaction** 142:3

**transcript** 153:7,19

**transfer** 67:4 115:15,24

**transferred** 53:11

**trap** 53:2

**trash** 130:24,25 131:1,3,10 132:8,10, 13,14 133:2,5,6, 16,25 134:2 135:14,21

**truck** 132:13

**true** 24:20 27:25 88:16 92:5 110:5 113:12 116:25 133:3 141:4,17 143:5,22 144:6,11

**Trustedform** 125:6,25

**trustee** 94:23

**truth** 5:3

**truthfully** 5:10 19:22

**turn** 33:16 34:25 54:21 58:1 67:7 82:11 130:11 134:5

**turned** 80:21

**turning** 22:10 29:3 33:17 60:13 61:9 63:15 65:18 67:3 69:13 71:5 72:20 73:14,19 75:17 76:17 90:13 91:21 92:12 94:6,25 95:5 96:17 98:13 109:21 110:10 117:22

**two-thirds** 58:14,22 59:20 60:1,3,18 64:7,10 67:20,24 70:1 71:2 75:7,22 76:9,22 77:16 78:11 79:11,22 80:10 81:12,23

**type** 13:17 89:23 123:10

**U**

**U.S.** 141:25

**understand** 6:15 19:23 97:21 152:17

**understanding** 23:2 49:7 72:8 99:19 139:8 140:8,10, 11

**understood** 6:2 11:16, 19 12:19 19:12 47:25 59:7 61:17 80:23 91:21 95:5 120:8 122:8,14

**unfair** 143:10

**Union** 53:13, 16 54:9 58:17,23 59:8 64:18 73:2 74:23 98:4 111:8 126:18

**University** 69:15

**unknown** 99:18

**unrepresented** 82:22

**useless** 134:4

**V**

**Vacation** 98:15

**Vacations** 77:3

**vendors** 25:1 55:2 65:25

**verbal** 123:12,18

**Verizon** 30:15,16, 17 31:25 32:17

**Veronica** 146:1,6,12 147:1

**version** 113:18 128:6,7,13

**versus** 14:15 19:17 22:3 39:18 88:7 135:3

**Viking** 82:16 83:2

**violated** 44:20 125:7

**violation** 85:20

**violations** 42:18 44:25 78:2 123:23 124:10

**virtual** 38:10

**voluntarily** 141:17 143:1

**voluntary** 142:8,12

**VPN** 38:8,9, 11

**W**

**W-2** 94:16

**wait** 51:21 91:13 143:9

**waited** 141:15 143:18

**waiting** 88:14

**waive** 152:13 153:1,4

**WAIVED** 154:5

**waiving** 152:25

**walking** 133:23

**wallet** 97:19

**wanted** 25:12 43:24 104:17 149:3

**ways** 116:11

**Wealth** 65:20 72:17 73:11 74:3,8,10 81:18

**Wednesday** 62:21 151:10

**Wedon' tneedroads48@ yahoo.com** 148:14

**week** 33:3 153:13

**weekday** 131:5,7

**weekend** 135:8,12, 16,22

**weeks** 86:24

**Wells** 111:2, 11

**whatsoever** 14:12

**where'd** 56:15,23 95:22

**Who'd** 37:22, 24 57:3

**Windows** 37:17,18 128:4,5, 11,13,14

**wins** 118:8

**Wireless** 30:16

**withholding** 94:14,17

**word** 125:23 128:14 129:15,20, 24

**words** 62:5 143:6

**work** 10:10 42:2,3,6 49:17 146:20,22

**worked** 41:14,21 46:17 48:2 103:12

**working** 41:15 45:23 129:15

**worth** 91:24

**Wow** 12:16

**wrap** 150:24

**write** 52:19

**writing** 50:7 100:9 109:15

**written** 123:6,7,9, 15 129:16

**wrote** 24:25

25:5,9
64:13
135:6

X

**XP** 128:11

Y

**year** 5:19, 22 7:21 9:19 10:2 12:4 30:23 37:8 40:9 44:7 47:14,15, 16 102:19, 24,25 103:6 106:11,14, 21,25 107:15 118:9 130:2,15, 16,17 131:11 149:13,22

**years** 10:4,6 11:24 12:1 14:15 15:22 42:9 48:5 102:20 105:2,14 106:12 107:15 108:14 113:6 119:24 126:11 130:13,15

**yesterday** 103:25 104:1,2

**young** 5:24

**younger** 38:1 56:12

**Attachments:** Demand Letter Fisher Investments.docx, Human v Fisher.docx

**From:** danh11polo@gmail.com <danh11polo@gmail.com>
**Sent:** Wednesday, July 17, 2024 8:29 AM
**To:** Inquiry <Inquiry@fi.com>
**Subject:** Human v Fisher Investments, Inc.

Legal Dept.-

Please find attached the lawsuit filed in St. Louis County, Missouri

Dan Human

PLEASE READ: The material contained in this email is confidential and solely for the use of the intended recipient. Please do not forward this email to others. Investment in securities involves the risk of loss. Past performance is no guarantee of future returns. Fisher Investments ("FI") is not a broker-dealer and cannot provide assurances and makes no representations or warranties as to the timing or price terms for the purchase or sale of particular securities. Market conditions and liquidity constraints may make it difficult to execute certain trades and FI will attempt to do so on a best efforts basis. FI is not responsible for errors or omissions in links from non-affiliated websites or other publicly available third party material provided. Third party information provided by FI does not necessarily reflect the view of FI or its employees. All email sent to or from this address will be received or otherwise recorded by FI's corporate email system and is subject to archival, monitoring or review by, and/or disclosure to, someone other than the recipient. FI's privacy policy can be found at https://www.fisherinvestments.com/en-us/privacy

WARNING: For your own protection, avoid sending identifying information such as social security or account numbers to us or others via email. Do not send time-sensitive, action-oriented messages, such as transaction requests, via email as it is our policy not to accept such items electronically.

EXHIBIT 1
PENGAD 800-631-6989

Fisher Investments, Inc.
6500 International Parkway
Plano, TX 75093

SETTLEMENT NEGOTIATIONS UNDER RULE 408

Legal Dept.

The purpose of this email is to advise you that I have filed suit today against your company in *Human v. Fisher Investments, Inc.* No. 24SL-CC-03265 in St. Louis County, Missouri. Your employees, agents, vendors, or telemarketers contacted me illegally, six (6) times on my personal cell phone, which I personally registered on the Federal and Missouri State Do Not Call lists. The callers identified your company and address. This is a clear violation of the TCPA and Missouri Do Not Call statute.

In lieu of the $39,000 in total damages, ($6,500 per call) I am willing to discuss settling the case for $20,000, half of the expected damages, provided we do so before I send a process server to effect service on your company. Solely for the purpose of settling the matter, you may contact me at the phone number or email below. I will leave this offer open until the close of business Friday, July 19, 2024. If we cannot discuss or resolve this issue, I will send it to a process server and begin the litigation process.

Additionally, please preserve any call log records, phone contact with employees, vendors or telemarketers, or ESI for discovery as this will need to be provided. The suit is filed as a Class Action, and we will also need to provide the information for other Putative Class members.

I look forward to hearing from you to avoid the expense of litigating the matter, however, if we cannot reach a reasonable settlement, I am willing to take the matter to trial.

Cordially,

Dan Human
10423 Conway Rd.
St. Louis, MO 63131
(208) 390-1355
danh11polo@gmail.com

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Confidential Settlement Agreement and Release (this "Agreement") is made effective as of the date of the final execution of this Agreement (the "Effective Date") by and between Plaintiff, Daniel Human ("Plaintiff"), on the one hand, and Defendant, Alleviate Tax, LLC, and its affiliated entities (collectively "Defendant") on the other hand for the purpose of resolving by compromise and settlement of all claims, controversies, alleged liabilities, and disputes between them. For the purposes of this Agreement, Plaintiff and Defendant are referred to individually as a "Party" and collectively as the "Parties."

## <u>RECITALS</u>

WHEREAS, Plaintiff filed a lawsuit on June 10, 2024, in the Circuit Court of St. Louis County, State of Missouri, that on July 17, 2024, was removed to the Eastern District of Missouri, Eastern Division, Case No.: 4:24-cv-00981-SRC, alleging violations of the Missouri No Call List and Telemarketing prohibitions set forth in §407.102&.l and Mo. Rev. Stat.§ 407.1076 and Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and 47 U.S.C. § 227(b)(l)(A) ("Claims"), against Defendant, (the "Complaint") arising out of alleged unsolicited calls to Plaintiff (the "Calls");

WHEREAS, Defendant denies Plaintiff's claims and has denied, and continues to deny, that it has any liability to Plaintiff for any such claims.

WHEREAS, the Parties hereto desire to compromise, settle, and release any and all claims which exist or which may exist between and among them, or their agents, assigns, and predecessors or successors, arising out of or relating to the facts, matters, events, or alleged violations of the TCPA and Missouri No Call List and Telemarketing prohibitions, without any admission of wrongdoing by either Party.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual promises, covenants, representations, and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. <u>Payment and Consideration</u>

(i) Within five (5) business days of Plaintiff providing (a) a signed copy of this Agreement and (b) a fully executed IRS Form W-9 for Plaintiff's counsel, Defendant shall pay by ACH, a total amount of Five Thousand Dollars ($5,000.00) ("Settlement Payment") to Daniel Human via wire to Butler Law Group, LLC. ACH instructions to be supplied in a separate email.

(ii) The Parties will each bear their own attorneys' fees and costs expended in connection with the Complaint. Plaintiff agrees not to make any further demand for attorneys' fees, interest, costs, or expenses of any kind.

EXHIBIT
PENGAD 800-631-6989
2

2. General Release and Waiver

(i) Except as expressly set forth in this Agreement, for and in consideration of the mutual covenants set forth herein, which are hereby excluded from and survive this general release and waiver, Plaintiff, on his own behalf, and on behalf of his grantees, agents, representatives, heirs, devisees, trustees, assigns, assignors, attorneys, affiliates or any other entities in which Plaintiff has an interest (collectively, the "Releasing Parties"), hereby agrees to release and forever discharge Defendant and each of their respective affiliates and subsidiaries, and each of its respective past and present agents, employees, representatives, officers, directors, shareholders, attorneys, accountants, insurers, receivers, advisors, consultants, parents, divisions, successors, heirs, predecessors in interest, corporate parent, contractors, and commonly-controlled corporations including, but not limited to, its owners, affiliates, employees, and agents (collectively "Released Parties"), from all liabilities, causes of action, charges, complaints, suits, claims, obligations, costs, losses, damages, rights, judgments, attorneys' fees, expenses, bonds, bills, penalties, fines, and all other legal responsibilities of any form whatsoever, whether known or unknown, whether presently existing, whether suspected or unsuspected, whether fixed or contingent, including those arising under any theory of law, whether common, constitutional, statutory or other of any jurisdiction, foreign or domestic, whether in law or in equity, which they had or may claim to have against any of them, including, without limitation, those arising out of or relating to: (a) the subject matter of this Agreement and the Complaint; (b) any acts or omissions by the Released Parties, including any alleged violations of the TCPA and/or federal or state laws or regulations related to telemarketing; and (c) any costs, attorneys' fees, or expenses incurred by the Releasing Parties in connection with the subject matter hereof (collectively, the "Released Claims"). The Releasing Parties hereby acknowledge and agree that, except as expressly set forth in this Agreement, the Released Parties have no other liabilities or obligations, of any kind or nature, owed to the Releasing Parties, in connection with or relating to the Released Claims or otherwise. It is further understood and agreed that this Agreement and the Settlement Payment made hereunder constitute, full and final satisfaction of all claims of every nature, direct or indirect, against all persons or entities, including those who are or might be held to be joint and/or successor tortfeasors with any of the parties released hereby, as well as those to whom any of the parties released are, or may be held to be, liable by way of contribution or indemnity for the payment of all or any part of any claim arising out of, or directly or indirectly related to, the facts and circumstances that were alleged in connection with the Complaint. It is expressly understood and agreed that this release is intended to cover, and does cover, not only known injuries and damages.

(ii) Plaintiff acknowledges the following: (a) he is represented by counsel or has had the opportunity to retain and consult with counsel; and (b) he has been specifically advised by his counsel of the consequences of the above waiver and this Agreement generally or has otherwise had the opportunity to consult with counsel and knowingly elected not to.

(iii) Plaintiff represents and warrants that: (a) Plaintiff is duly authorized to enter into this Agreement and may lawfully bind Releasing Parties and all persons or entities on whose behalf Plaintiff have agreed herein; (b) Plaintiff has not sold, pledged, encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any of the claims released in the

general release above; (c) Plaintiff did not instigate or cause to instigate the Complaint and represents and warrants that his Claims are not fraudulent; and (d) Plaintiff is not the subject of any bankruptcy filing.

(iv) Plaintiff further agrees, promises, and covenants that he will not, nor will any person, organization, or any other entity acting on their behalf, file, charge, claim, sue, participate in, join or cause or permit to be filed, charged or claimed, any action for damages or other relief (including injunctive, declaratory, monetary or other) against the Released Parties with respect to any Released Claims. The Parties agree that this Agreement may be pleaded as a full and complete defense to any and all Released Claims and causes of action being released pursuant to this Agreement. Each Party acknowledges and consents that the Agreement may be used as the basis for an injunction to halt any action, suit or other proceeding based upon the Released Claims. This covenant not to sue applies to any claims that could be brought in any forum or jurisdiction and is intended to be a full and complete bar to any such claims.

3. <u>Covenant Not To Sue</u>

Unless otherwise prohibited by law, Human further covenants and acknowledges that neither Human nor anyone claiming through Human has or will sue or cause or permit suit against the Released Parties upon any claim released or purported to be released herein or to participate in any way in any suit or proceeding or to execute, seek to impose, collect, or recover upon or otherwise enforce or accept any judgment, decision, award, warranty, or attachment upon any claim released or purported to be released herein.

4. <u>Intent Not To Sue</u>

Unless otherwise prohibited by law, Human's counsel, Butler Law Group LLC represents that neither Butler Law Group LLC nor anyone claiming through Butler Law Group LLC has the present intent to sue and will not sue or cause or permit suit against Alleviate upon any claim released or purported to be released herein or to participate in any way in any suit or proceeding or to execute, seek to impose, collect, or recover upon or otherwise enforce or accept any judgment, decision, award, warranty, or attachment upon any claim released or purported to be released herein.

5. <u>Confidentiality and Non-Disparagement</u>

The Parties shall not discuss, publish, or share any copy of, or any details relating to, this Agreement with any person or entity not a party to this Agreement, in any form, which may include, but are not limited to, media materials, print, digital, social media, community forums, and other public and private publications, except that the Plaintiff may state that the matter has been "fully and amicably resolved without any admission of fault." Plaintiff agrees the terms and existence of this Agreement, and all information and communications exchanged during discussions and settlement negotiations leading up to this Agreement (collectively "Confidential

Information"), is strictly confidential, and they shall not reveal Confidential Information or the names of the Parties to this Agreement to any other person or entity, except: (i) as required by law or order of the court or the other government authority; (ii) as is reasonably necessary to be disclosed to any Party's accountants, tax advisors, or attorneys (provided the disclosing Party notifies such recipient of the disclosing Party's confidentiality obligations hereunder and obtains assurances that such recipient will ensure that Confidential Information is only disclosed in accordance with the terms of this Agreement); (iii) or as is reasonably necessary to the defense of any action or enforcement of any rights to which the terms of this Agreement may apply.

This confidentiality provision and agreement is a material term of this Agreement, breach of which the Parties hereby agree will cause the Parties irreparable harm. In the event of a breach of this provision by of this provision by either party, the non-breaching party shall be entitled to equitable relief to protect its interests. Such equitable relief shall in no way limit the non-breaching party's right to obtain other remedies available under applicable law. All releases read under this paragraph are limited to those which have accrued as of the date of this Agreement. The terms and existence of this Agreement may be disclosed if required by law or subpoena

The Parties agree to not make any statements, written or oral, or cause or encourage others to make any statements, written or oral, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of either Party or any of their affiliates, subsidiaries, employees, directors, and/or officers.

6. Injunctive Relief; Remedies

The Parties expressly acknowledge and agree that the confidentiality agreements set forth in Section 3 ("Confidentiality and Non-Disparagement") are material inducements to each Party to enter into this Agreement and to release the Released Claims. Furthermore, the Parties acknowledge and agree that the disclosure of information related to the terms of this Agreement as prohibited by Section 3 would cause the non-breaching Party to suffer immediate, irreparable injury for which money damages would be an inadequate remedy, and that the non-breaching Party will be entitled to injunctive relief, as provided for under applicable law or equity, without being required to post any bond or other security, in the event of any such breach. Injunctive relief will not be deemed the exclusive remedy for any such breach but will be in addition to all other remedies available under applicable law.

7. Representations and Warranties

(i) As a material inducement for Defendant entering into this Agreement, Plaintiff represents and warrants that he is the subscriber and user of the number allegedly called, were the contacted Party with respect to the Calls alleged in the Complaint; he did not induce, solicit, or provide prior express consent or prior express written consent for the Calls alleged in the Complaint and is unaware of how the Calls alleged were generated; and he has full authority to enter into this Agreement to fully and finally resolve claims related to any Calls or future calls received. Defendant further represents and warrants that he will not induce, solicit, or provide

consent or prior express written consent to Released Parties or in any way elicit calls from Released Parties.

(ii) As a material inducement for entering into this Agreement, the Parties represent and warrant to each other that:

(a) they are entering into this Agreement solely of their own judgment and free will, and after the opportunity for consultation with their own legal counsel;

(b) this Agreement is fair, reasonable, and in their best interest;

(c) they have relied upon nothing said by anyone connected with this dispute, other than their own legal counsel, either as to liability, as to the extent of damages, chances of success in the trial court or on appeal, insurance coverage available, or as to any other matter, except as expressly set forth in this Agreement;

(d) they and their attorneys, accountants, agents, representatives and other advisors have had sufficient disclosure of information and knowledge of all material facts and legal rights and remedies necessary to evaluate the conduct of the other Parties, which is sufficient to make an informed decision to enter into and approve the terms of this Agreement;

(e) they have full authority to execute this Agreement in the capacities noted so as to bind each such Party to this Agreement; and

(f) no oral understanding, statement, promises or inducements contrary to the terms of this Agreement exist.

8. No Admission of Fault or Liability

It is understood and agreed that this Agreement and the performance of other obligations herein, are for the sole purpose of compromising the disputed Released Claims, and that this Agreement shall not be construed as an admission of liability or wrongdoing by Defendant or any of the Released Parties.

9. Investigation

Each of the Parties has made such investigation of the facts pertaining to this Agreement, as it deems necessary. The Parties understand that if any fact with respect to any matter covered by this Agreement is found hereafter to be other than, or different from, the facts now believed by the parties to be true, each Party expressly accepts and assumes the risk of such possible difference in facts and agrees that this Agreement shall become and remain effective notwithstanding such different facts.

10. Integration Clause

This Agreement contains the entire agreement of the Parties and supersedes any and all prior, written or oral, agreements among them concerning the subject matter hereof. There are no

representations, agreements, arrangements or understandings, oral or written, among the Parties relating to the subject matter of this Agreement that are not fully expressed herein.

11. Consultation With Counsel

The Parties represent and warrant that they have had the opportunity to present this Agreement to counsel, if any, with this Agreement and that they are executing this Agreement of their own free will after having had to opportunity to receive advice from counsel regarding execution of this Agreement.

12. Attorneys' Fees

In the event that any action is taken to enforce the terms of this Agreement, the prevailing Party shall be entitled to recover, in addition to other damages or remedies, its reasonable attorneys' fees, court costs, and other costs and expenses reasonably incurred in connection therewith, including but not limited to any reasonable attorneys' fees, court costs and other costs and expenses incurred in connection with seeking to recover the attorneys' fees, court costs and other costs and expenses of enforcement provided for by this paragraph.

13. Taxes

Plaintiff shall be solely responsible for federal, state, and local taxes due on the Settlement Payment, if any, and he specifically agrees to indemnify and hold Defendant harmless for any claims involving federal, state, or local taxes resulting from such responsibility.

14. Severability

If any one or more of the provisions of this Agreement should be ruled wholly or partly invalid or unenforceable by a court or other government body of competent jurisdiction, then: (i) the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable shall be unaffected; (ii) the effect of the ruling shall be limited to the jurisdiction of the court or other government body making the ruling; (iii) the provision(s) held wholly or partly invalid or unenforceable shall be deemed amended, and the court or other government body is authorized to reform the provision(s), to the minimum extent necessary to render them valid and enforceable in conformity with the Parties' intent as manifested herein; and (iv) if the ruling and/or the controlling principle of law or equity leading to the ruling is subsequently overruled, modified, or amended by legislature, judicial, or administrative action, then the provision(s) in question as originally set forth in this Agreement shall be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity by the State of California.

15. No Waiver

The failure of any Party to insist upon compliance with any of the provisions of this Agreement or the waiver thereof, in any instance, shall not be construed as a general waiver or relinquishment by such Party of any other provision of this Agreement.

16. Modification and Amendment

This Agreement may not be waived, altered, amended, or repealed, in whole or in part, except upon written agreement executed by the Party or Parties against which enforcement is sought.

17. Agreement Obligates, Extends, and Inures

The provisions of this Agreement shall be binding upon each of the Parties and each of the Parties' directors, officers, members, shareholders, trustees, partners, successors, agents, assigns, attorneys and employees, if any, and upon those who may assume any or all of the above-described capacities subsequent to the Effective Date. The provisions of this Agreement shall inure to the benefit of each of the Parties and each of the Parties' directors, officers, members, shareholders, trustees, partners, successors, agents, assigns, attorneys and employees, if any.

18. No Reliance

Each of the Parties represents and warrants that, except for the representations and warranties specifically set forth in this Agreement, in executing this Agreement, it does not rely, and has not relied, on any representation or statement made by any other Party to this Agreement, on any representation or statement made anyone acting on behalf of any Party to this Agreement, or any representation or statement made by any other person.

19. No Assignment or Transfer of Action

Plaintiff, on behalf of himself and the Releasing Parties, represents and warrants that: (i) they own the Claims released hereby; (ii) no other person or entity has any interest in such Claims; (iii) they have not sold, assigned, conveyed or otherwise transferred any such Claim, or any other Claim or demand against any person or entity released hereby; and (iv) they have the sole right to settle and release such Claims. The undersigned represents and warrants that to the best of their information and belief, he has no knowledge of any Claims held by one against the other that are not released hereby.

20. Multiple Counterparts

This Agreement may be executed in counterparts, each of which may be executed and delivered via facsimile or PDF electronic delivery with the same validity as if it were an ink-signed document and each of which shall be effective and binding on the Parties as of the Effective Date. Each such counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one and the same Agreement.

21. Construction

Each Party hereto has cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the same shall not be construed against any Party on the ground that said Party drafted this Agreement. This Agreement shall be governed by, and

construed in accordance with, the laws of the United States, and to the extent not preempted, the substantive laws of California. Venue for any cause of action arising out of this Agreement shall lie in Orange County, California.

22. Mutual Drafting

This Agreement is the product of negotiations "at arm's length" between the undersigned, both of whom had ample time in which to seek legal advice, if desired. As such, the terms of this Agreement are mutually agreed upon, and no part of this Agreement will be construed against the drafter.

23. Arbitration Agreement

If a dispute arises regarding the settlement set forth herein, including, but not limited to, any breach or alleged breach of this Agreement by either of the Parties (e.g., violating the covenant not to sue requirements of this Agreement, violation of Plaintiff's Representations and Warranties, attempting to collect waived debt, violating the non-disclosure requirements of this Agreement, etc.) the aggrieved party shall initiate the resolution process by giving notice setting out, in writing and in detail, the issues in dispute and the value of the claim to the other party. A meeting (either in-person or telephonic) between the Parties, attended by individuals with decision-making authority, must take place within thirty days from the date the notice was sent in an attempt to resolve the dispute through direct negotiations. If the dispute cannot be settled by direct negotiations within thirty days of the initiation of the resolution process, the Parties may initial mediation by giving notice to the other party. Mediation shall be attended by an individual representing each party with decision-making authority and the proceeding shall take place in California. If the dispute is not resolved by mediation within sixty days from the day of the notice requiring mediation, or if the dispute is unresolved within ninety days from the date of notice requiring direct negotiations, then the dispute shall be finally settled by binding arbitration administrated by AAA or JAMS and either party may initiate arbitration by giving notice to the other party. A party who violates this section shall pay all legal and consulting fees and costs incurred by the other party in any suit, action or proceeding to enforce this section. While the procedures under this section are pending, each party shall continue to perform its obligations under this release, unless to do so would be impossible or impracticable under the circumstances.

**THE UNDERSIGNED HAVE READ THE FOREGOING SETTLEMENT AGREEMENT AND RELEASE, FULLY UNDERSTAND IT, AND AGREE TO THE TERMS SET FORTH HEREIN.**

**DANIEL HUMAN**

Daniel Human

Plaintiff

Date: August ___, 2024

**Alleviate Tax, LLC**

______________________________

**Authorized Representative**

**Date: August___, 2024.**

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This **CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE** (the "Agreement") is made this ____ day of September 2024 (the "Effective Date"), by and between Daniel Human ("Mr. Human") and Frubbel LLC d/b/a Valu-Pass ("Frubbel") (each a "Party" and collectively the "Parties").

## Recitals

WHEREAS, Mr. Human filed a lawsuit titled *Human v. Frubbel, LLC d/b/a Valu-Pass*, in the United States District Court for the Eastern District of Missouri (the "Lawsuit") against Frubbel in which Mr. Human alleges that he received phone calls from or on behalf of Frubbel in violation of the Telephone Consumer Protection Act;

WHEREAS, Frubbel denies any wrongdoing.

WHEREAS, the Parties wish to resolve any and all claims between them.

WHEREAS, the Parties desire to avoid the expense, inconvenience, uncertainty and distraction of litigation and any other issue or dispute between them, and the Parties have reached an agreement to settle completely all claims between them under the terms set forth below.

## Agreement

NOW, THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Settlement Payment.** In consideration for the release of claims and other promises by Mr. Human set out in this Agreement, Frubbel shall pay the total amount of three thousand dollars ($3,000.00) ("Settlement Payment") with seven (7) days of Mr. Human returning a signed Agreement and providing a completed W9 form from the Butler Law Group, LLC. This Settlement Payment constitutes a full and complete settlement of all claims Mr. Human may assert or rights to which Mr. Human may be entitled to, inclusive of attorneys' fees and costs against the Released Parties. Counsel for Mr. Human will provide instructions for payment via ACH.

2. **Release.** Mr. Human individually and on behalf of his agents, attorneys, and assigns, irrevocably and unconditionally releases, acquits and forever discharges Frubbel, and any of its principals, employees, officers, shareholders, agents, attorneys, assigns, franchisors, parents, subsidiaries, and affiliates (the "Released Parties") from any and all claims, rights, interests, causes of action, and/or remedies of any nature, kind, or description, whether known or unknown, as of the date of this Agreement.

3. **Covenant Not to Sue; Right to Cure.** Mr. Human agrees that he will not file a court action regarding the matters released herein. In addition, to the extent that Mr. Human believes that Frubbel engages in future conduct that would give rise to a legal claim, he must provide written notice to Frubbel at rwarren@globaltravel.com and by FedEx Overnight delivery

signature required to Frubbel LLC, 2699 Lee Road Suite 350, Winter Park, Fl 32789 , at which time, Frubbel shall have thirty (30) days from the date of notice receipt to correct or cure any alleged violation without penalty

4. **Acknowledgements, Warranties and Representations.** Mr. Human's counsel hereby represents and warrants, on behalf of himself and his law firm, that at the time of execution of the Agreement, that he is not aware of any clients currently represented by him (other than Mr. Human) who have or may have claims against Frubbel or any of the Released Parties, and that he has no present intention to solicit additional claims against Frubbel or any of the Released Parties

Acknowledged by Butler Law Group, LLC: /s/Edwin V. Butler
Edwin v. Butler, Esq.

5. **Severability.** If one or more of the provisions, or portions thereof, of this Agreement is determined to be illegal or unenforceable, the remainder of this Agreement shall not be affected thereby, and each remaining provision or portion thereof shall continue to be valid and effective and shall be enforceable to the fullest extent permitted by law.

6. **No Contra Proferentem.** The Parties have mutually negotiated this Agreement and hereby agree that it shall not be construed against any Party based upon the assertion that one or more of them was the "drafter."

7. **No Admission of Liability.** Nothing herein shall constitute an admission by Frubbel of any wrongdoing or liability, or of the truth of any allegations of Mr. Human. The negotiation and execution of this Agreement, and all acts performed or documents executed pursuant to or in furtherance of the Agreement: (i) are not and shall not be deemed to be, and may not be used as, an admission or evidence of any wrongdoing or liability on the part of Frubbel or of the truth of any of the allegations in connection with the Lawsuit; (ii) are not and shall not be deemed to be, and may not be used as, an admission or evidence of any fault or omission on the part of Frubbel in any civil, criminal or administrative proceeding in any court, arbitration forum, administrative agency or other tribunal; and, (iii) are not and shall not be deemed to be and may not be used as an admission of the appropriateness of similar claims for class certification.

8. **Voluntary Agreement.** The Parties acknowledge and agree that they have read all the provisions of this Agreement in full, have reviewed those provisions with an attorney or had the opportunity to seek legal advice and understand the provisions of this Agreement and voluntarily agree to be bound thereby. The Parties further acknowledge and agree that they are entering into this Agreement based solely and exclusively upon their counsel's and/or their own analysis of the facts and/or information of which the Party and/or its counsel is independently aware and not based upon or in reliance upon any statements and/or representations of any other Party (except to the extent such statements and/or representations are fully and expressly set forth herein). The Parties acknowledge and agree that the consideration received pursuant to this Agreement is fair, reasonable, sufficient, just and adequate, and constitutes lawful consideration supporting the execution of this Agreement.

9. **Entire Agreement:** This Agreement contains the entire agreement between the Parties with respect to the subject matter of this Agreement and any agreement hereafter made shall be ineffective to change, modify or discharge this Agreement unless such subsequent agreement is in writing and signed by the Parties. All previous contracts, warranties, communications, covenants, commitments, representations or agreements, whether written or oral, between and among the Parties and/or their attorneys, are superseded unless expressly incorporated and made a part of this Agreement.

10. **Confidentiality:** Parties represent and warrant that they have not disclosed, nor will they disclose in the future, facts and circumstances regarding the negotiations leading up to this Agreement and the terms herein to any third party except: (a) by compulsion of a valid and enforceable subpoena; (b) by compulsion of a valid order of a court of competent jurisdiction; (c) to the extent necessary for a Party's attorneys or tax advisors to assist in the conduct of their business affairs, provided, however, that prior to disclosure under subparagraphs (a) and (b) above, the Parties will make diligent efforts to give the other Party sufficient and reasonable notice of such subpoena or order of the court to enable such other Party to object to the same and to move to quash or to take such other action as is allowed by law to prevent disclosure pursuant thereto. The Parties further agree to take such action as may be permissible and/or required under the appropriate rules of the court or administrative regulations to protect and preserve the confidentiality of this Agreement. The Parties further represent and agree that they will not make, whether directly or indirectly, either in their own name, anonymously, through employees, or agents, or under any other name, any disclosures or comments regarding the existence and terms of this Agreement or settlement negotiations and communications between the parties, on any social media site or any other site on the internet.

11. **No Media Comment:** The Parties and their attorneys and agents agree not to issue any press releases, hold any interviews with journalists, or make any other disclosures or comments to media (including to media via the internet) regarding this Agreement or the negotiations and communications between the Parties regarding settlement. If asked about the Agreement or its subject matter, the Parties and attorneys and agents will state only that all disputes between the parties have been resolved amicably.

12. **Non-Disparaging Statements:** from and after the Effective Date of this Agreement, the Party's agrees not to make any disparaging statements, comments, or insinuations about Frubbel or Mr. Human, including, and without limitation to, any communications on any social media platform, website, blog or chat room or otherwise, or any products or service that either offers, whether true or false, oral or written.

13. **Ownership of Claims.** Mr. Human hereby warrants and represents that he owns the entirety of any alleged claims in connection with the Lawsuit which is being released herein, and that he has not assigned, expressly or impliedly, any interest in such claims, nor has there been assignment by operation of law, or otherwise, nor has either assigned his rights, or entered into a subrogation agreement with any insurance carrier, nor has either filed any bankruptcy petition, made any assignment for the benefit of creditors, or engaged in any other insolvency proceedings, which would result in the claims alleged being subject to a claim of partial or total beneficial, equitable or legal ownership in the name of a trustee on behalf of such party creditors, or a similar

fiduciary able to assert such position, or have the claims be subject to an attachment, or assigned in any way or in any manner to any person or entity not a party to this Agreement, and that Mr. Human therefore has the sole and exclusive authority to enter into this Agreement in connection with the allegations contemplated herein, and no other party is required to join herein in order to fully compromise and release any claim asserted or that could have been asserted in connection with the Lawsuit against Frubbel or its affiliates.

14. **Limitations of Liability.** NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT, IN NO EVENT WILL FRUBBEL OR ITS AFFILIATES, PRINCIPALS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS OR SUPPLIERS BE LIABLE TO MR HUMAN FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR SPECIAL DAMAGES, LOST DATA, DELAYS, LOST PROFITS, LOSS OF REVENUE OR ANY OTHER ECONOMIC LOSS, COST OR EXPENSE ARISING FROM OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, EVEN IF FRUBBEL OR ITS AFFILIATES, PRINCIPALS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS OR SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL FRUBBEL BE LIABLE FOR ANY TYPE OF LOSS TO YOU CAUSED BY AN EVENT BEYOND ITS CONTROL, INCLUDING, BUT NOT LIMITED TO, GOVERNMENT RESTRICTIONS, NATURAL DISASTERS, TERRORIST ACTS, WARS, RIOTS, STRIKES, AND OTHER ACTS OF GOD. IN NO EVENT WILL COMPANY'S TOTAL AGGREGATE LIABILITY UNDER THIS AGREEMENT, WHETHER ARISING OUT OF BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, EXCEED FIVE HUNDRED DOLLARS ($500). IN NO EVENT WILL MR. HUMAN BRING ANY ACTION AGAINST THE FRUBBEL MORE THAN ONE (1) YEAR AFTER SUCH CAUSE OF ACTION ARISES.

15. **Choice of Law; Venue.** This Agreement shall be considered executed in the State of Florida and will be interpreted, construed, and enforced in accordance with Florida law, without regard to any conflicts of law provisions. Except for requests for injunctive relief, any dispute, claim, or controversy arising out of or relating to this Agreement, including any breach, shall be resolved through final and binding arbitration, administered by the American Arbitration Association under its Commercial Arbitration Rules. The arbitration shall take place in person at a location closest to Orlando, Florida, and any award rendered by the arbitrator(s) may be entered as a judgment in any court with proper jurisdiction. Each Party shall bear its own arbitration costs and attorneys' fees, except that the arbitrator may award attorneys' fees and costs in the event the arbitration is found to be frivolous. Any litigation not subject to arbitration shall be exclusively brought before the State or Federal Courts closest to Orange County, Florida.

16. **Multiple Counterparts.** This Agreement may be executed on separate signature pages by each of the Parties and will be deemed fully executed when each Party has signed and delivered a signature page to the other Party. Original signatures transmitted by facsimile are acceptable. All executed signature pages will be aggregated and attached to this Agreement and will constitute the entire Agreement of the Parties.

17. **Tax.** Mr. Human agrees and acknowledges that neither Frubbel nor its counsel have made any representations to him regarding the tax consequences of any payments or amounts received by him pursuant to this Agreement.

18. **Survival.** The representations, warranties, covenants, obligations releases and indemnities of the Parties set forth in this Agreement shall survive the termination of this Agreement.

9/18/2024
Date

Daniel Human

Date

Frubbel, LLC d/b/a Valu-Pass.
By: ______________
Its: ______________

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Confidential Separation Agreement and Release of Claims ("Agreement") is entered into by and between American Financial Network ("AFN") and Daniel Human ("Human") (collectively the "Parties").

**WHEREAS**, Human alleges that he received telephone calls from agents or representatives of AFN in violation of the Telephone Consumer Protection Act ("TCPA") and on October 31, 2023, filed a Complaint Class Action in the Circuit Court of St. Louis County, Missouri which was subsequently removed to the United States District Court for the Eastern District of Missouri, Case No. 4:23-cv-01559 (hereafter, the "Lawsuit");

**WHEREAS**, AFN denies Human's allegations asserted in the Lawsuit and denies engaging in any unlawful conduct;

**WHEREAS**, the Parties wish to resolve the disputes between them, including those claims set forth in the Lawsuit, on the terms and conditions set forth in this Agreement; and

**WHEREAS**, solely in order to avoid the costs and expenses inherent in litigation, the Parties desire to fully, finally and forever compromise and settle any and all claims, controversies and disputes each of them has, or may ever have, against the other, including but not limited to the Lawsuit.

**NOW, THEREFORE**, in consideration of the mutual covenants, agreements and promises set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**1. Settlement Payment:** AFN shall pay to Human the total gross sum of *Three Thousand Seven Hundred Fifty Dollars and Zero Cents* ($3,750.00) ("Settlement Amount") for which an IRS Form 1099-MISC shall issue.

The Settlement Amount shall be delivered to Human's counsel, Butler Law Group, LLC via ACH payment on or before the 10th calendar day following AFN's receipt of this Agreement executed by Human and each page initialed by Human and a form W-9 for Human's counsel.

No other payments of any money or benefits of any type shall be paid to Human pursuant to this Agreement other than as described in this section.

**2. Dismissal of Lawsuit:** Within five (5) days of his counsel's receipt of the Settlement Amount, Human agrees to dismiss the Lawsuit, with prejudice, each party to bear their own fees and costs.

**3. No Admission of Liability**: It is understood and agreed that this Agreement is a compromise of disputed claims, that AFN and any other person or entity released herein denies any liability for the claims that have been asserted, and nothing contained herein is to be construed as an admission of liability or responsibility on the part of AFN or any other person or entity released herein.



DH___

**4. Release of Claims:** Human agrees to forever release and discharge AFN and its subsidiaries, related companies, parents, successors and assigns, officers, board of directors, agents, and employees from any and all claims, debts, promises, agreements, demands, causes of action, attorneys' fees, losses and expenses of every nature whatsoever, known or unknown, suspected or unsuspected, filed or unfiled, arising prior to the date the Human signs this Agreement or in connection with, relating to, or based upon facts in existence prior to the date of execution of this Agreement, including, but not limited to all claims of violation of public policy; all claims based on tort and/or breach of contract, whether written or oral, express or implied, and any covenant of good faith and fair dealing; all claims for emotional distress; and all claims for equitable relief. This release also includes, without limitation, any and all claims under any state, federal or local law or other authority, including, but not limited to, the Telephone Consumer Protection Act (42 U.S.C. § 227); the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.020); and any regulations under or amendments of such authorities.

It is understood and agreed that this is a full, complete and final general release of any and all claims described above, and that Human agrees that it shall apply to all unknown, unanticipated, unsuspected and undisclosed claims, demands, liabilities, actions or causes of action, in law, equity or otherwise, as well as those which are now known, anticipated, suspected or disclosed. The waivers and releases of this Agreement do not include any claims that cannot be released by law or any rights that may arise after the date this Agreement is executed. This Agreement constitutes the complete, final and exclusive embodiment of the entire agreement between Human and AFN with regard to this subject matter. Human is not relying on any promise or representation by AFN that is not expressly stated herein.

**5. Confidentiality and Non-disparagement:** Human agrees that he will keep the terms of this Agreement and the amount of the Settlement Amount completely confidential and that he will not disclose any information concerning this Agreement to anyone. Human further agrees that he will not discuss his allegations against AFN unless ordered by a Court of law. Human further agrees that if anyone asks him about his claims alleged or the resolution of his claims, he will simply respond by stating, "the matter has been resolved and the resolution is confidential," or similar words to that effect. Human agrees and promises that he will not undertake any harassing or disparaging conduct directed at AFN or any agent or employee of AFN, in any manner likely to be harmful to AFN's business interests, products, services, or business reputations, including but not limited to by means of Facebook, Instagram, Snapchat, X (formerly known as Twitter), Tik Tok, or any other social media outlet or publication. Human further agrees and promises that he will not induce or incite any claims against AFN by any other person. Human agrees that any act in violation of any, or all, of Paragraph 6 will cause irreparable harm to AFN. Human agrees and acknowledges that the provisions set forth in Paragraph 6 of the Agreement are material terms, and that if Human breaches the provisions in these Paragraphs, then AFN shall be entitled to liquidated damages in the amount of twenty percent (20%) of the Settlement Payment, per proven breach, as determined by a court of competent jurisdiction. Human agrees and acknowledges that if he breaches the provisions in this Paragraph, AFN shall have, in addition to and without limiting any other remedy or right it may have at law or in equity, or as otherwise provided in this Agreement, the right to a temporary and permanent injunction restraining any such breach, without any bond or security being required. Should AFN be deemed a prevailing party in any action to enforce any or all of Paragraph 3 of this Agreement, then AFN shall be entitled to an award of its



**DH**____

reasonable attorneys' fees and costs incurred as a result of a claim against Human.

6. **Severability:** If any provision or clause of the Agreement is declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, that provision will immediately become null and void, leaving the remainder of the Agreement in full force and effect.

7. **Counterparts:** This Settlement Agreement shall become effective upon its execution, subject to subsequent dismissal of the Lawsuit. The parties may execute this Settlement Agreement in counterparts, and execution in counterparts shall have the same force and effect as if Human and AFN had signed the same instrument. Any signature or e-signature made by the signing party and transmitted by facsimile, email, or electronic signature (via DocuSign, SignNow, or similar e-signing service) to execute this Settlement Agreement shall be deemed an original signature for purposes of this Settlement Agreement and shall bind the signing party.

8. **Complete Agreement:** This Agreement represents the complete understanding between the Parties regarding the subject matter herein. No other promises or agreements as to the subject matter herein shall be binding on the Parties or shall modify the Agreement unless made in writing and signed by the Parties. The Agreement supersedes any prior agreements between the Parties and shall be binding upon the Parties, their successors and assigns, as to the subject matter herein; provided, however, that to the extent the Parties previously entered into an agreement providing for the confidentiality of AFN's information, such agreement shall remain in full force and effect. The Parties represent that they have not relied upon any promise or representation not contained in the Agreement in executing it. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

9. **Controlling Law:** This Agreement is made and entered into in Missouri and, to the extent the interpretation of this Agreement is not governed by applicable federal law, it shall be interpreted and enforced under and shall be governed by the laws of that state.

By signing below, Human affirms that he has read, and that he fully understands, the foregoing Settlement Agreement, including (but not limited to) its release of claims. Human affirms that he has been provided sufficient time to review the Agreement, that he has been advised to consult with legal counsel of his choice before executing the Agreement, and that he has done so.

| AMERICAN FINANCIAL NETWORK, INC. | DANIEL HUMAN<br>I am signing this Agreement voluntarily. |
|---|---|
| ______________________ | [signature] |
| Date: ______________ | Date: 8 / 6 / 2024 |



DH____

## ATTORNEYS' ACKNOWLEDGMENT AND RELEASE OF LIEN

Edwin Butler of Butler Law Group, LLC ("Human's Attorney") waives any claim to attorneys' liens or claims for fees and expenses and acknowledge that all such attorneys' liens or claims for fees and expenses have been satisfied by the AFN, by virtue of the payment of the Settlement Amount paid pursuant to this Confidential Settlement Agreement and Release of All Claims. Human's confidentiality commitments are binding upon Human's Attorney so that any violation of the confidentiality commitments by Human's Attorney have the same effect as if Human violated the confidentiality commitments.

**EDWIN BUTLER**
**BUTLER LAW GROUP, LLC**

Signature: Ed Butler

Date: August 8, 20[illegible]



DH____

**IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
AT SALT LAKE CITY**

| | | |
|---|---|---|
| Policy Scout, LLC, A Delaware Limited Liability Company,<br><br>Plaintiff/Counterdefendant,<br><br>Vs.<br><br>DANIEL HUMAN,<br><br>Defendant/Counterclaimant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 2:23-cv-00934-CMR |

---

## NOTICE OF SETTLEMENT

---

COMES NOW Defendant/Counterclaimant Daniel Human and hereby provides notice of settlement. The Parties anticipate that a joint notice of voluntary dismissal with prejudice of this case will be filed in the next three (3) days. In the meantime, the Parties respectfully request that the Court vacate all pending deadlines and stay the case, and that the Court retain jurisdiction and not dismiss the matter for fourteen (14) days pending completion and execution of all necessary documents.

Respectfully submitted,

/s/Daniel Human, pro se
Daniel Human
10423 Conway Rd.
St. Louis, MO 63131
Dh68litigation@yahoo.com

(314) 915-2988

Defendant pro se

Dated: January 24, 2024.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2024, a copy of the foregoing was filed electronically in the CM/ECF filing and notification system via pro se email filing procedures. Notice of this filing will be sent to the Plaintiff's counsel via electronic email and through the CM/ECF filing and notification system when processed by the Clerk of the Court.

Jodan Cameron
Cameron Ringwood, LC
6975 South Union Park Avenue
Suite 600
Cottonwood Heights, UT 84047
(385) 463-2425
jordan@cameronringwood.com

/s/Daniel Human
Daniel Human

# SETTLEMENT AGREEMENT, RELEASE, AND GENERAL WAIVER

This Settlement Agreement, Release and Waiver of All Claims ("Agreement") is entered into this 22nd day of January 2024 ("Effective Date"). The Parties to this Agreement are PolicyScout, LLC ("PolicyScout") on the one hand, and Dan Human ("Human") on the other hand. The parties to this Agreement are collectively referred to herein as the "Parties."

## RECITALS

PolicyScout filed a lawsuit against Human on October 11, 2023, in Utah Third District Court, Case No. 2309070677. The case was remanded to Utah Federal Court and assigned Case No. 2:23-cv-00934-CMR. Hereinafter, the "PolicyScout Lawsuit";

Human filed a *Counterclaim* in Missouri Federal Court, Case No. 4:23-cv-01377-SEP. That case was remanded to Utah and became part of the PolicyScout Lawsuit. Hereinafter, the "Human Lawsuit").

Each party denies all allegations of wrongdoing and denies each other Party's claims for relief;

NOW THEREFORE, consistent with the above promises, and for good and valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

## TERMS AND CONDITIONS

1. **Releases and Waivers.**

Except as to rights and obligations created by this Agreement, and subject to the parties compliance with their obligations under this Agreement, for value received, the receipt and adequacy of which is hereby acknowledged, each party hereby generally and mutually releases, waives, relinquishes and forever disavows and discharges any and all claims, demands, liabilities, obligations, debts, losses, injuries, costs, remedies, damages (including general, special, consequential, incidental, exemplary, punitive, etc.) and causes of action of any kind or character, in law or in equity, whether direct or indirect, known or unknown, presently existing or arising in the future, that each of them may have against one another, with respect to (a) the PolicyScout Lawsuit; (b) the Human Lawsuit; (c) any communications, telephonic or otherwise, between them; (d) any claims or controversies regarding any statements published or spoken against the other party; and (e) any costs, attorneys' fees or expenses incurred with respect to the claims identified herein. The foregoing releases and waivers shall extend to the PolicyScout and its shareholders, officers, directors, employees, attorneys, agents and assigns. This release and waiver is intended to be construed as broadly as possible.

It is agreed and understood that as to the matters released herein, the releases being provided apply to all injuries and damages, whether now known or unknown, and whether now existing or which may result in the future.

The Parties acknowledge that after they sign the Agreement, they may discover facts in addition to or different from those the Parties now know or believe to exist with respect to the claims released above and that if known or suspected at the time of executing this Agreement may have materially affected this Agreement. Nonetheless, the Parties agree to, and do hereby, waive and relinquish all rights afforded to them under California Civil Code section 1542, or any similar law of any State or territory of the United States or other jurisdiction.

The foregoing releases and waivers shall extend to PolicyScout and its shareholders, officers, directors, employees, attorneys, agents and assigns. This release and waiver are intended to be construed as broadly as possible.

Additionally, the Parties agree that this Agreement may be pleaded as a full and complete defense to any and all claims and causes of action being released in accordance with this Agreement, and the Parties hereto consent that it may be used as the basis for an injunction to halt any action, suit or other proceeding based upon claims released by this Agreement.

2. **Consideration.**

a. Dismissal With Prejudice. Within three (3) days of Human's filing Notice of Settlement, the Parties shall jointly move the Missouri and Utah courts for dismissal of the Human Lawsuit and the PolicyScout Lawsuit with prejudice, and each party will bear their own costs and attorney fees, to include waiver of the attorney fee award based on the improper removal to Missouri under Case No. 4:23-cv-01377-SEP.

b. Representations and Warranties. As material inducement for PolicyScout's entering into this Agreement, Human represents and warrants as follows: (1) Human does not submit his contact information through websites with the intent of generating calls for purposes of pursuing demands or lawsuits under TCPA or similar state laws; (2) Human did not intentionally submit his information to PolicyScout; and (3) Human will never in the future submit any contact information to any website owned, operated, or controlled by PolicyScout, or that otherwise identifies PolicyScout as a party who may contact Mr. Human.

3. **Notice and Cure.**

a. Within three (3) days of the execution of this Agreement, Human shall provide to PolicyScout a list of each and every phone number he presently has. PolicyScout will only use the phone numbers to ensure they are added to PolicyScout's internal Do Not Call List.

b. In the event Human receives any telephonic communication from, or on behalf of, PolicyScout in the future, to any phone number produced pursuant to 3.a. herein above, or any other phone number Human has not disclosed ("Future Communication"), Human may provide details of the Future Communication, including date, time, caller phone number, caller name, and recipient phone number, to PolicyScout within ten (10) days of Human's receipt of the Future Communication. ("Communication Notice").

c. Upon its receipt of a Communication Notice, PolicyScout thereafter has fourteen (14) days to add the phone number to PolicyScout's internal Do Not Call List. If PolicyScout adds the phone number to its Do Not Call List, and provides notice to Human regarding the same, the Releases and Waivers set forth herein above apply to Future Communications.

d. If Human elects not to provide a Communication Notice for any Future Communication to PolicyScout, he is forever precluded from pursuing claims against any party or otherwise complaining of the Future Communication in any manner.

4. **Costs and Fees.**

Each party to this Agreement shall bear its own costs and fees incurred in relation to this Agreement and all the claims and counterclaims which are released.

5. **Notice.**

a. To PolicyScout: PolicyScout
Attn: Compliance Officer
18080 S River Front Parkway, Suite 500
South Jordan, UT 84095

AND with a copy by email to:

Jordan Cameron
jordan@cameronringwood.com

b. To Human:

Edwin V. Butler
edbutler@butlerlawstl.com

6. **Choice of Law and Venue.**

This Agreement shall be interpreted and construed pursuant to the laws of the State of Utah. In the event any party hereto commences an action to enforce the terms hereof, the only proper venue for such action shall be the courts location in Utah. Each party submits to the jurisdiction of the courts located in Utah.

7. **No Admission of Fault, Liability and Non-Disparagement.**

It is understood and agreed that this Agreement and the performance of other obligations herein are made and entered into for the sole purpose of compromising disputed claims and this Agreement shall not be construed as an admission of liability by any party, liability being expressly denied by each party. Human agrees not to disparage PolicyScout, as to the issues being settled and released by this Settlement Agreement or any other issue. PolicyScout agrees not to disparage Human as to any issue being settled or any other issue. Each Party agrees not to

publicly publish this agreement to any other party in any other pending or future litigation or proceeding or on the internet unless required by the Court. If asked about this matter, the Parties are free to state that the matter settled without the payment of money or monetary consideration of any kind.

8. **Binding Agreement.**

This Agreement shall be binding upon each the parties hereto and shall inure to the benefit of each of the parties and their respective heirs, successors, attorneys, accountants, agents, partners, servants, employees, administrators, directors, officers, shareholders, trustees, insurers, representatives, and assigns.

9. **Enforcement.**

If any legal action or other proceeding is brought for the enforcement of this Agreement or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this agreement, the prevailing party shall be entitled to recover his, her or its reasonable attorney's fees and other fees and costs incurred in any such action or proceeding in addition to any other relief to which such party may be entitled.

10. **No Reliance.**

The Parties represent and warrant that, in executing and entering into this Agreement, they are not relying and have not relied upon any representation, promise or statement made by anyone which is not recited, contained or embodied in this Agreement. Furthermore, each of the parties to this Agreement has received independent legal advice or has had the opportunity to receive independent legal advice, from such Party's respective attorneys with respect to the advisability of executing this Agreement. The Parties are entering into this Agreement wholly of their own free will and volition.

11. **Entire Agreement.**

This Agreement comprises and contains the entire agreement between the Parties respecting the matters set forth in this Agreement, and supersedes and replaces all prior negotiations, understandings, proposed agreements and agreements between the Parties, written or oral. Neither Party has made any statement, representation or promise, other than as expressly set forth herein, to any other Party in entering into this Agreement, which has been relied upon by any other Party entering into this Agreement.

12. **Modification and Amendment.**

This Agreement may not be modified or amended in any way, except by a writing signed by the Party to be charged therewith.

13. **Construction of this Agreement.**

The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any Party hereto. Both Parties have participated in drafting this Agreement, which is the result of negotiations between the Parties, all of which have been represented by counsel during such negotiations or have had the opportunity to be represented by counsel. Accordingly, for purposes of interpreting this Agreement, it shall be considered that this Agreement was jointly drafted by all of the Parties. The Parties understand and expressly assume the risk that any fact not recited, contained or embodied herein may turn out hereafter to be other than, different from, or contrary to the facts now known to them or believed by them to be true. Nevertheless, the Parties intend by this Agreement to release finally, fully and forever, all matters released hereunder and agree that this Agreement shall be effective in all respects notwithstanding any such difference in facts, and shall not be subject to termination, modification or rescission by reason of any such difference in facts.

14. **Assignment.**

Unless otherwise disclosed by either Party, the Parties have not made or suffered any assignment, subrogation, hypothecation or other disposition of any claim, right, title, interest, demand or obligation it may possess relating to the matters set forth herein.

15. **Authority of Signatories.**

Each of the Parties to this Agreement represents and warrants that he/she/it is authorized to enter into this Agreement and that any required consents, authorizations, or approvals have been obtained.

16. **Counterparts; Facsimile and PDF Signatures.**

This Agreement may be executed in counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same Agreement. Facsimile and PDF signatures shall have the same force and effect as original signature.

**PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

IN WITNESS WHEREOF, the undersigned do hereby execute this agreement on the date first referenced above.

| POLICYSCOUT, LLC | DAN HUMAN |
| --- | --- |
| | Dan Human 1.22.24 |
| By:<br>Title: | By: Dan Human |

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is made and entered into as of the date of the last signature below, by and between Daniel Human ("Human") and Benepath, Inc d/b/a Benepath Insurance Agency, Compare Health Quotes, Clelland Green, Mike Pennewill, and Jennifer Gertz (collectively the "Defendants" or "Benepath") (Human and Defendants are collectively referred to as the "Parties").

## RECITALS

The following recitals are confirmed by the Parties as true and correct and are a substantive and contractual part of this Agreement.

**WHEREAS,** Human asserted claims against Defendants for specific violation(s) of the Telephone Consumer Protection Act, Missouri Telemarketing and No Call List Law, among other claims asserted in written correspondence and a complaint sent to the Defendants (collectively, "Allegations"). The case was removed to the United States District Court for the Eastern District of Missouri and was styled as Human v. Benepath, et al., 4:23-cv-00865 MTS.

**WHEREAS,** Defendants deny the Allegations in their entirety.

**WHEREAS,** the Parties now wish to resolve all disputes between them without the further costs of litigation and without admission of any liability. This includes any and all disputes or claims that Human may have against the Defendant Released Parties (defined below), known or unknown, or asserted, unasserted, or assertable by him at the time he executes this Agreement, including, without limitation, including the allegations in the First Amended complaint and concrete injuries to his rights to privacy and seclusion evinced therein.

**NOW, THEREFORE,** in consideration of the mutual promises and payment set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. ***Payment and Other Consideration***. Defendants will pay the total sum of Twelve Thousand Dollars and No Cents ($12,000.00) (the "Payment") to Human inclusive of all damages for personal injuries stated, statutory penalties, costs, expenses, and attorneys' fees, within 5 days of receipt by Defendants of Human's execution of this Agreement and for each party. The funds are to be ACH transferred into the Butler Law Group's trust account within that time frame, or a settlement check is to be delivered to Plaintiff's counsel's office within that period. Counsel will provide all ACH instructions upon request.

2. ***Mutual Release.*** UPON EXECUTION OF THIS AGREEMENT, HUMAN ON BEHALF OF HIMSELF IN CONSIDERATION OF THE ACTS AND PROMISES DESCRIBED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, HEREBY RELEASES AND FOREVER DISCHARGES ON BEHALF OF HIMSELF AND ON BEHALF OF ANY OF HIS CURRENT AND FORMER LEGAL REPRESENTATIVES AND HEIRS, DEFENDANTS PAR MANAGEMENT LLC D/B/A GLO TANNING CENTERS, INC

AND EACH OF THEIR RESPECTIVE AND CURRENT AND FORMER LEGAL REPRESENTATIVES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, ATTORNEYS, INSURERS, EMPLOYEES, MANAGERS, AGENTS, AFFILIATES, PARENTS, ASSIGNS, SUCCESSORS, AND OTHERS ACTING ON THEIR BEHALF, WHETHER NAMED IN THIS AGREEMENT OR NOT (COLLECTIVELY "DEFENDANT RELEASED PARTIES"), FROM ANY AND ALL KNOWN OR UNKNOWN CLAIMS, LAWSUITS, LIABILITIES, DEMANDS AND CAUSES OF ACTION OF ANY SORT AND ALL DAMAGES, IN LAW, EQUITY OR CONTRACT, WHICH HUMAN NOW HAS OR MAY HAVE, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO OR ASSERTABLE IN CONNECTION WITH THE ALLEGATIONS, AND ANY AND ALL CLAIMS WHICH WERE OR COULD HAVE BEEN ASSERTED AGAINST THE DEFENDANT RELEASED PARTIES AS OF THE DATE HUMAN SIGNS THIS AGREEMENT.

HUMAN INTENDS, IN EXECUTING THIS AGREEMENT, AND DOING THE ACTS CALLED FOR HEREIN, THAT THIS AGREEMENT CONSTITUTES A FULL AND FINAL ACCORD AND SATISFACTION AND SETTLEMENT OF AND A BAR TO EACH AND EVERY ITEM HEREBY RELEASED. IN CONNECTION WITH SUCH SETTLEMENT, RELEASE AND WAIVER, HUMAN ACKNOWLEDGES THAT HE IS AWARE THAT HE MAY DISCOVER FACTS DIFFERENT FROM OR IN ADDITION TO THE FACTS HE NOW KNOWS OR BELIEVES TO BE TRUE.

3. ***Dismissal.*** Human represents and warrants that he has filed a lawsuit or other legal proceeding regarding the subject matter of this Agreement and he agrees file a motion to dismiss the lawsuit with prejudice or other legal proceeding as long as the terms of the Agreement are satisfied by Defendants. If Claimant has filed a lawsuit, then he agrees to file a joint stipulation of dismissal with prejudice of the lawsuit within 5 days of his receipt of the Payment.

4. ***Admissions.*** It is expressly understood and agreed to by and between the Parties hereto that by entering into this Agreement, none of the Parties hereto admit the truth of any allegations made by any other party. This Agreement, and the compromise of disputed claims herein, shall not constitute a confession of judgment by any party.

5. ***Confidentiality Covenant***. From the date of this Agreement, except as otherwise specifically provided in this Agreement, neither the Parties nor anyone on their behalf shall disclose (in whole or in part) any of the terms or provisions of this Agreement to any other person or entity, unless and to the extent disclosure is compelled by an order from a court of competent jurisdiction, required by law, to secure advice from a legal or tax advisor, as necessary to disclose to lenders, auditors, potential successors, successors, or regulators, or as necessary to enforce this Agreement. The Parties may tell third parties that the Parties have amicably resolved their disputes.

6. ***Miscellaneous.*** The Parties acknowledge that each has had the assistance of counsel in this matter and that each has a full understanding of the above settlement and the contents, meaning and effect of this Agreement, and it is their intent to enter herein, and that this

Agreement is contractual in nature and not a mere recital, and that the settlement, discharge and release embodied in this Agreement shall inure to the benefit of the successors and assigns of each party.

7. ***Governing Law.*** This Agreement is governed by Missouri law without reference to its conflicts of laws provisions.

8. ***Effect of this Agreement.*** This Agreement is the entire Agreement between the Parties with respect to the subject matter hereof. It may be amended only by an agreement in writing, signed by the parties hereto.

9. ***Binding Effect.*** This Agreement is binding upon, and shall inure to the benefit of, the Parties hereto and the Defendant Released Parties and Human Released Parties.

10. ***Preparation of Agreement.*** Each party has cooperated in the preparation of this Agreement, and if any construction is made of this Agreement, each party shall be deemed to have cooperated in the drafting and preparation of this Agreement.

11. ***Captions.*** The captions and headings in this Agreement are for convenience of reference only and in no way define, limit or describe the scope or intent of any provisions or sections of this Agreement.

12. ***Execution in Counterparts.*** This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The Parties further agree that facsimile or electronic signatures shall be deemed sufficient to bind the Parties.

13. ***Severability.*** The invalidity, in whole or in part, of any term of this Agreement does not affect the validity of the remainder of this Agreement.

14. It is agreed by the parties, that any Benepath, Inc. Officer or legal representative can execute his/her signature on behalf of the collective Defendants, which is binding upon both Human and the collective Defendants to settle these disputes finally and fully.

IN WITNESS HEREOF, and intending to be legally bound hereby, the Parties hereto have executed this Agreement.

______________________________
Daniel Human

This 1st[th] day of August, 2023.

By:

______________________________
Authorized Representative
Benepath, Inc.

Date: This __ day of August, 2023.

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is made and entered into as of the date of the last signature below, by and between Daniel Human ("Human") and Benepath, Inc d/b/a Benepath Insurance Agency, Compare Health Quotes, Clelland Green, Mike Pennewill, and Jennifer Gertz (collectively the "Defendants" or "Benepath") (Human and Defendants are collectively referred to as the "Parties").

**RECITALS**

The following recitals are confirmed by the Parties as true and correct and are a substantive and contractual part of this Agreement.

**WHEREAS,** Human asserted claims against Defendants for specific violation(s) of the Telephone Consumer Protection Act, Missouri Telemarketing and No Call List Law, among other claims asserted in written correspondence and a complaint sent to the Defendants (collectively, "Allegations"). The case was removed to the United States District Court for the Eastern District of Missouri and was styled as Human v. Benepath, et al., 4:23-cv-00865 MTS.

**WHEREAS,** Defendants deny the Allegations in their entirety.

**WHEREAS,** the Parties now wish to resolve all disputes between them without the further costs of litigation and without admission of any liability. This includes any and all disputes or claims that Human may have against the Defendant Released Parties (defined below), known or unknown, or asserted, unasserted, or assertable by him at the time he executes this Agreement, including, without limitation, including the allegations in the First Amended complaint and concrete injuries to his rights to privacy and seclusion evinced therein.

**NOW, THEREFORE,** in consideration of the mutual promises and payment set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. ***Payment and Other Consideration***. Defendants will pay the total sum of Twelve Thousand Dollars and No Cents ($12,000.00) (the "Payment") to Human inclusive of all damages for personal injuries stated, statutory penalties, costs, expenses, and attorneys' fees, within 5 days of receipt by Defendants of Human's execution of this Agreement and for each party. The funds are to be ACH transferred into the Butler Law Group's trust account within that time frame, or a settlement check is to be delivered to Plaintiff's counsel's office within that period. Counsel will provide all ACH instructions upon request.

2. ***Mutual Release.*** UPON EXECUTION OF THIS AGREEMENT, HUMAN ON BEHALF OF HIMSELF IN CONSIDERATION OF THE ACTS AND PROMISES DESCRIBED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, HEREBY RELEASES AND FOREVER DISCHARGES ON BEHALF OF HIMSELF AND ON BEHALF OF ANY OF HIS CURRENT AND FORMER LEGAL REPRESENTATIVES AND HEIRS, DEFENDANTS PAR MANAGEMENT LLC D/B/A GLO TANNING CENTERS, INC

AND EACH OF THEIR RESPECTIVE AND CURRENT AND FORMER LEGAL REPRESENTATIVES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, ATTORNEYS, INSURERS, EMPLOYEES, MANAGERS, AGENTS, AFFILIATES, PARENTS, ASSIGNS, SUCCESSORS, AND OTHERS ACTING ON THEIR BEHALF, WHETHER NAMED IN THIS AGREEMENT OR NOT (COLLECTIVELY "DEFENDANT RELEASED PARTIES"), FROM ANY AND ALL KNOWN OR UNKNOWN CLAIMS, LAWSUITS, LIABILITIES, DEMANDS AND CAUSES OF ACTION OF ANY SORT AND ALL DAMAGES, IN LAW, EQUITY OR CONTRACT, WHICH HUMAN NOW HAS OR MAY HAVE, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO OR ASSERTABLE IN CONNECTION WITH THE ALLEGATIONS, AND ANY AND ALL CLAIMS WHICH WERE OR COULD HAVE BEEN ASSERTED AGAINST THE DEFENDANT RELEASED PARTIES AS OF THE DATE HUMAN SIGNS THIS AGREEMENT.

HUMAN INTENDS, IN EXECUTING THIS AGREEMENT, AND DOING THE ACTS CALLED FOR HEREIN, THAT THIS AGREEMENT CONSTITUTES A FULL AND FINAL ACCORD AND SATISFACTION AND SETTLEMENT OF AND A BAR TO EACH AND EVERY ITEM HEREBY RELEASED. IN CONNECTION WITH SUCH SETTLEMENT, RELEASE AND WAIVER, HUMAN ACKNOWLEDGES THAT HE IS AWARE THAT HE MAY DISCOVER FACTS DIFFERENT FROM OR IN ADDITION TO THE FACTS HE NOW KNOWS OR BELIEVES TO BE TRUE.

3. ***Dismissal.*** Human represents and warrants that he has filed a lawsuit or other legal proceeding regarding the subject matter of this Agreement and he agrees file a motion to dismiss the lawsuit with prejudice or other legal proceeding as long as the terms of the Agreement are satisfied by Defendants. If Claimant has filed a lawsuit, then he agrees to file a joint stipulation of dismissal with prejudice of the lawsuit within 5 days of his receipt of the Payment.

4. ***Admissions.*** It is expressly understood and agreed to by and between the Parties hereto that by entering into this Agreement, none of the Parties hereto admit the truth of any allegations made by any other party. This Agreement, and the compromise of disputed claims herein, shall not constitute a confession of judgment by any party.

5. ***Confidentiality Covenant.*** From the date of this Agreement, except as otherwise specifically provided in this Agreement, neither the Parties nor anyone on their behalf shall disclose (in whole or in part) any of the terms or provisions of this Agreement to any other person or entity, unless and to the extent disclosure is compelled by an order from a court of competent jurisdiction, required by law, to secure advice from a legal or tax advisor, as necessary to disclose to lenders, auditors, potential successors, successors, or regulators, or as necessary to enforce this Agreement. The Parties may tell third parties that the Parties have amicably resolved their disputes.

6. ***Miscellaneous.*** The Parties acknowledge that each has had the assistance of counsel in this matter and that each has a full understanding of the above settlement and the contents, meaning and effect of this Agreement, and it is their intent to enter herein, and that this

Agreement is contractual in nature and not a mere recital, and that the settlement, discharge and release embodied in this Agreement shall inure to the benefit of the successors and assigns of each party.

7. ***Governing Law.*** This Agreement is governed by Missouri law without reference to its conflicts of laws provisions.

8. ***Effect of this Agreement.*** This Agreement is the entire Agreement between the Parties with respect to the subject matter hereof. It may be amended only by an agreement in writing, signed by the parties hereto.

9. ***Binding Effect.*** This Agreement is binding upon, and shall inure to the benefit of, the Parties hereto and the Defendant Released Parties and Human Released Parties.

10. ***Preparation of Agreement.*** Each party has cooperated in the preparation of this Agreement, and if any construction is made of this Agreement, each party shall be deemed to have cooperated in the drafting and preparation of this Agreement.

11. ***Captions.*** The captions and headings in this Agreement are for convenience of reference only and in no way define, limit or describe the scope or intent of any provisions or sections of this Agreement.

12. ***Execution in Counterparts.*** This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The Parties further agree that facsimile or electronic signatures shall be deemed sufficient to bind the Parties.

13. ***Severability.*** The invalidity, in whole or in part, of any term of this Agreement does not affect the validity of the remainder of this Agreement.

14. It is agreed by the parties, that any Benepath, Inc. Officer or legal representative can execute his/her signature on behalf of the collective Defendants, which is binding upon both Human and the collective Defendants to settle these disputes finally and fully.

IN WITNESS HEREOF, and intending to be legally bound hereby, the Parties hereto have executed this Agreement.

Daniel Human

Daniel Human

This 1st[th] day of August, 2023.

By:

______________________________

Authorized Representative
Benepath, Inc.

Date: This __ day of August, 2023.

# SETTLEMENT AGREEMENT AND RELEASE

This confidential Settlement Agreement and Release (the "Agreement") is hereby made by and between Plaintiff Daniel Human ("Plaintiff") and Defendant Priority Automotive, Inc. d/b/a BMW of West St. Louis ("Defendant"). Plaintiff and Defendant shall be collectively referred to as the "Parties."

WHEREAS, Defendant is engaged in certain forms of sales and marketing either on its own behalf, through others, or on behalf of others;

WHEREAS, Plaintiff has alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq.*, by Defendant and/or the affiliates or partners of the same;

WHEREAS, Plaintiff commenced a class action lawsuit in the Circuit Court of St. Louis County, Missouri, then defendant removed to the Eastern District of Missouri (No. 4:23-cv-1577), captioned as *Daniel Human v Priority Automotive, Inc.* (the "Litigation"), seeking recovery for the alleged violations;

WHEREAS, Defendant denies any and all liability in the Litigation to Plaintiff or any others;

THEREFORE, for and in consideration of the foregoing promises, the covenants set forth herein, and other good and valuable consideration, the Parties to this Agreement desire to compromise, settle, and release any and all claims arising out of or relating to the alleged violations, without any admission of wrongdoing by Defendant, and hereby agree and warrant as follows:

1. Effective Date. By completing and signing this Agreement, the Parties agree to be bound by its terms once it is signed by all Parties hereto. All Parties must execute this Agreement for it to be effective. The "Effective Date" is the date on which the last party hereto signs the Agreement.

2. Payment by Defendant. In exchange for the promises and releases herein, Defendant agrees to send Plaintiff and Plaintiff's Counsel eight-thousand five-hundred dollars ($8,500) via ACH transfer to Plaintiff's Counsel's trust account, inclusive of attorneys' fees and costs (the "Settlement Amount"), no later than five (5) business days after the later of the (1) Effective Date, (2) the date that Defendant receives a W-9 (Rev. 2018) for Plaintiff's counsel signed within the past six months; and (3) Defendant receives ACH bank information to be used for the wire.

3. Dismissal. Plaintiff will file a dismissal with prejudice—dismissing all of Plaintiff's claims against Defendant and this Litigation in its entirety—within five (5) days of receiving the Settlement Amount. The Parties understand that this will fully resolve the Litigation between them.

4. Release.

Plaintiff, for and on behalf of himself, relatives (including, but not limited to, Daniel Human), heirs, executors, personal representatives, administrators, agents, attorneys, paralegals, predecessors, successors, and assigns ("Releasing Parties"), release and absolutely forever discharges the Defendant, its respective parents, subsidiaries, corporate affiliates, vendors, and all of its past and present officers, directors, members, shareholders, employees, insurers, assigns, heirs, executors, personal representatives, administrators, predecessors and successors, agents, advertising networks, of and from all claims, demands, damages, debts, liabilities, accounts, obligations, costs, expenses, liens, actions and/or causes of action of every kind or nature whatsoever, in law or in equity, whether known or unknown, accrued or unaccrued, contingent or non-contingent, which Plaintiff ever had or now has that has occurred between Plaintiff and Defendant from the beginning of time up to and including the Effective Date. Plaintiff does not release in this paragraph any executor performances required by Defendant under this Agreement, and further, does not release any third-party marketing partners, sub-contractors, telemarketers or affiliates other than those enumerated above.

The Releasing Parties acknowledge that they may hereafter discover facts different from, or in addition to, those which they now believe to be true. The Releasing Parties agree that the foregoing release and waiver shall be and remain effective in all respects notwithstanding such different or additional facts or discovery thereof. By executing this Agreement, the Releasing Parties acknowledge that they are represented by counsel, and they have been specifically advised by their counsel of the consequences of the above waiver and this Agreement generally.

5. Confidentiality and Non-Disparagement. Plaintiff shall not discuss, publish or share any copy of, or any details relating to, this Agreement with any person or entity not a party to this Agreement, except that Plaintiff may state if required by law that the matter has been "fully and amicably resolved without any admission of fault." Plaintiff shall also refrain from making any oral or written communication to any person or entity which disparages, or has the effect of damaging, the reputation of the Released Parties. Likewise, the Released Parties agree to never disparage or in any way damage the reputation of the Plaintiff.

6. Denial of Liability. It is expressly understood and agreed to by and among the undersigned hereto that by entering into this Agreement, none of the undersigned (nor their affiliates) admit the truth of the allegations made by any other party, and this is a compromise of a disputed claim, which should not be construed as an admission of liability on the part of any party or any affiliate of the same.

7. Agreement Fully Read and Understood. This Agreement has been carefully read by the undersigned and the contents are known and understood by the undersigned. The undersigned have each received or have had the opportunity to obtain independent legal advice from the attorneys of their choice with respect to the preparation, review, and advisability of executing this Agreement. The undersigned acknowledge that they have executed this Agreement after independent investigation and without fraud, duress, or undue influence.

8. Applicable Law. The existence, validity, construction and operation of this Agreement, and all of its covenants, agreements, representations, warranties, terms, and conditions, shall be determined in accordance with the substantive laws of the State of Missouri.

9. Entire Agreement. This Agreement sets forth the entire agreement between the undersigned, and fully supersedes any and all prior and/or contemporaneous agreements or understandings between the undersigned, which pertain to the subject matter hereof.

10. Modification. This Agreement may be modified, but only if the modification is in writing and signed by the undersigned to this Agreement.

11. Severability. Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be part of this Agreement.

12. Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Faxed and scanned signatures may be accepted as originals.

13. Mutual Drafting. This Agreement is the product of "arms-length" negotiations between the Parties, both of whom had ample time in which to seek legal advice, if desired. As such, the terms of this Agreement are mutually agreed-upon, and no part of this Agreement will be construed against the drafter.

14. Representations and Warranties. Plaintiff represents and warrants to Defendant that Plaintiff has not assigned, transferred, pledged, or otherwise conveyed any of his interest in any claims or causes of action released herein. Additionally, Plaintiff represents and warrants that he is not aware of any other individual, entity, or attorney who intends to make any demand or file litigation against Defendant. Plaintiff further represents and warrants that he has not been notified or otherwise informed of any such intention. Notwithstanding the foregoing, the Parties acknowledge and agree that nothing in this Agreement shall limit Plaintiff's counsel's ability to practice law in violation of Rule 5.6 of the American Bar Association's Rules of Professional Conduct or any state-law equivalent.

Accepted and agreed to by:

| | |
|---|---|
| Daniel Human | Priority Automotive, Inc. |
| Daniel Human (signature) | ______________________ |
| ______________________ | ______________________ |
| Date: March 28, 2024 | Print Name:<br>Title:<br>Date: |

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS

This Confidential Settlement Agreement and Release of All Claims (hereinafter the "Agreement") is made and effective as of March 24, 2025 (the "Effective Date") by, between, and among DANIEL HUMAN (hereinafter "Releasor") and GENERAL MOTORS LLC (hereinafter "GM"). Hereinafter, Releasor and GM may be referred to collectively as the "Parties" or individually as a "party." This Agreement is made and entered into with reference to the following facts:

a. Releasor claims that in 2024, he received several telephone calls from someone purportedly calling on behalf of GM ("the Telephone Calls").

b. In March 2024, Releasor filed a putative class action lawsuit against GM in the Twenty-First Judicial Circuit Court of St. Louis County, Missouri, asserting various claims arising from the Telephone Calls. On August 30, 2024, GM removed the lawsuit to the United States District Court for the Eastern District of Missouri (the "Lawsuit").

c. The Parties enter into this Agreement to settle all claims and disputes that Releasor may have against the Releasees (defined below) through the Effective Date, including without limitation those arising out of or relating to the Telephone Calls and/or other damages and/or any other actions, conduct, omissions, or events alleged in the Lawsuit (including in all complaints and proposed amended complaints), or which could have been made a part of the Lawsuit.

d. Without admitting any liability or wrongdoing whatsoever, it is the Parties' intention to affect a full and final settlement and resolution of all existing disputes and claims as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Recitals

The recitals set forth in paragraphs a through d above are incorporated into this Agreement by reference.

2. General Release and Discharge

Releasor, along with his heirs, executors, nominees, next-of-kin, attorneys, personal representatives, administrators, and assigns, does hereby fully and forever remise, release, and discharge GM and S&P Global, Inc. and Morley Companies, Incorporated, as well as

all of their predecessors, successors, parent corporations, subsidiaries, affiliates, directors, officers, partners, heirs, executors, administrators, attorneys, agents, employees, and assigns (collectively, "Releasees"), and each of them, from any and all past, present, or future claims, demands, rights, damages, costs, attorneys' fees, expenses, compensation of any nature whatsoever, and causes of action of whatsoever kind and nature, whether known or unknown, accrued and not yet accrued, no matter what theory of recovery may exist, that Releasor may now have, or may ever obtain, arising out of or in any way related to any act committed or omission allegedly made before the date of this Agreement, including without limitation the Telephone Calls and/or any other actions, conduct, omissions, or events alleged in the Lawsuit (including in all complaints and proposed amended complaints), that have been, or could have been brought, by Releasor against Releasees, including without limitation any and all known or unknown claims of personal. property, economic and non-economic injuries, and the consequences thereof, which have resulted or may result from the alleged acts or omissions of Releasees arising out of or in any way related to the Telephone Calls, and/or any other actions, conduct, omissions, or events alleged in the Lawsuit (including in all complaints and proposed amended complaints), that have been, or could have been brought, by Releasor against Releasees.

The foregoing Release and Discharge includes any liability whatsoever between the parties hereto: (a) which arises directly or indirectly out of or is in any manner related to the alleged acts or omissions of Releasees alleged in the Lawsuit (including in all complaints and proposed amended complaints); or (b) which arises directly or indirectly out of or is in any manner related to the injuries or damages alleged by Releasor in the Lawsuit (including in all complaints and proposed amended complaints), including, without limitation, those, if any, which may hereafter be acquired, directly or indirectly, from such injuries or damages.

Releasor hereby acknowledges and agrees that this Agreement is a general release and a compromise of matters involving disputed issues of law and fact. Releasor further expressly waives and assumes the risk of any and all claims for damages which exist as of this date but which the parties do not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect their decision to enter into this Agreement.

This is a release of Releasor's individual claims with prejudice.

3. <u>GM's Waiver of Claims for Fees and Costs</u>

In exchange for the releases and agreements and representations from Releasor and Releasor's counsel set forth in this Agreement, GM waives any claims it may have to recover costs (taxable or non-taxable) or fees or sanctions arising from the Lawsuit.

4. <u>Notice of Dismissal</u>

Releasor agrees to dismiss the Lawsuit by filing a Notice of Dismissal With Prejudice within five calendar days after Releasor's Counsel receives a copy of this Agreement fully executed by GM and GM's Counsel. The dismissal will provide that the

Parties shall bear their respective costs and attorneys' fees.

5. Representation by Releasor's Counsel.

Releasor's counsel agrees that as of the date of execution of this Agreement they have not been retained by any individuals or entities, other than Releasor, that have or may have any potential claims, grievances, or causes of actions against Releasees similar to those asserted in the Lawsuit (including in all complaints and proposed amended complaints), and resolved by this Agreement. Releasor's counsel further agree that they have no present intention to solicit or refer such persons to other counsel for the purpose of bringing such claims; provided, however, that nothing in this Paragraph shall be construed as a restriction of Releasor's counsel's right to practice law in contravention of any applicable rules governing professional conduct.

6. Confidentiality & Non-Disparagement Clause.

The Parties and their respective counsel represent and agree that each will keep the terms, value, and nature of the consideration given to Releasor and Releasor's Counsel, and the terms of this Agreement completely confidential. The Parties may only disclose these details to their professional (financial and legal) representatives, or as may otherwise be required by law through a subpoena, or a Court Order. Any professional representative must also be bound by the confidentially provisions herein. The Parties and their counsel each further represent and agree that they will not hereafter disclose any information concerning this Agreement in any way, including, but not limited to the Internet, the World Wide Web, social media of any kind, or in any other personal or electronic media. In addition to the obligation of confidentiality, the Parties and their counsel agree that they will not disparage Releasees, or their employees, officers, owners, or Board Members, nor seek to negatively influence Releasees' reputations or their employees', officers', owners', or Board Members' reputation(s) by making negative claims or comments to anyone in any way concerning the events that gave rise to the Lawsuit. Releasor agrees not to provide anyone with any information arising out of or in any way related to the Telephone Calls and/or other damage or matter relating to any other actions, conduct, omissions, or events alleged in the Lawsuit (including in all complaints and proposed amended complaints) prior to the entry of this Agreement. Breach or violation of any provision in this Paragraph will severely diminish GM's purposes for entering into this Agreement, as the Parties agree that these provisions, among others, are material and essential provisions of this Agreement. Should there be a breach of any provision in this Paragraph, either party shall be entitled to bring an action for either or both a restraining order/injunction and monetary damages.

No party will initiate contact with the press regarding the Lawsuit, and if a party is contacted by the press, the only statement that can be made is that the matter has been resolved. If Releasor or his counsel or GM receive a subpoena or other legal process requiring the disclosure of this Agreement or any of its terms, the recipient shall notify the other party promptly enough to permit the other party time to seek an order preventing

disclosure.

7. Disclaimer of Liability

It is understood and agreed that this Agreement and settlement is a compromise of doubtful and disputed claims, and that neither entry into this Agreement, nor the negotiation of this Agreement shall be considered an admission of liability whatsoever by any party to this Agreement. It is understood that GM has denied, and presently denies, the allegations contained in the Lawsuit (including in all complaints and proposed amended complaints) and that no past or present wrongdoing on the part of Releasees shall be implied from any negotiations or entry into this Agreement.

8. Hold Harmless

Releasor further covenants and agrees on his behalf and on behalf of his successors, assigns, representatives, heirs, administrators, and executors that they will not, at any time hereafter, commence, maintain, or prosecute any action or serve any claim against Releasees or any of their agents, representatives, affiliates, directors, officers, partners, attorneys, administrators, executors, successors, employees, parent corporations, or subsidiaries for damages, losses, liens, or other damages or losses of any kind or amount arising out of or in any way related to the Telephone Calls and/or any other actions, conduct, omissions, or events alleged in the Lawsuit (including in all complaints and proposed amended complaints).

Releasor further agrees to release, discharge, and hold harmless, on his own behalf and on behalf of his successors, assigns, representatives, heirs, administrators, and executors, Releasees and their agents, representatives, affiliates, directors, officers, partners, attorneys, administrators, executors, successors, employees, parent corporations, or subsidiaries from any and all past, present, or future claims, demands, obligations, actions, causes of action, damages, costs, attorney's fees, or any other expense or costs of any nature arising in any manner out of or in any way related to the Telephone Calls and/or any other actions, conduct, omissions, or events alleged in the Lawsuit (including in all complaints and proposed amended complaints) that hereafter may be commenced, maintained, or prosecuted by or on behalf of Releasor.

9. Representation of Comprehension of Document

In entering into this Agreement, each of the parties hereto represents that they have read the contents of this Agreement, that the terms contained herein have been fully explained to them by their attorneys, and that those terms are fully understood and voluntarily accepted by them, that they have relied solely upon legal advice of their respective attorneys, who are the attorneys of their own choosing, and the advice of any other legal or other professional as they or their attorneys may have deemed appropriate, and they have not relied upon the representations of the opposing party, or that party's attorneys or representatives, in evaluating the parties' claims or defenses or damages, or in deciding whether to accept this settlement; and hereafter no such party shall deny the validity of this Agreement on the ground that it did not have advice of counsel. Releasor

further represents that he has personally and/or through his attorneys of record fully investigated, to Releasor's full satisfaction, all the facts surrounding the various claims, controversies and disputes, and is fully satisfied with the terms and effects of this Agreement.

10. Miscellaneous Provisions

a. This Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, assigns, and successors of each party hereto.

b. Each party to this Agreement warrants and represents that they are fully and properly authorized to enter into this Agreement, they have not assigned any claim to a third party, that no other person or entity has or has had any interest in the claims, demands, obligations or causes of action referred to in this Agreement and that all necessary corporate, administrative, or governmental approvals have been obtained prior to execution of this Agreement.

c. The parties shall promptly execute any and all further or additional instruments and will perform any acts which may become necessary in order to effectuate and carry out the purposes of this Agreement.

d. Neither any failure nor any delay on the part of any party in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any right.

e. This Agreement constitutes the entire agreement of compromise and settlement between the parties. This Agreement supersedes all prior agreements or understandings between the parties, whether written or oral, relating to the subject matter hereof and incorporates the entire understanding of the parties with respect thereto. This Agreement shall not be altered or amended except by a writing signed by the party or parties to be charged with such alteration or amendment.

f. This Agreement is being executed and delivered, and is intended to be performed, in the State of Missouri, and to the extent permitted by law, the execution, validity, construction and performance of this Agreement shall be construed and enforced in accordance with the laws of the state of Michigan.

g. This Agreement shall not be construed against any party on the basis that that party's attorney drafted this Agreement.

h. If a provision of this Agreement is held to be illegal or invalid by a Court of competent jurisdiction, such provision shall either be rewritten by the Court

to be legal and valid—as long as the rewritten provision remains consistent with the intent of the parties expressed herein—or deemed to be severed and deleted. Neither such revision nor such severance and deletion shall affect the validity of the remaining provisions.

i. This Agreement may be executed in one or more counterparts and delivered by facsimile or electronically, all of which together shall constitute one and the same Agreement which shall be binding upon all parties hereto, notwithstanding that the signatures of the parties' designated representatives do not appear on the same page.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS THEREOF, each of the undersigned has executed this Confidential Settlement Agreement and Release of All Claims.

Dated: March 24, 25

DANIEL HUMAN
RELEASOR

RELEASOR'S COUNSEL (Approving Agreement as to Form and Content, and Agreeing to be Bound By Paragraphs 5 and 6):

Dated: 3/24/2025

Edwin V. Butler
Butler Law Group, LLC
1650 Des Peres Rd., Suite 220
St. Louis, MO 63131
edbutler@butlerlawstl.com
T: (314) 504-0001

*Attorney for Releasor*

RELEASEE GENERAL MOTORS LLC:

Dated: April 10, 2025

GENERAL MOTORS LLC
RELEASEE

BY: Todd Miller, Assistant Secretary

RELEASEE GENERAL MOTORS LLC'S COUNSEL (Approving Agreement as to Form and Content, and Agreeing to be Bound By Paragraph 6):

Dated: March 24, 2025

*/s/ Krista L. Lenart*
Krista L. Lenart (59601 MI)
Theodore W. Seitz (60320 MI)
DYKEMA GOSSETT PLLC
2723 S. State St., Ste. 400
Ann Arbor, MI 48104
klenart@dykema.com
tseitz@dykema.com
T: (734) 214-7660

*Attorneys for General Motors LLC*

FILED

JAN 30 2025

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

IN THE
CIRCUIT COURT OF ST LOUIS COUNTY
STATE OF MISSOURI

FILED
DEC 11 2024
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

| | |
|---|---|
| Daniel Human, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>V<br><br>Idaho Roofing Contractors,<br><br>Defendant. | )<br>)<br>)<br>)<br>) No. 24SL-CC05499<br>)<br>)<br>)<br>)<br>) |

## JUDGMENT BY DEFAULT

The Plaintiff, Daniel Human, moved for entry of judgment by default pursuant to Missouri Supreme Court Rule 74.05(a) against Defendant Idaho Roofing Contractors for their failure to answer or otherwise defend against their seven (7) violations of the Missouri and Federal no call lists, and for Judgment against the Defendant for their vicarious liability, and for fees and costs.

NOW THEREFORE, the Court finds that process was perfected on Defendant Idaho Roofing Contractors on October 24, 2024. Defendant Idaho Roofing Contractors has failed to plead, answer or otherwise defend against the Complaint withing thirty (30) days thereby entitling the Plaintiff to entry of judgment by default pursuant to Missouri Supreme Court Rule 74.05(b). Pursuant to Missouri Supreme Court Rule 74.05(c), a Default Judgment may include an award of damages for each of the seven (7) violations.

As such, in accordance with 407.1107 RSMo., the Plaintiff is entitled to $5,000 in damages for each known violation, or $35,000.00. Pursuant to 47 U.S.C. 227(c); 47

C.F.R. 64.1200(c)(2), Plaintiff is entitled to separate and distinct damages for the seven (7) independent TCPA violations of $1,500 per call-or $10,500.00. The individual Defendants ratification of the illegal calls further warrants a judgment in Plaintiff's favor for their vicarious liability equal to the maximum penalties herein of $$45,500.00 Plaintiff is also entitled to recover his reasonable fees and costs in the sum of $1,000.50

JUDGMENT BY DEFAULT is therefore granted in Plaintiff's favor against Defendant Idaho Roofing Contractors in the amount of $46,500.50, as well as all applicable post-judgment interest.

SO ORDERED:

David Vincent

Honorable David L. Vincent III
Circuit Court Judge

This 6th Day of December 2024

________________

Clerk of the Court

Cc: all parties

Facet Wealth, Inc.
Reg. Agent
Cogency Global, Inc.
850 New Burton Rd. Ste 201
Dover Kent, DE 19904

SETTLEMENT NEGOTIATIONS UNDER RULE 408

Legal Dept.

The purpose of this email is to advise you that I have filed suit today against your company in *Human v. Facet Wealth, Inc.* No. 24SL-CC-03226 in St. Louis County, Missouri. Your employees, agents, vendors, or telemarketers contacted me illegally, eight (8) times on my personal cell phone, which I personally registered on the Federal and Missouri State Do Not Call lists. The callers identified your company and address. This is a clear violation of the TCPA and Missouri Do Not Call statute.

In lieu of the $52,000 in total damages, ( $6,500 per call) I am willing to discuss settling the case for $20,000 provided we do so before I send a process to effect service on your company. Solely for the purpose of settling the matter, you may contact me at the phone number or email below. I will leave this offer open until the close of business Friday, July 19, 2024. If we cannot discuss or resolve this issue, I will send it to a process server and begin the litigation process.

Additionally, please preserve any call log records, phone contact with employees, vendors or telemarketers, or ESI for discovery as this will need to be provided. The suit is filed as a Class Action, and we will also need to provide the information for other Putative Class members.

I look forward to hearing from you to avoid the expense of litigating the matter, however, if we cannot reach a reasonable settlement, I am willing to take the matter to trial.

Cordially,

Dan Human
10423 Conway Rd.
St. Louis, MO 63131
(208) 390-1355
danh11polo@gmail.com

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This **CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE** (the "Agreement") is made and entered into upon the date of full execution of this Agreement (hereafter, the "Effective Date"), by the following parties (individually, a "**Party**" and collectively, the "**Parties**"): (1) Plaintiff Daniel Human ("**Plaintiff**") on the one hand, and (2) Defendant Dillon Automotive Group, Inc., d/b/a Dennis Dillon Nissan ("**Defendant**") on the other.

### RECITALS

**WHEREAS**, Plaintiff and Defendant are in a civil legal dispute concerning allegations made by Plaintiff, on behalf of himself and a putative class or classes of similarly situated persons, in a complaint filed in the Circuit Court of the County of St. Louis, State of Missouri and subsequently removed to and currently pending in the United States District Court for the Eastern District of Missouri (the "**Court**"), styled as *Daniel Human v. Dillon Automotive Group, Inc., d/b/a Dennis Dillon Nissan,* Case No. 4:24-cv-00309-CDP, which alleges, among other things, purported violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("**TCPA**") and related state telemarketing laws (herein the "**Action**");

**WHEREAS**, the Parties have determined that it is in their mutual and individual best interests to fully, completely, and forever resolve, compromise and settle all pending claims, causes of action, and disputes pursuant to the terms of this Agreement;

**WHEREAS**, Defendant denies all of Plaintiff's allegations in the Action and maintains that, at all times, it was in full compliance with all applicable laws, statutes, and regulations.

WHEREAS, Defendant believes that it has meritorious defenses to the claims asserted in the Action, and specifically denies that it engaged in any unlawful actions;

**WHEREAS**, this Agreement does not constitute and shall not be construed as an admission of liability or wrongdoing, and Defendant expressly denies any such liability or wrongdoing whatsoever;

**WHEREAS**, it is now the intention of the Parties and the objective of this Agreement to avoid the costs and inconvenience of litigation and settle and dispose of, fully and completely and forever, the claims released below.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants stated herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree to the following Terms and Conditions:

### TERMS AND CONDITIONS

**1. <u>Defendant's Consideration.</u>** As consideration to Plaintiff, Defendant agrees to pay Plaintiff the <u>total</u> amount of **Seven Thousand Five Hundred U.S. Dollars Only ($7,500.00)** (the "**Payment**"). The Payment shall be inclusive of claimed monetary damages to Plaintiff and any claimed attorneys' fees and costs. The Payment shall be in full and complete consideration to Plaintiff for the settlement and releases agreed to herein. Within five (5) business days of the Effective Date of this Agreement, or unless otherwise agreed to by the Parties in a separate writing, Defendant shall

transmit to Plaintiff's Counsel, via ACH transfer, the full amount of the Payment, with transmittal instructions to provided separately. Plaintiff's Counsel shall be solely responsible for allocating the Payment between Plaintiff and his attorneys. As a condition precedent to the aforementioned Payment, and before transmittal of same, Plaintiff's Counsel and Plaintiff shall provide fully completed and executed IRS Form W-9s to Defendant's Counsel, who is identified in Section 14 below. Neither Defendant or its counsel make any representation(s) as to the tax treatment of the Payment, and shall not be liable for any tax consequences incurred as a result of the Payment or this Agreement.

2. __**Plaintiff's Consideration.**__ No later than **three (3) business days** after receipt of the Payment, Plaintiff will voluntarily dismiss his individual claims in the Action against Defendant __with__ prejudice and without costs, and the class claims that Plaintiff alleged against Defendant in the Action will be dismissed __without__ prejudice and without costs. To the extent the Action has been dismissed prior to receipt of the Payment in whole or in part, Plaintiff's Counsel will file any additional paperwork or notices with the Court as may be necessary to effectuate the foregoing dismissals and to ensure there is a dismissal with prejudice as to Plaintiff's individual claims against Defendant, including dismissal of any appellate or other legal proceedings, as necessary. Unless otherwise required by the Court, applicable rules or law, the Parties shall refrain from using the term "settlement" on the Court's docket or from filing a "notice of settlement" with the Court. If such a notice has already been filed as of the Effective Date, however, the Parties shall refrain from using the word "settlement" going forward. To the extent applicable, Plaintiff shall also withdraw any other complaints that may have been filed or made against the Released Parties, as defined in Section 3.3 below, including but not limited to any complaint made with a government or regulatory agency or office or any complaint made online. As part of his consideration to Defendant, Plaintiff agrees to provide all of his business and personal telephone numbers (landline and mobile, including but not limited to facsimile numbers) currently in existence to Defendant, via Defendant's Counsel identified in Section 14 below, so that Defendant (at its option) may add those telephone numbers to an internal Do Not Call list, which are identified below in this Section. Plaintiff also agrees not to "opt-in" to receive calls or text messages from Defendant and/or on any website/URL owned or operated by Defendant (e.g., https://www.dennisdillon.com/) or that otherwise references Defendant by name (e.g., "Dennis Dillon") from the Effective Date forward. Plaintiff hereby discloses the following phone numbers:

Plaintiff's disclosed numbers: (314) 915-2988, (208) 390-1355.

3. __**Releases.**__

**3.1 Ownership of Released Claims.** In consideration of the covenants and agreements stated in this Agreement, Plaintiff hereby warrants and represents that he is the owner of any and all claims, has not assigned or transferred claims to any third party, and has full capacity and authority to enter into and perform this Agreement and to compromise and release the Released Claims, as defined in Section 3.4 below.

**3.2 Releasing Parties. "Releasing Parties"** means Plaintiff and his agents, estates, heirs, executors, administrators, successors, personal representatives, assigns, any other person or entity that might succeed to his rights and responsibilities under this Agreement, any entity in which Plaintiff holds or will hold an ownership interest, and each of their respective past, present and future officers, directors, employees, partners, shareholders, investors, accountants, owners, trustees, insurers, attorneys, agents, representatives and contractors.

**3.3 Released Parties.** "**Released Parties**" is defined as Defendant and each of its respective parents, subsidiaries, divisions, predecessors, successors, assigns, related partnerships or entities and each of their respective past, present and future officers, directors, employees, partners, shareholders, investors, accountants, owners, trustees, insurers, agents, representatives and contractors. Released Party shall refer to one of the Released Parties.

**3.4 Released Claims.** The Releasing Parties hereby fully and completely, irrevocably and expressly release and forever discharge the Released Parties from all liability for any and all past and present injuries, counterclaims, causes of action, demands, losses, expenses and damages whether known or unknown, suspected or unsuspected, foreseen or unforeseen, related to the subject matter of the Action, whether at law or in equity, whether absolute or contingent, whether arising under the common law, state or federal law, or any other law, which Plaintiff ever had, now has against the Released Parties (the "**Released Claims**").

The Parties agree that if the Releasing Party is contacted by any of the agreed to Released Parties after the execution of this Agreement, the Releasing party shall notify the Released party of the first such contact ("first instance"). If the Released Parties acknowledge the fact of the First Instance in writing and further promise that there will be no further contact (the "curative actions") within sixty (60) days, then the Releasing Party will release Releasing Party for such First Instance. During such 60 day period (which may be extended by agreement), Counsel for both parties shall reasonably cooperate and provide all information and evidence in support of any claim within 7 days of a written request, which may include email communications. Such information may include, for example, call or text logs, screenshots, webpages, call recordings, telephone records, and/or any communications with Defendant or any third party regarding the claim. If the dispute cannot be resolved in the 60-day cure period, any lawsuit against a Released Party shall be initiated in the United States District Court for the Court for the Eastern District of Missouri, or in the event jurisdiction is not proper in federal court, then state court in Missouri.

By executing this Agreement, it is the full and express intent of the Parties that the Releasing Parties forever and completely discharge and release the Released Parties from any and all liability for unknown and/or unforeseen losses, costs, expenses, liabilities, claims, damages and consequences thereof. This Release expressly includes, but shall not be deemed limited to, any claims which arise from or are related to alleged legal violations and any claims which were asserted or could have been asserted in the Action, including but not limited to any TCPA claims. This Release, however, (1) does not include any claims arising out of a failure to perform the terms of this Agreement and (2) is in no way to be construed to release any claims Plaintiff has or may have against any person or entity other than the Released Parties. For any telephone numbers not reported in accordance with Section 2 above, the Releasing Parties shall be deemed to have forever waived any claim of any kind (including but not limited to TCPA claims) related to such phone numbers. The Parties agree and acknowledge that this Release is an essential and material term of this Agreement and without this Release, the Agreement would not have been accepted. The Parties agree that this Agreement may be pleaded as a full and complete defense to any and all Released Claims being released pursuant to this Agreement. Each Party acknowledges and consents that the Agreement may be used as the basis for an injunction to halt any action, suit or other proceeding based on the Released Claims (without being required to post a bond or other security).

**3.6 Subsequent Discoveries.** The Releasing Parties acknowledge that they might hereafter discover facts in addition to or different from those they know or believe to be true with respect to the subject matter of this Agreement. Notwithstanding the discovery of any such additional

or different facts that, if known, would materially affect their decision to enter into this Agreement, the releases in this Agreement shall remain in effect. The Releasing Parties waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of any statute or law which might otherwise render unenforceable a release of unknown claims contained in this Agreement. The Releasing Parties represent and warrant that no promise or inducement has been made or offered by any of the Parties, except as set forth herein, and that this Agreement is not executed in reliance upon any statement or representation of any of the Parties or their representatives, concerning, among other things, the nature and extent of the injuries, damages or legal liability.

**3.7 Effect on Legal Proceedings.** Except as otherwise provided herein, in consideration of the covenants and agreements contained in this Agreement, the Releasing Parties: (1) fully and forever release, remise, quit-claim and discharge the Released Parties from the Released Claims; and (2) shall not bring, commence, institute, maintain, prosecute any action at law, proceeding in equity or any other legal proceeding against any of the Released Parties based on any of the Released Claims. Should any proceeding be instituted by, or on behalf of, a Releasing Party against a Released Party with respect to a Released Claim, this Release shall be deemed full satisfaction of any such claim(s) and a sufficient basis for the immediate dismissal thereof and/or an injunction against suit (without being required to post a bond or other security).

**4. Representations and Warranties.** The Parties hereby make the following representations and warranties, which shall be deemed material inducements for Defendant to enter into this Agreement:

**4.1 Plaintiff's Representations and Warranties.** Plaintiff, on behalf of himself and his agents, employees, representatives and attorneys, represents and warrants that (1) all of his telephone numbers currently in existence are listed in Section 2 above; (2) he is the current subscriber and sole user of the phone number at issue in the Action; (3) he does not intend to bring any other claims against a Released Party; (4) he does not know of any claims against the Released Parties that are not hereby released; (5) he does not know of any other individual with a potential claim against a Released Party; (6) he is not aware of any attorney who intends to bring a claim against a Released Party; (7) he is not seeking any plaintiffs or potential plaintiffs for the purposes of initiating any claim or lawsuit against a Released Party; (8) he will not seek or solicit plaintiffs or potential plaintiffs for the purposes of initiating any claim or lawsuit against a Released Party; (9) he does not have, or has permanently removed any solicitations regarding a Released Party on any websites or other forums; (10) he will not communicate any information concerning the Action to any potential class members or third parties for the purposes of assisting or encouraging the filing or prosecution of any action or proceeding against a Released Party; (11) he will not disclose to any third party the existence, terms or substance of any part of the settlement negotiations between the Parties, or the existence, terms or substance of any part of this Agreement; and (12) he will provide notice to Defendant's Counsel as provided in Section 3.4 above (individually or through his counsel) if he intends to pursue any future purported violations by and against a Released Party.

**4.3 Other Representations and Warranties.** Each of the Parties to this Agreement represents and warrants that no promise or inducement has been made or offered by any of the Parties, except as set forth herein, and that this Agreement is not executed in reliance upon any statement or representation of any of the Parties or their representatives, concerning, among other things, the nature and extent of the injuries, damages or legal liability. Each of the Parties to this Agreement represents and warrants that they have read this entire Agreement, understands each and every term, and has undertaken an investigation of the facts as deemed necessary. The Parties further acknowledge that

each Party has had the opportunity to consult legal counsel in connection with entering into this Agreement and respective counsel for each Party has explained the meaning and significance of each provision of this Agreement. This Agreement is executed freely and voluntarily with full knowledge and understanding of its terms, has been negotiated at arm's length and in good faith, and has been signed without duress, coercion, or undue influence of any kind. By entering into this Agreement, the Parties represent and warrant they will assume the risk of any differences between the Parties' respective understandings of the facts and agree that this Agreement shall remain effective despite any such differences.

**4.4 Remedies for Breach.** The Parties agree that damages for each breach of the representations and warranties in Sections 4.1 and/or 4.2 shall be paid to Defendant. A court of competent jurisdiction may grant injunctive relief, in addition to monetary remedies, in the event any of the representations and warranties in this Section 4 are breached and/or a Party is required to enforce this Agreement. The Parties consent to the immediate dismissal of any litigation filed in disregard of the above representations and warranties. This provision is not intended to limit any remedies available under applicable law.

**5. Non-Disparagement.** The Parties agree not to disparage each other, each other's business practices, products or services, or agents, partners, employees, affiliates, managers, officers, directors, members, attorneys, insurers, parents, subsidiaries, successors, principals, assigns, shareholders and/or representatives, now or at any time in the future, in public or in private. The term "disparage" shall mean any statement which, directly or by reasonable implication, creates a negative impression about the reputation, character, practices, and/or conduct of another in the mind of any reasonable person to whom the statement is made, and includes verbal, written and/or electronic statements.

**6. Confidentiality.** The Parties and their Counsel agree to keep the terms of this Agreement and all documents and things exchanged during settlement negotiations leading up to this Agreement (collectively, "**Confidential Information**"), strictly confidential and agree not to disclose Confidential Information to any other person, except (1) financial or tax accountants, advisors, insurers, indemnitors, consultants, or attorneys; (2) as may be required in connection with any action to enforce the Agreement; (3) as may be required by a judicial or regulatory body; (4) as is reasonably necessary to the defense of any action to which the terms of this Agreement may apply; or (5) as otherwise required by law.

**6.1 Breach of Confidentiality.** The Parties acknowledge and agree that the disclosure of Confidential Information prohibited by this Section 6 is a material term of this Agreement, the violation of which could result in irreparable harm and make remedies for breach difficult to calculate. Accordingly, the Parties agree that damages for each breach of this provision shall be paid to the non-breaching party. The Parties also agree that injunctive relief may be sought by the non-breaching party (without being required to post a bond or other security) and that any attorneys' fees, court fees, and/or costs incurred to enforce this provision shall be paid by the non-breaching party.

**6.2 Disclosure of Confidential Information.** In the event Plaintiff is requested to reveal Confidential Information, Plaintiff shall provide Defendant fourteen (14) days' notice, or as much time as may be practical under the circumstances, in accordance with Section 14 below, prior to revealing the Confidential Information in order to provide Defendant an opportunity to object or take other legal action deemed necessary to protect its interests.

7. **Cooperation.** Plaintiff, Defendant, and their respective attorneys agree to fully cooperate with one another and to use their best efforts to affect the consummation of this Agreement and the dismissal of the Action, as provided in Section 2 above.

8. **Entire Agreement.** This Agreement embodies the entire understanding of the Parties. All prior representations and agreements, whether oral or in writing, have been merged into and replaced by this Agreement, and this Agreement otherwise supersedes any such prior representations and agreements. No other agreement, statement, amendment, or promise made by or to either Party will be binding on the Parties unless (1) it is made in writing and signed by the Parties and (2) specifically refers to this Agreement. This Agreement may be amended only by a written agreement executed and signed by the Parties.

9. **Captions and Grammar.** Paragraph titles or captions contained in this Agreement are used for convenience or reference only. The singular includes the plural, the plural includes the singular, and the use of pronouns and gender shall apply to all genders.

10. **Recitals.** The recitals set forth above are incorporated herein by reference and made a material part of this Agreement. The representations contained in the recitals shall survive any default hereunder.

11. **Benefit and Burden.** This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective heirs, executors, administrators, agents, employees, affiliates, managers, officers, directors, partners, attorneys, parents, subsidiaries, successors, principals, assigns, shareholders and/or representatives. This Agreement shall be binding, enforceable, discoverable and admissible to establish the rights, obligations and duties of the Parties in any action brought to enforce this Agreement.

12. **Choice of Law and Venue.** This Agreement shall be governed in accordance with the law of Idaho without giving effect to any conflicts of law principles. Any dispute between the Parties or proceeding to enforce this Agreement shall be filed in the United States District Court for the Court for the District of Idaho, or in the event jurisdiction is not proper in federal court, then state court in Idaho. Each Party expressly consents to jurisdiction and venue as provided herein and waives any objections to jurisdiction or venue.

13. **Severability.** If any of the provisions, terms, or clauses of this Agreement are declared illegal, unenforceable, or ineffective in a legal forum of competent jurisdiction, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

14. **Notices.** All notices, requests, demands or other communications under this Agreement shall be made in writing and shall be deemed to have been given on the date of sending. Though email communication is also encouraged, all notices, requests, demands or other communications under this Agreement shall be served personally by hand delivery or overnight courier (with receipt of delivery) and addressed as follows:

*To Plaintiff:*

James A. Marks, Atty
**25 East Frisco Ave**
**Webster Groves MO 63119**
*jmarks@willcraftlegal.com*

*To Defendant:*

John W. McGuinness
A. Paul Heeringa
**Manatt, Phelps & Phillips, LLP**
151 N. Franklin Street
Chicago, IL 60606
*jmcguinness@manatt.com*
*pheeringa@manatt.com*

**15. Costs.** Each Party is to bear their own costs and fees unless otherwise stated above. However, in the event that any action is taken to interpret or enforce the terms of this Agreement, the non-prevailing Party shall pay the prevailing Party's reasonable attorneys' fees and costs expended, in addition to other damages or remedies. A Party shall be entitled to injunctive relief in the event of a breach of, or in order to enforce the terms of, this Agreement (without being required to post a bond or other security).

**16. Non-Admissibility.** This Agreement and all negotiations and non-public correspondence leading up to its execution shall be deemed to be within the protection of Federal Rule of Evidence 408 and any analogous state or federal rules or principles. Neither this Agreement, nor its terms, conditions, contents or provisions, nor any negotiations leading up to the execution of this Agreement, shall constitute a precedent or be admissible for any purpose in any proceeding; provided, however, that this Agreement shall be admissible in any proceeding to enforce its terms.

**17. Waivers.** No waiver of any of the promises, obligations, terms or conditions of this Agreement shall be valid or enforceable unless it is in writing and signed by the Party against whom the waiver is sought to be enforced. The failure of any Party to insist upon compliance with any of the provisions of this Agreement, or a waiver in a particular instance, shall not be construed as a general waiver or relinquishment by such Party or a waiver of any other provision of this Agreement. Plaintiff waives any procedural requirements under applicable law that may govern, relate to, or apply to this Agreement and agrees to be bound by the terms of this Agreement as stated.

**18. Joint Preparation.** This Agreement shall be construed as if the Parties jointly prepared it. Any uncertainty or ambiguity in this Agreement shall be not interpreted against a Party on the basis that the Party drafted the Agreement.

**19. Authority.** The Parties represent to one another that they have full power and authority to sign and enter into this Agreement, provide the releases and representations identified herein, carry out their respective obligations, and to be bound by this Agreement. The Parties further represent that all necessary action has been taken to authorize the execution and delivery of this Agreement.

**20. Execution and Counterparts.** This Agreement may be executed by each of the Parties in counterparts with the same effect as if the Parties had signed the same copy. This Agreement may be executed by electronic means, PDF or by facsimile, and such electronic, PDF or facsimile copies shall

be treated as originals for all purposes. Each counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one and the same Agreement. This Agreement will be deemed "fully executed" as of the Effective Date when signed by an authorized representative for each of the Parties, as well as their respective counsel.

**[SIGNATURES FOLLOW]**

***SIGNED, AGREED TO, AND EXECUTED BY THE PARTIES AS DATED BELOW:***

**PLAINTIFF:**

*Daniel Human*

Daniel Human

Date: 4/29/2024

**FOR DEFENDANT:**

*Dillon Automotive Group, Inc., d/b/a Dennis Dillon Nissan*

By: ______________________________

Printed Name: ______________________

Title: ______________________________

Date: ______________________________

**CONFIDENTIAL SETTLEMENT AGREEMENT**
**AND GENERAL RELEASE OF CLAIMS**

This Confidential Settlement Agreement and General Release of Claims (the "Agreement") is made and entered into by and between Daniel Angelo Human ("Plaintiff"), an individual residing in Missouri, and NORC at the University of Chicago ("Defendant"), a registered 501(c)(3) not-for-profit organization incorporated in Colorado and headquartered in Chicago, Illinois (individually a "Party" and collectively the "Parties").

**RECITALS**

**WHEREAS,** on July 5, 2024, Plaintiff filed a complaint in the 21st Judicial Circuit Court, St. Louis County, Missouri, assigned case number 24SL-CC03278 (the "Action").

**WHEREAS,** Plaintiff alleges that communications to a telephone number ending in -1355 regarding the National Immunization Survey on behalf of the Centers for Disease Control and Prevention ("CDC") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.020, *et seq.* ("MMPA").

**WHEREAS,** Plaintiff's attorney (James A. Marks of Will Craft Legal Services in Webster Groves, Missouri) ("Plaintiff's Attorney") has represented to counsel for Defendant that Plaintiff's full telephone number is (208) 390-1355.

**WHEREAS,** Plaintiff's Attorney has represented to counsel for Defendant that he has not been contacted by any other person or entity about the Action, does not presently represent any other person or entity with claims against the Defendant, is not pursuing any other actions against the Defendant, and does not intend to pursue any other actions against the Defendant.

**WHEREAS,** Defendant denies Plaintiff's allegations and denies any wrongdoing or liability to Plaintiff or anyone else based on the facts alleged in the Action or otherwise.

**WHEREAS,** Defendant has nevertheless voluntarily placed Plaintiff's telephone number on its internal Do-Not-Call list.

**WHEREAS,** the Parties, without admitting or determining liability, fault or wrongdoing, and to avoid the uncertainties, time and expense inherent in further litigation of their dispute, desire to settle and compromise the Action in accordance with the following terms and conditions.

**NOW, THEREFORE,** the Parties, for the good and valuable consideration of the mutual covenants and promises in this Agreement, and for other good and valuable consideration, agree as follows:

## TERMS AND CONDITIONS

### I. Performance

A. **Dismissal of the Action Without Prejudice.** Within four (4) days of the Effective Date of this Agreement, Plaintiff shall cause the Action and all claims asserted therein to be dismissed without prejudice, with the Parties bearing their own costs and attorneys' fees, by filing a Notice of Voluntary Dismissal that is substantially similar to the Notice that is attached to this Agreement as Exhibit A. This Agreement is conditioned upon dismissal of the Action with prejudice.

B. **Settlement Payment.** Within ten (10) days of the later of the dismissal of the Action with prejudice or Defendant's receipt of a properly formatted and fully executed W-9 from each of Plaintiff and Plaintiff's Attorney, Defendant shall make one (1) payment to Plaintiff totaling five thousand dollars ($5,000.00) (the "Settlement Payment"). The Settlement Payment shall be made by automated clearing house transfer to Plaintiff's Attorney and shall be allocable between Plaintiff and Plaintiff's Attorney as separately agreed to among themselves.

### II. Release

A. **Releasing Parties.** "Releasing Parties" means Plaintiff; his spouses; his children; his estates; his heirs; his executors; his agents; his administrators; his successors; his representatives; his assigns; any other person who resides with Plaintiff; any person or entity that might succeed to Plaintiff's rights and responsibilities under this Agreement; any entity in which Plaintiff holds or will hold an ownership interest; and each of the foregoing's past, present, and future officers, directors, employees, partners, shareholders, investors, accountants, owners, trustees, insurers, underwriters, attorneys, agents, representatives, vendors, and contractors.

B. **Released Claims.** "Released Claims" means any and all past, present, or future claims, costs, compensations, expenses, liabilities, damages, demands, accounts, debts, obligations, liens, suits, rights, actions, and causes of action of any kind or nature, whether based in tort, contract, statute or other theory of recovery, whether known or unknown, whether latent or patent, whether suspected or unsuspected, which any of the Releasing Parties has had, now has, or may have against any of the Released Parties by reason of any matter, event, thing, act, or transaction occurring or arising before the Effective Date of this Agreement, including but not limited to any and all matters arising out of or related to the Action, the facts alleged in the Action, and the claims asserted in the Action. Notwithstanding the foregoing, the release of any third-party lead generators or third-party callers shall be limited to claims arising from or relating to the communications alleged in the Action or other actions taken by or on behalf of Defendant.

C. **Released Parties.** "Released Parties" means Defendant; the CDC; either of their parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns; and each of the foregoing's past, present and future officers, directors, employees, agents, partners, principals, shareholders, investors, accountants, administrators, owners, trustees, insurers, underwriters, attorneys, representatives, vendors, and contractors.

**D. General Release.** In consideration of the covenants and agreements contained in this Agreement, each of the Releasing Parties: (1) fully and forever releases, remises, quit-claims and discharges the Released Parties from the Released Claims; and (2) shall not bring, commence, institute, maintain, prosecute or voluntarily aid in any action at law, proceeding in equity, or any other legal proceeding against any of the Released Parties based on any of the Released Claims. Should any proceeding be instituted by, or on behalf of, a Releasing Party against a Released Party with respect to a Released Claim, this Agreement shall be deemed full satisfaction of any such claim(s) and sufficient basis for the immediate dismissal thereof.

**E. Binding Effect.** The Parties acknowledge that they might hereafter discover facts in addition to or different from those they know or believe to be true with respect to the subject matter of this Agreement. Notwithstanding the discovery of any such additional or different facts that, if known, would materially affect a Party's decision to enter into this Agreement, the releases in this Agreement shall be and remain in effect. The Parties hereby waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of any statute or law which might otherwise render unenforceable a release contained in this Agreement, including but not limited to Section 1542 of the California Civil Code, which they understand states as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

## III. Attorneys' Fees

Each Party shall bear its own costs and attorneys' fees incurred in connection with the Action and this Agreement except that, in any action or proceeding between the Parties to enforce this Agreement, including but not limited to this Agreement's confidentiality provisions, the prevailing Party shall be entitled to all reasonable attorneys' fees and costs incurred in connection with such an enforcement proceeding.

## IV. No Other Known Claims or Claimants

Plaintiff represents and warrants that Plaintiff:

a) does not know any person or entity other than Plaintiff that purports to have claims, complaints, charges, or lawsuits against the Defendant;

b) has not shared and will not share with any third party any information that was gathered in connection with investigating or prosecuting the Action;

c) has not encouraged and will not encourage any third party to file or consider filing any claims, complaints, charges, or lawsuits against the Defendant or any third party based on, related to, or arising from the Action;

d) has not assisted and will not assist any third party with filing or considering filing any claims, complaints, charges, or lawsuits against the Defendant or any third party based on, related to, or arising from the Action;

e) has not been represented by and are not represented by any attorneys, law firms, or legal organizations other than Plaintiff's Attorney in connection with the Action; and

f) has not consulted with or received legal advice from any attorneys, law firms, or legal organizations other than Plaintiff's Attorney in connection with the Action.

The Parties agree that the representations and warranties set forth in this section are material inducements to Defendant to enter into this Agreement.

## V. Non-Admission

The Parties enter into this Agreement in compromise of the disputed claims asserted in the Action. Nothing in this Agreement shall constitute or be construed as an admission of any issue of law, fact, or liability or an acknowledgement as to the validity of any claim asserted in the Action against Defendant or any other Released Party.

## VI. Non-Admissibility

This Agreement and all negotiations and correspondence leading up to its execution shall be deemed to be within the protection of Federal Rule of Evidence 408 and any analogous state or federal rules, statutes, or principles. Neither this Agreement, nor any terms, conditions, contents or provisions hereof, nor any negotiations leading up to the execution of this Agreement, shall constitute a precedent or be admissible for any purpose in any proceeding; provided, however, that this Agreement shall be admissible in any proceeding to enforce any of its terms. The Parties shall redact the amount of the Settlement Payment from any copy of this Agreement that is filed in any subsequent action to enforce this Agreement, unless the amount of the Settlement Payment is at issue, in which case the entire Agreement must be filed under seal.

## VII. Non-Disparagement

Plaintiff agrees that, except as may be compelled by a court of competent jurisdiction, he will not make or cause to be made to any third party any statement or comment, whether publicly, privately, orally, or in writing, that is critical of or disparaging to Defendant; the CDC; either of their parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, or business partners; or any of the foregoing's past, present, or future officers, directors, or employees. Plaintiff further agrees to remove or cause to be removed any such statements or comments on the websites or social media posts of his or his spouse, children, and other immediate family members within five (5) days of the Effective Date of this Agreement and as a condition to receiving the Settlement Payment. Plaintiff represents and warrants that neither he nor any of his immediate family members made any such statements or comments before the Effective Date of this Agreement.

## VIII. Confidentiality

A. **Confidentiality.** The Parties expressly incorporate the protections of Rule 408 of the Federal Rules of Evidence and its state equivalents. Plaintiff represents and warrants that, as of the Effective Date of this Agreement, Plaintiff and Plaintiff's Attorney have not disclosed to any third party the terms or substance of any part of the settlement negotiations between the Parties, or the terms or substance of any part of this Agreement. The Parties further expressly acknowledge, understand, and agree that, as an integral and material term of this Agreement and the consideration for this Agreement, Plaintiff and Plaintiff's Attorney will not disclose to any third party the terms or substance of any settlement negotiations or the terms or substance of any part of this Agreement except as necessary to enforce this Agreement, or as may be compelled or otherwise required by law. The Parties intend that this confidentiality provision be interpreted as broadly as possible to provide the maximum confidentiality. Notwithstanding the foregoing, nothing in this section shall be construed to prevent the Parties from disclosing amounts paid and received pursuant to this Agreement to their accountants, lenders, tax advisors, or tax authorities, or to prevent Defendant from disclosing amounts paid to its insurance carriers, regulators, auditors, vendors, or employees who have a business or legal reason to know about the Agreement. The Parties further agree that the only response to any inquiry about the amount of the Settlement Payment, the terms of this Agreement, or the disposition of the Action, shall be to the effect that there has been no admission of fault and that the Parties have agreed to an amicable resolution of the case that is satisfactory to both Parties.

B. **Essential Element.** The Confidentiality provision of this Agreement is an essential and material term of this Agreement.

C. **Agreement to Cooperate.** The Parties shall cooperate and take such reasonable steps as are necessary to protect the confidentiality of the terms and substance of this Agreement.

D. **Breach.** This Confidentiality provision and agreement is a material term of this Agreement, breach of which the Parties agree will cause the non-breaching Party irreparable harm. Breach of this provision will not affect the release of claims in Section II. Plaintiff acknowledges that Defendant may bring suit, pursuant to Section XII.J herein below, to enforce the terms of this Agreement and to recover damages for breach of this Agreement, including a suit for equitable relief and injunctive relief.

## IX. Consent to Future Calls

In exchange for the Settlement Payment and the other good and valuable consideration in this Agreement, Plaintiff expressly agrees and consents to receiving telephone calls and text messages from or on behalf of Defendant at any telephone number to which Plaintiff is subscribed or assigned or otherwise uses (including calls and text messages sent using artificial voices, prerecorded voices, and equipment that has the capacity to automatically select or dial numbers), and Plaintiff hereby waives any claims or causes of action (including under the TCPA, the MMPA, and any theory or principle of invasion of privacy) arising from or relating to any such call or text message. The foregoing consent and waiver are irrevocable and cannot be altered or withdrawn

without a written agreement to that effect signed by Defendant.

X. **Resolution of Future Disputes**

A. **Arbitration of Disputes.** In exchange for the Settlement Payment and the other good and valuable consideration in this Agreement, Plaintiff agrees that any claim against Defendant arising after the Effective Date of this Agreement, except for an action to enforce any term of this Agreement (as addressed in Section XII.J), shall be resolved individually in: (a) binding arbitration with the American Arbitration Association or JAMS pursuant to the version of the applicable rules that are in effect when arbitration is commenced; or (b) small claims court if the claim is for money damages and the amount claimed is within the jurisdiction of that court. In arbitration, there is a neutral arbitrator rather than a judge. In arbitration and small claims court. there is no jury and there is less discovery and less appellate review than in court.

B. **Class Action Waiver.** In exchange for the Settlement Payment and the other good and valuable consideration in this Agreement, for any claim arising after the Effective Date of this Agreement, Plaintiff waives the right to prosecute or participate in a class action, collective action, or other representative action against the Defendant, and agrees to seek relief from the Defendant only on behalf of Plaintiff individually, and only to the extent necessary to remedy Plaintiff's individual claims.

XI. **Representations and Warranties**

A. **Authorization to Execute.** The Parties represent and warrant that the persons executing this Agreement are duly authorized to do so.

B. **Sole Subscriber and Authorized User.** Plaintiff represents and warrants that he is the sole subscriber and authorized user of the (208) 390-1355 telephone number described in the Complaint in the Action. Plaintiff further represents and warrants that he has been the sole subscriber and authorized user of that number since at least May 1, 2024, through and including the Effective Date of this Agreement. Plaintiff represents and warrants that he neither requested nor caused, either directly or indirectly, the communications challenged in the Action.

C. **Assignment of Claims.** Plaintiff represents and warrants that no claim or portion of any claim referenced in this Agreement has been sold, assigned, conveyed, or otherwise transferred to any other entity or person.

D. **Reading and Understanding.** The Parties represent and warrant that they have carefully read this Agreement, have had it explained to them by attorneys of their choosing, if any, and fully understand and voluntarily accept the terms and conditions of this Agreement.

E. **Reliance on Own Judgment.** Plaintiff represents and warrants that he has relied upon his own judgment and that of his attorneys, if any, regarding the proper, sufficient, and agreed-upon consideration for this Agreement. Plaintiff further represents and warrants that no statement or representation by Defendant or its agents, employees, officers, directors, attorneys, or legal representatives influenced or induced him to execute this Agreement.

F. **Reliance on Own Counsel.** The Parties represent and warrant that they have relied upon the advice of counsel of their choosing, if any, concerning the legal consequences of this Agreement, including but not limited to the taxability of the Settlement Payment under federal, state, and local law.

## XII. Construction, Interpretation and Enforcement

A. **Choice of Law.** This Agreement is made pursuant to, and shall be construed and enforced in accordance with, the laws of the State of Illinois, without giving effect to otherwise applicable conflicts of law principles.

B. **Entire Agreement.** This Agreement constitutes the single and entire agreement between the Parties. All prior disclosures, negotiations, and agreements have been and are merged and integrated into and are superseded by this Agreement. No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any of the Parties to this Agreement except as specifically set forth in this Agreement.

C. **Usage.** As used in this Agreement, the masculine gender includes the masculine, feminine, and neutral, where applicable, and use of the singular includes the plural, where applicable.

D. **Joint Preparation.** This Agreement shall be construed as if the Parties jointly prepared it. Any uncertainty or ambiguity in this Agreement shall not be interpreted against a Party on the basis that the Party drafted the Agreement.

E. **Captions.** The captions used in this Agreement are for convenience and identification purposes only and are not part of this Agreement.

F. **Recitals.** The Recitals are a material part of this Agreement and are incorporated into this Agreement in their entirety.

G. **Modification.** This Agreement shall not be modified except by a writing signed by the Parties.

H. **Waiver.** No waiver of any of the promises, obligations, terms, or conditions of this Agreement shall be valid or enforceable unless it is written and signed by the Party against whom the waiver is sought to be enforced.

I. **Severability.** If the release contained in this Agreement is judicially determined to be illegal or otherwise unenforceable, then this Agreement shall be null and void. If any other provision of this Agreement is judicially determined to be illegal or otherwise unenforceable, that provision shall be severed from this Agreement and all remaining provisions shall remain in full force and effect.

J. **Enforcement.** Any action to enforce this Agreement shall be brought in the proper court embracing Chicago, Illinois. If a party breaches this Agreement, a non-breaching Party shall

be entitled, in addition to any other remedy, to a decree of specific performance. **THE PARTIES EXPRESSLY AND IRREVOCABLY WAIVE THEIR RIGHT TO A JURY TRIAL IN ANY FUTURE ACTION TO ENFORCE THE TERMS OF THIS AGREEMENT.**

**K. Binding Effect.** This Agreement, including but not limited to its releases, is for the benefit of and shall be binding upon the Parties and each of their respective agents, estates, heirs, executors, administrators, successors, personal representatives, assigns, or any other person or entity that might succeed to their rights and responsibilities under this Agreement.

**XIII. Other Terms and Conditions**

**A. Acknowledgement.** Plaintiff acknowledges that he is not required to sign this Agreement, that he may consult any attorney of his choosing before signing this Agreement, and that, by signing this Agreement, he is giving up certain rights that he has.

**B. Notices.** Except as may be expressly stated otherwise in this Agreement, all notices or other communications hereunder shall be in writing and shall be sent by recognized overnight courier service (with receipt of delivery) to the receiving Party at their respective address set forth below:

| | |
|---|---|
| To Defendant: | Michael P. Daly<br>Faegre Drinker Biddle & Reath LLP<br>One Logan Square, Suite 2000<br>Philadelphia, PA 19103 |
| To Plaintiff: | James A. Marks<br>Will Craft Legal Services<br>22 East Frisco Avenue, Suite 200<br>Webster Groves, MO 63119 |

**C. Execution.** This Agreement may be executed in one or more counterparts, each of which shall be an original as against any Party who signed it, and all of which shall constitute one and the same document. A facsimile, photostatic or electronic (e.g., PDF format) copy of this Agreement as executed shall be deemed an original.

**D. Effective Date.** The Effective Date of this Agreement shall be the date on which the last counterpart of this Agreement is signed.

**E. Taxability of Settlement Payment.** This Agreement is enforceable regardless of the tax consequences of the Agreement or taxability of the Settlement Payment. Neither Defendant nor its attorneys have made any representations or warranties regarding the tax consequences of the Agreement or taxability of the Settlement Payment. Plaintiff represents and warrants that he has not relied upon any representations or warranties of Defendant or its attorneys regarding the tax consequences of the Agreement or taxability of the Settlement Payment. Plaintiff understands and expressly agrees that any income tax or other tax payable by him under tax laws, including any interest or penalties ultimately determined to be payable from the Settlement Payment, as well

as any state or federal reporting or payment obligations on his part arising from or attributable to the Settlement Payment, are Plaintiff's sole and exclusive responsibility.

F. **Further Assurances.** The Parties agree to do all acts and things and to make, execute, acknowledge and deliver such written documents, instructions, and/or instruments in such forms as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement, including but not limited to the execution, filing or recording of any reporting documents, affidavits, deeds, or agreements.

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties have made and executed this Agreement as of the date(s) set forth below.

| **Plaintiff** | **Defendant** |
|---|---|
| By: Daniel Human (signature)<br>Daniel Angelo Human | By: ____________<br>Michael W. Boyer |
| | Title: Vice President & General Counsel<br>NORC at the University of Chicago |
| Dated: August 14th, 2024 | Dated: ____________ |

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Confidential Settlement Agreement and Release (this "Agreement") is made effective as of the date of the final execution of this Agreement (the "Effective Date") by and between Plaintiff, Daniel Human ("Plaintiff"), on the one hand, and Defendant, Alleviate Tax, LLC, and its affiliated entities (collectively "Defendant") on the other hand for the purpose of resolving by compromise and settlement of all claims, controversies, alleged liabilities, and disputes between them. For the purposes of this Agreement, Plaintiff and Defendant are referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, Plaintiff filed a lawsuit on June 10, 2024, in the Circuit Court of St. Louis County, State of Missouri, that on July 17, 2024, was removed to the Eastern District of Missouri, Eastern Division, Case No.: 4:24-cv-00981-SRC, alleging violations of the Missouri No Call List and Telemarketing prohibitions set forth in §407.102&.l and Mo. Rev. Stat.§ 407.1076 and Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and 47 U.S.C. § 227(b)(l)(A) ("Claims"), against Defendant, (the "Complaint") arising out of alleged unsolicited calls to Plaintiff (the "Calls");

WHEREAS, Defendant denies Plaintiff's claims and has denied, and continues to deny, that it has any liability to Plaintiff for any such claims.

WHEREAS, the Parties hereto desire to compromise, settle, and release any and all claims which exist or which may exist between and among them, or their agents, assigns, and predecessors or successors, arising out of or relating to the facts, matters, events, or alleged violations of the TCPA and Missouri No Call List and Telemarketing prohibitions, without any admission of wrongdoing by either Party.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual promises, covenants, representations, and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. Payment and Consideration

(i) Within five (5) business days of Plaintiff providing (a) a signed copy of this Agreement and (b) a fully executed IRS Form W-9 for Plaintiff's counsel, Defendant shall pay by ACH, a total amount of Five Thousand Dollars ($5,000.00) ("Settlement Payment") to Daniel Human via wire to Butler Law Group, LLC. ACH instructions to be supplied in a separate email.

(ii) The Parties will each bear their own attorneys' fees and costs expended in connection with the Complaint. Plaintiff agrees not to make any further demand for attorneys' fees, interest, costs, or expenses of any kind.

2. General Release and Waiver

(i) Except as expressly set forth in this Agreement, for and in consideration of the mutual covenants set forth herein, which are hereby excluded from and survive this general release and waiver, Plaintiff, on his own behalf, and on behalf of his grantees, agents, representatives, heirs, devisees, trustees, assigns, assignors, attorneys, affiliates or any other entities in which Plaintiff has an interest (collectively, the "Releasing Parties"), hereby agrees to release and forever discharge Defendant and each of their respective affiliates and subsidiaries, and each of its respective past and present agents, employees, representatives, officers, directors, shareholders, attorneys, accountants, insurers, receivers, advisors, consultants, parents, divisions, successors, heirs, predecessors in interest, corporate parent, contractors, and commonly-controlled corporations including, but not limited to, its owners, affiliates, employees, and agents (collectively "Released Parties"), from all liabilities, causes of action, charges, complaints, suits, claims, obligations, costs, losses, damages, rights, judgments, attorneys' fees, expenses, bonds, bills, penalties, fines, and all other legal responsibilities of any form whatsoever, whether known or unknown, whether presently existing, whether suspected or unsuspected, whether fixed or contingent, including those arising under any theory of law, whether common, constitutional, statutory or other of any jurisdiction, foreign or domestic, whether in law or in equity, which they had or may claim to have against any of them, including, without limitation, those arising out of or relating to: (a) the subject matter of this Agreement and the Complaint; (b) any acts or omissions by the Released Parties, including any alleged violations of the TCPA and/or federal or state laws or regulations related to telemarketing; and (c) any costs, attorneys' fees, or expenses incurred by the Releasing Parties in connection with the subject matter hereof (collectively, the "Released Claims"). The Releasing Parties hereby acknowledge and agree that, except as expressly set forth in this Agreement, the Released Parties have no other liabilities or obligations, of any kind or nature, owed to the Releasing Parties, in connection with or relating to the Released Claims or otherwise. It is further understood and agreed that this Agreement and the Settlement Payment made hereunder constitute, full and final satisfaction of all claims of every nature, direct or indirect, against all persons or entities, including those who are or might be held to be joint and/or successor tortfeasors with any of the parties released hereby, as well as those to whom any of the parties released are, or may be held to be, liable by way of contribution or indemnity for the payment of all or any part of any claim arising out of, or directly or indirectly related to, the facts and circumstances that were alleged in connection with the Complaint. It is expressly understood and agreed that this release is intended to cover, and does cover, not only known injuries and damages.

(ii) Plaintiff acknowledges the following: (a) he is represented by counsel or has had the opportunity to retain and consult with counsel; and (b) he has been specifically advised by his counsel of the consequences of the above waiver and this Agreement generally or has otherwise had the opportunity to consult with counsel and knowingly elected not to.

(iii) Plaintiff represents and warrants that: (a) Plaintiff is duly authorized to enter into this Agreement and may lawfully bind Releasing Parties and all persons or entities on whose behalf Plaintiff have agreed herein; (b) Plaintiff has not sold, pledged, encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any of the claims released in the

general release above; (c) Plaintiff did not instigate or cause to instigate the Complaint and represents and warrants that his Claims are not fraudulent; and (d) Plaintiff is not the subject of any bankruptcy filing.

(iv) Plaintiff further agrees, promises, and covenants that he will not, nor will any person, organization, or any other entity acting on their behalf, file, charge, claim, sue, participate in, join or cause or permit to be filed, charged or claimed, any action for damages or other relief (including injunctive, declaratory, monetary or other) against the Released Parties with respect to any Released Claims. The Parties agree that this Agreement may be pleaded as a full and complete defense to any and all Released Claims and causes of action being released pursuant to this Agreement. Each Party acknowledges and consents that the Agreement may be used as the basis for an injunction to halt any action, suit or other proceeding based upon the Released Claims. This covenant not to sue applies to any claims that could be brought in any forum or jurisdiction and is intended to be a full and complete bar to any such claims.

3. Covenant Not To Sue

Unless otherwise prohibited by law, Human further covenants and acknowledges that neither Human nor anyone claiming through Human has or will sue or cause or permit suit against the Released Parties upon any claim released or purported to be released herein or to participate in any way in any suit or proceeding or to execute, seek to impose, collect, or recover upon or otherwise enforce or accept any judgment, decision, award, warranty, or attachment upon any claim released or purported to be released herein.

4. Intent Not To Sue

Unless otherwise prohibited by law, Human's counsel, Butler Law Group LLC represents that neither Butler Law Group LLC nor anyone claiming through Butler Law Group LLC has the present intent to sue and will not sue or cause or permit suit against Alleviate upon any claim released or purported to be released herein or to participate in any way in any suit or proceeding or to execute, seek to impose, collect, or recover upon or otherwise enforce or accept any judgment, decision, award, warranty, or attachment upon any claim released or purported to be released herein.

5. Confidentiality and Non-Disparagement

The Parties shall not discuss, publish, or share any copy of, or any details relating to, this Agreement with any person or entity not a party to this Agreement, in any form, which may include, but are not limited to, media materials, print, digital, social media, community forums, and other public and private publications, except that the Plaintiff may state that the matter has been "fully and amicably resolved without any admission of fault." Plaintiff agrees the terms and existence of this Agreement, and all information and communications exchanged during discussions and settlement negotiations leading up to this Agreement (collectively "Confidential

Information"), is strictly confidential, and they shall not reveal Confidential Information or the names of the Parties to this Agreement to any other person or entity, except: (i) as required by law or order of the court or the other government authority; (ii) as is reasonably necessary to be disclosed to any Party's accountants, tax advisors, or attorneys (provided the disclosing Party notifies such recipient of the disclosing Party's confidentiality obligations hereunder and obtains assurances that such recipient will ensure that Confidential Information is only disclosed in accordance with the terms of this Agreement); (iii) or as is reasonably necessary to the defense of any action or enforcement of any rights to which the terms of this Agreement may apply.

This confidentiality provision and agreement is a material term of this Agreement, breach of which the Parties hereby agree will cause the Parties irreparable harm. In the event of a breach of this provision by of this provision by either party, the non-breaching party shall be entitled to equitable relief to protect its interests. Such equitable relief shall in no way limit the non-breaching party's right to obtain other remedies available under applicable law. All releases read under this paragraph are limited to those which have accrued as of the date of this Agreement. The terms and existence of this Agreement may be disclosed if required by law or subpoena

The Parties agree to not make any statements, written or oral, or cause or encourage others to make any statements, written or oral, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of either Party or any of their affiliates, subsidiaries, employees, directors, and/or officers.

6. Injunctive Relief: Remedies

The Parties expressly acknowledge and agree that the confidentiality agreements set forth in Section 3 ("Confidentiality and Non-Disparagement") are material inducements to each Party to enter into this Agreement and to release the Released Claims. Furthermore, the Parties acknowledge and agree that the disclosure of information related to the terms of this Agreement as prohibited by Section 3 would cause the non-breaching Party to suffer immediate, irreparable injury for which money damages would be an inadequate remedy, and that the non-breaching Party will be entitled to injunctive relief, as provided for under applicable law or equity, without being required to post any bond or other security, in the event of any such breach. Injunctive relief will not be deemed the exclusive remedy for any such breach but will be in addition to all other remedies available under applicable law.

7. Representations and Warranties

(i) As a material inducement for Defendant entering into this Agreement, Plaintiff represents and warrants that he is the subscriber and user of the number allegedly called, were the contacted Party with respect to the Calls alleged in the Complaint; he did not induce, solicit, or provide prior express consent or prior express written consent for the Calls alleged in the Complaint and is unaware of how the Calls alleged were generated; and he has full authority to enter into this Agreement to fully and finally resolve claims related to any Calls or future calls received. Defendant further represents and warrants that he will not induce, solicit, or provide

consent or prior express written consent to Released Parties or in any way elicit calls from Released Parties.

(ii) As a material inducement for entering into this Agreement, the Parties represent and warrant to each other that:

(a) they are entering into this Agreement solely of their own judgment and free will, and after the opportunity for consultation with their own legal counsel;

(b) this Agreement is fair, reasonable, and in their best interest;

(c) they have relied upon nothing said by anyone connected with this dispute, other than their own legal counsel, either as to liability, as to the extent of damages, chances of success in the trial court or on appeal, insurance coverage available, or as to any other matter, except as expressly set forth in this Agreement;

(d) they and their attorneys, accountants, agents, representatives and other advisors have had sufficient disclosure of information and knowledge of all material facts and legal rights and remedies necessary to evaluate the conduct of the other Parties, which is sufficient to make an informed decision to enter into and approve the terms of this Agreement;

(e) they have full authority to execute this Agreement in the capacities noted so as to bind each such Party to this Agreement; and

(f) no oral understanding, statement, promises or inducements contrary to the terms of this Agreement exist.

8. No Admission of Fault or Liability

It is understood and agreed that this Agreement and the performance of other obligations herein, are for the sole purpose of compromising the disputed Released Claims, and that this Agreement shall not be construed as an admission of liability or wrongdoing by Defendant or any of the Released Parties.

9. Investigation

Each of the Parties has made such investigation of the facts pertaining to this Agreement, as it deems necessary. The Parties understand that if any fact with respect to any matter covered by this Agreement is found hereafter to be other than, or different from, the facts now believed by the parties to be true, each Party expressly accepts and assumes the risk of such possible difference in facts and agrees that this Agreement shall become and remain effective notwithstanding such different facts.

10. Integration Clause

This Agreement contains the entire agreement of the Parties and supersedes any and all prior, written or oral, agreements among them concerning the subject matter hereof. There are no

representations, agreements, arrangements or understandings, oral or written, among the Parties relating to the subject matter of this Agreement that are not fully expressed herein.

11. Consultation With Counsel

The Parties represent and warrant that they have had the opportunity to present this Agreement to counsel, if any, with this Agreement and that they are executing this Agreement of their own free will after having had to opportunity to receive advice from counsel regarding execution of this Agreement.

12. Attorneys' Fees

In the event that any action is taken to enforce the terms of this Agreement, the prevailing Party shall be entitled to recover, in addition to other damages or remedies, its reasonable attorneys' fees, court costs, and other costs and expenses reasonably incurred in connection therewith, including but not limited to any reasonable attorneys' fees, court costs and other costs and expenses incurred in connection with seeking to recover the attorneys' fees, court costs and other costs and expenses of enforcement provided for by this paragraph.

13. Taxes

Plaintiff shall be solely responsible for federal, state, and local taxes due on the Settlement Payment, if any, and he specifically agrees to indemnify and hold Defendant harmless for any claims involving federal, state, or local taxes resulting from such responsibility.

14. Severability

If any one or more of the provisions of this Agreement should be ruled wholly or partly invalid or unenforceable by a court or other government body of competent jurisdiction, then: (i) the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable shall be unaffected; (ii) the effect of the ruling shall be limited to the jurisdiction of the court or other government body making the ruling; (iii) the provision(s) held wholly or partly invalid or unenforceable shall be deemed amended, and the court or other government body is authorized to reform the provision(s), to the minimum extent necessary to render them valid and enforceable in conformity with the Parties' intent as manifested herein; and (iv) if the ruling and/or the controlling principle of law or equity leading to the ruling is subsequently overruled, modified, or amended by legislature, judicial, or administrative action, then the provision(s) in question as originally set forth in this Agreement shall be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity by the State of California.

15. No Waiver

The failure of any Party to insist upon compliance with any of the provisions of this Agreement or the waiver thereof, in any instance, shall not be construed as a general waiver or relinquishment by such Party of any other provision of this Agreement.

16. Modification and Amendment

This Agreement may not be waived, altered, amended, or repealed, in whole or in part, except upon written agreement executed by the Party or Parties against which enforcement is sought.

17. Agreement Obligates, Extends, and Inures

The provisions of this Agreement shall be binding upon each of the Parties and each of the Parties' directors, officers, members, shareholders, trustees, partners, successors, agents, assigns, attorneys and employees, if any, and upon those who may assume any or all of the above-described capacities subsequent to the Effective Date. The provisions of this Agreement shall inure to the benefit of each of the Parties and each of the Parties' directors, officers, members, shareholders, trustees, partners, successors, agents, assigns, attorneys and employees, if any.

18. No Reliance

Each of the Parties represents and warrants that, except for the representations and warranties specifically set forth in this Agreement, in executing this Agreement, it does not rely, and has not relied, on any representation or statement made by any other Party to this Agreement, on any representation or statement made anyone acting on behalf of any Party to this Agreement, or any representation or statement made by any other person.

19. No Assignment or Transfer of Action

Plaintiff, on behalf of himself and the Releasing Parties, represents and warrants that: (i) they own the Claims released hereby; (ii) no other person or entity has any interest in such Claims; (iii) they have not sold, assigned, conveyed or otherwise transferred any such Claim, or any other Claim or demand against any person or entity released hereby; and (iv) they have the sole right to settle and release such Claims. The undersigned represents and warrants that to the best of their information and belief, he has no knowledge of any Claims held by one against the other that are not released hereby.

20. Multiple Counterparts

This Agreement may be executed in counterparts, each of which may be executed and delivered via facsimile or PDF electronic delivery with the same validity as if it were an ink-signed document and each of which shall be effective and binding on the Parties as of the Effective Date. Each such counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one and the same Agreement.

21. Construction

Each Party hereto has cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the same shall not be construed against any Party on the ground that said Party drafted this Agreement. This Agreement shall be governed by, and

construed in accordance with, the laws of the United States, and to the extent not preempted, the substantive laws of California. Venue for any cause of action arising out of this Agreement shall lie in Orange County, California.

22. Mutual Drafting

This Agreement is the product of negotiations "at arm's length" between the undersigned, both of whom had ample time in which to seek legal advice, if desired. As such, the terms of this Agreement are mutually agreed upon, and no part of this Agreement will be construed against the drafter.

23. Arbitration Agreement

If a dispute arises regarding the settlement set forth herein, including, but not limited to, any breach or alleged breach of this Agreement by either of the Parties (e.g., violating the covenant not to sue requirements of this Agreement, violation of Plaintiff's Representations and Warranties, attempting to collect waived debt, violating the non-disclosure requirements of this Agreement, etc.) the aggrieved party shall initiate the resolution process by giving notice setting out, in writing and in detail, the issues in dispute and the value of the claim to the other party. A meeting (either in-person or telephonic) between the Parties, attended by individuals with decision-making authority, must take place within thirty days from the date the notice was sent in an attempt to resolve the dispute through direct negotiations. If the dispute cannot be settled by direct negotiations within thirty days of the initiation of the resolution process, the Parties may initial mediation by giving notice to the other party. Mediation shall be attended by an individual representing each party with decision-making authority and the proceeding shall take place in California. If the dispute is not resolved by mediation within sixty days from the day of the notice requiring mediation, or if the dispute is unresolved within ninety days from the date of notice requiring direct negotiations, then the dispute shall be finally settled by binding arbitration administrated by AAA or JAMS and either party may initiate arbitration by giving notice to the other party. A party who violates this section shall pay all legal and consulting fees and costs incurred by the other party in any suit, action or proceeding to enforce this section. While the procedures under this section are pending, each party shall continue to perform its obligations under this release, unless to do so would be impossible or impracticable under the circumstances.

**THE UNDERSIGNED HAVE READ THE FOREGOING SETTLEMENT AGREEMENT AND RELEASE, FULLY UNDERSTAND IT, AND AGREE TO THE TERMS SET FORTH HEREIN.**

**DANIEL HUMAN**

Daniel Human

Plaintiff

Date: August ___, 2024

**Alleviate Tax, LLC**

______________________________
**Authorized Representative**

**Date: August___, 2024.**

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This **CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE** (the "Agreement") is made this ____ day of September 2024 (the "Effective Date"), by and between Daniel Human ("Mr. Human") and Frubbel LLC d/b/a Valu-Pass ("Frubbel") (each a "Party" and collectively the "Parties").

## Recitals

WHEREAS, Mr. Human filed a lawsuit titled *Human v. Frubbel, LLC d/b/a Valu-Pass*, in the United States District Court for the Eastern District of Missouri (the "Lawsuit") against Frubbel in which Mr. Human alleges that he received phone calls from or on behalf of Frubbel in violation of the Telephone Consumer Protection Act;

WHEREAS, Frubbel denies any wrongdoing.

WHEREAS, the Parties wish to resolve any and all claims between them.

WHEREAS, the Parties desire to avoid the expense, inconvenience, uncertainty and distraction of litigation and any other issue or dispute between them, and the Parties have reached an agreement to settle completely all claims between them under the terms set forth below.

## Agreement

NOW, THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**1.** **Settlement Payment.** In consideration for the release of claims and other promises by Mr. Human set out in this Agreement, Frubbel shall pay the total amount of three thousand dollars ($3,000.00) ("Settlement Payment") with seven (7) days of Mr. Human returning a signed Agreement and providing a completed W9 form from the Butler Law Group, LLC. This Settlement Payment constitutes a full and complete settlement of all claims Mr. Human may assert or rights to which Mr. Human may be entitled to, inclusive of attorneys' fees and costs against the Released Parties. Counsel for Mr. Human will provide instructions for payment via ACH.

2. **Release.** Mr. Human individually and on behalf of his agents, attorneys, and assigns, irrevocably and unconditionally releases, acquits and forever discharges Frubbel, and any of its principals, employees, officers, shareholders, agents, attorneys, assigns, franchisors, parents, subsidiaries, and affiliates (the "Released Parties") from any and all claims, rights, interests, causes of action, and/or remedies of any nature, kind, or description, whether known or unknown, as of the date of this Agreement.

3. **Covenant Not to Sue; Right to Cure.** Mr. Human agrees that he will not file a court action regarding the matters released herein. In addition, to the extent that Mr. Human believes that Frubbel engages in future conduct that would give rise to a legal claim, he must provide written notice to Frubbel at rwarren@globaltravel.com and by FedEx Overnight delivery

signature required to Frubbel LLC, 2699 Lee Road Suite 350, Winter Park, Fl 32789 , at which time, Frubbel shall have thirty (30) days from the date of notice receipt to correct or cure any alleged violation without penalty

4. **Acknowledgements, Warranties and Representations.** Mr. Human's counsel hereby represents and warrants, on behalf of himself and his law firm, that at the time of execution of the Agreement, that he is not aware of any clients currently represented by him (other than Mr. Human) who have or may have claims against Frubbel or any of the Released Parties, and that he has no present intention to solicit additional claims against Frubbel or any of the Released Parties

Acknowledged by Butler Law Group, LLC: /s/Edwin V. Butler
Edwin v. Butler, Esq.

5. **Severability.** If one or more of the provisions, or portions thereof, of this Agreement is determined to be illegal or unenforceable, the remainder of this Agreement shall not be affected thereby, and each remaining provision or portion thereof shall continue to be valid and effective and shall be enforceable to the fullest extent permitted by law.

6. **No Contra Proferentem.** The Parties have mutually negotiated this Agreement and hereby agree that it shall not be construed against any Party based upon the assertion that one or more of them was the "drafter."

7. **No Admission of Liability.** Nothing herein shall constitute an admission by Frubbel of any wrongdoing or liability, or of the truth of any allegations of Mr. Human. The negotiation and execution of this Agreement, and all acts performed or documents executed pursuant to or in furtherance of the Agreement: (i) are not and shall not be deemed to be, and may not be used as, an admission or evidence of any wrongdoing or liability on the part of Frubbel or of the truth of any of the allegations in connection with the Lawsuit; (ii) are not and shall not be deemed to be, and may not be used as, an admission or evidence of any fault or omission on the part of Frubbel in any civil, criminal or administrative proceeding in any court, arbitration forum, administrative agency or other tribunal; and, (iii) are not and shall not be deemed to be and may not be used as an admission of the appropriateness of similar claims for class certification.

8. **Voluntary Agreement.** The Parties acknowledge and agree that they have read all the provisions of this Agreement in full, have reviewed those provisions with an attorney or had the opportunity to seek legal advice and understand the provisions of this Agreement and voluntarily agree to be bound thereby. The Parties further acknowledge and agree that they are entering into this Agreement based solely and exclusively upon their counsel's and/or their own analysis of the facts and/or information of which the Party and/or its counsel is independently aware and not based upon or in reliance upon any statements and/or representations of any other Party (except to the extent such statements and/or representations are fully and expressly set forth herein). The Parties acknowledge and agree that the consideration received pursuant to this Agreement is fair, reasonable, sufficient, just and adequate, and constitutes lawful consideration supporting the execution of this Agreement.

9. **Entire Agreement:** This Agreement contains the entire agreement between the Parties with respect to the subject matter of this Agreement and any agreement hereafter made shall be ineffective to change, modify or discharge this Agreement unless such subsequent agreement is in writing and signed by the Parties. All previous contracts, warranties, communications, covenants, commitments, representations or agreements, whether written or oral, between and among the Parties and/or their attorneys, are superseded unless expressly incorporated and made a part of this Agreement.

10. **Confidentiality:** Parties represent and warrant that they have not disclosed, nor will they disclose in the future, facts and circumstances regarding the negotiations leading up to this Agreement and the terms herein to any third party except: (a) by compulsion of a valid and enforceable subpoena; (b) by compulsion of a valid order of a court of competent jurisdiction; (c) to the extent necessary for a Party's attorneys or tax advisors to assist in the conduct of their business affairs, provided, however, that prior to disclosure under subparagraphs (a) and (b) above, the Parties will make diligent efforts to give the other Party sufficient and reasonable notice of such subpoena or order of the court to enable such other Party to object to the same and to move to quash or to take such other action as is allowed by law to prevent disclosure pursuant thereto. The Parties further agree to take such action as may be permissible and/or required under the appropriate rules of the court or administrative regulations to protect and preserve the confidentiality of this Agreement. The Parties further represent and agree that they will not make, whether directly or indirectly, either in their own name, anonymously, through employees, or agents, or under any other name, any disclosures or comments regarding the existence and terms of this Agreement or settlement negotiations and communications between the parties. on any social media site or any other site on the internet.

11. **No Media Comment:** The Parties and their attorneys and agents agree not to issue any press releases, hold any interviews with journalists, or make any other disclosures or comments to media (including to media via the internet) regarding this Agreement or the negotiations and communications between the Parties regarding settlement. If asked about the Agreement or its subject matter, the Parties and attorneys and agents will state only that all disputes between the parties have been resolved amicably.

12. **Non-Disparaging Statements:** from and after the Effective Date of this Agreement, the Party's agrees not to make any disparaging statements, comments, or insinuations about Frubbel or Mr. Human, including, and without limitation to, any communications on any social media platform, website, blog or chat room or otherwise, or any products or service that either offers, whether true or false, oral or written.

13. **Ownership of Claims.** Mr. Human hereby warrants and represents that he owns the entirety of any alleged claims in connection with the Lawsuit which is being released herein, and that he has not assigned, expressly or impliedly, any interest in such claims, nor has there been assignment by operation of law, or otherwise, nor has either assigned his rights, or entered into a subrogation agreement with any insurance carrier, nor has either filed any bankruptcy petition, made any assignment for the benefit of creditors, or engaged in any other insolvency proceedings, which would result in the claims alleged being subject to a claim of partial or total beneficial, equitable or legal ownership in the name of a trustee on behalf of such party creditors, or a similar

fiduciary able to assert such position, or have the claims be subject to an attachment, or assigned in any way or in any manner to any person or entity not a party to this Agreement, and that Mr. Human therefore has the sole and exclusive authority to enter into this Agreement in connection with the allegations contemplated herein, and no other party is required to join herein in order to fully compromise and release any claim asserted or that could have been asserted in connection with the Lawsuit against Frubbel or its affiliates.

14. **Limitations of Liability.** NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT, IN NO EVENT WILL FRUBBEL OR ITS AFFILIATES, PRINCIPALS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS OR SUPPLIERS BE LIABLE TO MR HUMAN FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR SPECIAL DAMAGES, LOST DATA, DELAYS, LOST PROFITS, LOSS OF REVENUE OR ANY OTHER ECONOMIC LOSS, COST OR EXPENSE ARISING FROM OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, EVEN IF FRUBBEL OR ITS AFFILIATES, PRINCIPALS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS OR SUPPLIERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL FRUBBEL BE LIABLE FOR ANY TYPE OF LOSS TO YOU CAUSED BY AN EVENT BEYOND ITS CONTROL, INCLUDING, BUT NOT LIMITED TO, GOVERNMENT RESTRICTIONS, NATURAL DISASTERS, TERRORIST ACTS, WARS, RIOTS, STRIKES, AND OTHER ACTS OF GOD. IN NO EVENT WILL COMPANY'S TOTAL AGGREGATE LIABILITY UNDER THIS AGREEMENT, WHETHER ARISING OUT OF BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, EXCEED FIVE HUNDRED DOLLARS ($500). IN NO EVENT WILL MR. HUMAN BRING ANY ACTION AGAINST THE FRUBBEL MORE THAN ONE (1) YEAR AFTER SUCH CAUSE OF ACTION ARISES.

15. **Choice of Law; Venue.** This Agreement shall be considered executed in the State of Florida and will be interpreted, construed, and enforced in accordance with Florida law, without regard to any conflicts of law provisions. Except for requests for injunctive relief, any dispute, claim, or controversy arising out of or relating to this Agreement, including any breach, shall be resolved through final and binding arbitration, administered by the American Arbitration Association under its Commercial Arbitration Rules. The arbitration shall take place in person at a location closest to Orlando, Florida, and any award rendered by the arbitrator(s) may be entered as a judgment in any court with proper jurisdiction. Each Party shall bear its own arbitration costs and attorneys' fees, except that the arbitrator may award attorneys' fees and costs in the event the arbitration is found to be frivolous. Any litigation not subject to arbitration shall be exclusively brought before the State or Federal Courts closest to Orange County, Florida.

16. **Multiple Counterparts.** This Agreement may be executed on separate signature pages by each of the Parties and will be deemed fully executed when each Party has signed and delivered a signature page to the other Party. Original signatures transmitted by facsimile are acceptable. All executed signature pages will be aggregated and attached to this Agreement and will constitute the entire Agreement of the Parties.

17. **Tax.** Mr. Human agrees and acknowledges that neither Frubbel nor its counsel have made any representations to him regarding the tax consequences of any payments or amounts received by him pursuant to this Agreement.

18. **Survival.** The representations, warranties, covenants, obligations releases and indemnities of the Parties set forth in this Agreement shall survive the termination of this Agreement.

9/18/2024
Date

Daniel Human

Date

Frubbel, LLC d/b/a Valu-Pass.
By: ________________
Its: ________________

**CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE**

This confidential Settlement Agreement and Release ("Agreement") is made and entered into by and between American Financial Network, Inc. ("AFN") and Daniel Human ("Human" or "Complainant") (collectively, the "Parties").

The Parties have chosen to enter into this Agreement in order to avoid further proceedings with respect to certain claims Plaintiff has made against Defendant American Financial Network, Inc in the above-captioned lawsuit. The Parties understand and agree that AFN denies every allegation of wrongdoing made by Plaintiff in the above-captioned matter, initially filed in the Circuit Court of St. Louis County, State of Missouri, Case No. 24SL-CC04682 (the "Litigation"), and removed to the United States District Court, Eastern District of Missouri, Case No. 4:23-cv-01559 SEP, including but not limited to Plaintiff's claims of violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. §227 ("TCPA"), corresponding federal regulations, and the Missouri No Call List and Telemarketing prohibitions, as set forth in MO. REV. STAT. § 407.1076 et seq., 407.1095(3), 407.1098.1 and 407.1101.

The Parties understand and agree that the making of this Agreement shall not, in any way, be construed or considered an admission by any Parties of guilt or non-compliance with any federal, state or local law or of any other wrongdoing whatsoever. AFN denies all material allegations set forth in the Litigation. AFN specifically disputes that it violated the TCPA, Missouri "No Call" and Telemarketing laws, or that Plaintiff is entitled to any relief from AFN. To this end, the settlement of this Litigation, this Agreement, and all acts performed or documents executed pursuant to or in furtherance of the settlement of this Litigation are not and shall not be deemed to be, and may not be used as, an admission or evidence of any wrongdoing, fault, or liability on the part of AFN or of the truth of any of the allegations in the Litigation, in any civil, criminal, or administrative proceeding in any court, arbitration forum, administrative agency or other tribunal, and are not and shall not be deemed to be and may not be used as an admission of the appropriateness of these or similar claims for class certification. AFN denies that it is liable to Plaintiff or any putative class member in any manner whatsoever and denies all allegations of wrongdoing and assert that their actions have been lawful and proper in all respects.

WHEREAS, the Released Parties are engaged in certain forms of lead generation and other methods of contacting consumers, including, but not limited to, sales and marketing calls and/or text messages, either on their own behalf, through others, or on behalf of others.

WHEREAS, Human has alleged certain sales, marketing or other call and/or text message related law violations by the Released Parties.

WHEREAS, the Parties hereto desire to compromise, settle, and release any and all claims arising out of or relating to the alleged violations, without any admission of wrongdoing by either party.

***NOW THEREFORE***, in consideration of the mutual covenants, promises, terms, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.** **Payment:** The Released Parties shall pay the total sum of three thousand seven hundred-fifty ($3,750.00) U.S. dollars ("Settlement Amount") to the trust account of Edwin Butler Law Group, LLC through ACH within five (5) business days after this Agreement is fully executed by all Parties. The Settlement Payment shall be in full satisfaction of all monies due and owing to Human in connection with those above titled actions. The Settlement Payment is inclusive of monetary damages, attorneys' fees, and costs.

**2.** **Release by Complainant:**

In consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Daniel Human, on behalf of Complainant and Complainant's heirs, successors, legal representatives and assigns, does hereby release, acquit and forever discharge AFN , along with each of its current, former and future owners, members, partners, officers, directors, shareholders, employees, agents, assigns, successors, servants, insurers, representatives, and attorneys, from all claims, liabilities, demands, suits, class actions and causes of action of every nature and kind, whether vested or contingent, past, known or unknown, in law or in equity, matured or unmatured, whether or not such claims were or could have been brought or raised in any applicable civil action, related to all telephone calls and/or text messages sent to or received by Daniel Human that were sent by, or on behalf of AFN from the beginning of time up until the date of execution of this Agreement by all parties as stated in the above litigation. Notwithstanding the foregoing, AFN shall not be released from the obligations imposed by this Agreement.[1]

**3.** **Confidentiality & Non-Disparagement:** The Parties agree to keep this Agreement and each and every term contained herein completely confidential and that, except as required by law, they will not hereafter disclose the terms of this Agreement to anyone (other than to their affiliates and related and constituent entities, attorneys, accountants, and corporate officers and directors). If Human or his counsel receives a subpoena or other compulsory process commanding and/or requesting production of information concerning this Agreement, the subpoenaed party may produce this Agreement, but must notify the Released Parties at least ten (10) business days before producing same. Notice shall be sent to the Released Parties attorneys, by email. Following the execution of this Agreement and receipt of the Payment: (1) Complainant shall immediately dismiss any lawsuits and class action claims filed against any of the Released Parties by Complainant; (2) Complainant shall immediately withdraw all complaints and negative reviews filed by Complainant about any Released Party; and (3) The parties shall not disparage the other parties to any third party, nor shall Complainant make any future complaint or negative review regarding any of the Released Parties, with respect to the specific allegations released under this Agreement.

[1] This Agreement shall not be construed in any form or fashion to release any third-party telemarketing or lead generation companies. This is a release solely releasing American Financial Network Wealth, Inc, and its owners, officers and employees.

**4.** **Denial of Liability:** It is expressly understood and agreed to by and among the undersigned hereto that by entering into this Agreement, none of the undersigned (nor their affiliates) hereto admit the truth of the allegations made by any other party, and this is a compromise of a disputed claim, which should not be construed as an admission of liability on the part of any party or any affiliate or the same. This Agreement is inadmissible as evidence against any party except to enforce the terms of the Agreement and is not an admission of wrongdoing or liability on the part of any party to this Agreement.

**5.** **Complainant's Representation:** Complainant hereby represents, agrees, warrants and assures that, as of the date of execution of this Agreement, he is not aware of any other individuals, persons or entities that have or may have any potential claims, grievances, or causes of actions against the Released Parties similar to those asserted in the Demand and resolved by this Agreement. The complainant further agrees that he has no intention to solicit or refer any such persons to his counsel or other counsel for the purpose of bringing such claims. Complainant further agrees that he will not assist or provide legal advice to any person who wishes to bring the same or similar claims against the Released Parties. Complainant further agrees that he is not personally aware of any other potential lawsuits, potential plaintiffs or potential claims against the Released Parties as of the date of this Agreement. Complainant agrees and acknowledges that the representations, warranties and assurances in this Paragraph constitute material inducements for the Released Parties to enter into this Agreement.

**6.** **Scope of Agreement:** It is the intent of the Parties that this Agreement cover the relationship between them as it relates to the receipt of any telephone calls and/or text messages received by Complainant up to and including the date of execution of this agreement by the Released Parties. It is agreed that Complainant does not wish to receive telephone calls and/or text messages from, or on behalf of the Released Parties and that the Released Parties do not wish for Human to receive any telephone calls and/or text messages from, or on behalf of the Released Parties. Accordingly, the Parties agree as follows:

- **A.** Human shall immediately provide a list to Released Parties of all telephone numbers that he currently owns, uses, licenses or maintains, including, but not limited to the telephone numbers at which he allegedly received telephone calls by, and/or text messages ("Current Telephone Numbers") from Released Parties, so they can act in an attempt to prevent any future telephone calls or text messages In such an event, the release remains in effect as to the initial allegations which represent the subject of this release.
- **B.** Human warrants that neither he, nor anyone on his behalf, has knowingly opted in or otherwise requested and will not knowingly opt in or otherwise request in the future, to receive any commercial telephone call or text message from the Released Parties, its parents and subsidiaries, and any Affiliates.
- **C.** Human acknowledges and agrees that the representations and warranties of this section are essential and material terms of this Agreement, and that the Released Parties would not have entered into this Agreement without such representations from Human.
- **D.** The Released Parties agree to cease and desist making, causing to be made, or assisting others in making calls, and/or sending text messages, to Complainant at the Current Telephone Numbers, and to add Human's Current Telephone Numbers to their suppression list, if such a list exists.
- **E.** Mr. Humans telephone numbers are (208) 390-1355 and (314) 915-2988.

7. **Assigns and Successors-in-Interest:** This Agreement shall be binding upon and inure to the benefit of the heirs, successors, and assigns of the undersigned hereto. Complainant represents that he has not already assigned or otherwise transferred or conveyed their claim or any interest in the same and will indemnify Released Parties if this is the case.

8. **Agreement Fully Read and Understood:** This Agreement is being executed voluntarily and without any duress or undue influence, with the full intent of settling and releasing claims as set forth herein. The Parties acknowledge that:

- **A.** This Agreement has been carefully read by the undersigned and the contents and consequences are known and understood by the undersigned.
- **B.** This Agreement is the product of negotiations "at arm's length" between the undersigned.
- **C.** They are fully aware of the legal and binding effect of this Agreement; and
- **D.** They have no other obligations, duties, and/or responsibilities other than those expressly delineated and set forth in this Agreement.
- **E.** They have each received or have had the opportunity to obtain if they so choose independent legal advice from the attorneys of their choice with respect to the preparation, review, and advisability of executing this Agreement.
- **F.** As such, the terms of this Agreement are mutually agreed-upon, and no part of this Agreement will be construed against the drafter.

9. **Applicable Law, Venue for Disputes:** The existence, validity, construction and operation of this Agreement, and all of its covenants, agreements, representations, warranties, terms, and conditions, shall be determined in accordance with the laws of the State of Missouri. The parties consent to the jurisdiction of the courts in Missouri and agree that the venue in any future dispute between them shall be proper in this forum only.

10. **Entire Agreement:** This Agreement sets forth the entire agreement between the undersigned, and fully supersedes any and all prior and/or contemporaneous agreements or understandings between the undersigned, which pertain to the subject matter hereof. The terms of this Agreement may not be contradicted by evidence of any prior or contemporaneous agreement, and no extrinsic evidence whatsoever may be introduced to vary its terms in any judicial proceeding involving this Agreement.

11. **Modification:** This Agreement may be modified, but only if the modification is in writing and signed by all parties to this Agreement.

12. **Severability:** Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be part of this Agreement.

13. **Counterparts:** This Agreement may be executed in multiple counterparts, each of which shall be treated as an original.

**14.** **Headings:** Headings or captions contained in this Agreement are solely for the convenience of the Parties hereto, are not a part of this Agreement, and shall not be used for the interpretation of, or determination of the validity of, this Agreement or any provision hereof.

**15.** **Authority to Bind:** Signatories to this Agreement represent and warrant to be duly authorized to bind the signatories and to fully and completely resolve the disputes described in this Agreement.

**Effective Date:** The effective date shall be the date of the last signature below.

**IN WITNESS THEREOF, the Parties evidence their agreement by their signatures:**

**DANIEL HUMAN**

Signature: [signature]

Date: August 1, 2024

**American Financial Network, Inc**

Signature: ____________________

Name: ____________________

Title: ____________________

Date: ____________________

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release ("**Agreement**") is made effective as of the date of the last signature to this Agreement ("**Effective Date**"), by and between Plaintiff Daniel Human ("**Plaintiff**") and Defendant Benepath, Inc. d/b/a Benepath Insurance Agency ("**Defendant**"). Plaintiff and Defendant are sometimes each individually referred to herein as a "**Party**," and are sometimes collectively referred to herein as the "**Parties**." This Agreement is made and entered into with respect to the following facts:

## RECITALS

A. On May 16, 2023, Plaintiff filed a lawsuit in the Circuit Court of St. Louis County, Missouri, case number 23SL-CC02032, captioned *Daniel Human, individually and on behalf of all others similarly situated v. Benepath, Inc., Compare Health Quotes, Clelland Green, Mike Pennewill, Jennifer Getz, and John and Jane Does 1 through 7*, which was subsequently removed to the United States District Court for the Eastern District of Missouri, case 4:23-cv-00865-MTS (the "**Action**"). The Action generally alleges that, that between December 28, 2022 and December 29, 2022 he received a total of seven (7) calls from Benepath's agents, employees and/or vendors soliciting the purchase of insurance despite Plaintiff's telephone number being on State and Federal do not call lists (the "**Subject Incident**").

B. Defendant denies Plaintiff's allegations asserted in the Action. Defendant also denies any liability arising from those allegations, from any other aspect the Subject Incident, or from any actions taken by Defendant with regard to the Subject Incident.

C. The Parties desire to settle and compromise any and all claims relative to the Action, completely resolve their disputes concerning the issues involved in the Action, avoid the risks and expenses of further litigation, and dispense with further litigation in this Action by entering into this Agreement.

D. Therefore, in consideration of the agreements and representations made herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

### 1. CONSIDERATION

1.1. Settlement Payment. Defendant will cause to be paid to Plaintiff the sum of Twelve-Thousand Dollars and Zero Cents ($12,000.00) (the "**Settlement Payment**"), within thirty (30) calendar days of (1) the Effective Date *and* (2) the receipt of an executed IRS W-9 form for the payee hereunder. Such Settlement Payment shall be paid by check made payable to Butler Law Group and Daniel Human which shall be forwarded to Plaintiff's counsel, Butler Law Group, LLC, 1650 Des Peres Rd., Suite 220, St. Louis, MO 63131.

1.2. No Further Payment Obligations. The Parties agree that no payments or further consideration will be made by Defendant except for the Settlement Payment. Defendant shall bear no

further expenses, costs, damages, or fees incurred or claims due by the Parties or by any of their respective attorneys, agents, or representatives.

1.3. Complete Satisfaction. The Settlement Payment shall be in complete satisfaction of any and all claims for fees, costs, and/or expenses under state or federal law which Plaintiff has or may have against Defendant arising out of or in connection the Action and/or the Subject Incident, the events underlying the dispute between the Parties, and/or negotiating and implementing this Agreement, including attorneys' fees and expenses incurred throughout, except for as otherwise specifically provided for herein. Plaintiff acknowledges and agrees that the Settlement Payment constitutes consideration beyond that which, but for the mutual covenants set forth in this Agreement, Defendant otherwise would not be obligated to provide, nor would Plaintiff otherwise be entitled to receive. In consideration of the Settlement Payment, Plaintiff agrees that she will have been fully compensated for the alleged damages and injuries stemming from the allegations set forth in the Action and all other claims arising from the Subject Incident, known or unknown, for future injury, damage claims which are the subject matter of this Agreement. Furthermore, Plaintiff agrees that she will not seek, pursue, file or otherwise attempt to obtain any further compensation or relief in any forum against Defendant, and Plaintiff hereby gives her voluntary waiver of any and all rights available to her related to the Action and/or the Subject Incident as referenced above.

1.4. Responsibility for Distribution. Other than as set forth in Section 1.1 above, neither Defendant, nor their attorneys or insurers, shall be liable in any manner whatsoever for the distribution, division or payment of any portion of the Settlement Payment paid to Plaintiff. Plaintiff and her counsel shall assume full responsibility for said distribution, division or payment, including those related to any liens.

1.5. Responsibility for Liens. Plaintiff hereby understands and agrees that Plaintiff, and not Defendant, is responsible for the payment, discharge, and/or fulfillment of any lien or charges against the Settlement Payment, including liens described in Sections 4.1 through 4.4 below. If a claim of interest in any form or in any forum is asserted, arises, or is made by any person or entity, for payment of any liens or charges against the Settlement Payment and/or Defendant, Plaintiff agrees to fully defend Defendant and/or any insurance company which provides coverage to Defendant, with regard to any such claim, lien, charge, or interest. Plaintiff agrees to fully indemnify Defendant and/or any insurance company which provides coverage to Defendant, with regard to any such claim, lien, charge, or interest for which Plaintiff would otherwise be lawfully liable.

1.6. Responsibility for Tax Consequences. Plaintiff is aware that certain State and Federal income tax consequences may be incurred as a result of the consummation of this Agreement. The Parties are independently relying on their own legal counsel and/or Tax advisors in connection with such consequences. Plaintiff acknowledges and agrees that Defendant has made no representations to her regarding the tax consequences of the Settlement Payment paid to her pursuant to this Agreement. Plaintiff understands and agrees that Plaintiff, and not Defendant, is responsible for any federal and state taxes, if any, which are required by law to be paid with respect to this settlement.

## 2. PLAINTIFF'S SETTLEMENT OBLIGATIONS

2.1. Tax Identification. Prior to any payment being due by Defendant, Plaintiff through counsel ("**Plaintiff's Counsel**") will provide to Defendant a complete and current W-9 for the Payee identified in Section 1.1.

2.2. Notice of Receipt of Settlement Payment. Plaintiff 's Counsel shall notify Defendant within five (5) days of receipt by Plaintiff's Counsel of the Settlement Payment..

2.3. Dismissal of Complaint. Plaintiff's Counsel, within five (5) calendar days of receipt of the settlement funds, shall file a Request for Dismissal of the Action as to Defendants, with prejudice. If Defendant's counsel does not automatically receive an electronic service copy at the time of filing, Plaintiff's Counsel shall provide Defendant's counsel with conformed copies, via E-mail, of the filed Request for Dismissal of the Action, and any resulting Court Order(s).

## 3. RELEASES AND WAIVERS

3.1. Plaintiff's Release of All Claims. Plaintiff, for himself and on behalf of any other person or entity which could make a claim through him, does hereby absolutely, fully and forever release, relieve, waive, relinquish, acquit, and discharge Defendant of and from any and all demands, liabilities, statutory violations, actions, causes of action of every nature, character or description whatsoever, whether known or unknown, suspected or claimed arising out of, related to, or connected with the Action, and/or the Subject Incident, or any matters directly or indirectly related thereto. Plaintiff understands and further acknowledges that Defendant shall bear no further responsibility whatsoever as to the Action and/or the Subject Incident, and that each Party shall be responsible for their own attorneys' fees and costs and expenses incurred in connection with the Action, this Agreement, and reaching this settlement. This release includes all claims existing at law or in equity, in any form or manner of any nature or related thereto, whether civil or administrative, compensatory or punitive, or available in any form of any nature, whether or not now known, suspected, claimed or alleged, or which could have been alleged, in any pleadings, briefs, records, or other papers in any way related to or occurring as a result of the Action and/or the Subject Incident.

3.2. *Civil Code* Section 1542 Waiver. This Agreement settles in full any and all claims Plaintiff may have against Defendant related to the Action and/or the Subject Incident. In addition, Plaintiff expressly waives and relinquishes, to the fullest extent permitted by law, the provisions, rights and benefits of California *Civil Code* section 1542, or any other similar provision under federal or state law, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Plaintiff is deemed to understand and acknowledge the significance of this waiver of California *Civil Code* Section 1542. Plaintiff may hereafter discover facts in addition to or different from those which she now knows or believes to be true with respect to the subject matter of the released claims, the Action and/or the Subject Incident, but Plaintiff, upon execution of this Agreement, shall have fully, finally, and forever settled and released any and all claims, known or unknown, suspected or

unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exists or heretofore have existed, without regard to the subsequent discovery or existence of such different or additional facts.

## 4. REPRESENTATIONS AND WARRANTIES

4.1. Ownership of Claims. The Parties warrant that each has standing to release each other and all related persons and entities from the claims being released under this Agreement. Plaintiff warrants and represents that she is the only person or entity which has any interest in any of the matters herein released, and that none of her claims, causes of action, costs or demands, or any part thereof, have been assigned, granted or transferred in any way to any other person or entity, except as otherwise stated herein. If such a claim of interest in any form or in any forum is asserted or arises in the future by any party claiming to have standing through Plaintiff, whether statutory or contractual, Plaintiff agrees to fully defend and indemnify Defendant and any insurance company which provides coverage to Defendant with regard to any such claim.

4.2. No Pending and Future Claims. Plaintiff represents and warrants that, prior to signing this Agreement, Plaintiff has not filed or pursued any complaint, grievance, charge, or lawsuit of any kind with any court, regulatory, governmental or administrative agency, or arbitrator against Defendant asserting any claims that are released in this Agreement, other than the Action, and will not do so at any time hereafter. Plaintiff further represents and warrants that if any agency, court, or arbitrator assumes jurisdiction of any complaint, claim, grievance, or action against Defendant, Plaintiff will direct, to the extent possible, that agency, court, or arbitrator to withdraw from or dismiss with prejudice the matter.

4.3. Authority to Enter Into Agreement. The Parties warrant and represent that each has full authority to provide the release, and to enter into a binding release agreement with respect to the allegations set forth in the Action. Plaintiff warrants and represents that she has full authority to execute the same on her behalf, and that she is acting in the course and scope of such authority, and is duly authorized to execute this Agreement.

4.4. Representations a Material Term. The Parties agree that the representations and warranties in Section 5 of this Agreement are a material part of the Agreement.

## 5. CONFIDENTIALITY

5.1 Confidentiality. Plaintiff agrees to the following: Plaintiff shall keep the existence, terms and conditions of this Settlement Agreement completely confidential, including but not limited to any conversations, correspondence and/or other documents, whether or not directly involving Benepath which culminated in this Release. This Confidentiality Provision is independent of all other terms or provisions of this Settlement Agreement. Any breach of this Confidentiality Provision shall not abridge, affect, breach, discharge, impair, void or waive any other terms or provisions of this Settlement Agreement, or any other right or obligation under this Settlement Agreement, all of which shall survive and remain in full force and effect notwithstanding any breach of this Confidentiality Provision. By execution of this Settlement Agreement, Plaintiffs affirm that they have not previously disclosed the terms of the Settlement Agreement or the value of the Settlement to any person or entity in violation of this Section.

## 6. GENERAL PROVISIONS

6.1. Full and Final Settlement. This Agreement constitutes the settlement and compromise of any and all disputes concerning the allegations set forth in the Action.

6.2. Complete Agreement. The Agreement constitutes the entire agreement between the Parties, and cancels and supersedes any prior offers of settlement, agreements, correspondence, discussions, and negotiations between the Parties which may have related to the subject matter contained in this Agreement. No agreements or representations, written or oral, have been made by any Party that are not set forth expressly in this Agreement.

6.3. Modification, Amendment, Waiver. No modification, amendment or waiver of any provision of this Agreement will be effective unless approved in writing by all Parties. The failure at any time to enforce any of the provisions of this Agreement will in no way be construed as a waiver of similar or dissimilar provisions and will not affect the right of any Party thereafter to enforce each and every provision hereof in accordance with its terms.

6.4. Construction and Use of Headings. As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires. The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify, or otherwise be used in the interpretation of any of the provisions hereof.

6.5. Severability. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

6.6. Successors, Heirs, Executors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs, executors, and assigns.

6.7. Governing Law; Conflict of Law This Agreement will be construed in accordance with the laws of the State of Missouri, without regard to principles of conflicts of law otherwise applicable to such determination; provided, however, this in no way shall prevent the application of the benefits of federal law where applicable.

6.8. No Admission of Liability. The Agreement constitutes the settlement of a disputed claim. It shall neither constitute nor be construed as an admission of liability or fault by any Party.

6.9. Admissibility of Agreement. The Agreement shall not be admissible in any legal proceeding for any purpose other than the enforcement of this Agreement. The Parties agree that this Agreement may be introduced into evidence in any subsequent proceeding to enforce the terms of this Agreement.

6.10. Agreement Jointly Prepared. This Agreement was jointly prepared and negotiated by Parties and their respective attorneys. Any uncertainty or ambiguity not removed by resorting to the rules of contractual interpretation found in California Civil Code sections 1635-1653 shall not be construed against any of Parties. Furthermore, Parties understand and agree that this Agreement is fully enforceable. The Parties agree to not challenge this Agreement as illegal, invalid, or unenforceable.

6.11. Complete Defense. This Agreement may be asserted as a complete defense to any claim that may be brought relating to any released claim made by the Parties.

6.12. Fees and Expenses for Enforcement. In the event any Party commences any action or other proceeding for legal or equitable relief to enforce the terms of the Agreement, the prevailing party shall be entitled to recover, in addition to any monetary or other relief awarded by the Court, the prevailing party's reasonable attorneys' fees and costs.

6.13. Tax Liability. Plaintiff agrees to indemnify and hold Defendant harmless from any claims, demands, deficiencies, levies, assessments, executions, judgments or recoveries by any governmental entity against Defendant for any amounts claimed due on account of this Agreement to the extent the liability is Plaintiff's and she is provided with reasonable notice giving her an opportunity to cure, or pursuant to claims made under any federal or state tax laws, and any costs, expenses or damages sustained by Defendant by reason of any such claims, including any amounts paid by Defendant as taxes, deficiencies, levies, assessments, fines, penalties, interest or otherwise.

6.14. Cooperation. The Parties agree to cooperate fully, to execute and deliver any and all supplementary documents and instruments (with acknowledgment where necessary), and take all additional actions, which reasonably may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement without the receipt of further consideration.

6.15. Advice of Counsel. The Parties acknowledge that they have been represented by counsel of their choice in the negotiations leading up to the execution of this Agreement and that they have read this Agreement and have had it fully explained to them by their counsel.

6.16. Legal Capacity. Each of the undersigned warrants that he or she is of legal age, legally competent to execute this Agreement, and has the authority of the Party for whom the undersigned is executing this Agreement.

6.17. Execution in Counterparts. The Agreement may be executed in two or more counterparts, each of which will be deemed an original, including facsimile and digital counterparts. All counterparts so executed shall constitute one agreement and instrument, binding on all the Parties to this Agreement.

**THIS SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS HAS BEEN REVIEWED AND APPROVED BY THE PARTIES**

DANIEL HUMAN

Dated: August 7th, 2023

By: ______________________________

BENEPATH, INC.

Dated: August _____, 2023

By: ______________________________

Name:

Title:

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This confidential Settlement Agreement and Release ("Agreement") is made and entered into by and between Facet Wealth, Inc ("Facet") and Daniel Human ("Human" or "Complainant")(collectively, the "Parties").

The Parties have chosen to enter into this Agreement in order to avoid further proceedings with respect to certain claims Plaintiff has made against Defendant Facet Wealth, Inc in the above-captioned lawsuit. The Parties understand and agree that Facet denies every allegation of wrongdoing made by Plaintiff in the above-captioned matter, initially filed in the Circuit Court of St. Louis County, State of Missouri, Case No. 24SL-CC0322 (the "Litigation"), including but not limited to Plaintiff's claims of violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. §227 ("TCPA"), corresponding federal regulations, and the Missouri No Call List and Telemarketing prohibitions, as set forth in MO. REV. STAT. § 407.1076 et seq., 407.1095(3), and 407.1101.

The Parties understand and agree that the making of this Agreement shall not, in any way, be construed or considered an admission by any Parties of guilt or non-compliance with any federal, state or local law or of any other wrongdoing whatsoever. Facet denies all material allegations set forth in the Litigation. Facet specifically disputes that it violated the TCPA, Missouri "No Call" and Telemarketing laws, or that Plaintiff is entitled to any relief from Facet. To this end, the settlement of this Litigation, this Agreement, and all acts performed or documents executed pursuant to or in furtherance of the settlement of this Litigation are not and shall not be deemed to be, and may not be used as, an admission or evidence of any wrongdoing, fault, or liability on the part of Facet or of the truth of any of the allegations in the Litigation, in any civil, criminal, or administrative proceeding in any court, arbitration forum, administrative agency or other tribunal, and are not and shall not be deemed to be and may not be used as an admission of the appropriateness of these or similar claims for class certification. Facet denies that it is liable to Plaintiff or any putative class member in any manner whatsoever and denies all allegations of wrongdoing and assert that their actions have been lawful and proper in all respects.

WHEREAS, the Released Parties are engaged in certain forms of lead generation and other methods of contacting consumers, including, but not limited to, sales and marketing calls and/or text messages, either on their own behalf, through others, or on behalf of others.

WHEREAS, Human has alleged certain sales, marketing or other call and/or text message related law violations by the Released Parties.

WHEREAS, the Parties hereto desire to compromise, settle, and release any and all claims arising out of or relating to the alleged violations, without any admission of wrongdoing by either party.

NOW THEREFORE, in consideration of the mutual covenants, promises, terms, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Payment:** The Released Parties shall pay the total sum of twelve thousand ($12,000.00) U.S. dollars ("Settlement Amount") to Human within three (3) business days after this Agreement is fully executed by all Parties. The Settlement Amount shall be sent via wire transfer or ACH transfer payable to Daniel Human and delivered, to the following bank account: First Community Credit Union, St. Louis, Missouri, account number 920544986, routing number 281081877. The Settlement Payment shall be in full satisfaction of all monies due and owing to Human in connection with the demand, Agreement and final settlement of all claims in the case of Human v. Facet Wealth, Inc, No. 24SL-CC0322. The Settlement Payment is inclusive of monetary damages, attorneys' fees, and costs.

2. **Release by Complainant:**

In consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Daniel Human, on behalf of Complainant and Complainant's heirs, successors, legal representatives and assigns, does hereby release, acquit and forever discharge Facet Wealth, along with each of its current, former and future owners, members, partners, officers, directors, shareholders, employees, agents, assigns, successors, servants, insurers, representatives, and attorneys, from all claims, liabilities, demands, suits, class actions and causes of action of every nature and kind, whether vested or contingent, past, known or unknown, in law or in equity, matured or unmatured, whether or not such claims were or could have been brought or raised in any applicable civil action, related to all telephone calls and/or text messages sent to or received by Daniel Human that were sent by, or on behalf of Facet Wealth, Inc. from the beginning of time up until the date of execution of this Agreement by all parties as stated in the above litigation. Notwithstanding the foregoing, Facet shall not be released from the obligations imposed by this Agreement.[1]

3. **Confidentiality & Non-Disparagement:** Human agrees to keep this Agreement completely confidential and that, except as required by law, they will not hereafter disclose the terms of this Agreement to anyone (other than to their affiliates and related and constituent entities, attorneys, accountants, and corporate officers and directors). If Human or his counsel receives a subpoena or other compulsory process commanding and/or requesting production of information concerning this Agreement, the subpoenaed party may produce this Agreement, but must notify the Released Parties at least ten (10) business days before producing same. Notice shall be sent to the Released Parties attorneys, by email. Following the execution of this Agreement and receipt of the Payment: (1) Complainant shall immediately dismiss any lawsuits and class action claims filed against any of the Released Parties by Complainant; (2) Complainant shall immediately withdraw all complaints and negative reviews filed by Complainant about any Released Party; and (3) The parties shall not disparage the other parties to any third party, nor shall Complainant make any future complaint or negative review regarding any of the Released Parties, with respect to the specific allegations released under this Agreement.

---

[1] This Agreement shall not be construed in any form or fashion to release any third party telemarketing or lead generation companies. This is a release solely focused on Facet Wealth, Inc, and its owners, officers and employees.

4. **Denial of Liability:** It is expressly understood and agreed to by and among the undersigned hereto that by entering into this Agreement, none of the undersigned (nor their affiliates) hereto admit the truth of the allegations made by any other party, and this is a compromise of a disputed claim, which should not be construed as an admission of liability on the part of any party or any affiliate or the same. This Agreement is inadmissible as evidence against any party except to enforce the terms of the Agreement and is not an admission of wrongdoing or liability on the part of any party to this Agreement.

5. **Complainant's Representation:** Complainant hereby represents, agrees, warrants and assures that, as of the date of execution of this Agreement, he is not aware of any other individuals, persons or entities that have or may have any potential claims, grievances, or causes of actions against the Released Parties similar to those asserted in the Demand and resolved by this Agreement. Complainant further agrees that he has no intention to solicit or refer any such persons to his counsel or other counsel for the purpose of bringing such claims. Complainant further agrees that he will not assist or provide legal advice to any person who wishes to bring the same or similar claims against the Released Parties. Complainant further agrees that he is not personally aware of any other potential lawsuits, potential plaintiffs or potential claims against the Released Parties as of the date of this Agreement. Complainant agrees and acknowledges that the representations, warranties and assurances in this Paragraph constitute material inducements for the Released Parties to enter into this Agreement.

6. **Scope of Agreement:** It is the intent of the Parties that this Agreement cover the relationship between them as it relates to the receipt of any telephone calls and/or text messages received by Complainant up and through the date of execution of this agreement by the Released Parties. It is agreed that Complainant does not wish to receive telephone calls and/or text messages from, or on behalf of the Released Parties and that the Released Parties do not wish for Human to receive any telephone calls and/or text messages from, or on behalf of the Released Parties. Accordingly, the Parties agree as follows:

- **A.** Human shall immediately provide a list to Released Parties of all telephone numbers that he currently owns, uses, licenses or maintains, including, but not limited to the telephone numbers at which he allegedly received telephone calls by, and/or text messages ("Current Telephone Numbers") from Released Parties, so they can act in an attempt to prevent any future telephone calls or text messages In such an event, the release remains in effect as to the initial allegations which represent the subject of this release.
- **B.** Human warrants that neither he, nor anyone on his behalf, has knowingly opted in or otherwise requested and will not knowingly opt in or otherwise request in the future, to receive any commercial telephone call or text message from the Released Parties, its parents and subsidiaries, and any Affiliates.
- **C.** Human acknowledges and agrees that the representations and warranties of this section are essential and material terms of this Agreement, and that the Released Parties would not have entered into this Agreement without such representations from Human.
- **D.** The Released Parties agree to cease and desist making, causing to be made, or assisting others in making calls, and/or sending text messages, to Complainant at the Current Telephone Numbers, and to add Human's Current Telephone Numbers to their suppression list, if such a list exists.
- E. Mr. Humans telephone numbers are (208) 390-1355 and (314) 915-2988.

7. **Assigns and Successors-in-Interest:** This Agreement shall be binding upon and inure to the benefit of the heirs, successors, and assigns of the undersigned hereto. Complainant represents that he has not already assigned or otherwise transferred or conveyed their claim or any interest in the same, and will indemnify Released Parties if this is the case.

8. **Agreement Fully Read and Understood:** This Agreement is being executed voluntarily and without any duress or undue influence, with the full intent of settling and releasing claims as set forth herein. The Parties acknowledge that:

- **A.** This Agreement has been carefully read by the undersigned and the contents and consequences are known and understood by the undersigned.
- **B.** This Agreement is the product of negotiations "at arms length" between the undersigned.
- **C.** They are fully aware of the legal and binding effect of this Agreement; and
- **D.** They have no other obligations, duties, and/or responsibilities other than those expressly delineated and set forth in this Agreement.
- **E.** They have each received or have had the opportunity to obtain if they so choose, independent legal advice from the attorneys of their choice with respect to the preparation, review, and advisability of executing this Agreement.
- **F.** As such, the terms of this Agreement are mutually agreed-upon, and no part of this Agreement will be construed against the drafter.

9. **Applicable Law, Venue for Disputes:** The existence, validity, construction and operation of this Agreement, and all of its covenants, agreements, representations, warranties, terms, and conditions, shall be determined in accordance with the laws of the State of Missouri. The parties consent to the jurisdiction of the courts in Missouri and agree that venue in any future dispute between them shall be proper in this forum only.

10. **Entire Agreement:** This Agreement sets forth the entire agreement between the undersigned, and fully supersedes any and all prior and/or contemporaneous agreements or understandings between the undersigned, which pertain to the subject matter hereof. The terms of this Agreement may not be contradicted by evidence of any prior or contemporaneous agreement, and no extrinsic evidence whatsoever may be introduced to vary its terms in any judicial proceeding involving this Agreement.

11. **Modification:** This Agreement may be modified, but only if the modification is in writing and signed by all parties to this Agreement.

12. **Severability:** Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be part of this Agreement.

13. **Counterparts:** This Agreement may be executed in multiple counterparts, each of which shall be treated as an original.

**14.** **Headings:** Headings or captions contained in this Agreement are solely for the convenience of the Parties hereto, are not a part of this Agreement, and shall not be used for the interpretation of, or determination of the validity of, this Agreement or any provision hereof.

**15.** **Authority to Bind:** Signatories to this Agreement represent and warrant to be duly authorized to bind the signatories and to fully and completely resolve the disputes described in this Agreement.

**Effective Date:** The effective date shall be the date of the last signature below.

**IN WITNESS THEREOF, the Parties evidence their agreement by their signatures:**

**DANIEL HUMAN**

Signature: Daniel Human

Name: Daniel Human

Date: July 19, 2024

**Facet Wealth, Inc**

Signature: ____________

Name: ____________

Title: ____________

Date: ____________

**CONFIDENTIAL SETTLEMENT AGREEMENT**
**AND RELEASE OF ALL CLAIMS**

**PARTIES**

This Confidential Settlement Agreement and Release ("Release") is entered into on the date signed below ("Effective Date") by and between International Union of Police Associations AFL CIO, International Union of Police Associations, d/b/a National Police and Troopers Association, ("Defendants") a District of Columbia, Florida, and Colorado based corporation with a principal office at 5631 Bee Ridge Road, Suite 200, Sarasota, Florida 34233, and Daniel Human ("Plaintiff"), an individual represented by Edwin Butler of Butler Law Group, LLC and residing in St. Louis County, Missouri, together, the ("Parties").

**RECITALS**

**WHEREAS**, Plaintiff has presented a lawsuit for damages against Defendants, arising from the facts alleged and more fully set forth in the case captioned *Daniel Human v. International Union of Police Associations, et al.*, Case No. 4:24-cv-00570-SEP, United States District Court for the Eastern District of Circuit Court of Missouri, which to suit, Complaint and other pleadings and documents filed therein reference is hereby specifically made;

**WHEREAS,** this mutually desired Release and the payment of any consideration hereunder, are not, are not intended to be, and are not to be deemed to be any evidence of or any admission of liability on the part of Defendants or any other person, firm, insurer, association, corporation, or entity in any manner connected with the aforementioned allegations of Plaintiff, but this Release and the payment of any consideration hereunder constitutes a compromise and settlement of disputed claims;

**WHEREAS**, Plaintiff and Defendants are mindful of the costs and uncertainties engendered by further litigation, and wish to settle and compromise all disputes, differences, claims, and legal controversies between the Parties as hereinafter set forth;

**WHEREAS**, Defendants deny any legal liability for any damages; however, the Parties desire to enter this Release to provide certain payments in full settlement and discharge of all claims against Defendants upon the terms and conditions set forth herein; and

**WHEREAS,** Defendants have agreed to fund the entirety of the settlement in return for dismissal of all claims with prejudice against it and all Parties so funded have agreed to forego any claims for fees and costs.

**AGREEMENT**

Plaintiff and Defendants agree as follows:

**1.0 GENERAL RELEASE AND DISCHARGE OF ANY AND ALL CLAIMS**

In consideration of the sum of Fifteen Hundred dollars ($1,500.00)("Payment"), paid entirely by Defendants, the sufficiency of which consideration is hereby acknowledged, Plaintiff hereby releases, settles,

cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, rights, actions, and causes of action, of every kind or description whatsoever, whether known or unknown, knowable or unknowable, past, present, and future, including but not limited to any claim for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, Mo. Rev. Stat. §§ 407.1098.1, 407.1076, trespass to chattels, invasion of privacy, negligence, negligence *per se*, other statutory or regulatory violations, duress, improper conduct of any type, physical or bodily injuries, mental anguish or injury of any type, emotional distress, pain and suffering, loss of enjoyment of life, loss of services, consortium or companionship, economic loss claims of any type, consumer relief claims, attorney claims for rights to all or part of the proceeds of this settlement, punitive or exemplary damages, interest of any type, any other related damages, and all other tangible or intangible losses, without exception, whether based on a tort, intentional tort, contract, statute, regulation or any other theory of recovery, which Plaintiff now has, previously had, or may hereafter have or assert against Defendants or any other person, firm, association, corporation or entity, arising out of or by reason of or in any manner connected with the incidents and alleged events set forth in the pleadings described herein, from the beginning of the world to the Effective Date of this Release, except for the agreements and promises contained in this Release.

**REPLACE PARAGRAPH IN ITS ENTIRETY BY:**

**10 Plaintiff relinquishes any and all claims against Defendant of any kind or nature whatsoever which are in any way related to or arise from those matters pleaded in this Litigation, whether class, individual, or otherwise, including any claim for costs, expenses, pre or post judgment interest, post-judgment relief, penalties, fees (including attorneys' fees, expert fees and consulting fees) for any kind of relief whatsoever, including injunctive relief, monetary relief, damages, punitive damages, restitution, reimbursement, disgorgement, and economic injury. Plaintiff, on behalf of himself and his respective past, present, or future heirs, successors, assigns, agents, representatives and attorneys, hereby settle compromise, release, remit, acquit, discharge Defendant and each of their past and present owners, members, officers, directors, stockholders, insurers, attorneys (including, but not limited to, the attorneys of The Bernhoft Law Firm, S.C.), agents, servants, representatives, employees, parent companies, subsidiaries, affiliates, partners, fiduciaries, administrators, predecessors, successors in interest, assigns and all other persons, firms, representatives or corporations acting by, through or for the benefit of any of the Defendant (the "Defendant's Released Parties"), from any and all claims, demands, actions and causes of action, whether arising in contract, tort, law, equity or otherwise, in common law or statute, whether now known or unknown, suspected or unsuspected, from the beginning of time through the Effective Date of this Agreement, including but not limited to claims and/or causes of action that were alleged or that could have been alleged by Plaintiff, including, without limitation: (i) any and all claims directly or indirectly arising out of, or in any way connected with the matters raised or that may have been raised by Plaintiff; (ii) any and all claims or demands for attorney's fees and costs arising out of, or any way connected with the Action, (iii) any claims which arise from or are related to alleged TCPA or state law telemarketing violations; and (iv) any other matters, whether or not related to the Claim, accrued or existing as of the Effective Date. Notwithstanding any provision to the contrary, the release does not apply to relief either party may seek to enforce the Agreement as provided in paragraph 11 herein**

**11 Plaintiff further agrees and understands that he hereby waives and give up any right to become, and promise not to consent to become, a member or class representative of any class in**

**a case in which claims are asserted against the Defendant in regard to the released claims. If, without any of the Plaintiffs' prior knowledge and consent, he/she is made a member or representative of a class in any such proceeding, he/she hereby agrees to either decline to submit a claim to such class proceeding or to opt out of the class at the first opportunity upon receiving notice of his class member status. In the event that Plaintiff submits a claim to such class proceeding or does not request exclusion, Defendant may refuse payment to such Plaintiff in connection with any recovery in such class proceeding.**

1.2 This Release is a general release and Plaintiff further expressly assumes the risk of any and all claims for damages which exist as of the Effective Date or which the Plaintiff may or may not know exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Plaintiff's decision to enter into this Release.

1.2 The consideration recited herein is the sole and only consideration, and there have been no promises or representations made except as herein contained.

1.4 This settlement is a compromise of a disputed claim and the Payment made hereunder are not intended to be and are not to be deemed to be any evidence of or an admission of liability or wrongdoing on the part of Defendants, by whom liability is expressly denied.

**2.0 PAYMENT**

In consideration for this Release set forth above, Plaintiff agrees to provide a Form W-9 and to Defendants within three (3) days of the Effective Date of this Release. Defendants agree to pay the sum specified above within ten (10) days of the Effective Date of this Release: Payment shall be paid to paid to Butler Law Group, LLC, 1650 Des Peres Road, Suite 220, St. Louis, Missouri 63131 via ACH bank transfer or through a check received within the above time proscribed.

**3.0 ENTIRE AGREEMENT AND APPLICABILITY**

This Release contains the entire agreement between Plaintiff and Defendants regarding the matters set forth herein and shall be binding. There are no other understandings or agreements, verbal or otherwise, between the Parties except as herein expressly set forth.

**4.0 REPRESENTATION OF COMPREHENSION OF DOCUMENT**

Plaintiff represents that all aspects of this Release, including the legal consequences of this Release, have been understood; and that the terms of this Release have been completely read and understood; and, further, that the terms of this Release are fully understood and voluntarily accepted by Plaintiff. Accordingly, Plaintiff hereby releases and holds harmless Defendants and any and all counsel or consultants for Defendants from any claim, cause of action, or other right of any kind which Plaintiff may assert because of the legal, income tax, or other consequences of this Release are other than those anticipated by Plaintiff.

**5.0 DELIVERY OF DISMISSAL WITH PREJUDICE**

Within three (3) days of receipt of the consideration described herein above, Plaintiff shall inform the court that the matter has been settled or satisfied, both of which have the effect of making the lawsuit captioned above res adjudicate and provide a copy of the dismissal with prejudice to Defendants.

6.0 **WARRANTY OF CAPACITY TO EXECUTE AGREEMENT**

Plaintiff represents and warrants that no other person or entity has or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Release, that Plaintiff has the sole right and exclusive authority to execute this Release and to receive, or direct payment of, the Payment specified in it; and, also, that none of the claims, demands, or obligations referred to in this Release have been sold, assigned, subrogated, transferred, or otherwise disposed of by Plaintiff. Plaintiff further warrants that Plaintiff is the sole entity which may have a potential cause of action against Defendants relative to Plaintiff's claims as recited herein.

7.0 **GOVERNING LAW AND SEVERABILITY**

This Release shall be construed in accordance with the laws of Missouri. Should any portion of this Release be deemed invalid or unenforceable as a matter of law, all other sections shall nonetheless be deemed valid and enforceable.

8.0 **CONFIDENTIALITY**

Plaintiff and Defendants mutually desire that this Release be confidential. The Parties have since the date that this Release was reached kept the terms of this Release confidential and shall keep the terms of this Release and all the underlying facts, terms, conditions, and Payment of this Release strictly confidential. The Parties shall not expressly or implicitly reveal any of the terms, conditions, or Payment of this Release, whether as an anonymous case report, using fictitious names, in generic form, or otherwise, to any person or entity including but not limited to legal trade journals, reporting services, government agencies, the media, internal newsletters, law firm marketing materials, web sites, or the Internet, and the Parties shall not take any action or inaction calculated to lead to such a revelation or disclosure to another, other than as lawfully required to legal beneficiaries, legal representatives, tax preparers, financial advisors, or to effect this Release and the distribution of the Payment or to carry out the terms of this Release. Plaintiff shall use discretion in limiting the amount of case specific detail filed with any court which might need to approve this Release and shall not otherwise publicize any court filing or the contents of this Release. The Parties shall not respond either expressly, anonymously, "off the record," "not for attribution," or otherwise to any inquiries by the media or any other person or entity in respect to this Release or any fact involved in the matter recited herein. Plaintiff shall not object to or otherwise resist efforts by Defendants or its attorneys to seal or otherwise protect the records of any court where filings regarding this Release might be required. Plaintiff also warrants that no disclosure has been made prior to or in anticipation of the Effective Date of this Release. All Parties desire confidentiality, thus mutual consideration is given.

8.1 If any of the permitted disclosures are to be made, Plaintiff and Defendants and its attorneys shall all make good faith efforts to assist and cooperate with each other so that any such allowable disclosure shall be specifically tailored and as narrow as possible, only disclosing the minimum information required by law.

8.2 The Parties acknowledge that this confidentiality provision is a material term of this Release, and that this provision is contractual in nature and not a mere recital. The breach of this confidentiality provision will provide Defendants and Plaintiff with a right of action against the breaching Party or Parties on all theories and causes of action recognized by law and the Disciplinary Rules of the Bar.

9.0 **GOOD FAITH SETTLEMENT**

The Parties agree and represents that this Release set forth herein was entered into in good faith and to the satisfaction of the Parties.

**10.0 TAX ADVICE**

Neither Defendants nor its counsel have made any representation concerning, nor shall they be responsible in any manner, for any tax consequences to the Plaintiff, or any other person because of the execution of this Release, or of Payment made pursuant to this Release.

**11.0 ACTION TO ENFORCE OR INTERPRET AGREEMENT**

If any suit or action or other proceeding is commenced to enforce or interpret any of the terms or provisions of this Release, the prevailing Party in such suit, action, or other proceeding shall be entitled to an award against the other Party for the prevailing Party's reasonable attorney's fees and costs incurred both at trial and on any appeal.

**12.0 EXECUTION/ACKNOWLEDGEMENT/SIGNATURES**

This Release consists of four (4) pages. By signing below, the Parties fully and voluntarily agree to all the foregoing provisions.

| | |
|---|---|
| [signature] | [signature] |
| Daniel Human | International Union of Police Associations, et al. |
| August 26, 2024 | 8.26.24 |
| Date | Date |

Electronically Filed - ST LOUIS COUNTY - October 09, 2024 - 05:48 AM

IN THE
CIRCUIT COURT OF ST LOUIS COUNTY
STATE OF MISSOURI

FILED
01/16/25
JOAN M. GILMER
CIRCUIT CLERK
ST. LOUIS COUNTY, MO

| | | |
|---|---|---|
| Daniel Human, individually and on behalf of all others similarly situated, | ) | |
| Plaintiffs. | ) | |
| Vs. | ) | No. 23SL-CC05215 |
| Health IQ Insurance Services, Inc., | ) | |
| Defendants. | ) | |

## CORRECTED JUDGMENT BY DEFAULT

The Plaintiff, Daniel Human, moved for entry of judgment by default pursuant to Missouri Supreme Court Rule 74.05(a) against Defendant Health IQ Insurance Services, Inc. for their failure to answer or otherwise defend against their ten (10) violations of the Missouri and federal no call lists, and for Judgment against the individual defendants based on their vicarious liability, and for attorney fees and costs. The Court Granted the Plaintiff's request for Default Judgment on August 9, 2024. Plaintiff has now moved to correct the Court's prior Judgment Nunc Pro Tunc due to a scrivenor's error. The Court take Judicial Notice that the Defendant has not engaged or defended the Plaintiff's Complaint. The Court will therefore correct the original Judgment.

*NOW, THEREFORE*, the Court finds that Process was perfected on Defendant Health IQ Insurance Services, Inc. on January 29, 2024. Defendant Health IQ Insurance Services, Inc. has failed to plead, answer or otherwise defend against the Complaint within thirty (30) days thereby entitling the Plaintiff to entry of judgment by default pursuant to Missouri Supreme Court Rule 74.05(b). Pursuant to Missouri Supreme Court Rule 74.05(c), a Default Judgement may include and award of damages for each of the ten (10) violations.

Electronically Filed - ST LOUIS COUNTY - October 09, 2024 - 05:48 AM

As such, in accord with § 407.1107 RSMo., the Plaintiff is entitled to $5,000 in damages for each known violation, or $50,000.00. Pursuant to 47 U.S.C. 227(c) (5); 47 C.F.R. 64.1200 (c)(2), Plaintiff is entitled to separate and distinct damages for the ten (10) independent TCPA violations of $1,500.00 per call – or $15,000.00. Plaintiff is also entitled to recover his reasonable attorney fees and costs in the sum of $2,750.50.

***JUDGEMENT BY DEFAULT*** is therefore granted in Plaintiff's favor against Defendant Health IQ Insurance Services, Inc. in the amount of $67,500.50, as well as all applicable post-judgment interest.

SO ORDERED:

[redacted] Division 13
January 14, 2025

Honorable Bruce Hilton
Circuit Court Judge

This ___day of October 2024.

______________________________
Clerk of the Court

Cc: all parties

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

**THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE** (the "Agreement") is entered into this 18th day of April, 2024 by and between DANIEL HUMAN ("HUMAN" or "Plaintiff") and DREAMSTYLE REMODELING OF IDAHO, LLC ("DSRL" or the "Defendant"). Plaintiff and Defendant shall be referred to as "Parties."

## RECITALS

A. On December 22, 2023, HUMAN filed suit against DREAM STYLE REMODELING OF IDAHO, INC., in the case styled as *Human v. Dream Style Remodeling of Idaho, Inc., and John and Jane Does 1 through 4*, in the Circuit Court of St. Louis County, Missouri, Case No. 23SL-CC05459, which was thereafter removed to the Eastern District of Missouri, Class Action Complaint, Case No. 4:24-cv-00226 ("Lawsuit"), alleging violations of the Telephone Consumer Protection Act (Violations of 47 U.S.C. § 227) and the Missouri No Call and Anti Telemarketing statutes, based on alleged telemarketing calls in violation of (i) the national do not call registry, (ii) violations of the statutes concerning robocall and automatic telephone dialing calls, and (iii) violations of the Missouri Do Not Call registry. Plaintiff also filed to represent a putative class in the Lawsuit, seeking to represent the foregoing three sets of classes. In addition, Plaintiff filed a count against Defendant for vicarious liability for violations involving third party marketing agents. Plaintiff filed an amended complaint to name the entity "DREAM STYLE REMODELING OF IDAHO, LLC"[1] as the Defendant instead of "DREAM STYLE REMODELING OF IDAHO, INC."

[1] The correct name of the entity is "DREAMSTYLE REMODELING OF IDAHO, LLC."

B. The Defendant denies any and all liability and damages hereunder; however, is entering into this agreement to resolve the disputes between the Parties in an effort to avoid the cost and time involved in litigation.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions contained herein, and intending to be legally bound, the Parties hereby agree as follows:

1. **Recitals**. The foregoing recitals are correct and are incorporated in this Agreement.

2. **Payment from DSRL to HUMAN**. Within ten (10) days from the date this Agreement is fully executed, DSRL shall deliver to HUMAN, the sum of **Seven Thousand Five Dollars and 00/100 ($7,500.00)("Settlement Sum")**, made payable by ACT, wire transfer to "BUTLER LAW GROUP, LLC TRUST ACCOUNT," and ACH information to follow to Edwin V. Butler, Esq., Butler Law Group, LLC, 1650 Des Peres Rd., Suite 220, St. Louis, MO 63131. Prior to issuance of payment, HUMAN's attorney shall submit a completed W-9 to DSRL, and any 1099 forms issued by DSRL will be consistent with the amounts included in this paragraph.

3. **Release**. Effective upon HUMAN'S receipt of the payment and clearance of funds described and set forth above in Paragraph 2 of this Agreement, HUMAN, including his heirs, administrators, successors, assigns, representatives, attorneys and agents, hereby releases, waives, acquits and forever discharges DSRL, and its affiliates, successors, subsidiaries, related entities, parent or sister companies, distributors, telemarketing providers, lead generators, service providers, employees, independent contractors, direct sellers, manufacturers, installers, officers, directors, shareholders, members, partners, owners, agents, representatives, lenders, financing entities, current and former retailers, and insurers, from any and all claims that HUMAN now has or ever had against DSRL, whether the facts giving rise to such claims are now known or unknown, including without limitation, (i) any claims that were asserted, (ii) claims that could have been

asserted, (iii) or claims against parties who could have been added as defendants, in the Lawsuit, including but not limited to those claims and damages that arise directly or indirectly out of or related in any way to any telephone calls or marketing HUMAN received from or on behalf of DSRL, or parties who participated in such marketing, including claims for attorneys' fees and costs. The parties expressly agree and acknowledge, without limitation, that this release applies equally to the following entities as it does to DSRL: Dreamstyle Remodeling, LLC, HomeRenew Buyer, Inc., HomeRenew Intermediate Holdings, Inc., and HomeRenew Group Holdings, L.P. as well as the entities named in the Complaint and Amended Complaint, Dream Style Remodeling of Idaho, Inc. and Dream Style Remodeling of Idaho, LLC.

Notwithstanding the foregoing, the parties expressly acknowledge that this Release excludes any claims, rights or causes of action arising from or out of or related to the obligations under this Agreement.

4. **Dismissal of Lawsuit**. Within five (5) days of receipt of payment from DSRL, the parties shall file in the Lawsuit a stipulation for dismissal with prejudice of the Lawsuit, each party to bear its own attorneys' fees and costs. A copy of the Stipulation for Dismissal to be executed by the Parties and filed in the Lawsuit is attached as Exhibit "A."

5. **Non-Admission Clause**. By entering into this Agreement, the parties do not admit any liability whatsoever to one another or to any other party including any non-parties arising out of any claims asserted in the Lawsuit, or that could have been asserted in the Lawsuit, and expressly deny and all such liability.

6. **Confidentiality**.

The Parties agree not to divulge the contents of this Agreement, or the existence of any such settlement, including, but not limited to the manner, amount and source of payment. The

settlement of the above referenced Lawsuit shall not be characterized by the Parties as a victory or defeat, or as a substantial or insubstantial resolution, or in any similar fashion whatsoever. The Plaintiff agrees that the existence and terms of the Agreement shall remain in the strictest of confidences, and that his Agreement to keep the terms confidential is the essence of this Agreement.

Notwithstanding the foregoing, the Parties are permitted to disclose the terms of this Agreement to their (1) attorneys, (2) accountants and income tax preparers, or (3) banking institution either paying or receiving such settlement funds. In addition, DSRL is entitled to communicate the terms of this Agreement to its affiliates, subsidiaries, parents, retailers, and telemarketing providers, including the following entities: Dreamstyle Remodeling, LLC, HomeRenew Buyer, Inc., HomeRenew Intermediate Holdings, Inc., and HomeRenew Group Holdings, L.P. as well as the entities named in the Complaint and Amended Complaint, Dream Style Remodeling of Idaho, Inc. and Dream Style Remodeling of Idaho, LLC. Should any Party disclose the settlement or Agreement to any such Parties identified above, then such Party will instruct that person or entity receiving such information, to maintain the Agreement and settlement terms in confidence, except as required to comply with applicable rules, statutes, or regulations of any governmental agency, and then only to the extent necessary to comply with such law, regulation or agreement with legal authorities.

The Parties represent and warrant that they have not disclosed or disseminated to any person the terms or conditions of settlement or this Agreement, other than to those they are entitled to disclose or disseminate to under this Paragraph of the Agreement. Plaintiff represents that she is not currently aware and does not know or has not communicated with any other potential class members concerning the allegations in the Action, nor encouraged any third party to serve a

demand or file a lawsuit against Defendant. Plaintiff agrees not to encourage or solicit any other third parties who received calls from Defendant to serve a demand or file a lawsuit against Defendant for violation of the Federal and/or state telemarketing laws.

This confidentiality provisions shall survive and be given effect separately from any other provision of this Agreement to the extent it may later be determined to be invalid, unenforceable or inoperative.

7. **Non-Disparagement**.

The Parties agree not to make any statements or representations, or otherwise communicate, directly or indirectly, in writing, orally, or otherwise, or take any action which may, directly or indirectly, disparage the other or any of its subsidiaries, affiliates, retailers, marketing providers, consultants or their respective officers, directors, employees, advisors, or businesses. This includes, but is not limited to, statements or communications made in any public forum, social media or website. Plaintiff expressly acknowledges that this paragraph applies to statements made regarding DSRL as well as the following entities: Dreamstyle Remodeling, LLC, HomeRenew Buyer, Inc., HomeRenew Intermediate Holdings, Inc., and HomeRenew Group Holdings, L.P. as well as the entities named in the Complaint and Amended Complaint, Dream Style Remodeling of Idaho, Inc. and Dream Style Remodeling of Idaho, LLC.

This non-disparagement provision shall survive and be given effect separately from any provision of this Agreement to the extent it may later be determined to be invalid, unenforceable or inoperative.

7. **Entire Agreement**. This Agreement constitutes and represents the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior

understandings, negotiations and agreements. This Agreement shall not be altered or amended in any manner, except in writing and signed by each of the Parties.

8. **Review and Interpretation**. The Parties acknowledge and agree that each has been given the opportunity to review independently this Agreement and agree to the language set forth in this Agreement. In the event of any ambiguity or dispute regarding the interpretation of any part of the Agreement, the interpretation of this Agreement shall not be resolved by any rule of construction or interpretation against the Party who causes the uncertainty or against the drafter, and all Parties expressly agree that in the event of any ambiguity or dispute regarding the interpretation and construction of this Agreement, this Agreement shall be interpreted as if each party participated in the drafting. Both parties are entering into this Agreement knowingly and voluntarily.

9. **Authority to Execute and to Enter Into Agreement**. The undersigned individuals executing this Agreement on behalf of their respective Parties represent and warrant that the individuals are authorized to enter into and execute this Agreement on behalf of such Parties and that this Agreement shall be binding on the Parties, their successors, assigns, affiliates, related parties, officers, agents, and consultants.

10. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument. A counterpart may include a PDF, document signed on DocuSign, scan or facsimile of this Agreement.

11. **Dispute Resolution and Governing Law**. This Agreement and all issues and questions relating to the validity, interpretation, performance and enforcement shall be governed, construed and interpreted in accordance with the laws of the State of Idaho, notwithstanding any

conflicts-of-laws doctrines to the contrary. If any dispute arises from this Agreement, venue shall be in the state courts of Idaho.

12. **Attorneys' Fees and Costs**. Each party shall bear their own attorneys' fees and costs for resolution of this dispute and preparation of this Agreement; however, if there is any breach of this Agreement, the prevailing party shall be entitled to recovery of its attorneys' fees and costs for any efforts made in the collection of funds, enforcement of this Agreement, whether those amounts are incurred in pre-litigation, litigation or on appeal. Notwithstanding the foregoing, the first time Defendant is in default for non-payment of any of the sums stated in Paragraph 2. above, Plaintiff shall notify Defendant's counsel at djz@berensonllp.com, and provide a five (5) day notice and opportunity to cure the default prior to proceeding with any action to enforce of this Agreement.

13. **Severability**. Upon mutual agreement of the Parties to this Agreement, if any provision of this Agreement shall be held to be invalid, unenforceable or inoperative, then the provision found to be invalid, unenforceable or inoperative shall be considered severed from this Agreement, and such holding shall not effect the validity, enforceability or operation of any other provision of this Agreement.

14. **Waiver**. No breach of any provision hereof can be waived unless done in writing. Waiver of any one breach shall not be deemed a waiver of any other breach of this Agreement or any provisions of this Agreement.

15. **Time**. Time is of essence to this Agreement. This Agreement shall be executed no later than April 16, 2024.

**IN WITNESS WHEREOF**, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officers.

**THE UNDERSIGNED HAVE READ THE FOREGOING SETTLEMENT AND RELEASE AGREEMENT AND FULLY UNDERSTAND IT.**

4/18/2024

DANIEL HUMAN, Individually

By: DREAMSTYLE REMODELING OF IDAHO, LLC

______________________________

Printed Name:______________________

Title:__________________________

**Exhibit "A"**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

DANIEL HUMAN, on behalf of himself and others
similarly situated,
CASE NO. 2:24-cv-00226

Plaintiff,

vs.

DREAM STYLE REMODELING OF IDAHO,
LLC, and John and Jane Does 1 through 4,

Defendants.

---

**JOINT STIPULATION FOR DISMISSAL WITH PREJUDICE**

---

Plaintiff, DANIEL HUMAN, and Defendant, DREAM STYLE REMODELING OF IDAHO, LLC, stipulate to the dismissal of all the claims brought, or which could have been brought in the above-styled case, by DANIEL HUMAN, individually on behalf of himself against all Defendants, are dismissed *with prejudice*, each party to bear its own attorney's fees and costs.

| | |
|---|---|
| /s/ Edwin V. Butler<br>Edwin V, Butler Mo. 32489<br>Butler Law Group, LLC<br>1650 Des Peres Rd., Suite 220<br>St. Louis, MO 63131<br>Email: ebutler@butlerlawstl.com<br>314-504-0001<br>*Attorneys for Plaintiff and proposed class* | LEWIS RICE LLC<br><br>/s/ Jeremy P. Brummond<br>Jeremy P. Brummond, #50940(MO)<br>600 Washington Avenue, Suite 2500<br>St. Louis, Missouri 6310<br>Tel: (314) 444-7600 (Telephone)<br>Fax: (314) 241-6058 (Facsimile)<br>jbrummond@lewisrice.com<br>*Counsel for Defendant, Dream Style Remodeling of Idaho, LLC*<br><br>Diane J. Zelmer, Esq. (*pro hac vice*) |

| | |
|---|---|
| | FL Bar No: 27251<br>E-mail: djz@berensonllp.com<br>Secondary: hac@berensonllp.com<br>BERENSON LLP<br>4495 Military Trail, Suite 203<br>Jupiter FL 33458<br>Phone: 561-429-4496<br>Facsimile: (703) 991-2195<br>*Counsel for Defendant, Dream Style Remodeling of Idaho, LLC* |

SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Settlement Agreement") is entered into by and among Daniel Human ("Plaintiff" or "Human"), on the one hand, and Great Day Improvements, LLC, and its direct and indirect subsidiaries (together "GDI"), on the other hand. Human and GDI are collectively referred to in this Settlement Agreement as the "Parties."

RECITALS:

Whereas, on November 29, 2023, Human filed a Complaint in the Circuit Court of St. Louis County against GDI entitled Human v. Great Day Improvements, LLC, No 23SL-CC05158 (the "Complaint") alleging that GDI violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA") and the Missouri Do Not Call List telemarketing laws § 407.010 (the "MDNC"), *et seq.* by placing phone calls to him (the "Action");

Whereas, the Complaint alleges that marketing calls were placed to Human by or on behalf of GDI on several dates, including but not limited to November 23, 2022 and December 7, 2022;

Whereas, GDI denies and disputes every allegation in the Complaint and in the Action; and

Whereas, without any admission as to fault, liability, or wrongdoing, or as to the validity of the other party's positions, the Parties desire to avoid the further expense and uncertainties attendant with litigation and to settle and voluntarily compromise any and all claims or causes of action that Human has, or may have, against GDI, which in any way relate to the allegations set forth in the Complaint and/or Action, including, but not limited to any claims or causes of action under the TCPA, the MDNC, or any other legal theory;

NOW, THEREFORE, the Parties, in consideration of the facts, acknowledgements, agreements, general release, and promises contained in this Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the Parties, with the intent to be legally bound, do hereby promise and agree as follows:

AGREEMENT:

1. Recitals. The Parties incorporate the Recitals herein by reference.

2. Dismissal of the Action with Prejudice. Within five (5) business days from the date Plaintiff receives the Settlement Payment and as material consideration for this Agreement, Plaintiff shall cause to be filed a voluntary dismissal of all claims with prejudice.

3. Payment. GDI, within five (5) business days after delivery of a copy of the Settlement Agreement executed by Human to GDI, GDI, shall deliver a wire transfer payable to his Counsel, James Marks Trust Account in the amount of $5,000.00 (the "Settlement Payment") as full and complete consideration for the settlement agreed herein ACH instructions will be provided in a separate email or text by Human's attorney.

4. Representations and Warranties by Human: Human represents and warrants the following:

   a. That he has not received any payment or compensation from any source other than GDI under this Settlement Agreement, related to any of the alleged phone calls from or on behalf of GDI.

   b. That he did not give consent for any of the alleged phone calls.

   c. That he has not shared and will not share with any third-party any recordings made of calls between him and GDI.

   d. That any complaint which he may file against any other party, or their respective officers, directors, employees, agents, or representatives will not publicly name GDI as having any involvement in any alleged unwanted calls made by them to Human.

   e. That he is the sole and current owner of the claims being released in this Agreement and that any such claims have not been assigned or otherwise transferred to any other person or entity.

5. Release of Claims.

   a. Human, as well as his assigns, heirs, executors, administrators, successors, representatives, agents, partners, attorneys, predecessors-in-interest, and any (past or present) authorized users of any cellular, landline, or voice over internet protocol telephones for which he is the owner, user or subscriber, hereby release, resolve, relinquish, and discharge each and every one of the Released Parties (as defined in Section 4.c below) from each of the Released Claims (as defined in Section 4.b below). Human further agrees that he will not institute any action or cause of action (in law, in equity or administratively), suits, debts, liens, or claims, known or unknown, fixed or contingent, which they may have or claim to have, in state or federal court, in arbitration, or with any state, federal or local government agency or with any administrative or advisory body, arising from or related in any way to the Released Claims against the Released Parties as detailed above.

   b. "Released Claims" means any and all claims, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses, and attorneys' fees of any nature whatsoever, whether based on any federal law, state law, common law, territorial law, foreign law, contract, rule, regulation, any regulatory promulgation (including, but not limited to, any opinion or declaratory ruling), or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, as of the effective date of this agreement, that arise out of or relate in any way to the allegations against the Released Parties in the Complaint or the Action or any other claim that Human

might have under the TCPA, the MDNC, or any other legal theories for any calls placed by or on behalf of GDI or its direct or indirect subsidiaries to any cellular, landline, or voice over internet protocol phone for which Human is the owner, user, or subscriber through January 11, 2024.

c. "Released Parties" means GDI and each of its respective past, present, and future parents, subsidiaries, affiliated companies, corporations, and independent contractor agents, and each of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, joint ventures, assigns, or related entities, and each of their respective executors, successors, assigns, and legal representatives, the defendants identified in the correspondence, and/or any other party acting on behalf of GDI or its direct or indirect subsidiaries. "Released Parties" specifically includes current and former GDI. Notwithstanding any other language contained in the first sentence of this section 4(c), the "Released Parties" do not include any GDI marketing partners, and each of their respective past, present, and future parents, subsidiaries, affiliated companies, corporations, and independent contractor agents, and each of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, joint ventures, assigns, or related entities.

d. The release in this Settlement Agreement shall be interpreted to the fullest extent of res judicata principles.

7. Confidentiality.

The Parties expressly incorporate the protections of Rule 408 of the Federal Rules of Evidence and any other applicable state and/or federal law. Plaintiff and Plaintiff's Counsel represent that to date, neither has disclosed to any third party the terms or substance of any part of the settlement negotiations between the Parties, or the terms or substance of any part of this Agreement. The Parties to this Agreement further expressly acknowledge, understand, and agree that, as an integral and material term of this Agreement and the consideration for this Agreement, the Parties and their counsel will not disclose to any third party the terms or substance of any settlement negotiation or the terms or substance of any part of this Agreement, except as necessary to enforce this Agreement, as required by any governmental agency, or as otherwise required by law. Among other things, this provision prohibits Plaintiff, Plaintiff's Counsel, or any other representative, agent, attorney, or associate of Plaintiff from issuing a press release, holding a press conference, responding to press or other inquiries from non-parties about the settlement, or otherwise initiating any publicity with newspapers, publications, mass media, social media, or posting to internet websites information concerning this litigation or the terms of the Agreement. In addition, if the Parties are ever asked about the resolution of this matter, they (and their counsel, auditors, and/or tax advisors) may say only that "the matter is over"

or "no comment" without elaboration, except to enforce this Agreement or as may be compelled or otherwise required by law. The Parties intend that this confidentiality provision be interpreted as broadly as possible in order to provide the maximum confidentiality.

8. Representations: The Parties represent that, respectively, they (a) have read this entire Agreement and understand its terms; (b) have been given a reasonable and adequate period of time to consider this Agreement before signing it; (c) fully understand the terms and effects of this Agreement; (d) fully understand their right to discuss all aspects of this Agreement with an attorney of their choice, and have availed themselves of this right; (e) are voluntarily executing this Agreement by their own free act and deed; and (f) understand that no payment or consideration has been promised to Plaintiff for entering into and signing this Agreement which is not specified in this Agreement. Plaintiff further represents that he does not have any claims against Quest or any of the Released Parties, of any kind or nature, other than those asserted in the Complaint and/or Action, and acknowledges that this representation is a material part of the Agreement.

8. No Admission of Liability. This Agreement is executed by the Parties for the sole purpose of compromising and forever resolving all claims asserted, or that could have been asserted, in the Complaint and/or Action, and it is expressly understood and agreed as a condition hereof, that this Agreement shall not constitute or be construed as an admission of liability, negligence, or fault of GDI or any of the Released Parties, or as evidencing or indicating an admission of the truth or correctness of any of the claims asserted in the Complaint and/or Action.

9. Other Plaintiffs: Plaintiff and Plaintiff's counsel represent that as of the date of execution of this Agreement for the purpose of making the representations set forth in this paragraph, they have not been retained by, and have no knowledge of, any individuals or entities, other than Human, that have or may have any potential claims, grievances, or causes of actions against GDI or any of the Released Parties similar to those asserted in the Action or that have sought to or considered retaining Plaintiff's Counsel. Plaintiff and Plaintiff's counsel further represent that they will not solicit such persons or refer such persons to other counsel for the purpose of bringing claims similar to those asserted in the Action; provided, however, that nothing in this paragraph shall be construed as a restriction of Plaintiff's Counsel's right to practice in contravention of the applicable rules of professional responsibility.

10. Non-Disparagement. Human agrees not to disparage GDI, as to the issues being settled and released by this Settlement Agreement or any other issue. GDI agrees not to disparage Human as to any issue.

11. Governing Law. This Settlement Agreement shall be construed and interpreted in accordance with the laws of the State of Missouri without reference to choice of law principles.

12. Entire Agreement and Successors in Interest. This Agreement contains the entire agreement and understanding concerning the subject matter of the agreement among the Parties and

supersedes and replaces all prior negotiations or proposed settlement agreements, written or oral. Each of the Parties to this Agreement acknowledges that no other Party to this Agreement, nor any agent or attorney of any such Party, has made any promise, representation, or warranty, express or implied, not contained in this Agreement to induce either Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement. It is expressly understood and agreed that this Agreement may not be altered, amended, modified, or otherwise changed in any respect, except by a writing duly executed by the Parties, their successors or assigns in interest, or their authorized representatives. This Agreement is a fully integrated contract.

13. Effective Date. This Agreement shall be effective when the Agreement is fully executed by all Parties. To the extent the Parties or their counsel execute this Agreement on different days, the Effective Date shall be the date of the last signature of the Parties and/or their counsel.

14. No Construction Against Drafter. This Settlement Agreement was drafted jointly by the Parties and all Parties have had the opportunity to consult with and be represented by counsel. In construing and interpreting this Settlement Agreement, no provision of this Settlement Agreement will be construed or interpreted against any Party based upon the contention that this Settlement Agreement or a portion of it was purportedly drafted or prepared by that Party.

15. Agreement Constitutes a Complete Defense: To the extent permitted by law, this Agreement may be pled as a full and complete defense to any action, suit, or other proceedings that may be instituted, prosecuted or attempted against Quest or any of the Release, Parties contrary to this Agreement.

16. Counterparts. This Settlement Agreement may be signed in counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together will constitute one and the same instrument.

17. Authority. Each person executing this Settlement Agreement on behalf of any of the Parties hereto represents that such person has the authority to so execute this Settlement Agreement.

18. No Oral Modification. This Settlement Agreement shall not be altered, amended, or modified by any oral representation made before or after the execution of this Settlement Agreement. All modifications must be in writing and duly executed by all Parties.

19. No Fine or Penalty: The Parties agree that no part of any payments by GDI pursuant to this Agreement constitutes (i) a fine or penalty under any law or (ii) a payment to settle any actual or potential liability for a fine or penalty under any law.

20. Responsibility for Tax Liability: The Settlement Payment is a gross payment that may be subject to applicable taxes. Plaintiff understands and agrees that GDI assumes no liability whatsoever to any local, state, or federal taxing authority for the consequences or treatment of settlement proceeds, including attorneys' fees and costs, paid in resolution of the Action. Plaintiff therefore agrees to make no claim against GDI for any payment or non-payment of taxes or regarding or relating to the reporting of the payment described in this Agreement, if any, to any taxing authorities. Plaintiff acknowledges that GDI has not made any representations about the tax consequences of the payment set forth herein.

IN WITNESS WHEREOF, the Parties hereto have caused this document to be executed on the 10th day of January 10, 2024.

Great Day Improvements, LLC

By: ______________________________

Its: ______________

Dated: ______________

DANIEL HUMAN
JANUARY 10, 2024

Dated: January 11, 2024

James Marks, Attorney for Plaintiff

/s/ James Marks, Attorney at Law
James Marks

**APPROVED BY ALL PARTIES**

**CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS**

THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS (hereinafter referred to as the "Agreement") is made and entered into as of the 25th day of October, 2023, by and between DANIEL HUMAN (hereinafter referred to as "**HUMAN**"), on the one hand, and NEW AMERICAN FUNDING, LLC, f/k/a Broker Solutions, Inc. (hereinafter referred to as "**NAF**"), on the other hand. In this Agreement, **HUMAN** and **NAF** shall be collectively referred to as the "Parties."

**RECITALS**

A. On or about September 1, 2023, **HUMAN** filed a lawsuit against **NAF** in the Circuit Court of St. Louis County, Missouri, styled *Daniel Human, individually and on behalf of all those similarly situated v. Broker Solutions, Inc., et al.*, Case Number 23SL-CC03724 (hereinafter the "Lawsuit").

   In the Lawsuit, **HUMAN** alleges claims against **NAF** (i) for violations of Missouri's Telemarketer Laws, including but not limited to Mo. Rev. Stat. 407.1076, 407.1104 and 407.1082 (Count I), and (ii) for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (Count II), with said claims arising out of alleged unsolicited, non-consensual phone calls **NAF**, by and through its agents and employees, made to **HUMAN**.

B. On or about October 10, 2023, **NAF** timely removed the Lawsuit to the United States District Court for the Eastern District of Missouri where it was assigned case number 4:23-cv-01271.

C. **NAF** denies all allegations of wrongdoing asserted against it in the Lawsuit, denies it is liable to **HUMAN** under any theory or claim, and specifically denies it is liable to **HUMAN** for violations of Missouri's Telemarketer Laws, the Telephone Consumer Protection Act, or any other law or rule of law, whether by statute, the common law, or otherwise.

D. The Parties desire to resolve and settle all disputes between them, without any Party admitting any liability whatsoever to the other Party.

**NOW, THEREFORE,** in consideration of the promises, mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

APPROVED BY ALL PARTIES

1. **Recitals**: The foregoing recitals are incorporated in this Agreement as an integral part hereof.

2. **Payment and Conditions Relating Thereto**:

a. **NAF** shall pay to **HUMAN** the gross sum total of Eleven Thousand Dollars ($11,000.00), as provided herein. This payment shall be referred to as the "Settlement Funds".

b. The Settlement Funds shall be in the form of a check made payable to "Butler Law Group, LLC" only. **HUMAN** understands and agrees that any portion of the Settlement Funds that he is entitled to as a result of this Agreement will be paid to him from the settlement check made payable to "Butler Law Group, LLC" as referenced in the preceding sentence. **NAF** shall provide the check to its attorneys who will then provide said check to **HUMAN's** attorney.

c. The Settlement Funds shall be paid within ten (10) days after this Agreement has been signed by **HUMAN**, and counsel for **NAF** receives a copy of the signed Agreement by email.

d. **HUMAN** understands and agrees that the Settlement Funds referenced herein shall constitute the entire amount of compensation provided to him under this Agreement, and **HUMAN**, including any successors and/or assigns, shall not seek any further compensation or damages from **NAF** or any other employees or agents of **NAF** for any other claimed damages, costs, or attorney's fees in connection with the matters encompassed in this Agreement, including those which **HUMAN** could have brought in the Lawsuit or which in any way, directly or indirectly, arise out of or relate to the claims alleged in the Lawsuit, including but not limited to any claims **HUMAN** could have asserted in any Amended Complaint or in any way arising out of any actual or attempted communications or interactions between **HUMAN** and **NAF**, or any alleged business relationship or attempted business relationship between **HUMAN** and **NAF**.

3. **Global Release**: In consideration of the Settlement Funds described above, and of other good and valuable consideration, receipt of which is hereby acknowledged, **HUMAN** presently, generally, fully, finally, and forever releases, acquits, and discharges **NAF**, and its insurers, and any other current or former employee or agent of **NAF**, from any and all claims, and from any and all damages, directly or indirectly arising from or in connection with any of the following: (i) all acts or omissions or other conduct, or the breach of any legal duty occurring prior to the effective date of this Agreement concerning the occurrences that form the basis of the Lawsuit and/or **HUMAN's** alleged damages; (ii) all allegations made or that might or could have been made by **HUMAN** with respect to the occurrences that form the basis of the Lawsuit; and/or (iii) any other acts and/or omissions of **NAF** and/or any current or former employee or agent of **NAF** relating in any way to actual or attempted communications or interactions between **HUMAN** and **NAF**, or any alleged business relationship or attempted business relationship between **HUMAN** and **NAF**. It is the Parties' express intent that this global release shall be construed broadly in favor of the extinguishment of any and all claims and/or potential claims, known or unknown by **HUMAN** (a) which in any way relate to the Lawsuit, (b) which in any way, directly or indirectly, arise out of or relate to the claims alleged against **NAF** in the Lawsuit, and/or (c) which have accrued as of the date **HUMAN** signs this Agreement.

4. **Dismissal**: **HUMAN** shall dismiss with prejudice any and all claims brought against **NAF** in the Lawsuit within ten (10) days of the receipt of the Settlement Funds, and any dismissal shall be in a format provided by **NAF's** counsel to **HUMAN's** counsel.

5. **No Solicitation of Future Class Members**: As a material inducement for **NAF** to enter into this Agreement, **HUMAN** agrees that he will not solicit alleged potential class members, as identified in the Lawsuit, either directly or indirectly, or recruit or encourage alleged potential

putative class members to file suit against **NAF** regarding the claims and allegations at issue in the Lawsuit.

6. **Taxes**: **HUMAN** shall be solely responsible for, and is legally bound to pay any taxes determined to be due and owing, including penalties and interest related thereto, to any federal, state, local, or regional taxing authority resulting from payment of the Settlement Funds. **HUMAN** understands that **NAF** has not made any representations to him regarding the tax treatment of the Settlement Funds paid pursuant to this Agreement. Moreover, **HUMAN** agrees to indemnify and hold **NAF** harmless in the event any governmental taxing authority asserts against **NAF** and/or any of its insurers, any claim for unpaid taxes, failure to withhold taxes, penalties, or interest based upon the payment of the Settlement Funds.

7. **No Outstanding or Known Future Claims/Causes of Action other than those identified**: **HUMAN** affirms that other than the Lawsuit, he has not filed any other civil complaints, claims, charges, or actions against **NAF** or against any of **NAF's** current or former partners, officers, directors, assigns, agents or employees with any local, state or federal agency or local, state or federal court based on conduct, misconduct, or any other acts or omissions occurring prior to the date of this Agreement and that he will not do so at any time hereinafter.

8. **Warranties**: The Parties agree, represent, and warrant that:

a. The Settlement Funds described above, paid in consideration for this Agreement, is the sole consideration for its execution and is paid by or on behalf of **NAF** in full satisfaction of all damages accruing to **HUMAN** and of all claims of **HUMAN**, in all possible capacities, against **NAF**, as described in the release provision detailed above.

b. The individuals signing this Agreement are legally and mentally competent to sign this Agreement, are duly authorized and empowered to bind any individuals or entities for which

he or she has signed this Agreement, and possess all requisite consents, approvals, authorizations to execute and deliver this instrument in all capacities stated herein.

c. The Parties agree this Agreement is entered into in good faith after arduous arms-length negotiations and that the Parties believe this Agreement is in their best interest.

d. **HUMAN** presently own 100% of the damages and of the claims released by this Agreement, and no other person or entity owns any interest therein by assignment, lien, subrogation or otherwise; **HUMAN** has not in any way assigned or otherwise transferred to any person or entity any interest in the damages or claims released by this Agreement; and **HUMAN** presently possesses the exclusive right to receive all of the consideration paid for this Agreement.

9. **<u>No Admission of Liability</u>**: This Agreement and compliance with this Agreement shall not be construed as an admission by **NAF** of any liability whatsoever, or as an admission by **NAF** of any violations of the rights of **HUMAN**, including but not limited to any rights derived from any statute, contract, and/or the common law. To the contrary, **NAF** unconditionally and without qualification denies all liability to **HUMAN**, including but not limited to liability for any of the acts and/or omissions alleged in the Lawsuit or in any way, directly or indirectly, arising out of actual or attempted communications or interactions between **HUMAN** and **NAF**, or any alleged business relationship or attempted business relationship between **HUMAN** and **NAF**. The foregoing specifically includes, but is not limited to, any acts and/or omissions of **NAF's** current or former agents or employees and/or any other persons acting or purporting to act on behalf of **NAF**.

10. **<u>Confidentiality of Agreement</u>**: The Parties agree they will keep the fact of, terms of, and amount reflected in this Agreement confidential and they will not hereinafter disclose any information concerning this Agreement to anyone, provided the Parties may make such disclosures

as are required by law and as are necessary for legitimate law enforcement, tax, or compliance purposes.

11. **Agreement is Legally Binding**: The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs, and estates.

12. **Entire Agreement**: This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the Parties hereto.

13. **New or Different Facts: No Effect**: Absent fraud and except as provided herein, this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement or the discovery or existence of any new or additional fact, or any fact different from that which either Party now knows or believes to be true. Notwithstanding the foregoing, nothing in this Agreement shall be construed as, or constitute, a release of any Parties' rights to enforce the terms of this Agreement.

14. **Interpretation**: Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement. The headings within this Agreement are purely for convenience and are not to be used as an aid in interpretation. All of the definitions, provisions, and terms hereof are contractual and not mere recitals.

15. **Governing Law**: This Agreement is made and entered into within and shall be governed by, construed, interpreted, and enforced in accordance with Missouri law.

**APPROVED BY ALL PARTIES**

16. **Reliance on Own Counsel**: In entering into this Agreement, the Parties acknowledge that they have relied upon the legal advice of their respective attorneys, who are the attorneys of their own choosing, that such terms are fully understood and voluntarily accepted by them, and that, other than the consideration set forth herein, no promises or representations of any kind have been made to them by the other Parties. The Parties represent and acknowledge that in executing this Agreement they did not rely, and have not relied upon any representation or statement, whether oral or written, made by the other Parties or by the other Parties' agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise.

17. **Effective Date**: The terms of the Agreement will be effective upon the date signed by HUMAN.

**READ THE FOREGOING DOCUMENT CAREFULLY. IT INCLUDES A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

**IN WITNESS WHEREOF**, and intending to be legally bound, the undersigned individuals have caused this Agreement to be executed as of the date set forth below.

**DANIEL HUMAN**

[signature]
Printed Name: Daniel Human
Date: October 25, 2023

**NEW AMERICAN FUNDING, LLC,**
**(by an authorized representative)**

______________________________
**Printed Name:** ______________________
**Date:** ______________________________

APPROVED BY ALL PARTIES

**COMPROMISE SETTLEMENT AGREEMENT AND RELEASE**

This Compromise Settlement Agreement and Release ("Agreement") is hereby entered into by and between Plaintiff Daniel Human ("Plaintiff") and Defendants Alleviate Tax, LCC ("Defendant"). The above-stated parties are sometimes collectively referred to as the Parties. This agreement is effective as of the date of the first signature affixed below (the "Effective Date").

**I.**
**ATTORNEYS**

The attorneys for the Parties are as follows:

Plaintiff:
Daniel Human

Edwin V. Butler Esq.
Butler Law Group, LLC
1650 Des Peres Rd.
Suite 220
St.Louis, MO 63131
*Counsel for Plaintiff*

Defendants:
Alleviate Tax, LLC

Brittany Andres
400 Spectrum Center, Ste. 1550
Irvine, CA 92618
www.troutmanamin.com
P: (949) 350-5612 (No ATDS)
F: (949) 203-8689.COM
*Counsel for Defendant*

**II.**
**RECITALS**

WHEREAS, Plaintiff filed certain lawsuit styled *Daniel Human v. Alleviate Tax, LLC*, No. 4:24-cv-981 in the United States District Court for the Eastern District of Missouri (the "Lawsuit"), alleging violations of the Telephone Consumer Protection Act and related statutes.

WHEREAS, the Parties, acknowledging the disputed nature of the claims, and further acknowledging the uncertainty of litigation, and recognizing the costs, including without limitation, legal fees and other opportunity costs, and without admitting liability, desire to

compromise and settle this dispute and to fully, finally, and completely dispose of all matters in controversy between the Parties.

## III.
## COVENANTS

NOW, THEREFORE, the Parties covenant and agree as follows:

1. **Consideration.** Parties agree to dismiss and or waive all claims they may have against each other. Defendants agree to send to Plaintiff the total sum of five thousand dollars ($5000.00) within five (5) days of receipt of this signed Settlement Agreement and Mutual Release. ***Payment will be made payable to and sent to Edwin Butler and the Butler Law Group, LLC, 1650 Des Peres Rd., Ste 220, St. Louis, Mo. 63131.***

2. **Attorneys' Fees.** All of the Parties agree to bear their own attorney's fees.

3. **No Admission.** This Agreement is entered into for the purpose of settling all disputed civil claims that the Parties may have now or in the future against one another arising from Defendants' alleged phone calls directed to Plaintiff. The Parties agree that neither the giving of any consideration hereunder nor its acceptance shall operate as or be evidence of any admission, either liability for, merit in or lack of merit in, any claim hereby released, and agree that by the execution of this Agreement, Defendants do not admit to the truthfulness of any of the claims made in the Lawsuit; rather such claims and liability have been and are hereby expressly denied by Defendants.

4. **Release by Plaintiff.** Upon the execution of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed, Plaintiff for themselves and all of Plaintiff's respective agents, administrators, personal representatives, insurers, predecessors, successors, assigns, attorneys, and all persons or entities claiming by, through, for, or under them, do hereby absolutely, irrevocably, and unconditionally

acquit and release and forever discharge Defendants, all current and former owners of the account(s) relating to the Lawsuit, and all of Defendants' respective partners, agents, executors, clients, administrators, personal representatives, insurers, heirs, predecessors, attorneys, and all persons or entities claiming by, through, for, or under them, from any and all liability, claims, demands, causes of action, or suits, both at law or in equity, and from all debts, expenses, and costs liquidated or unliquidated, absolute or contingent and whether known or unknown which Plaintiff has or may hereafter have in whole or in part, as a result of, whether directly or indirectly, concerning or otherwise pertaining in any form or fashion to the transactions, events, circumstances, or agreements arising from the alleged phone calls of Defendants directed to Plaintiff, from the beginning of time through the execution of this release.

5. **Confidentiality.** The terms and conditions of this settlement are confidential. The Parties may make a limited disclosure for the purpose of responding to any administrative agency or entity they may be required to respond to as a matter of law. Defendants may disclose the amount and terms of the Agreement in reporting to licensing boards, certification boards or insurance carriers. The Parties may also make a limited disclosure as required to their accountants. The parties and their counsel may disclose the settlement to their tax professional for tax purposes. The Parties further acknowledge and agree that, in the event any other questions or inquiries are made or directed to them or to their attorneys concerning this Agreement, no other statement shall be made except that the matter was disposed of by mutual agreement and release.

6. **Additional Warranties and Representations.** All of the Parties to this Agreement warrant and represent that (1) no promise or agreement not herein expressed has been made, (2) this Agreement and any other instruments referenced in this Agreement are not executed in reliance upon any statement, representation, omission, and/or conduct of any other party or attorney of any

other party, (3) the provisions of this Agreement are contractual and not merely recital, (4) all parties have authority to enter into this Agreement, and (5) the Parties represent and warrant that no other person or entity has any interest in the claims, demands, obligations, actions, causes of action, or the Lawsuit referred to in this Agreement, and any alleged oral or written contracts described herein.

7. **Binding Effect.** This Agreement will inure to the benefit of and be binding upon all Parties hereto and their executors, administrators, personal representatives, heirs, officers, directors, shareholders, employees, successors, assigns, attorneys, and all persons or entities claiming by, through, for, or under them. In the event a party to this Agreement is a corporation or partnership, each such party represents it has full authority to execute this Agreement and to perform the obligations required herein.

8. **Governing Law.** This Agreement shall be governed by the laws of the State of Missouri, and in any lawsuit, action, or proceeding instituted by any party hereto directly arising out of or with respect to this Agreement, proper venue shall be deemed to be exclusively in Missouri.

9. **Modification.** This Agreement may not be modified, amended, superseded, or cancelled orally or in any manner other than by written instrument signed by the Parties to this Agreement.

10. **No Prior Agreements.** This Agreement constitutes the entire Agreement and understanding of the Parties and supersedes any and all other prior agreements of the Parties, whether oral or written, relating to the subject matter of the Lawsuit and this Agreement.

11. **Severability.** If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, such provision will

be fully severable, and this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision never compromised a part hereof, and the remaining provisions hereof will remain in full force and effect and will not be effected by the illegal, invalid, or unenforceable provision or by its severance here from.

12. **Execution of Documents.** Each of the Parties hereto shall execute such further documents and writings that may be necessary to effectuate the terms and conditions of this Agreement, including and not limited to Motion to Dismiss with Prejudice. Each of the Parties hereto represent and warrant that they have authorized the persons whose signatures appear upon this Agreement to execute such Agreement on their behalf and for the consideration stated.

13. **Extensive Negotiations.** The Parties hereto agree that this Agreement is the result of extensive negotiations by and between the Parties and represents the agreement of the Parties. The Parties acknowledge that this Agreement has been revised and critiqued by all Parties for language, and all parts of the Agreement shall in all cases be construed as a whole, according to its form, meaning, and not strictly for or against any one of the Parties.

14. **Multiple Counterparts and Faxed Signatures.** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the Parties may execute this Agreement by signing any such counterpart. Faxed or electronic copies of signatures will be treated the same as original signatures for purposes of this Agreement.

15. **Miscellaneous.** The Parties declare that this Agreement is given in good faith and that the terms hereof have been completely read, are fully understood, and voluntarily accepted for the purposes stated herein.

EXECUTED this 13th day of August, 2024, but effective as of the terms of this Agreement.

Daniel Human

*Daniel Human*

EXECUTED this ____ day of August, 2024, but effective as of the terms of this Agreement.

*Alleviate Tax, LLC*

By: ______________________________

Name: ______________________________

Title: ______________________________

SETTLEMENT AGREEMENT AND RELEASE

This confidential Settlement Agreement and Release (the "Agreement") is made this 5th day of January, 2024, by and between Great Resort Vacations LLP ("Company"), and Daniel Human, ("Complainant").

WHEREAS, Company is engaged in certain forms of sales, marketing or other calling, either on its own behalf, through others, or on behalf of others,

WHEREAS, Complainant has alleged certain sales, marketing or other call related law violations by Company and/or the affiliates or partners of the same,

WHEREAS, the parties hereto desire to compromise, settle, and release any and all claims arising out of or relating to the alleged violations, without any admission of wrongdoing by either party.

1. Payment. Company shall pay the sum of nine thousand U.S. dollars ($9,000.00) ("Settlement Amount") to Complainant. The settlement Amount shall be made in three payments; the first payment of $5,000 due no later than January 14, 2024, the second payment of $2,000 due 30 days thereafter and the final payment of $2,000 due 30 days thereafter. In the event Complainant alleges any default in the timing of any payment hereunder, Complainant shall provide written notice to Company, or its counsel and Company shall be afforded one week to cure said default. The Settlement Amount shall be sent via electronic funds transfer to James A. Marks, Attorney for Plaintiff and wire instructions will be provided to Defendant's Counsel via email with the executed settlement Agreement.

2. Release by Complainant. In consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Complainant, on behalf of Complainant and Complainant's heirs, successors, legal representatives and assigns, does hereby release, acquit and forever discharge Company, and all their respective corporate parent, subsidiary and affiliated entities, along with each of their current, and former owners, members, partners, officers, directors, shareholders, employees, agents, marketers, vendors, contractors, assigns, successors, servants, insurers, representatives, and attorneys, together with any and all other persons and entities who are or might be liable (collectively, the "Released Parties"), from any and all claims, liabilities, demands, suits, class actions and causes of action of every nature and kind, whether vested or contingent, past or current, accrued or unaccrued, known or unknown, in law or in equity, matured or unmatured, whether or not such claims were or could have been brought or raised in any applicable civil action, or as a result of the alleged conduct which gave rise to the instant dispute, including without limiting the generality of the foregoing, those claims and allegations expressly raised, and solely in any previous correspondence between Complainant and Company, in any court pleading filed by Complainant, those arising out of or relating to the facts, circumstances, or occurrences surrounding the above-mentioned correspondence, and those arising out of, relating to or resulting from the facts, circumstances, or occurrences concerning the alleged conduct which gave rise to this dispute. This Agreement covers and includes all claims that Complainant

has against the Released Parties whether known or not, despite the fact that any applicable state and/or federal law may provide otherwise. This Agreement also covers any claims assigned to Complaint by other parties which relate in any way to the subject telemarketing calls. Notwithstanding the foregoing, the Released Parties shall not be released from the obligations imposed by this Agreement.

3. Dismissal of Claims, Confidentiality & Non-Disparagement. The Parties shall not discuss, publish or share any copy of, or any details relating to, this Agreement with any person or entity not a party to this Agreement, except that the Parties may state that the matter has been "fully and amicably resolved without any admission of fault." Following the execution of this Agreement: (1) Complainant shall immediately dismiss any lawsuits and class action claims filed against Company by Complainant; (2) Complainant shall immediately withdraw all complaints and negative reviews filed by Complainant about Company; (3) Complainant shall immediately inform any regulator investigating Company at Complainant's request that the matter has been fully and amicably resolved to Complainant's satisfaction; (4) the Parties shall not disparage Company to any third party, nor make any future complaint or negative review regarding Company; and (5) If Complainant has not already done so, Complainant shall immediately provide a list of all of Complainant's telephone numbers so Company can act in an attempt to prevent future calls/messages to such numbers. In the event of a breach of this provision by Complainant, Complainant shall forfeit Complainant's settlement amount and shall be liable to Company for an immediate return of the settlement amount, plus all reasonable court costs and attorney's fees required in order for Company to enforce this provision—in such a case, Complainant's claims against Company shall remain waived.

4. Denial of Liability. It is expressly understood and agreed to by and among the undersigned hereto that by entering into this Agreement, none of the undersigned (nor their affiliates) hereto admit the truth of the allegations made by any other party, and this is a compromise of a disputed claim, which should not be construed as an admission of liability on the part of any party or any affiliate or the same.

5. Assigns and Successors-in-Interest. This Agreement shall be binding upon and inure to the benefit of the heirs, successors, and assigns of the undersigned hereto. The claimant represents that they have not already assigned or otherwise transferred or conveyed their claim or any interest in the same, and will indemnify Company if this is the case.

6. Agreement Fully Read and Understood. This Agreement has been carefully read by the undersigned and the contents are known and understood by the undersigned. The undersigned have each received or have had the opportunity to obtain if they so choose independent legal advice from the attorneys of their choice with respect to the preparation, review, and advisability of executing this Agreement. The undersigned acknowledge that they have executed this Agreement after independent investigation and without fraud, duress, or undue influence.

7. Applicable Law, Venue for Disputes. The existence, validity, construction and operation of this Agreement, and all of its covenants, agreements, representations, warranties,

terms, and conditions, shall be determined in accordance with the laws of the State of Missouri. The parties consent to the jurisdiction of the courts in Missouri and agree that venue in any future dispute between them shall be proper in this forum only.

8. Entire Agreement. This Agreement sets forth the entire agreement between the undersigned, and fully supersedes any and all prior and/or contemporaneous agreements or understandings between the undersigned, which pertain to the subject matter hereof. The terms of this Agreement may not be contradicted by evidence of any prior or contemporaneous agreement, and no extrinsic evidence whatsoever may be introduced to vary its terms in any judicial proceeding involving this Agreement.

9. Modification. This Agreement may be modified, but only if the modification is in writing and signed by the undersigned to this Agreement.

10. Severability. Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be part of this Agreement.

11. Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Faxed and scanned signatures may be accepted as originals.

12. Mutual Drafting. This Agreement is the product of negotiations "at arm's length" between the undersigned, both of whom had ample time in which to seek legal advice, if desired. As such, the terms of this Agreement are mutually agreed-upon, and no part of this Agreement will be construed against the drafter.

In accordance with Mr. Human's satisfaction of paragraph 3 above, he discloses that he presently owns two phones with the identifying numbers: 314-915-2988 and 208-390-1355. Mr. Human owns no other phones.

Accepted and agreed to by:

Daniel Human (Complainant): Daniel Human

Date: January 6, 2024

Great Resort Vacations LLP (Company):

Authorized Signature:

Date:

**Sort Date Entries: Descending Ascending**

**Display Options:** All Entries

**01/31/2025**

**Judge/Clerk - Note**
NO TAX

**01/30/2025**

**Judgment Entered**
JUDGMENT BY DEFAULT IS THEREFORE GRANTED IN PLAINTIFF'S FAVOR AGAINST DEFENDANT IDAHO ROOFING CONTRACTORS IN THE AMOUNT OF $46,500.50 AS WELL S ALL APPLICABLE POST-JUDGMENT INTEREST. SO ORDERED: JUDGE DAVID LEE VINCENT, III

**Default Judgment**

**Civil Motion Hearing Held**

**Associated Entries: 12/17/2024 - Civil Motion Hearing Scheduled**
**Scheduled For:** 01/30/2025; 9:00 AM; DAVID L VINCENT III ; St Louis County

**12/17/2024**

**Civil Motion Hearing Scheduled**

**Associated Entries: 01/30/2025 - Civil Motion Hearing Held**
**Scheduled For:** 01/30/2025; 9:00 AM; DAVID L VINCENT III ; St Louis County

**Notice of Hearing Filed**
Notice of Hearing
**Filed By:** DANIEL HUMAN

**12/11/2024**

**Motion for Default Judgment**

**10/31/2024**

**Agent Served**
Document ID - 24-SMCC-10154; Served To - IDAHO ROOFING CONTRACTORS; Served Date - 10/24/2024; Served Time - 00:00:00; Service Type - SP; Reason Description - SERV; Service Text -

**10/22/2024**

**Confid Filing Info Sheet Filed**

**Summons Issued-Circuit**
Document ID: 24-SMCC-10154, for IDAHO ROOFING CONTRACTORS

**Pet Filed in Circuit Ct**

FILED
FEB 05 2025
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

IN THE
CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

Daniel Human, individually and on behalf of others similarly situated,

Plaintiff,

Vs

Vacation Ownership Brokerage, LLC d/b/a Timeshare Broker Services

Defendant.

Case No. 24SL-CC05237

FILED
FEB 13 2025
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

## JUDGMENT BY DEFAULT

The Plaintiff, Daniel Human, moved for entry of Judgment by Default pursuant to Missouri Supreme Court Rule 74.05(a) against Defendant Vacation Ownership Brokerage, LLC for their failure to answer or otherwise defend against their three (3) violations of the Missouri and Federal do not call lists, and for Judgment against the defendants based on their vicarious liability, and for costs and fees.

NOW, THEREFORE, the Court finds that Process was perfected on the defendants on October 30, 2024. Defendant Vacation Ownership Brokerage, LLC failed to plead, answer or defend against the Complaint within thirty (30) days thereby entitling the Plaintiff to entry of Judgment by default pursuant to Missouri Supreme Court Rule 74.05(b). Pursuant to Missouri Supreme Court Rule 74.05(c), a Default Judgment may include an award of damages for each of the three (3) violations.

As such, in accord with 407.1107 RSMo, the Plaintiff is entitled to $5,000 in damages for each known violation, or $15,000. Pursuant to 47 U.S.C. 227(c)(5); 47 C.F.R. 64.1200 (c)(2), Plaintiff is entitled to separate and distinct damages for the three (3) independent TCPA violations of $1,500 per call-or $4,500. The Individual Defendant's ratification of the illegal calls further warrants a judgment in Plaintiff's favor equal to the maximum penalties of $19,500. Plaintiff is also entitled to recover his reasonable fees and costs in the sum of $1,000.50.

***JUDGMENT BY DEFAULT*** is therefore granted in Plaintiff's favor against Defendant Vacation Ownership Brokerage, LLC in the amount of $40,000.50. as well as all applicable post-judgment interest.

SO ORDERED:

Honorable John N. Borbonus III

This 13th day of February, 2025

_______________

Clerk of the Court

Cc: all parties

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This confidential Settlement Agreement and Release (the "Agreement") is hereby made by and between Plaintiff Daniel Human ("Plaintiff") and Defendant DiCarlo Insurance, LLC ("Defendant"). Plaintiff and Defendant shall be collectively referred to as the "Parties."

WHEREAS, Defendant is engaged in certain forms of sales and marketing either on its own behalf, through others, or on behalf of others;

WHEREAS, Plaintiff has alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq.* by Defendant and/or the affiliates or partners of the same through a Complaint, which would be filed in the Circuit Court of St. Louis County, State of Missouri on December 11, 2023 (the "Complaint");

WHEREAS, Defendant denies any and all liability related to the Complaint;

THEREFORE, for and in consideration of the foregoing promises, the covenants set forth herein, and other good and valuable consideration, the Parties to this Agreement desire to compromise, settle, and release any and all claims arising out of or relating to the alleged violations, without any admission of wrongdoing by Defendant, and hereby agree and warrant as follows:

1. Effective Date. By completing and signing this Agreement, the Parties agree to be bound by its terms once it is signed by all Parties hereto. All Parties must execute this Agreement for it to be effective. The "Effective Date" is the date on which the last party hereto signs the Agreement.

2. Consideration. In exchange for the promises and releases herein, Defendant agrees to pay Plaintiff six thousand dollars ($6,000) via ACH electronic bank transfer, in two payments of three thousand ($3,000) each to Plaintiff's attorney's account as enumerated below, the first three-thousand-dollar ($3,000) payment no later than three (3) days after signing of this agreement. The second payment of three thousand dollars ($3,000) to be made within thirty (30) days of the first payment, to the Trust account of attorney James Marks, information which will be sent by email immediately upon the execution of this Agreement.

3. Release of Claims.

   a. Human, as well as his assigns, heirs, executors, administrators, successors, representatives, agents, partners, attorneys, predecessors-in-interest, and any (past or present) authorized users of any cellular, landline, or voice over internet protocol telephones for which he is the owner, user or subscriber, hereby release, resolve, relinquish, and discharge each and every one of the Released Parties (as defined in Section 3.c below) from each of the Released Claims (as defined in Section 4.b below). Human further agrees that he will not institute any action or cause of action (in law, in equity or administratively), suits, debts, liens, or claims, known or

unknown, fixed or contingent, which they may have or claim to have, in state or federal court, in arbitration, or with any state, federal or local government agency or with any administrative or advisory body, arising from or related in any way to the Released Claims against the Released Parties as detailed above.

b. "Released Claims" means any and all claims, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses, and attorneys' fees of any nature whatsoever, whether based on any federal law, state law, common law, territorial law, foreign law, contract, rule, regulation, any regulatory promulgation (including, but not limited to, any opinion or declaratory ruling), or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, as of the effective date of this agreement, that arise out of or relate in any way to the allegations against the Released Parties as alleged, other claims that Human might have under the TCPA, the MDNC, or any other legal theories for any calls placed by or on behalf of DiCarlo Insurance LLC or its direct or indirect subsidiaries to any cellular, landline, or voice over internet protocol phone for which Human is the owner, user, or subscriber between the dates of December 4, 2023 and December 8, 2023.

c. "Released Parties" means DiCarlo Insurance LLC and each of its respective past, present, and future parents, subsidiaries, affiliated companies, corporations, and independent contractor agents, and each of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, joint ventures, assigns, or related entities, and each of their respective executors, successors, assigns, and legal representatives, the defendants identified in the correspondence. Notwithstanding any other language contained in the first sentence of this section 3(c), the "Released Parties" do not include any DiCarlo Insurance LLC's marketing partners or lead providers, and each of their respective past, present, and future parents, subsidiaries, affiliated companies, corporations, and independent contractor agents, and each of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, joint ventures, assigns, or related entities.

d. The release in this Settlement Agreement shall be interpreted to the fullest extent of res judicata principles.

4. <u>Confidentiality and Non-Disparagement</u>. The Parties shall not discuss, publish or share any copy of, or any details relating to, this Agreement with any person or entity not a party to this Agreement. The Parties shall not make any comments that disparage, or attempt to disparage, Defendant or Plaintiff. As to Defendant, the terms in Paragraph 3 shall only apply to

Defendant's officers, directors, employees or representatives who have knowledge of the terms of the settlement of this Complaint.

5. Dismissal with prejudice. In consideration of the terms of this Settlement, if Plaintiff has already filed the Complaint, Plaintiff shall dismiss the potential lawsuit with prejudice within five (5) business days of receiving the final Payment. All causes of action that were brought or could have been brought in the Complaint are dismissed with prejudice.

6. Agreement Fully Read and Understood. This Agreement has been carefully read by the undersigned and the contents are known and understood by the undersigned. The undersigned have each received or have had the opportunity to obtain independent legal advice from the attorneys of their choice with respect to the preparation, review, and advisability of executing this Agreement. The undersigned acknowledge that they have executed this Agreement after independent investigation and without fraud, duress, or undue influence.

7. Applicable Law. The existence, validity, construction, and operation of this Agreement, and all of its covenants, agreements, representations, warranties, terms, and conditions, shall be determined in accordance with the substantive laws of the State of Missouri.

8. Entire Agreement. This Agreement sets forth the entire agreement between the undersigned, and fully supersedes any and all prior and/or contemporaneous agreements or understandings between the undersigned, which pertain to the subject matter hereof.

9. Modification. This Agreement may be modified, but only if the modification is in writing and signed by the undersigned to this Agreement.

10. Severability. Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be part of this Agreement.

11. Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. Faxed and scanned signatures may be accepted as originals.

12. Mutual Drafting. This Agreement is the product of "arms-length" negotiations between the Parties, both of whom had ample time in which to seek legal advice, if desired. As such, the terms of this Agreement are mutually agreed-upon, and no part of this Agreement will be construed against the drafter.

13. Representations and Warranties. The Plaintiff represents and warrants to Defendant that Plaintiff has not assigned, transferred, pledged, or otherwise conveyed any of his interest in any claims or causes of action released herein. Plaintiff has actual authority to enter into this Agreement on behalf of himself and any others bound by this agreement. Additionally, Plaintiff represents and warrants that he has not and will not encourage any other individuals regarding bringing claims against Defendant and is not aware of any other individuals who have or may have claims against Defendant. Plaintiff also represents that he does not have any other

known claims against Defendant. The representations made in this Paragraph are a material term of this agreement.

14. Attorneys' Fees. The prevailing party in any lawsuit over an alleged breach of this agreement shall recover reasonable attorneys' fees and costs.

IN WITNESS WHEREOF, the Parties hereto have caused this document to be executed on the 5th day of April, 2024.

Accepted and agreed to by:

Daniel Human

Daniel Human
10423 Conway Rd.
St. Louis Mo. 63131

Date: April 5, 2024

DiCarlo Insurance, LLC

Authorized Representative for
DiCarlo Insurance, LLC

Print Name:
Title:
Date: April 5, 2024

# SETTLEMENT AGREEMENT, RELEASE, AND GENERAL WAIVER

This Settlement Agreement, Release and Waiver of All Claims ("Agreement") is entered into this 22nd day of January 2024 ("Effective Date"). The Parties to this Agreement are PolicyScout, LLC ("PolicyScout") on the one hand, and Dan Human ("Human") on the other hand. The parties to this Agreement are collectively referred to herein as the "Parties."

## RECITALS

PolicyScout filed a lawsuit against Human on October 11, 2023, in Utah Third District Court, Case No. 2309070677. The case was remanded to Utah Federal Court and assigned Case No. 2:23-cv-00934-CMR. Hereinafter, the "PolicyScout Lawsuit";

Human filed a *Counterclaim* in Missouri Federal Court, Case No. 4:23-cv-01377-SEP. That case was remanded to Utah and became part of the PolicyScout Lawsuit. Hereinafter, the "Human Lawsuit").

Each party denies all allegations of wrongdoing and denies each other Party's claims for relief;

NOW THEREFORE, consistent with the above promises, and for good and valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

## TERMS AND CONDITIONS

1. **Releases and Waivers.**

Except as to rights and obligations created by this Agreement, and subject to the parties compliance with their obligations under this Agreement, for value received, the receipt and adequacy of which is hereby acknowledged, each party hereby generally and mutually releases, waives, relinquishes and forever disavows and discharges any and all claims, demands, liabilities, obligations, debts, losses, injuries, costs, remedies, damages (including general, special, consequential, incidental, exemplary, punitive, etc.) and causes of action of any kind or character, in law or in equity, whether direct or indirect, known or unknown, presently existing or arising in the future, that each of them may have against one another, with respect to (a) the PolicyScout Lawsuit; (b) the Human Lawsuit; (c) any communications, telephonic or otherwise, between them; (d) any claims or controversies regarding any statements published or spoken against the other party; and (e) any costs, attorneys' fees or expenses incurred with respect to the claims identified herein. The foregoing releases and waivers shall extend to the PolicyScout and its shareholders, officers, directors, employees, attorneys, agents and assigns. This release and waiver is intended to be construed as broadly as possible.

It is agreed and understood that as to the matters released herein, the releases being provided apply to all injuries and damages, whether now known or unknown, and whether now existing or which may result in the future.

The Parties acknowledge that after they sign the Agreement, they may discover facts in addition to or different from those the Parties now know or believe to exist with respect to the claims released above and that if known or suspected at the time of executing this Agreement may have materially affected this Agreement. Nonetheless, the Parties agree to, and do hereby, waive and relinquish all rights afforded to them under California Civil Code section 1542, or any similar law of any State or territory of the United States or other jurisdiction.

The foregoing releases and waivers shall extend to PolicyScout and its shareholders, officers, directors, employees, attorneys, agents and assigns. This release and waiver are intended to be construed as broadly as possible.

Additionally, the Parties agree that this Agreement may be pleaded as a full and complete defense to any and all claims and causes of action being released in accordance with this Agreement, and the Parties hereto consent that it may be used as the basis for an injunction to halt any action, suit or other proceeding based upon claims released by this Agreement.

2. **Consideration.**

a. Dismissal With Prejudice. Within three (3) days of Human's filing Notice of Settlement, the Parties shall jointly move the Missouri and Utah courts for dismissal of the Human Lawsuit and the PolicyScout Lawsuit with prejudice, and each party will bear their own costs and attorney fees, to include waiver of the attorney fee award based on the improper removal to Missouri under Case No. 4:23-cv-01377-SEP.

b. Representations and Warranties. As material inducement for PolicyScout's entering into this Agreement, Human represents and warrants as follows: (1) Human does not submit his contact information through websites with the intent of generating calls for purposes of pursuing demands or lawsuits under TCPA or similar state laws; (2) Human did not intentionally submit his information to PolicyScout; and (3) Human will never in the future submit any contact information to any website owned, operated, or controlled by PolicyScout, or that otherwise identifies PolicyScout as a party who may contact Mr. Human.

3. **Notice and Cure.**

a. Within three (3) days of the execution of this Agreement, Human shall provide to PolicyScout a list of each and every phone number he presently has. PolicyScout will only use the phone numbers to ensure they are added to PolicyScout's internal Do Not Call List.

b. In the event Human receives any telephonic communication from, or on behalf of, PolicyScout in the future, to any phone number produced pursuant to 3.a. herein above, or any other phone number Human has not disclosed ("Future Communication"), Human may provide details of the Future Communication, including date, time, caller phone number, caller name, and recipient phone number, to PolicyScout within ten (10) days of Human's receipt of the Future Communication. ("Communication Notice").

c. Upon its receipt of a Communication Notice, PolicyScout thereafter has fourteen (14) days to add the phone number to PolicyScout's internal Do Not Call List. If PolicyScout adds the phone number to its Do Not Call List, and provides notice to Human regarding the same, the Releases and Waivers set forth herein above apply to Future Communications.

d. If Human elects not to provide a Communication Notice for any Future Communication to PolicyScout, he is forever precluded from pursuing claims against any party or otherwise complaining of the Future Communication in any manner.

4. **Costs and Fees.**

Each party to this Agreement shall bear its own costs and fees incurred in relation to this Agreement and all the claims and counterclaims which are released.

5. **Notice.**

a. To PolicyScout: PolicyScout
Attn: Compliance Officer
18080 S River Front Parkway, Suite 500
South Jordan, UT 84095

AND with a copy by email to:

Jordan Cameron
jordan@cameronringwood.com

b. To Human:

Edwin V. Butler
edbutler@butlerlawstl.com

6. **Choice of Law and Venue.**

This Agreement shall be interpreted and construed pursuant to the laws of the State of Utah. In the event any party hereto commences an action to enforce the terms hereof, the only proper venue for such action shall be the courts location in Utah. Each party submits to the jurisdiction of the courts located in Utah.

7. **No Admission of Fault, Liability and Non-Disparagement.**

It is understood and agreed that this Agreement and the performance of other obligations herein are made and entered into for the sole purpose of compromising disputed claims and this Agreement shall not be construed as an admission of liability by any party, liability being expressly denied by each party. Human agrees not to disparage PolicyScout, as to the issues being settled and released by this Settlement Agreement or any other issue. PolicyScout agrees not to disparage Human as to any issue being settled or any other issue. Each Party agrees not to

publicly publish this agreement to any other party in any other pending or future litigation or proceeding or on the internet unless required by the Court. If asked about this matter, the Parties are free to state that the matter settled without the payment of money or monetary consideration of any kind.

8. **Binding Agreement.**

This Agreement shall be binding upon each the parties hereto and shall inure to the benefit of each of the parties and their respective heirs, successors, attorneys, accountants, agents, partners, servants, employees, administrators, directors, officers, shareholders, trustees, insurers, representatives, and assigns.

9. **Enforcement.**

If any legal action or other proceeding is brought for the enforcement of this Agreement or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this agreement, the prevailing party shall be entitled to recover his, her or its reasonable attorney's fees and other fees and costs incurred in any such action or proceeding in addition to any other relief to which such party may be entitled.

10. **No Reliance.**

The Parties represent and warrant that, in executing and entering into this Agreement, they are not relying and have not relied upon any representation, promise or statement made by anyone which is not recited, contained or embodied in this Agreement. Furthermore, each of the parties to this Agreement has received independent legal advice or has had the opportunity to receive independent legal advice, from such Party's respective attorneys with respect to the advisability of executing this Agreement. The Parties are entering into this Agreement wholly of their own free will and volition.

11. **Entire Agreement.**

This Agreement comprises and contains the entire agreement between the Parties respecting the matters set forth in this Agreement, and supersedes and replaces all prior negotiations, understandings, proposed agreements and agreements between the Parties, written or oral. Neither Party has made any statement, representation or promise, other than as expressly set forth herein, to any other Party in entering into this Agreement, which has been relied upon by any other Party entering into this Agreement.

12. **Modification and Amendment.**

This Agreement may not be modified or amended in any way, except by a writing signed by the Party to be charged therewith.

13. **Construction of this Agreement.**

The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any Party hereto. Both Parties have participated in drafting this Agreement, which is the result of negotiations between the Parties, all of which have been represented by counsel during such negotiations or have had the opportunity to be represented by counsel. Accordingly, for purposes of interpreting this Agreement, it shall be considered that this Agreement was jointly drafted by all of the Parties. The Parties understand and expressly assume the risk that any fact not recited, contained or embodied herein may turn out hereafter to be other than, different from, or contrary to the facts now known to them or believed by them to be true. Nevertheless, the Parties intend by this Agreement to release finally, fully and forever, all matters released hereunder and agree that this Agreement shall be effective in all respects notwithstanding any such difference in facts, and shall not be subject to termination, modification or rescission by reason of any such difference in facts.

14. **Assignment.**

Unless otherwise disclosed by either Party, the Parties have not made or suffered any assignment, subrogation, hypothecation or other disposition of any claim, right, title, interest, demand or obligation it may possess relating to the matters set forth herein.

15. **Authority of Signatories.**

Each of the Parties to this Agreement represents and warrants that he/she/it is authorized to enter into this Agreement and that any required consents, authorizations, or approvals have been obtained.

16. **Counterparts; Facsimile and PDF Signatures.**

This Agreement may be executed in counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same Agreement. Facsimile and PDF signatures shall have the same force and effect as original signature.

**PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

IN WITNESS WHEREOF, the undersigned do hereby execute this agreement on the date first referenced above.

| POLICYSCOUT, LLC | DAN HUMAN |
| --- | --- |
| | Dan Human 1.22.24 |
| By: | By: Dan Human |
| Title: | |

## CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE

**THIS CONFIDENTIAL SETTLEMENT AGREEMENT and GENERAL RELEASE** ("Agreement") executed on and as of the date set forth in the signature block below, by and between, on one side, DANIEL HUMAN, his spouses and his heirs, successors and/or assigns ("Plaintiff" or "Human"), and on the other side, HEALTHMARKETS INSURANCE AGENCY, INC. ("HealthMarkets") and USHEALTH ADVISORS, LLC ("USHA"), including any of their respective parents, subsidiaries, affiliates, predecessors, successors, future acquisitions, assigns, officers, directors, attorneys, agents, representatives, independent contractors, and employees, including but not limited to, any UnitedHealth Group related entities and all of its parents, subsidiaries, affiliates, predecessors, successors, future acquisitions, assigns, officers, directors, attorneys, agents, representatives, independent contractors, and employees (collectively, "Defendants")[1] ("Human" and "Defendants" may be referred to singularly as a "Party" or collectively as the "Parties").

WHEREAS, on November 8, 2023, Human filed a Complaint against USHA in the Circuit Court of the Twenty-First Judicial Circuit in and for St. Louis County, Missouri, which USHA removed to the United States District Court for the Eastern District of Missouri on December 11, 2023, *Human v. USHEALTH Advisors, LLC*, Case No. 4:23-cv-01586, asserting individual and class claims against USHA under the Missouri Revised Statutes § 407.1098.1 and § 407.1076 ("RSMo") and Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), based upon calls and text messages that Human purportedly received that were allegedly placed by or at the direction of USHA.

WHEREAS, on December 21, 2023, Human filed a Complaint against HealthMarkets in the Circuit Court of the Twenty-First Judicial Circuit in and for St. Louis County, Missouri, which HealthMarkets removed to the United States District Court for the Eastern District of Missouri on February 2, 2023, *Human v. HealthMarkets Insurance Services, Inc.*, Case No. 4:24-cv-00187-MTS, asserting individual and class claims against HealthMarkets under the Missouri Revised Statutes § 407.1098.1 and § 407.1076 ("RSMo") and Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), based upon calls and text messages that Human purportedly received that were allegedly placed by or at the direction of HealthMarkets (Case No. 4:23-cv-01586 and Case No. 4:24-cv-00187-MTS will be referred to collectively as the "Lawsuits").

WHEREAS, Defendants expressly denied and disputed, and continue to deny and dispute, each of the allegations in the Lawsuits and any and all liability to Human or to the putative class members, and admit no wrongdoing of any kind nor any liability, nor acknowledge any breach of any agreement, warranty, statute, or law; and

---

[1] For the avoidance of doubt, the term "Defendants" includes for all purposes of this Agreement UnitedHealth Group Incorporated ("UHG") and all entities identified as subsidiaries of UHG in UHG's most recent Form 10-K Annual Report filed with the Securities and Exchange Commission, at Exhibit 21.1 (available at https://www.sec.gov/Archives/edgar/data/731766/000073176622000008/0000731766-22-000008-index.htm and https://www.sec.gov/Archives/edgar/data/731766/000073176622000008/unhex21112312021.htm).

WHEREAS, without any admission as to fault, liability or wrongdoing or as to the validity of the other Party's positions or allegations, Parties desire to avoid the further expense and uncertainties of litigation and to settle and voluntarily compromise any and all claims or causes of action that Human had, has, or may have had at any time against Defendants, including those that relate in any way to Human's claims or allegations set forth in the Lawsuits;

NOW, THEREFORE, for and in consideration of the promises, covenants, and agreements contained herein, and other good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Affirmation of Recitals. The Parties agree, represent, and warrant that the recitals set forth above are true and correct. The recitals are incorporated herein by this reference.

2. Payment. The Parties have agreed to settle the Lawsuits for a total payment by Defendants to Human in the amount of Ten Thousand U.S. Dollars (US $10,000.00) (the "Total Settlement Payment"). The Total Settlement Payment shall resolve any and all claims or causes of action that Human had, has, or may seek to assert in the future against Defendants, which in any way are based upon, arise out of, or otherwise relate to Human's claims or allegations set forth in the Lawsuits or that could have been set forth in the Lawsuits, inclusive of attorneys' fees, costs, or other monies. The Total Settlement Payment shall be made by check mailed to the payee, Butler Law Group, LLC, at [insert address], within 21 days upon receipt by counsel for Defendants of the later of both a completed and fully executed Settlement Agreement, a Form w9 completed by Human, and a Form W9 completed by the Butler Law Group, LLC.

3. Notice of Settlement and Dismissal. The Parties agree that a Stipulation of Dismissal with Prejudice of the Lawsuits shall be filed by Human within five (5) calendar days of the execution of this Agreement. The provisions of this Paragraph are in furtherance of and not in limitation to this Settlement Agreement. For Case No. 4:23-cv-01586, the Stipulation of Dismissal shall be worded as follows: "The Plaintiff Daniel Human, and Defendant, USHEALTH Advisors, LLC, by and through their respective attorneys, and pursuant to Fed. R. Civ. P. 41(a), hereby stipulate and agree to the dismissal with prejudice of Human's claims against Defendant. Each Party shall bear their own respective costs and attorneys' fees. This Stipulation for Dismissal disposes of the entire action." For Case No. 4:24-cv-00187-MTS, the Stipulation of Dismissal shall be worded as follows: "The Plaintiff Daniel Human, and Defendant, HealthMarkets Insurance Services, Inc., by and through their respective attorneys, and pursuant to Fed. R. Civ. P. 41(a), hereby stipulate and agree to the dismissal with prejudice of Human's claims against Defendant. Each Party shall bear their own respective costs and attorneys' fees. This Stipulation for Dismissal disposes of the entire action."

4. Release. The Parties hereby release, acquit, satisfy, and forever discharge each other and, for Defendants, including their past, present, and future officers, representatives, directors, managers, shareholders, members, employees, predecessors, successors, assigns, affiliates, subsidiaries, parent and sister entities, trusts, beneficiaries, heirs, attorneys, principals, partners, joint venturers, insurers, agents, vendors, independent contractors, estates, and

any entities in which they may have a controlling interest (the Defendants released parties are collectively referred to as the "Defendants Released Parties") from any and all liabilities, claims, actions, causes of action, suits, debts, liens, rights, duties, obligations, agreements, promises, representations, damages, sums of money, accounts, reckonings, costs (including costs of suit and attorneys' fees and expenses), claims for attorneys' fees, claims for costs, claims for any distributions (including without limitation distributions for taxes), or demands, of whatever nature, character, type, or description, whether known or unknown, existing or potential, accrued or unaccrued, or suspected or unsuspected, which the Parties may have or assert, or may hereafter have or assert, against each other. This Release does not include a release of the Parties' obligations under the terms of this Agreement.

Human expressly waives and relinquishes any and all rights and benefits that he may have under, or that may be conferred upon him by the laws of the state of Missouri, or any other law, including but not limited to any other law of any state or territory that is similar, comparable, or equivalent to the laws of the state of Missouri, to the fullest extent that he may lawfully waive such rights or benefits pertaining to the released claims and/or Lawsuit.

Human further understands, acknowledges, has been advised by his own independent attorneys, and agrees that the Release set forth in this Section 4 of this Settlement Agreement applies to all claims for all types of injuries, damages, penalties, attorneys' fees, costs, or any other losses of any kind to Human, whether they are known or unknown, foreseen or unforeseen, or patent or latent, which Human may have against the Defendants Released Parties. Accordingly, the Release set forth in this Section 4 of this Settlement Agreement specifically extends to claims Human does not know of or suspects to exist in his favor as of the date of this Settlement Agreement.

Human is aware that there are pending, or may be filed in the future, class action lawsuits against some or all of the Defendants and/or Defendants Released Parties regarding purported violations of the TCPA, and claims similar to those alleged by Human in the Lawsuits. Human agrees to, and understands that, this Settlement Agreement and Release bars him from participating as a class member in any class action(s) against any of the Defendants and/or Defendants Released Parties under any purported violation of the TCPA, the Federal Trade Commission's Telemarketing Sales Rule ("TSR"), or any other federal, state, common law, or statutory claims. Plaintiffs expressly waive and relinquish any and all rights and benefits that they may have to participate in any putative and/or actual class action against any of the Defendants and/or Defendant Released Parties.

5. <u>Representations and Warranties</u>. Human represents and warrants that:

   a. He is, and has been at all times relevant here, the subscriber and regular user of all telephone number(s) at issue in the Lawsuits and at all times has retained the legal rights relative to the use of the telephone number(s) at issue in this Lawsuits.

b. Has never transferred the right to primary use of the telephone number(s) at issue in the Lawsuits to anyone else, including but not limited to any of his employees and/or agents.

All warranties and representations made herein are not mere recitals and survive the execution of the Agreement.

6. Counsel Representations and Warranties. On behalf of themselves and their respective law firms, counsel of record for Human represent, warrant and agree that:

   a. They do not currently represent any other client, clients or individuals in connection with any claims against Defendants;

   b. They have no present intention to solicit or represent new clients for the purpose of bringing claims against Defendants relating to the subject matter of the Lawsuits;

   c. They do not currently have, and are not currently aware of any additional individuals or entities with any claims against Defendants; and

   d. They have not referred to any attorney, law firm, or agent thereof any actual or potential claim against Defendants.

Counsel for Human make these representations freely and voluntarily. All Parties acknowledge and agree that the foregoing terms do not, and shall not be construed to, limit Human's counsel's right or ability to practice law going forward.

7. Covenants and Provision of Telephone Numbers; Right to Cure. Human agrees to provide Defendants with all of his and any member of his household's current telephone numbers, including, but not limited to, cellular, landline, call-forwarding, ring/master (or similar technology), Google Voice and Internet telephone numbers etc., within five (5) business days of the execution date of this Agreement. Human further agrees to notify Defendants within 30 days upon his acquisition of any new telephone numbers, including, but not limited to, cellular, landline, call-forwarding, ring/master (or similar technology), Google Voice and Internet telephone numbers etc. Defendants agree to place all of Human's current telephone numbers on any internal Do Not Call Lists within 31 days upon Defendants' receipt of any such telephone numbers from Human. To the extent Human or any member of his household subsequently request to be called by any person or entity associated with Defendants, then any such calls from Defendants would not be subject to the provisions of this Paragraph. In the event Human or a member of his household alleges they received a call from any Defendants to any of their telephone numbers, they shall provide notice to Defendants alleging same and providing all necessary information requested by Defendants to substantiate the circumstances relating to any alleged telephone calls or text messages, and Defendants shall have thirty (30) days from receipt of notice from Human or the member of his household to allow Defendants to ensure no further calls are made. Neither Human nor any member of his household shall have a legal claim for any telephone call or text message sent prior to the expiration of the 30 day cure period;

and neither Human nor any member of his household shall have a legal claim for any telephone call or text message unless the process set forth in this Paragraph 7 is first followed and only if he or the member of his household then receive another call or text message after the 30 day cure period (and only if Human and/or the member of this household did not otherwise request to receive a telephone call or text message).

8. No Admission of Liability. Nothing in this Settlement Agreement, nor any act (including, but not limited to, the execution of this Settlement Agreement) of Human or Defendants, nor any transaction occurring between Human and Defendants prior to the date hereof is or shall be treated, construed, or deemed as an admission by any Party hereto of any liability, fault, responsibility, or guilt of any kind to any other Party hereto or to any person, as to any allegation or claim, or otherwise, for any purpose whatsoever; all such liability, fault, responsibility, and guilt of any kind being expressly denied.

9. Legal Capacity. Human acknowledges that he has entered into this Settlement Agreement voluntarily and of his own free will, and has the legal capacity to execute this Settlement Agreement. Human further acknowledges that he has been represented by counsel in connection with the negotiation of this Settlement Agreement.

   Defendants acknowledge that they have entered into this Settlement Agreement voluntarily and of their own free will, and that the representative(s) signing for Defendants, respectively, has the legal capacity to execute this Settlement Agreement on behalf of Defendants, respectively. Defendants further acknowledge that they have been represented by counsel in connection with the negotiation of this Settlement Agreement.

10. Confidentiality. As a material condition of this Settlement Agreement, the Parties expressly agree that except as otherwise expressly provided herein or as may be required by applicable law, regulation, court order or order of governmental authority, or as may be required to effectuate the terms of this Settlement Agreement, the settlement reached in this Settlement Agreement as stated herein, the terms and/or matters stated in this Settlement Agreement, and any discovery produced in the Lawsuits by any Party or nonparty (the "Confidential Information") is and shall remain confidential. Notwithstanding the foregoing, the terms of this Settlement Agreement may be disclosed by the Parties to their respective legal advisors, financial advisors, accountants, and other third-party professionals to the extent necessary to fulfill or comply with legal, corporate, or regulatory obligations. A breach of this confidentiality may result in a lawsuit filed against the breaching party for damages and/or injunctive relief; and, in the event such a lawsuit is required, the breaching party shall be responsible for attorneys' fees and costs incurred in bringing the action, including any appeals that may be necessary. If asked, the Parties shall state only that "the matter has settled".

11. Nondisparagement. The Parties shall not disparage each other in any way. If asked, the Parties shall state only that "the matter has settled".

12. Entire Agreement. This Settlement Agreement supersedes all prior discussions and agreements among the Parties hereto with respect to the subject matter hereof and with

respect to the transactions set forth in this Settlement Agreement, and constitutes the sole and entire agreement of the Parties with respect thereto. Any representation, inducement, promise, or agreement, whether oral or written, among the Parties hereto with respect to the transactions described herein that are not embodied herein shall be of no force and effect. The terms of this Settlement Agreement are contractual and not merely a recital.

13. Modifications. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the Parties. No waiver of any provisions of this Agreement shall be deemed or constitute a continuing waiver. No waiver shall be binding unless set forth in writing and signed by the Party making the waiver.

14. Severability. If any provision of this Settlement Agreement shall be found by a court to be void, voidable, invalid, or unenforceable, the remaining portions shall remain in full force and effect.

15. Counterparts. This Settlement Agreement may be executed by facsimile transmission and in counterpart originals by each Party that together shall constitute one single agreement as between the Parties. True and correct copies of the fully executed Settlement Agreement will be effective to enforce the terms and conditions set forth herein.

16. Choice of Law and Venue. The Parties agree that this Settlement Agreement shall be interpreted in accordance with the laws of the State of Texas, without regard to any choice of laws principles. The exclusive venue for any disputes arising out of or relating to this Settlement Agreement shall be a court of competent jurisdiction sitting in Tarrant County, Texas. The Parties further agree to irrevocably waive any right to a jury trial in any action for breach of the provisions of this Agreement, including, but not limited to, the enforcement of this Agreement.

17. Taxable Consequences. Each Party agrees to be responsible for his/its own tax consequences arising out of or related to this Settlement Agreement, if any; each Party agrees that he/it is not relying upon any representation, opinion, or statement by any other Party to this Settlement Agreement. This provision constitutes part of the consideration for the Settlement Agreement.

18. Binding Effect. This Settlement Agreement shall be binding upon, and inure to the benefit of all Parties, including, but not limited to, the past, present, or future legal successors, subrogees, assigns, transferees, grantees, and/or heirs of each Party, and, to the extent expressly provided, shall obligate, extend to, and inure to the benefit of the Released Parties.

19. No Presumption Against Drafter. Should any provision of this Settlement Agreement require interpretation or construction, then this Settlement Agreement shall be interpreted and construed without any presumption that the provisions of this Agreement are to be construed against the Party which itself or through its agents or attorneys prepared this Agreement. The Parties and their attorneys have fully and equally participated in the preparation, negotiation, review and approval of this Agreement.

20. Authority. Each of the Parties represents that the person signing this Settlement Agreement on its behalf has the authority to execute this document and thereby bind it, and each of the persons signing this Agreement represents that he or she has the authority to execute this document on behalf of the entity for which he or she is signing.

21. Representation of Counsel. The Parties acknowledge that they have received or had the opportunity to receive the advice of independent counsel with respect to all matters concerning this Settlement Agreement, and that the terms of this Settlement Agreement are fully understood and voluntarily accepted by each Party.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**SIGNATURE PAGE**

IN WITNESS WHEREOF, this Settlement Agreement has been executed by the undersigned on the dates below indicated.

Dated: April ___, 2024

USHEALTH Advisors, LLC
Print Name: ______________________
Title: ______________________

Dated: April ___, 2024

HealthMarkets Insurance Agency, Inc.
Print Name: ______________________
Title: ______________________

Dated: April 16, 2024

Daniel Human
Plaintiff

Dated: April 16th, 2024

Edwin V. Butler
(As to Paragraph 6 only)
Print Name: Edwin V. Butler
Title: Attorney

# CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is made and entered into as of the date of the last signature below, by and between Daniel Human ("Human") and Call Trader, LLC, d/b/a thehealthscout.com, Brook Whitmore, Shivani Gupta, John Dougherty, and Kiran Mathew (collectively the "Defendants" or "Call Trader") (Human and Defendants are collectively referred to as the "Parties").

## RECITALS

The following recitals are confirmed by the Parties as true and correct and are a substantive and contractual part of this Agreement.

**WHEREAS,** Human asserted claims against Defendants for specific violation(s) of the Telephone Consumer Protection Act, Missouri Telemarketing and No Call List Law, among other claims asserted in written correspondence and a complaint sent to the Defendants (collectively, "Allegations"). The case was removed to the United States District Court for the Eastern District of Missouri and was styled as Human v. Call Trader, et al., 4:23-cv-00843.

**WHEREAS,** Defendants deny the Allegations in their entirety.

**WHEREAS,** the Parties now wish to resolve all disputes between them without the further costs of litigation and without admission of any liability. This includes any and all disputes or claims that Human may have against the Defendant Released Parties (defined below), known or unknown, or asserted, unasserted, or assertable by him at the time he executes this Agreement, including, without limitation, including the allegations in the First Amended complaint and concrete injuries to his rights to privacy and seclusion evinced therein.

**NOW, THEREFORE,** in consideration of the mutual promises and payment set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. ***Payment and Other Consideration***. Defendants will pay the total sum of Six Thousand Dollars and No Cents ($6,000.00) (the "Payment") to Human inclusive of all damages for personal injuries stated, statutory penalties, costs, expenses, and attorneys' fees, within 5 days of receipt by Defendants of Human's execution of this Agreement and for each party. The funds are to be ACH transferred into the Butler Law Group's trust account within that time frame, or a settlement check is to be delivered to Plaintiff's counsel's office within that period. Counsel will provide all ACH instructions upon request.

2. ***Mutual Release.*** UPON EXECUTION OF THIS AGREEMENT, HUMAN ON BEHALF OF HIMSELF IN CONSIDERATION OF THE ACTS AND PROMISES DESCRIBED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, HEREBY RELEASES AND FOREVER DISCHARGES ON BEHALF OF HIMSELF AND ON BEHALF OF ANY OF HIS CURRENT AND FORMER LEGAL REPRESENTATIVES AND HEIRS, DEFENDANTS CALL TRADER, LLC D/B/A THEHEALTHSCOUT.COM, BROOK

WHITMORE, SHIVASNI GUPTA, JOHN DOUGHTERY, AND KIRAN MATHEW AND EACH OF THEIR RESPECTIVE AND CURRENT AND FORMER LEGAL REPRESENTATIVES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, ATTORNEYS, INSURERS, EMPLOYEES, MANAGERS, AGENTS, AFFILIATES, PARENTS, ASSIGNS, SUCCESSORS, AND OTHERS ACTING ON THEIR BEHALF, WHETHER NAMED IN THIS AGREEMENT OR NOT (COLLECTIVELY "DEFENDANT RELEASED PARTIES"), FROM ANY AND ALL KNOWN OR UNKNOWN CLAIMS, LAWSUITS, LIABILITIES, DEMANDS AND CAUSES OF ACTION OF ANY SORT AND ALL DAMAGES, IN LAW. EQUITY OR CONTRACT, WHICH HUMAN NOW HAS OR MAY HAVE, INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO OR ASSERTABLE IN CONNECTION WITH THE ALLEGATIONS, AND ANY AND ALL CLAIMS WHICH WERE OR COULD HAVE BEEN ASSERTED AGAINST THE DEFENDANT RELEASED PARTIES AS OF THE DATE HUMAN SIGNS THIS AGREEMENT.

HUMAN INTENDS, IN EXECUTING THIS AGREEMENT, AND DOING THE ACTS CALLED FOR HEREIN, THAT THIS AGREEMENT CONSTITUTES A FULL AND FINAL ACCORD AND SATISFACTION AND SETTLEMENT OF AND A BAR TO EACH AND EVERY ITEM HEREBY RELEASED. IN CONNECTION WITH SUCH SETTLEMENT, RELEASE AND WAIVER, HUMAN ACKNOWLEDGES THAT HE IS AWARE THAT HE MAY DISCOVER FACTS DIFFERENT FROM OR IN ADDITION TO THE FACTS HE NOW KNOWS OR BELIEVES TO BE TRUE.

3. ***Dismissal.*** Human represents and warrants that he has filed a lawsuit or other legal proceeding regarding the subject matter of this Agreement and he agrees file a motion to dismiss the lawsuit with prejudice or other legal proceeding as long as the terms of the Agreement are satisfied by Defendants. If Claimant has filed a lawsuit, then he agrees to file a joint stipulation of dismissal with prejudice of the lawsuit within 5 days of his receipt of the Payment.

4. ***Admissions.*** It is expressly understood and agreed to by and between the Parties hereto that by entering into this Agreement, none of the Parties hereto admit the truth of any allegations made by any other party. This Agreement, and the compromise of disputed claims herein, shall not constitute a confession of judgment by any party.

5. ***Confidentiality Covenant.*** From the date of this Agreement, except as otherwise specifically provided in this Agreement, neither the Parties nor anyone on their behalf shall disclose (in whole or in part) any of the terms or provisions of this Agreement to any other person or entity, unless and to the extent disclosure is compelled by an order from a court of competent jurisdiction, required by law, to secure advice from a legal or tax advisor, as necessary to disclose to lenders, auditors, potential successors, successors, or regulators, or as necessary to enforce this Agreement. The Parties may tell third parties that the Parties have amicably resolved their disputes.

6. ***Miscellaneous.*** The Parties acknowledge that each has had the assistance of counsel in this matter and that each has a full understanding of the above settlement and the

contents, meaning and effect of this Agreement, and it is their intent to enter herein, and that this Agreement is contractual in nature and not a mere recital, and that the settlement, discharge and release embodied in this Agreement shall inure to the benefit of the successors and assigns of each party.

7. ***Governing Law.*** This Agreement is governed by Missouri law without reference to its conflicts of laws provisions.

8. ***Effect of this Agreement.*** This Agreement is the entire Agreement between the Parties with respect to the subject matter hereof. It may be amended only by an agreement in writing, signed by the parties hereto.

9. ***Binding Effect.*** This Agreement is binding upon, and shall inure to the benefit of, the Parties hereto and the Defendant Released Parties and Human Released Parties.

10. ***Preparation of Agreement.*** Each party has cooperated in the preparation of this Agreement, and if any construction is made of this Agreement, each party shall be deemed to have cooperated in the drafting and preparation of this Agreement.

11. ***Captions.*** The captions and headings in this Agreement are for convenience of reference only and in no way define, limit or describe the scope or intent of any provisions or sections of this Agreement.

12. ***Execution in Counterparts.*** This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument. The Parties further agree that facsimile or electronic signatures shall be deemed sufficient to bind the Parties.

13. ***Severability.*** The invalidity, in whole or in part, of any term of this Agreement does not affect the validity of the remainder of this Agreement.

14. It is agreed by the parties, that any Call Trader LLC or legal representative can execute his/her signature on behalf of the collective Defendants, which is binding upon both Human and the collective Defendants to settle these disputes finally and fully.

IN WITNESS HEREOF, and intending to be legally bound hereby, the Parties hereto have executed this Agreement.

Daniel Human

This 4th day of August, 2023.

By:

Authorized Representative
Call Trader LLC, on Behalf of All Defendants.

Date: This __ day of August, 2023.

**CONFIDENTIAL SETTLEMENT AGREEMENT
AND GENERAL RELEASE OF CLAIMS**

This CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS (this "Agreement") is made effective as of the date of the final execution and delivery of this Agreement (the "Effective Date") by and between Daniel A. Human ("Plaintiff"), on the one hand, and STL Design and Build, LLC ("STLDB") and Thomas Levinson (collectively, "the STLDB Defendants"), on the other hand. For the purposes of this Agreement, Plaintiff and the STLDB Defendants each are referred to individually as a "Party" and collectively as the "Parties."

**RECITALS**

WHEREAS, a dispute has arisen between the Parties regarding alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq*., and regulations promulgated thereunder, 47 C.F.R. § 64.1200(c)(2) ("DNC"), and the Missouri Merchandising Practices Act, Mo. Rev. Stat. 407.1076, *et seq*. ("MMPA"), that Plaintiff alleges were made by or on behalf of the STLDB Defendants (the "Calls"); and

WHEREAS, Plaintiff filed a lawsuit against the STLDB Defendants and two Doe Defendants in the Missouri Circuit Court, County of St. Louis, captioned *Daniel Human v. STL Design and Build, LLC, et al.*, and denominated 23SL-CC00932; which lawsuit was removed by the STLDB Defendants to the United States District Court for the Eastern District of Missouri, where it now is denominated as Case No. 4:23-cv-00684-MTS ("the Lawsuit"), alleging that the STLDB Defendants violated the TCPA, the DNC and the MMPA as a result of the alleged Calls; and

WHEREAS, Defendant STLDB thereafter filed a counterclaim for fraud against Plaintiff ("the Counterclaim");

WHEREAS, the STLDB Defendants deny Plaintiff's allegations and deny that they, or either of them, violated the TCPA, the DNC, the MMPA or any other law; and

WHEREAS, Plaintiff denies STLDB's allegations of fraud; and

WHEREAS, solely for purposes of settlement and compromise and avoiding the burden, expense, and uncertainty of contested litigation, and without any admission of fault, wrongdoing or liability, the Parties now wish to resolve the dispute between them;

THEREFORE, the Parties, in consideration of the promises contained in this Agreement and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

**AGREEMENT**

1. Payment by the STLDB Defendants. Within ten (10) business days of Plaintiff providing a signed copy of this Agreement and counsel's W-9 to the STLDB Defendants' counsel, Mary Ann L. Wymore, the STLDB Defendants shall send a valid check payable to BUTLER LAW GROUP LLC in the total amount of Seven Thousand Five Hundred Dollars and No Cents ($7,500.00) ("Settlement Sum"), via overnight mail to plaintiff's counsel of record in the Lawsuit,

Edwin V. Butler, Butler Law Group, LLC, 1650 Des Peres Rd., Suite 220, St. Louis, Missouri 63131.

2. Dismissal. Immediately upon receipt by Plaintiff's counsel of the Settlement Sum, the Parties shall file a stipulation of dismissal of the Lawsuit and Counterclaim with prejudice, in a form attached hereto as Exhibit A, with all parties to bear their own costs and attorneys' fees.

3. General Release and Waiver. Upon timely receipt and clearing of the Settlement Sum, Plaintiff, individually, and on behalf of his agents, attorneys, representatives, insurers, trustees, heirs, devisees, successors, and assigns, and all those owning or sharing any interest in the telephone number (314) 915-2988, and/or any other telephone number for which Plaintiff is an accountholder or in which Plaintiff has an interest, unconditionally releases and forever discharges the STLDB Defendants and their respective past, present and future members, officers, owners, directors, agents, employees, attorneys, representatives, insurers, parents, subsidiaries, affiliates and commonly-controlled companies, if any, successors and assigns ("the STLDB Releasees") from any and all of Plaintiff's known and unknown claims, demands, liabilities, debts, accounts, obligations, actions and causes of action, at law or in equity or arbitration, that now exist or that may arise in the future based upon or arising out of omissions, acts, or events occurring prior to Plaintiff's execution of this Agreement whether suspected or unsuspected, including those arising under any theory of law, whether common, constitutional, statutory or other of any jurisdiction, foreign or domestic, which he had or may claim to have against any of them, including, without limitation, those arising out of or relating to: (i) the subject matter of this Agreement and the Calls; (ii) any acts or omissions by the STLDB Releasees occurring prior to the Effective Date, including any alleged violations of the TCPA, DNC, MMPA or other state or federal laws or regulations related to telemarketing; and (iii) any costs, attorneys' fees or expenses incurred by or on behalf of Plaintiff in connection with the subject matter hereof prior to the Effective Date (collectively, the "Released Claims").

4. Understanding of Release. Plaintiff acknowledges that he is aware that he may discover facts in addition to or different from those which he currently knows or believes to be true with respect to the subject matters of this Agreement, but that it is his intention hereby, fully, finally and forever to settle and release all matters which now exist, may exist, or previously existed by Plaintiff against the STLDB Defendants or any of the STLDB Releasees, whether or not now known or unknown, suspected or unsuspected. In furtherance of such intent, the releases given herein shall be and shall remain in effect as a full and complete release, notwithstanding the discovery or existence of any such additional or different facts.

5. Plaintiff's Covenant Not To Sue.

a. Plaintiff covenants not to sue or bring, or voluntarily assist others in suing or bringing, any type of claim, action, proceeding or investigation against the STLDB Releasees in connection with any matter covered by this Agreement and occurring before the Parties' complete execution of this Agreement.

b. Plaintiff warrants and represents that, with the exception of the Lawsuit, neither he nor any other person or entity acting for or on his behalf, is a party against any of

the STLDB Releasees in any currently pending lawsuit, charge, complaint, petition, or accusatory pleading with any federal, state or local governmental agency or in any court. In the event Plaintiff or anyone acting for or on his behalf has made any such lawsuit, complaint, charge, petition, or accusatory pleading with any federal, state or local governmental agency or in any court, Plaintiff hereby agrees to withdraw or cause to be withdrawn such lawsuit, complaint, charge, petition, or accusatory pleading immediately upon receipt of the Settlement Sum.

6. Telephone Numbers. Plaintiff agrees, represents, and warrants that his current telephone number, (314) 915-2988, is his sole current telephone number and that such telephone number is the only telephone number associated with the Calls at issue in the Lawsuit.

7. Counsel's Warranty: Plaintiff's attorney, Butler Law Group, LLC, hereby represents and warrants that at this time it is not aware of any other resolved or unresolved claims of any other individual or entity which can be asserted against any of the STLDB Releasees.

8. Confidentiality. Plaintiff agrees to keep the terms and existence of this Agreement, and all information and communications exchanged during settlement discussions and negotiations leading up to this Agreement (collectively "Confidential Information"), as strictly confidential, and shall not reveal Confidential Information to any other person or entity, except: (i) as required by law or order of the court or other government authority; (ii) as is reasonably necessary to be disclosed to Plaintiff's spouse, or to Plaintiff's accountants, tax advisors, or attorneys (provided the disclosing Party notifies such recipient of the disclosing Party's confidentiality obligations hereunder and obtains assurances that such recipient will ensure that Confidential Information is only disclosed in accordance with the terms of this Agreement); or (iii) as is reasonably necessary to the defense of any action to which the terms of this Agreement may apply.

9. No Admission of Fault or Liability. It is understood and agreed that this Agreement and the performance of other obligations herein, are for the sole purpose of compromising the disputed Released Claims, and that this Agreement shall not be construed as an admission of liability or wrongdoing by the STLDB Defendants or by Plaintiff.

10. Investigation. Each of the Parties has made such investigation of the facts pertaining to this Agreement, as it deems necessary. The Parties understand that if any fact with respect to any matter covered by this Agreement is found hereafter to be other than, or different from, the facts now believed by the parties to be true, each Party expressly accepts and assumes the risk of such possible difference in facts and agrees that this Agreement shall become and remain effective notwithstanding such different facts.

11. Consultation With Counsel. The Parties each hereby acknowledge that they have had an adequate opportunity to have this document reviewed by their attorneys, that the contents of this document have been explained to them by counsel, and that they understand the document in full.

12. Ownership of Claims. Plaintiff represents and warrants that: (i) Plaintiff is duly authorized to enter into this Agreement; (ii) Plaintiff is the subscriber of the telephone number alleged to have received the Calls; and (iii) Plaintiff has not sold, pledged, encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any of the Released Claims.

13. Attorneys' Fees. In the event that any action is taken to enforce the terms of this Agreement, the prevailing party shall be entitled to recover, in addition to other damages or remedies, its reasonable attorneys' fees, court costs, and other costs and expenses reasonably incurred in connection therewith.

14. Severability. Should any provision of the Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and any illegal or invalid part, term or provision shall be deemed not to be part of this Agreement.

15. No Waiver. The failure of any Party to insist upon compliance with any of the provisions of this Agreement or the waiver thereof, in any instance, shall not be construed as a general waiver or relinquishment by such Party of any other provision of this Agreement.

16. Modification and Amendment. This Agreement may not be waived, altered, changed, modified, amended or repealed, in whole or in part, except upon written agreement executed by all Parties to this Agreement.

17. Binding Effect. This Agreement shall be binding upon and benefit the Parties and their heirs, successors, and assigns.

18. No Reliance. The Parties each warrant that except as expressly set forth herein, no representations of any kind or character has been made to him or it by the other Party or his or its agents, representatives, employees or attorneys, or any other person, to induce him or it to execute this Agreement.

19. Multiple Counterparts. This Agreement may be executed in counterparts, each of which may be executed and delivered via facsimile or PDF electronic delivery with the same validity as if it were an ink-signed document and each of which shall be effective and binding on the Parties as of the Effective Date. Each such counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one and the same Agreement.

20. Miscellaneous.

a. The language of all parts of this Agreement shall, in all cases, be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties.

b. This Agreement shall be construed as drafted by the Parties jointly.

c. The titles of the various paragraphs are intended solely for convenience or reference, and are not intended and shall not be deemed for any purpose whatsoever to modify, explain or place any construction upon any of the provisions of this Agreement and shall not affect the meaning or interpretation of this Agreement.

d. All warranties and representations made herein are not mere recitals and shall survive the execution of this Agreement.

e. The Recitals set forth in the "WHEREAS" clauses above shall form a part of this Agreement as though fully incorporated in the body of this Agreement.

f. This Agreement contains the entire agreement of the Parties and supersedes any and all prior, written or oral, agreements among them concerning the subject matter hereof. There are no representations, agreements, arrangements or understandings, oral or written, among the Parties relating to the subject matter of this Agreement that are not fully expressed herein.

IN WITNESS WHEREOF the undersigned Parties do hereby execute this Agreement as of the date written below.

**DANIEL A. HUMAN**

[signature]
Daniel A. Human

Date: October 26, 2023

**STL DESIGN AND BUILD, LLC**

[signature]
Thomas Levinson,
its Managing Member

Date: October 30, 2023

**THOMAS LEVINSON**

[signature]
Thomas Levinson

Date: October 30 2023

Outlook

## Human v Fisher Investments

**From** Dan Human <danialahuman@icloud.com>
**Date** Tue 12/10/2024 11:28 AM
**To** edbutler@butlerlawstl.com <edbutler@butlerlawstl.com>

11:25

Fisher Investments
to me



### 13 Retirement Tips

Fisher Investments shares these 7 income strategies to help you retire comfortably.

Learn more

Sent from my iPhone

EXHIBIT
3
PENGAD 800-631-6989

Outlook

## Another Fisher ad!

**From** Dan Human <danialahuman@icloud.com>
**Date** Thu 12/12/2024 9:34 AM
**To** edbutler@butlerlawstl.com <edbutler@butlerlawstl.com>
[redacted]

9:33

Fisher Investments
to me



### 13 Retirement Tips

Fisher Investments shares these 7 income strategies to help you retire comfortably.

Learn more

Sent from my iPhone

DANIEL
HUMAN
SETTLEMENTS

| Defendant | Date | Amount | Attorney |
|---|---|---|---|
| GM | 3/24/25 | $0 | Butler |
| Frubbel | 9/18/24 | $3,000 | Butler |
| Intl Union of Police | 8/26/24 | $1,500 | Butler |
| NORC U Chi | 8/14/24 | $5,000 | Marks |
| Alleviate Tax | 8/13/24 | $5,000 | Butler |
| Am Fin Net | 8/6/24 | $3,750 | Butler |
| Alleviate Tax | Aug-24 | $5,000 | Butler |
| Facet Wealth | 7/19/24 | $12,000 | n/a |
| Dillon Auto | 4/29/24 | $7,500 | Marks |
| Dream Style Remodel | 4/18/24 | $7,500 | Butler |
| HealthMarket s/USHealth | 4/16/24 | $10,000 | Butler |
| DiCarlo Ins | 4/5/24 | $6,000 | Marks |
| Priority Auto | 3/28/24 | $8,500 | Marks |
| PolicyScout | 1/22/24 | $0 | Butler |
| Great Day Improvement s | 1/10/24 | $5,000 | Marks |
| Great Resort | 1/5/24 | $9,000 | Marks |
| STLDB | 10/30/23 | $7,500 | Butler |
| New Am Funding | 10/25/23 | $11,000 | Butler |
| Call Trader | 8/4/23 | $6,000 | Butler |
| Benepath | 8/1/23 | $12,000 | Butler |
| **TOTAL** | | **$120,250** | |

EXHIBIT
4
PENGAD 800-631-6989

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

**DANIEL HUMAN,**
**individually and on behalf of**
**all others similarly situated,**

**Plaintiffs,**

**v.** **Civil Action No. 4:24-cv-01634-NCC**

**VIKING STEEL STRUCTURES, LLC,**

**Defendant.**

**AGREED STIPULATION OF DISMISSAL**

COME NOW the parties, Plaintiff Daniel Human, individually and on behalf of all other similarly situated, *pro se*, and Defendant Viking Steel Structures, LLC, by and through its counsel, Brian R. Shank, and Evans & Dixon, L.L.C., and hereby stipulate and represent to the Court that the matters in dispute between them have been compromised and settled and jointly move the Court to dismiss this action with prejudice, with each of the parties to pay their own respective costs and fees.

Accordingly, it is the **ORDER** and **JUDGMENT** of the Court that Plaintiff's claims against Viking Steel Structures, LLC and all claims related thereto, are hereby **DISMISSED WITH PREJUDICE.**

ENTERED:

____________________________
HON. NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE



PENGAD 800-631-6989 EXHIBIT 5

Agreed to by:

/s/ Daniel Human
10423 Conway Rd.
St. Louis, Mo. 63131
Email: danh11polo@gmail.com
*Plaintiff Pro Se*

*/s/ Brian R. Shank*
Brian R. Shank (Mo. Bar No. 59955)
EVANS & DIXON, L.L.C.
211 N. Broadway, Suite 2500
St. Louis, MO 63102-2727
Phone: 314-552-4051
Facsimile: 314-884-4451
Email: bshank@evans-dixon.com
*Counsel for Viking Steel Structures, LLC*

FILED
JUN 04 2024
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

FILED
JUN 04 2...
JOAN M. GI...
CIRCUIT CLERK, ST...

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| DANIEL HUMAN, Plaintiff | ) | |
| v. | ) | No. 24SL-cc-01657 |
| DAVID RAMIREZ & ASSOC., INC., Defendants; | ) | |

NOTICE OF SETTLEMENT

COMES NOW, Plaintiff, Daniel Human, pro se and notifies the Court that the parties have reached terms to settle this matter without any further litigation.

Respectfully Submitted,

Daniel Human
10423 Conway Rd.
St. Louis, MO 63131
Pro se

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

EASTERN DISTRICT OF MISSOURI

Case number *(if known)*

Chapter you are filing under:

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

■ Chapter 13

☐ Check if this is an amended filing

# Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy

06/24

**The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.**

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

## Part 1: Identify Yourself

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **1. Your full name**<br>Write the name that is on your government-issued picture identification (for example, your driver's license or passport).<br>Bring your picture identification to your meeting with the trustee. | **Daniel**<br>First name<br>**A.**<br>Middle name<br>**Human**<br>Last name and Suffix (Sr., Jr., II, III) | First name<br>Middle name<br>Last name and Suffix (Sr., Jr., II, III) |
| **2. All other names you have used in the last 8 years**<br>Include your married or maiden names and any assumed, trade names and *doing business as* names.<br>Do NOT list the name of any separate legal entity such as a corporation, partnership, or LLC that is not filing this petition. | | |
| **3. Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number** (ITIN) | **xxx-xx-1266** | |

EXHIBIT
PENGAD 800-631-6989
6

Debtor 1 **Daniel A. Human** Case number *(if known)*

| | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 4. | **Your Employer Identification Number (EIN), if any.** | EIN | EIN |
| 5. | **Where you live** | **10423 Conway Road**<br>**Saint Louis, MO 63131**<br>Number, Street, City, State & ZIP Code | **If Debtor 2 lives at a different address:**<br>Number, Street, City, State & ZIP Code |
| | | **Saint Louis**<br>County | County |
| | | **If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address.<br><br>Number, P.O. Box, Street, City, State & ZIP Code | **If Debtor 2's mailing address is different from yours, fill it in here.** Note that the court will send any notices to this mailing address.<br><br>Number, P.O. Box, Street, City, State & ZIP Code |
| 6. | **Why you are choosing *this district* to file for bankruptcy** | *Check one:*<br>■ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) | *Check one:*<br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) |

## Part 2: Tell the Court About Your Bankruptcy Case

**7. The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)).* Also, go to the top of page 1 and check the appropriate box.

- ☐ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ■ Chapter 13

**8. How you will pay the fee**

- ■ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.
- ☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).
- ☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9. Have you filed for bankruptcy within the last 8 years?**

- ☐ No.
- ■ Yes.

| | | | | | |
|---|---|---|---|---|---|
| District | **EDMO - Ch. 7 - Discharged** | When | **11/18/94** | Case number | **94-46271** |
| District | **EDMO - Ch. 7 - Discharged** | When | **8/04/87** | Case number | **87-42251** |
| District | | When | | Case number | |

**10. Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

- ■ No
- ☐ Yes.

| | | | | | |
|---|---|---|---|---|---|
| Debtor | | | | Relationship to you | |
| District | | When | | Case number, if known | |
| Debtor | | | | Relationship to you | |
| District | | When | | Case number, if known | |

**11. Do you rent your residence?**

- ■ No. Go to line 12.
- ☐ Yes. Has your landlord obtained an eviction judgment against you?
  - ☐ No. Go to line 12.
  - ☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

## Part 3: Report About Any Businesses You Own as a Sole Proprietor

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

- ■ No. Go to Part 4.
- ☐ Yes. Name and location of business

Name of business, if any

Number, Street, City, State & ZIP Code

*Check the appropriate box to describe your business:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code, and are you a *small business debtor?***

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D)

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines.* If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

- ■ No. I am not filing under Chapter 11.
- ☐ No. I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.
- ☐ Yes. I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.
- ☐ Yes. I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

## Part 4: Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

- ■ No.
- ☐ Yes.

What is the hazard?

If immediate attention is needed, why is it needed?

Where is the property?

Number, Street, City, State & Zip Code

## Part 5: Explain Your Efforts to Receive a Briefing About Credit Counseling

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

### About Debtor 1:

*You must check one:*

- ■ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

  Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

- ☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

  Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

- ☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

  To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

  Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.
  If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

  Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

- ☐ **I am not required to receive a briefing about credit counseling because of:**

  - ☐ **Incapacity.**
    I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.
  - ☐ **Disability.**
    My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.
  - ☐ **Active duty.**
    I am currently on active military duty in a military combat zone.

  If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

### About Debtor 2 (Spouse Only in a Joint Case):

*You must check one:*

- ☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

  Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

- ☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

  Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

- ☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

  To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

  Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

  If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

  Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

- ☐ **I am not required to receive a briefing about credit counseling because of:**

  - ☐ **Incapacity.**
    I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.
  - ☐ **Disability.**
    My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.
  - ☐ **Active duty.**
    I am currently on active military duty in a military combat zone.

  If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

**Part 6: Answer These Questions for Reporting Purposes**

**16. What kind of debts do you have?**

16a. **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.

■ Yes. Go to line 17.

16b. **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.

☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts

**17. Are you filing under Chapter 7?**

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

■ No. I am not filing under Chapter 7. Go to line 18.

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No

☐ Yes

**18. How many Creditors do you estimate that you owe?**

■ 1-49
☐ 50-99
☐ 100-199
☐ 200-999
☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000
☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

**19. How much do you estimate your assets to be worth?**

■ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million
☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million
☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**20. How much do you estimate your liabilities to be?**

■ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million
☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million
☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**Part 7: Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**/s/ Daniel A. Human**
**Daniel A. Human**
Signature of Debtor 1

Signature of Debtor 2

Executed on **April 28, 2025**
MM / DD / YYYY

Executed on
MM / DD / YYYY

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

**/s/ David N. Gunn** Date **April 28, 2025**
Signature of Attorney for Debtor MM / DD / YYYY

**David N. Gunn**
Printed name

**Consumer Law Center of Saint Louis**
Firm name

**2249 South Brentwood**
**Saint Louis, MO 63144**
Number, Street, City, State & ZIP Code

Contact phone **(314) 961-9822** Email address **generalmail@thebkco.com**

**54880 MO**
Bar number & State

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Daniel A. Human** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | | | |
| | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI | | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

# Official Form 106Sum

## Summary of Your Assets and Liabilities and Certain Statistical Information 12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.**

### Part 1: Summarize Your Assets

| | Your assets<br>Value of what you own |
|---|---|
| 1. **Schedule A/B: Property** (Official Form 106A/B)<br>1a. Copy line 55, Total real estate, from Schedule A/B | $ **0.00** |
| 1b. Copy line 62, Total personal property, from Schedule A/B | $ **7,267.00** |
| 1c. Copy line 63, Total of all property on Schedule A/B | $ **7,267.00** |

### Part 2: Summarize Your Liabilities

| | Your liabilities<br>Amount you owe |
|---|---|
| 2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D)<br>2a. Copy the total you listed in Column A, *Amount of claim,* at the bottom of the last page of Part 1 of *Schedule D* | $ **0.00** |
| 3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F)<br>3a. Copy the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F* | $ **5,557.00** |
| 3b. Copy the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F* | $ **9,755.47** |
| **Your total liabilities** | $ **15,312.47** |

### Part 3: Summarize Your Income and Expenses

| | |
|---|---|
| 4. *Schedule I: Your Income* (Official Form 106I)<br>Copy your combined monthly income from line 12 of *Schedule I* | $ **1,627.00** |
| 5. *Schedule J: Your Expenses* (Official Form 106J)<br>Copy your monthly expenses from line 22c of *Schedule J* | $ **1,280.00** |

### Part 4: Answer These Questions for Administrative and Statistical Records

6. **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

■ Yes

7. **What kind of debt do you have?**

■ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

☐ **Your debts are not primarily consumer debts**. You have nothing to report on this part of the form. *Check this box* and submit this form to the court with your other schedules.

8. **From the *Statement of Your Current Monthly Income*:** Copy your total current monthly income from Official Form 122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14. $ **0.00**

9. **Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:**

| **From Part 4 on *Schedule E/F*, copy the following:** | **Total claim** |
|---|---|
| 9a. Domestic support obligations (Copy line 6a.) | $ **0.00** |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $ **5,557.00** |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $ **0.00** |
| 9d. Student loans. (Copy line 6f.) | $ **0.00** |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $ **0.00** |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | +$ **0.00** |
| 9g. **Total.** Add lines 9a through 9f. | $ **5,557.00** |

**Fill in this information to identify your case and this filing:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Daniel A. Human** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse, if filing) | | | |
| | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI | | |
| Case number | | | |

☐ Check if this is an amended filing

# Official Form 106A/B
# Schedule A/B: Property

**12/15**

**In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

## Part 1: Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

■ No. Go to Part 2.
☐ Yes. Where is the property?

## Part 2: Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☐ No
■ Yes

3.1 Make: **Nissan**
Model: **Rogue**
Year: **2018**
Approximate mileage: **156,000**
Other information:
**2019 Nissan Rogue Utility 4D SV 2WD I4**
**Location: 10423 Conway Road, Saint Louis MO 63131**

**Who has an interest in the property?** Check one
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this is community property** (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| Current value of the entire property? | Current value of the portion you own? |
|---|---|
| **$4,750.00** | **$4,750.00** |

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
*Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

■ No
☐ Yes

5 **Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here.............=>** **$4,750.00**

## Part 3: Describe Your Personal and Household Items

**Do you own or have any legal or equitable interest in any of the following items?**

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

6. **Household goods and furnishings**
*Examples:* Major appliances, furniture, linens, china, kitchenware

☐ No
■ Yes. Describe.....

**Household Goods & Furnishings: $1200.00**

**Location: 10423 Conway Road Saint Louis, MO 63131**
***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear, and depreciation of the property considering the length of time that the Debtor has owned the property.**
****the valuation assumes that a significant portion of the Debtor's property of this category is depreciated to the point where it has no re-sale value whatsoever.**
*****this is a layperson's valuation. the Debtor has no professional or specialized knowledge on how to value property or the likelihood of sale in the event of liquidation**
******The Debtor expressly reserves the right to assert a different value for insurance purposes and replacement**

**$1,200.00**

7. **Electronics**
*Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games

☐ No
■ Yes. Describe.....

**Electronics: $100.00**
**1 Computer, 1 Cell Phone**

**Location: 10423 Conway Road Saint Louis, MO 63131**
***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear, and depreciation of the property considering the length of time that the Debtor has owned the property.**
****the valuation assumes that a significant portion of the Debtor's property of this category is depreciated to the point where it has no re-sale value whatsoever.**
*****this is a layperson's valuation. the Debtor has no professional or specialized knowledge on how to value property or the likelihood of sale in the event of liquidation**
******The Debtor expressly reserves the right to assert a different value for insurance purposes and replacement**

**$100.00**

8. **Collectibles of value**
*Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles

■ No
☐ Yes. Describe.....

9. **Equipment for sports and hobbies**
*Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments

■ No
☐ Yes. Describe.....

10. **Firearms**
*Examples:* Pistols, rifles, shotguns, ammunition, and related equipment

■ No
☐ Yes. Describe.....

11. **Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
☐ No
■ Yes. Describe.....

**Wearing Apparel: $700.00**

**Location: 10423 Conway Road Saint Louis, MO 63131**
***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear, and depreciation of the property considering the length of time that the Debtor has owned the property.**
****the valuation assumes that a significant portion of the Debtor's property of this category is depreciated to the point where it has no re-sale value whatsoever.**
*****this is a layperson's valuation. the Debtor has no professional or specialized knowledge on how to value property or the likelihood of sale in the event of liquidation**
******The Debtor expressly reserves the right to assert a different value for insurance purposes and replacement** **$700.00**

12. **Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
☐ No
■ Yes. Describe.....

**Other Jewelry: $10.00**

**Location: 10423 Conway Road Saint Louis, MO 63131**
***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear, and depreciation of the property considering the length of time that the Debtor has owned the property.**
****the valuation assumes that a significant portion of the Debtor's property of this category is depreciated to the point where it has no re-sale value whatsoever.**
*****this is a layperson's valuation. the Debtor has no professional or specialized knowledge on how to value property or the likelihood of sale in the event of liquidation**
******The Debtor expressly reserves the right to assert a different value for insurance purposes and replacement** **$10.00**

13. **Non-farm animals**
*Examples:* Dogs, cats, birds, horses
■ No
☐ Yes. Describe.....

14. **Any other personal and household items you did not already list, including any health aids you did not list**
■ No
☐ Yes. Give specific information.....

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ............................................................................. **$2,010.00**

**Part 4:** Describe Your Financial Assets

**Do you own or have any legal or equitable interest in any of the following?**

**Current value of the portion you own?**
Do not deduct secured

claims or exemptions.

16. **Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
☐ No
■ Yes.........................................................................................................

| | |
|---|---|
| **Cash** | **$86.00** |

17. **Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
☐ No
■ Yes....................... Institution name:

| | | | |
|---|---|---|---|
| 17.1. | **Checking and Savings** | **First Community CU checking and savings** | **$421.00** |
| 17.2. | **Internet Based Deposit and Spending Account** | **Cash App** | **$0.00** |
| 17.3. | **Internet Based Deposit and Spending Account** | **Venmo** | **$0.00** |

18. **Bonds, mutual funds, or publicly traded stocks**
*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
■ No
☐ Yes.................. Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
■ No
☐ Yes. Give specific information about them..................
Name of entity: % of ownership:

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
■ No
☐ Yes. Give specific information about them
Issuer name:

21. **Retirement or pension accounts**
*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
■ No
☐ Yes. List each account separately.
Type of account: Institution name:

22. **Security deposits and prepayments**
Your share of all unused deposits you have made so that you may continue service or use from a company
*Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
■ No
☐ Yes. ..................... Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
■ No
☐ Yes............ Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
■ No

☐ Yes............ Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**

■ No
☐ Yes. Give specific information about them...

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements

■ No
☐ Yes. Give specific information about them...

27. **Licenses, franchises, and other general intangibles**
*Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses

■ No
☐ Yes. Give specific information about them...

**Money or property owed to you?**

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

28. **Tax refunds owed to you**

■ No
☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

29. **Family support**
*Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement

■ No
☐ Yes. Give specific information......

30. **Other amounts someone owes you**
*Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay, workers' compensation, Social Security benefits; unpaid loans you made to someone else

☐ No
■ Yes. Give specific information..

| Description | Current value |
|---|---|
| **Default Judgment in case #24SL-CC05499<br>Idaho Roofing Contractors<br>1565 Rolling Hills Dr.<br>Meridian, ID 83643<br>*the Debtor received a default judgment in the amount of $46,500 but he is not sure if it is collectable. the judgment debtor has been unresponsive, they are located out of state, and the Debtor is not sure if they have any assets upon which the judgment can attach.** | **Unknown** |
| **Default Judgment in case #24SL-CC05237<br>Vacation Ownership Brokerage, LLC<br>8545 Commodity Circle Ste 325<br>Orlando, FL 32819<br>*the Debtor received a default judgment in the amount of $40,000.50 but he is not sure if it is collectable. the judgment debtor has been unresponsive, they are located out of state, and the Debtor is not sure if they have any assets upon which the judgment can attach.** | **Unknown** |

| | |
|---|---|
| **Default Judgment in case #23SL-CC05215**<br>**Health HQ, Inc.**<br>**5465 Legacy Drive**<br>**Suite 650**<br>**Plano, TX 75024**<br>***the Debtor received a default judgment in the amount of $67,500.50 but he is not sure if it is collectable. the judgment debtor has been unresponsive, they are located out of state, and the Debtor is not sure if they have any assets upon which the judgment can attach.** | **Unknown** |

31. **Interests in insurance policies**
*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance

■ No
☐ Yes. Name the insurance company of each policy and list its value.

Company name: Beneficiary: Surrender or refund value:

32. **Any interest in property that is due you from someone who has died**
If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.

■ No
☐ Yes. Give specific information..

33. **Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
*Examples:* Accidents, employment disputes, insurance claims, or rights to sue

☐ No
■ Yes. Describe each claim.........

| | |
|---|---|
| **Pending legal claim against Health Enrollment Group, Inc. - 25SL-CC01422**<br>***the Debtor is representing himself pro se** | **Unknown** |
| **Pending legal claim against Brevo - 25SL-CC02700**<br>***the Debtor is representing himself pro se** | **Unknown** |
| **Pending legal claim against Golden State Advisors - 25SL-CC02137**<br>***the Debtor is representing himself pro se** | **Unknown** |

34. **Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**

■ No
☐ Yes. Describe each claim.........

35. **Any financial assets you did not already list**

■ No
☐ Yes. Give specific information..

36. **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here**........................................ **$507.00**

**Part 5:** **Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.**

37. **Do you own or have any legal or equitable interest in any business-related property?**

■ No. Go to Part 6.
☐ Yes. Go to line 38.

**Part 6:** **Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.**
If you own or have an interest in farmland, list it in Part 1.

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
■ No. Go to Part 7.
☐ Yes. Go to line 47.

**Part 7:** **Describe All Property You Own or Have an Interest in That You Did Not List Above**

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
■ No
☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** .................................... **$0.00**

**Part 8:** **List the Totals of Each Part of this Form**

| | | | | |
|---|---|---|---|---|
| 55. | **Part 1: Total real estate, line 2** | | | **$0.00** |
| 56. | **Part 2: Total vehicles, line 5** | **$4,750.00** | | |
| 57. | **Part 3: Total personal and household items, line 15** | **$2,010.00** | | |
| 58. | **Part 4: Total financial assets, line 36** | **$507.00** | | |
| 59. | **Part 5: Total business-related property, line 45** | **$0.00** | | |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | **$0.00** | | |
| 61. | **Part 7: Total other property not listed, line 54** | + **$0.00** | | |
| 62. | **Total personal property.** Add lines 56 through 61... | **$7,267.00** | Copy personal property total | **$7,267.00** |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | | | **$7,267.00** |

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Daniel A. Human** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | | | |
| | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI | | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

# Official Form 106C

## Schedule C: The Property You Claim as Exempt

4/25

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

**Part 1: Identify the Property You Claim as Exempt**

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

■ You are claiming state and federal nonbankruptcy exemptions. 11 U.S.C. § 522(b)(3)

☐ You are claiming federal exemptions. 11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **2018 Nissan Rogue 156,000 miles 2019 Nissan Rogue Utility 4D SV 2WD I4**<br>**Location: 10423 Conway Road, Saint Louis MO 63131**<br>Line from *Schedule A/B*: **3.1** | **$4,750.00** | ■ **$3,000.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **RSMo § 513.430.1(5)** |
| **Household Goods & Furnishings: $1200.00**<br>**Location: 10423 Conway Road Saint Louis, MO 63131**<br>***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear,**<br>Line from *Schedule A/B*: **6.1** | **$1,200.00** | ■ **$1,200.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **RSMo § 513.430.1(1)** |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Electronics: $100.00**<br>**1 Computer, 1 Cell Phone**<br><br>**Location: 10423 Conway Road Saint Louis, MO 63131**<br>***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and**<br>Line from *Schedule A/B*: **7.1** | **$100.00** | ■ **$100.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **RSMo § 513.430.1(1)** |
| **Wearing Apparel: $700.00**<br><br>**Location: 10423 Conway Road Saint Louis, MO 63131**<br>***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear, and depreciatio**<br>Line from *Schedule A/B*: **11.1** | **$700.00** | ■ **$700.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **RSMo § 513.430.1(1)** |
| **Other Jewelry: $10.00**<br><br>**Location: 10423 Conway Road Saint Louis, MO 63131**<br>***the valuation of this property is based on an estimation of a hypothetical liquidation estate sale (yard sale). The value factors in varying age, wear and tear, and depreciation o**<br>Line from *Schedule A/B*: **12.1** | **$10.00** | ■ **$10.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **RSMo § 513.430.1(2)** |
| **Checking and Savings: First Community CU checking and savings**<br>Line from *Schedule A/B*: **17.1** | **$421.00** | ■ **$421.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **RSMo § 513.430.1(3)** |

3. **Are you claiming a homestead exemption of more than $214,000?**
(Subject to adjustment on 4/01/28 and every 3 years after that for cases filed on or after the date of adjustment.)

■ No

☐ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

  ☐ No

  ☐ Yes



Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | Daniel A. Human | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | | | |
| | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI | | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

Official Form 106D

## Schedule D: Creditors Who Have Claims Secured by Property

12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).**

**1. Do any creditors have claims secured by your property?**

■ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

☐ Yes. Fill in all of the information below.

**Fill in this information to identify your case:**

Debtor 1: **Daniel A. Human**
First Name / Middle Name / Last Name

Debtor 2 (Spouse if, filing)
First Name / Middle Name / Last Name

United States Bankruptcy Court for the: EASTERN DISTRICT OF MISSOURI

Case number (if known)

☐ Check if this is an amended filing

## Official Form 106E/F
## Schedule E/F: Creditors Who Have Unsecured Claims 12/15

**Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY claims and Part 2 for creditors with NONPRIORITY claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Property (Official Form 106A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G). Do not include any creditors with partially secured claims that are listed in Schedule D: Creditors Who Have Claims Secured by Property. If more space is needed, copy the Part you need, fill it out, number the entries in the boxes on the left. Attach the Continuation Page to this page. If you have no information to report in a Part, do not file that Part. On the top of any additional pages, write your name and case number (if known).**

### Part 1: List All of Your PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims against you?**

☐ No. Go to Part 2.

■ Yes.

2. **List all of your priority unsecured claims.** If a creditor has more than one priority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. If a claim has both priority and nonpriority amounts, list that claim here and show both priority and nonpriority amounts. As much as possible, list the claims in alphabetical order according to the creditor's name. If you have more than two priority unsecured claims, fill out the Continuation Page of Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.

(For an explanation of each type of claim, see the instructions for this form in the instruction booklet.)

| | Total claim | Priority amount | Nonpriority amount |
|---|---|---|---|
| 2.1 **Internal Revenue Service** — Last 4 digits of account number **???** | **$5,557.00** | **$5,557.00** | **$0.00** |

Priority Creditor's Name

**PO Box 7346**
**Philadelphia, PA 19101-7346**
Number Street City State Zip Code

**When was the debt incurred?** 2023

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of PRIORITY unsecured claim:**

☐ Domestic support obligations
■ Taxes and certain other debts you owe the government
☐ Claims for death or personal injury while you were intoxicated
☐ Other. Specify

**Income tax**

### Part 2: List All of Your NONPRIORITY Unsecured Claims

3. **Do any creditors have nonpriority unsecured claims against you?**

☐ No. You have nothing to report in this part. Submit this form to the court with your other schedules.

■ Yes.

4. **List all of your nonpriority unsecured claims in the alphabetical order of the creditor who holds each claim.** If a creditor has more than one nonpriority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. Do not list claims already included in Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.If you have more than three nonpriority unsecured claims fill out the Continuation Page of Part 2.

**Total claim**

4.1 **Check Systems LLC**
Nonpriority Creditor's Name
**229 West Genesee Street**
**Buffalo, NY 14201**
Number Street City State Zip Code
**Who incurred the debt?** Check one.
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**
**Is the claim subject to offset?**
■ No
☐ Yes

**Last 4 digits of account number** — **$0.00**
**When was the debt incurred?**
**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
**Type of NONPRIORITY unsecured claim:**
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify **Notice Only**

---

4.2 **Fisher Investments, Inc. et. al.**
Nonpriority Creditor's Name
**c/o Watstein Terepka LLC**
**1055 Howell Mill Road**
**8th Floor**
**Atlanta, GA 30318**
Number Street City State Zip Code
**Who incurred the debt?** Check one.
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**
**Is the claim subject to offset?**
■ No
☐ Yes

**Last 4 digits of account number** **7MTS** — **Unknown**
**When was the debt incurred?** **2025**
**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☐ Unliquidated
■ Disputed
**Type of NONPRIORITY unsecured claim:**
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify **Order for attorney fees related to discovery sanctiions**

---

4.3 **Mercury/FBT**
Nonpriority Creditor's Name
**Attn: Bankruptcy**
**Po Box 84064**
**Columbus, GA 31908**
Number Street City State Zip Code
**Who incurred the debt?** Check one.
■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**
**Is the claim subject to offset?**
■ No
☐ Yes

**Last 4 digits of account number** **1871** — **$700.00**
**When was the debt incurred?** **Opened 11/21 Last Active 3/03/25**
**As of the date you file, the claim is:** Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
**Type of NONPRIORITY unsecured claim:**
☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify **Credit Card**

**4.4** **RDAC**
Nonpriority Creditor's Name
**PO Box 1489**
**Goodlettsville, TN 37070**
Number Street City State Zip Code

Last 4 digits of account number **$1,747.97**
When was the debt incurred? **Balance due as of 04/2025**

Who incurred the debt? Check one.
- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ Check if this claim is for a community debt

Is the claim subject to offset?
- ■ No
- ☐ Yes

As of the date you file, the claim is: Check all that apply
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Type of NONPRIORITY unsecured claim:
- ☐ Student loans
- ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
- ☐ Debts to pension or profit-sharing plans, and other similar debts
- ■ Other. Specify **Collection Account**

---

**4.5** **Receivable Solutions**
Nonpriority Creditor's Name
**1414 Main St.**
**Columbia, SC 29210**
Number Street City State Zip Code

Last 4 digits of account number **$7,307.50**
When was the debt incurred? **Balance due as of 04/2025**

Who incurred the debt? Check one.
- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ Check if this claim is for a community debt

Is the claim subject to offset?
- ■ No
- ☐ Yes

As of the date you file, the claim is: Check all that apply
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Type of NONPRIORITY unsecured claim:
- ☐ Student loans
- ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
- ☐ Debts to pension or profit-sharing plans, and other similar debts
- ■ Other. Specify **Collection Account - Mercy Hospital**

---

**4.6** **TeleCheck Services, Inc.**
Nonpriority Creditor's Name
**Attention: Bankruptcy Department**
**P.O. Box 4451**
**Houston, TX 77210-4451**
Number Street City State Zip Code

Last 4 digits of account number **$0.00**
When was the debt incurred?

Who incurred the debt? Check one.
- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ Check if this claim is for a community debt

Is the claim subject to offset?
- ■ No
- ☐ Yes

As of the date you file, the claim is: Check all that apply
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Type of NONPRIORITY unsecured claim:
- ☐ Student loans
- ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
- ☐ Debts to pension or profit-sharing plans, and other similar debts
- ■ Other. Specify **Notice Only**

## Part 3: List Others to Be Notified About a Debt That You Already Listed

**5. Use this page only if you have others to be notified about your bankruptcy, for a debt that you already listed in Parts 1 or 2. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the original creditor in Parts 1 or 2, then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Parts 1 or 2, list the additional creditors here. If you do not have additional persons to be notified for any debts in Parts 1 or 2, do not fill out or submit this page.**

## Part 4: Add the Amounts for Each Type of Unsecured Claim

**6. Total the amounts of certain types of unsecured claims. This information is for statistical reporting purposes only. 28 U.S.C. §159. Add the amounts for each type of unsecured claim.**

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 1** | 6a. | **Domestic support obligations** | 6a. | $ 0.00 |
| | 6b. | **Taxes and certain other debts you owe the government** | 6b. | $ 5,557.00 |
| | 6c. | **Claims for death or personal injury while you were intoxicated** | 6c. | $ 0.00 |
| | 6d. | **Other.** Add all other priority unsecured claims. Write that amount here. | 6d. | $ 0.00 |
| | 6e. | **Total Priority.** Add lines 6a through 6d. | 6e. | $ 5,557.00 |

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 2** | 6f. | **Student loans** | 6f. | $ 0.00 |
| | 6g. | **Obligations arising out of a separation agreement or divorce that you did not report as priority claims** | 6g. | $ 0.00 |
| | 6h. | **Debts to pension or profit-sharing plans, and other similar debts** | 6h. | $ 0.00 |
| | 6i. | **Other.** Add all other nonpriority unsecured claims. Write that amount here. | 6i. | $ 9,755.47 |
| | 6j. | **Total Nonpriority.** Add lines 6f through 6i. | 6j. | $ 9,755.47 |

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | Daniel A. Human | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | | | |
| | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI | | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

# Official Form 106G

## Schedule G: Executory Contracts and Unexpired Leases

12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the additional page, fill it out, number the entries, and attach it to this page. On the top of any additional pages, write your name and case number (if known).**

1. **Do you have any executory contracts or unexpired leases?**

■ No. Check this box and file this form with the court with your other schedules. You have nothing else to report on this form.

☐ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B:Property* (Official Form 106 A/B).

2. **List separately each person or company with whom you have the contract or lease. Then state what each contract or lease is for (for example, rent, vehicle lease, cell phone).** See the instructions for this form in the instruction booklet for more examples of executory contracts and unexpired leases.

| | Person or company with whom you have the contract or lease<br>Name, Number, Street, City, State and ZIP Code | State what the contract or lease is for |
|---|---|---|
| 2.1 | Name<br>Number Street<br>City State ZIP Code | |
| 2.2 | Name<br>Number Street<br>City State ZIP Code | |
| 2.3 | Name<br>Number Street<br>City State ZIP Code | |
| 2.4 | Name<br>Number Street<br>City State ZIP Code | |
| 2.5 | Name<br>Number Street<br>City State ZIP Code | |

**Fill in this information to identify your case:**

Debtor 1 **Daniel A. Human**
First Name Middle Name Last Name

Debtor 2
(Spouse if, filing) First Name Middle Name Last Name

United States Bankruptcy Court for the: EASTERN DISTRICT OF MISSOURI

Case number
(if known)

☐ Check if this is an amended filing

# Official Form 106H
## Schedule H: Your Codebtors

12/15

**Codebtors are people or entities who are also liable for any debts you may have. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, and number the entries in the boxes on the left. Attach the Additional Page to this page. On the top of any Additional Pages, write your name and case number (if known). Answer every question.**

**1. Do you have any codebtors?** (If you are filing a joint case, do not list either spouse as a codebtor.

■ No
☐ Yes

**2. Within the last 8 years, have you lived in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

■ No. Go to line 3.
☐ Yes. Did your spouse, former spouse, or legal equivalent live with you at the time?

**3. In Column 1, list all of your codebtors. Do not include your spouse as a codebtor if your spouse is filing with you. List the person shown in line 2 again as a codebtor only if that person is a guarantor or cosigner. Make sure you have listed the creditor on Schedule D (Official Form 106D), Schedule E/F (Official Form 106E/F), or Schedule G (Official Form 106G). Use Schedule D, Schedule E/F, or Schedule G to fill out Column 2.**

| | *Column 1:* **Your codebtor**<br>Name, Number, Street, City, State and ZIP Code | *Column 2:* **The creditor to whom you owe the debt**<br>Check all schedules that apply: |
|---|---|---|
| 3.1 | Name<br>Number Street<br>City State ZIP Code | ☐ Schedule D, line<br>☐ Schedule E/F, line<br>☐ Schedule G, line |
| 3.2 | Name<br>Number Street<br>City State ZIP Code | ☐ Schedule D, line<br>☐ Schedule E/F, line<br>☐ Schedule G, line |

Fill in this information to identify your case:

Debtor 1 **Daniel A. Human**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: EASTERN DISTRICT OF MISSOURI

Case number
(If known)

Check if this is:
☐ An amended filing
☐ A supplement showing postpetition chapter 13 income as of the following date:

MM / DD/ YYYY

# Official Form 106I

## Schedule I: Your Income

12/15

**Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse. If you are separated and your spouse is not filing with you, do not include information about your spouse. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

### Part 1: Describe Employment

1. **Fill in your employment information.**

If you have more than one job, attach a separate page with information about additional employers.

Include part-time, seasonal, or self-employed work.

Occupation may include student or homemaker, if it applies.

| | Debtor 1 | Debtor 2 or non-filing spouse |
|---|---|---|
| **Employment status** | ☐ Employed<br>■ Not employed | ☐ Employed<br>☐ Not employed |
| **Occupation** | | |
| **Employer's name** | | |
| **Employer's address** | | |
| **How long employed there?** | | |

### Part 2: Give Details About Monthly Income

**Estimate monthly income as of the date you file this form.** If you have nothing to report for any line, write $0 in the space. Include your non-filing spouse unless you are separated.

If you or your non-filing spouse have more than one employer, combine the information for all employers for that person on the lines below. If you need more space, attach a separate sheet to this form.

| | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|
| 2. **List monthly gross wages, salary, and commissions** (before all payroll deductions). If not paid monthly, calculate what the monthly wage would be. | 2. | $ 0.00 | $ N/A |
| 3. **Estimate and list monthly overtime pay.** | 3. | +$ 0.00 | +$ N/A |
| 4. **Calculate gross Income.** Add line 2 + line 3. | 4. | $ 0.00 | $ N/A |

Debtor 1 **Daniel A. Human** Case number (*if known*)

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| | **Copy line 4 here** | 4. | $ 0.00 | $ N/A |
| 5. | **List all payroll deductions:** | | | |
| 5a. | **Tax, Medicare, and Social Security deductions** | 5a. | $ 0.00 | $ N/A |
| 5b. | **Mandatory contributions for retirement plans** | 5b. | $ 0.00 | $ N/A |
| 5c. | **Voluntary contributions for retirement plans** | 5c. | $ 0.00 | $ N/A |
| 5d. | **Required repayments of retirement fund loans** | 5d. | $ 0.00 | $ N/A |
| 5e. | **Insurance** | 5e. | $ 0.00 | $ N/A |
| 5f. | **Domestic support obligations** | 5f. | $ 0.00 | $ N/A |
| 5g. | **Union dues** | 5g. | $ 0.00 | $ N/A |
| 5h. | **Other deductions.** Specify: | 5h.+ | $ 0.00 | + $ N/A |
| 6. | **Add the payroll deductions.** Add lines 5a+5b+5c+5d+5e+5f+5g+5h. | 6. | $ 0.00 | $ N/A |
| 7. | **Calculate total monthly take-home pay.** Subtract line 6 from line 4. | 7. | $ 0.00 | $ N/A |
| 8. | **List all other income regularly received:** | | | |
| 8a. | **Net income from rental property and from operating a business, profession, or farm** Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income. | 8a. | $ 0.00 | $ N/A |
| 8b. | **Interest and dividends** | 8b. | $ 0.00 | $ N/A |
| 8c. | **Family support payments that you, a non-filing spouse, or a dependent regularly receive** Include alimony, spousal support, child support, maintenance, divorce settlement, and property settlement. | 8c. | $ 0.00 | $ N/A |
| 8d. | **Unemployment compensation** | 8d. | $ 0.00 | $ N/A |
| 8e. | **Social Security** | 8e. | $ 0.00 | $ N/A |
| 8f. | **Other government assistance that you regularly receive** Include cash assistance and the value (if known) of any non-cash assistance that you receive, such as food stamps (benefits under the Supplemental Nutrition Assistance Program) or housing subsidies. Specify: **Social Security ($1627.00 actual amount)** | 8f. | $ 1,627.00 | $ N/A |
| 8g. | **Pension or retirement income** | 8g. | $ 0.00 | $ N/A |
| 8h. | **Other monthly income.** Specify: | 8h.+ | $ 0.00 | + $ N/A |
| 9. | **Add all other income.** Add lines 8a+8b+8c+8d+8e+8f+8g+8h. | 9. | $ 1,627.00 | $ N/A |

10. **Calculate monthly income.** Add line 7 + line 9. Add the entries in line 10 for Debtor 1 and Debtor 2 or non-filing spouse. — 10. $ **1,627.00** + $ **N/A** = $ **1,627.00**

11. **State all other regular contributions to the expenses that you list in *Schedule J*.**
Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives.
Do not include any amounts already included in lines 2-10 or amounts that are not available to pay expenses listed in *Schedule J*.
Specify: — 11. +$ **0.00**

12. **Add the amount in the last column of line 10 to the amount in line 11.** The result is the combined monthly income. Write that amount on the *Summary of Schedules* and *Statistical Summary of Certain Liabilities* and Related *Data*, if it applies — 12. $ **1,627.00**
**Combined monthly income**

13. **Do you expect an increase or decrease within the year after you file this form?**
- ■ No.
- ☐ Yes. Explain:

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | Daniel A. Human |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI |
| Case number (If known) | |

Check if this is:
☐ An amended filing
☐ A supplement showing postpetition chapter 13 expenses as of the following date:
MM / DD / YYYY

Official Form 106J

## Schedule J: Your Expenses

12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

### Part 1: Describe Your Household

1. **Is this a joint case?**
   ■ No. Go to line 2.
   ☐ Yes. **Does Debtor 2 live in a separate household?**
      ☐ No
      ☐ Yes. Debtor 2 must file Official Form 106J-2, *Expenses for Separate Household* of Debtor 2.

2. **Do you have dependents?** ■ No
   Do not list Debtor 1 and Debtor 2. ☐ Yes. Fill out this information for each dependent..............
   Do not state the dependents names.

| Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|
| | | ☐ No ☐ Yes |
| | | ☐ No ☐ Yes |
| | | ☐ No ☐ Yes |
| | | ☐ No ☐ Yes |

3. **Do your expenses include expenses of people other than yourself and your dependents?** ■ No ☐ Yes

### Part 2: Estimate Your Ongoing Monthly Expenses

**Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J*, check the box at the top of the form and fill in the applicable date.**

**Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 106I.)**

| | | Your expenses |
|---|---|---|
| 4. **The rental or home ownership expenses for your residence.** Include first mortgage payments and any rent for the ground or lot. | 4. $ | 600.00 |
| **If not included in line 4:** | | |
| 4a. Real estate taxes | 4a. $ | 0.00 |
| 4b. Property, homeowner's, or renter's insurance | 4b. $ | 0.00 |
| 4c. Home maintenance, repair, and upkeep expenses | 4c. $ | 0.00 |
| 4d. Homeowner's association or condominium dues | 4d. $ | 0.00 |
| 5. **Additional mortgage payments for your residence,** such as home equity loans | 5. $ | 0.00 |

Debtor 1 **Daniel A. Human** Case number (if known)

| | | | |
|---|---|---|---|
| 6. | **Utilities:** | | |
| | 6a. Electricity, heat, natural gas | 6a. $ | 0.00 |
| | 6b. Water, sewer, garbage collection | 6b. $ | 0.00 |
| | 6c. Telephone, cell phone, Internet, satellite, and cable services | 6c. $ | 70.00 |
| | 6d. Other. Specify: | 6d. $ | 0.00 |
| 7. | **Food and housekeeping supplies** | 7. $ | 300.00 |
| 8. | **Childcare and children's education costs** | 8. $ | 0.00 |
| 9. | **Clothing, laundry, and dry cleaning** | 9. $ | 50.00 |
| 10. | **Personal care products and services** | 10. $ | 20.00 |
| 11. | **Medical and dental expenses** | 11. $ | 20.00 |
| 12. | **Transportation.** Include gas, maintenance, bus or train fare. Do not include car payments. | 12. $ | 120.00 |
| 13. | **Entertainment, clubs, recreation, newspapers, magazines, and books** | 13. $ | 0.00 |
| 14. | **Charitable contributions and religious donations** | 14. $ | 0.00 |
| 15. | **Insurance.** Do not include insurance deducted from your pay or included in lines 4 or 20. | | |
| | 15a. Life insurance | 15a. $ | 0.00 |
| | 15b. Health insurance | 15b. $ | 0.00 |
| | 15c. Vehicle insurance | 15c. $ | 100.00 |
| | 15d. Other insurance. Specify: | 15d. $ | 0.00 |
| 16. | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. Specify: | 16. $ | 0.00 |
| 17. | **Installment or lease payments:** | | |
| | 17a. Car payments for Vehicle 1 | 17a. $ | 0.00 |
| | 17b. Car payments for Vehicle 2 | 17b. $ | 0.00 |
| | 17c. Other. Specify: | 17c. $ | 0.00 |
| | 17d. Other. Specify: | 17d. $ | 0.00 |
| 18. | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5, *Schedule I, Your Income* (Official Form 106I).** | 18. $ | 0.00 |
| 19. | **Other payments you make to support others who do not live with you.** Specify: | 19. $ | 0.00 |
| 20. | **Other real property expenses not included in lines 4 or 5 of this form or on *Schedule I: Your Income*.** | | |
| | 20a. Mortgages on other property | 20a. $ | 0.00 |
| | 20b. Real estate taxes | 20b. $ | 0.00 |
| | 20c. Property, homeowner's, or renter's insurance | 20c. $ | 0.00 |
| | 20d. Maintenance, repair, and upkeep expenses | 20d. $ | 0.00 |
| | 20e. Homeowner's association or condominium dues | 20e. $ | 0.00 |
| 21. | **Other:** Specify: | 21. +$ | 0.00 |
| 22. | **Calculate your monthly expenses** | | |
| | 22a. Add lines 4 through 21. | $ | 1,280.00 |
| | 22b. Copy line 22 (monthly expenses for Debtor 2), if any, from Official Form 106J-2 | $ | |
| | 22c. Add line 22a and 22b. The result is your monthly expenses. | $ | 1,280.00 |
| 23. | **Calculate your monthly net income.** | | |
| | 23a. Copy line 12 *(your combined monthly income)* from Schedule I. | 23a. $ | 1,627.00 |
| | 23b. Copy your monthly expenses from line 22c above. | 23b. -$ | 1,280.00 |
| | 23c. Subtract your monthly expenses from your monthly income. The result is your *monthly net income.* | 23c. $ | 347.00 |

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**
For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

■ No.
☐ Yes. Explain here:

**Fill in this information to identify your case:**

| | | | |
|---|---|---|---|
| Debtor 1 | **Daniel A. Human** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse if, filing) | | | |
| | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI | | |
| Case number (if known) | | | |

☐ Check if this is an amended filing

Official Form 106Dec

# Declaration About an Individual Debtor's Schedules

**12/15**

**If two married people are filing together, both are equally responsible for supplying correct information.**

**You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Sign Below

**Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?**

■ No

☐ Yes. Name of person ____________ Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119)

**Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.**

X **/s/ Daniel A. Human**
**Daniel A. Human**
Signature of Debtor 1

Date **April 28, 2025**

X ____________
Signature of Debtor 2

Date ____________

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Daniel A. Human**<br>First Name / Middle Name / Last Name |
| Debtor 2 (Spouse if, filing) | First Name / Middle Name / Last Name |
| United States Bankruptcy Court for the: | EASTERN DISTRICT OF MISSOURI |
| Case number (if known) | |

☐ Check if this is an amended filing

# Official Form 107
## Statement of Financial Affairs for Individuals Filing for Bankruptcy

04/25

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

**Part 1: Give Details About Your Marital Status and Where You Lived Before**

**1. What is your current marital status?**

☐ Married
■ Not married

**2. During the last 3 years, have you lived anywhere other than where you live now?**

☐ No
■ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|
| **1245 Pinecrest Ln**<br>**Apt B**<br>**Ballwin, MO 63011** | From-To:<br>**2/2022 to 5/2023** | ☐ Same as Debtor 1 | ☐ Same as Debtor 1<br>From-To: |

**3. Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

■ No
☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

**Part 2 Explain the Sources of Your Income**

**4. Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

☐ No
■ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) | **Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| | Debtor 1<br>**Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) | Debtor 2<br>**Sources of income**<br>Check all that apply. | **Gross income**<br>(before deductions and exclusions) |
|---|---|---|---|---|
| **From January 1 of current year until the date you filed for bankruptcy:** | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | **$0.00** | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |
| **For last calendar year: (January 1 to December 31, 2024 )** | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | **$0.00** | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |
| **For the calendar year before that: (January 1 to December 31, 2023 )** | ■ Wages, commissions, bonuses, tips<br>☐ Operating a business | **$37,500.00** | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | |

**5. Did you receive any other income during this year or the two previous calendar years?**
Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

List each source and the gross income from each source separately. Do not include income that you listed in line 4.

☐ No
■ Yes. Fill in the details.

| | Debtor 1<br>**Sources of income**<br>Describe below. | **Gross income from each source**<br>(before deductions and exclusions) | Debtor 2<br>**Sources of income**<br>Describe below. | **Gross income**<br>(before deductions and exclusions) |
|---|---|---|---|---|
| **From January 1 of current year until the date you filed for bankruptcy:** | **Social Security** | **$6,508.00** | | |
| **For last calendar year: (January 1 to December 31, 2024 )** | **Social Security** | **$19,300.00** | | |
| **For the calendar year before that: (January 1 to December 31, 2023 )** | **Social Security** | **$17,537.00** | | |

## Part 3: List Certain Payments You Made Before You Filed for Bankruptcy

**6. Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

☐ No. **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $8,575* or more?

☐ No. Go to line 7.
☐ Yes List below each creditor to whom you paid a total of $8,575* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

* Subject to adjustment on 4/01/28 and every 3 years after that for cases filed on or after the date of adjustment.


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

■ Yes. **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

☐ No. Go to line 7.
■ Yes List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| **American Express**<br>**PO Box 981537**<br>**El Paso, TX 79998** | **Over the past 90 days** | **$1,409.00** | **$0.00** | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other__ |
| **Discover**<br>**PO Box 6103**<br>**Carol Stream, IL 60197-6103** | **Over the past 90 days** | **$1,307.00** | **$0.00** | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other__ |
| **Wells Fargo**<br>**PO Box 10438**<br>**Des Moines, IA 50306-0438** | **Over the past 90 days** | **$657.00** | **$0.00** | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other__ |
| **JPMorgan Chase Bank, N.A.**<br>**270 Park Ave., 1st Florr**<br>**New York, NY 10017** | **Over the past 90 days** | **$947.00** | **$0.00** | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other__ |
| **Apple Card**<br>**c/o Goldman Sachs Bank**<br>**Lockbox 6112**<br>**PO Box 7247**<br>**Philadelphia, PA 19170** | **Over the past 90 days** | **$750.00** | **$0.00** | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other__ |
| **First Community Credit Union**<br>**15715 Manchester Rd**<br>**Ballwin, MO 63011** | **Over the past 90 days** | **$1,369.00** | **$0.00** | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other__ |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| **Wells Fargo Auto**<br>**PO Box 17900**<br>**Denver, CO 80217** | **Over the past 90 days** | **$4,156.00** | **$0.00** | ☐ Mortgage<br>■ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |

7. **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

■ No
☐ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|

8. **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
Include payments on debts guaranteed or cosigned by an insider.

■ No
☐ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment Include creditor's name |
|---|---|---|---|---|

**Part 4: Identify Legal Actions, Repossessions, and Foreclosures**

9. **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

☐ No
■ Yes. Fill in the details.

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Human v. Fisher Investments, Inc. and Smart Asset Advisors, LLC**<br>**4:24-cv-01177-MTS** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri**<br>**111 S. 10th Street**<br>**Saint Louis, MO 63102** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| **Daniel Human**<br>**v**<br>**Cox Automotive Inc**<br>**24SL-CC08176** | **TCPA and/or other consumer protection statutes** | **St. Louis Co** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human**<br>**v**<br>**Boost Health, LLC**<br>**23SL-CC05097** | **TCPA and/or other consumer protection statutes** | **St Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human**<br>**v**<br>**Health HQ, Inc.**<br>**23SL-CC05215** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Daniel Human<br>v<br>Dicarlo Insurance LLC<br>23SL-CC05285** | **TCPA and/or other consumer protection statutes** | **St Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Insurance Solutions, LLC<br>23SL-CC05358** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Edge Financial, Inc.<br>24SL-CC00329** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>International Union of Police<br>24SL-CC01286** | **TCPA and/or other consumer protection statutes** | **St Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| **Daniel Human<br>v<br>General Motors, LLC<br>24SL-CC01355** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>David Ramirez & Assoc, Inc.<br>24SL-CC01657** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 6/7/24** |
| **Daniel Human<br>v<br>Hoover Venture, LC<br>24SL-CC02434** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Fluent, Inc.<br>24SL-CC02435** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 6/10/24** |
| **Daniel Human<br>v<br>Alleviate Tax, LLC<br>24SL-CC02679** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>National Enrollment Center LLC<br>24SL-CC02959** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| Daniel Human<br>v<br>Quo Tewizard.com, LLC<br>24SL-CC03227 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Norc at the University of Chicago<br>24SL-CC03278 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Facer Wealth, INC.<br>24SL-CC03226 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Lendor Corp<br>24SL-CC03763 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Liberty GMC<br>24SL-CC03845 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Workmoney Foundation Inc.<br>24SL-CC03844 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Rebrandly Holdings, Inc<br>24SL-CC04585 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>REG AGT: The Corporation Trust Co<br>24SL-AC31591 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Rebrandly Holdings, Inc.<br>24SL-AC31594 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Daniel Human<br>v<br>Pearson Auto Group<br>24SL-CC05156 | TCPA and/or other consumer protection statutes | St. Louis County | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>Motion to dismiss filed by Debtor on 10/23/2024 |
| Daniel Human<br>v<br>Vacation Ownership Brokerage<br>24SL-CC05237 | TCPA and/or other consumer protection statutes | St. Louis County | ☐ Pending<br>☐ On appeal<br>■ Concluded |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Daniel Human<br>v<br>Boomer Benefits<br>24SL-CC05335** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human v<br>24SL-CC05334** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>☐ Concluded |
| **Daniel Human<br>v<br>Idaho Roofing Contractors<br>24SL-CC05499** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>DRB Capital Group, LLC<br>24SL-CC05701** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Viking Steel Structures, LLC<br>24SL-CC05876** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Cover Right Insurance Service<br>24SL-CC06693** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>America's Health Group, INC.<br>24SL-CC07112** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Elite Insurance Partners<br>24SL-CC07110** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Prodigy Insurance Services, Inc.<br>24SL-CC07578** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Sicuro Health, LLC<br>24SL-CC07931** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Syndicate Holdings<br>24SL-CC08213** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 3/13/2025** |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Daniel Human<br>v<br>Assured Health Group, LLC<br>25SL-CC00388** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Zinnia Tech Solutions LLC.<br>25SL-CC00387** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Autoweb Inc.<br>25SL-CC01493** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Brevo International Investment Group<br>25SL-CC01858** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 3/13/2025** |
| **Daniel Human<br>v<br>Cox Automotive, Inc.<br>25SL-CC01859** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 3/13/2025** |
| **Daniel Human<br>v<br>Golden State Advisors, LLC<br>25SL-CC02137** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| **Daniel Human<br>v<br>Diamond and Jewelry Brokers, INC.<br>25SL-CC02287** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 3/21/2025** |
| **Daniel Human<br>v<br>Rosland Capital, LLC<br>25SL-CC02581** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 4/1/2025** |
| **Daniel Human<br>v<br>Brevo<br>25SL-CC02700** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Daniel Human<br>v<br>Health Insurance Alliance, LLC<br>25SL-CC07485** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Daniel Human<br>v<br>Prodigy Insurance Associates, LLC<br>25SL-CC00896** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 4/1/2025** |
| **Daniel Human<br>v<br>Broulim's Pharamacy<br>25SL-CC03007** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded<br>**Motion to dismiss filed by Debtor on 6/7/24** |
| **Daniel Human<br>v<br>Health Enrollment Group Inc.<br>25SL-CC01422** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| **Daniel Human<br>v<br>Groudworks FRS, LLC<br>24SL-CC03764** | **TCPA and/or other consumer protection statutes** | **St. Louis County** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. American Financial Network, Inc. et al<br>4:2023cv01559** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of MIssouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. Priority Automotive, Inc. et al<br>4:2023cv01577** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. USHealth Advisors, LLC et al<br>4:2023cv01586** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. Frubbel, LLC et al<br>4:2024cv00050** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

Debtor 1 **Daniel A. Human** Case number (if known)

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **Human v. Healthmarkets Insurance Services, Inc. et al<br>4:2024cv00187** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. Dream Style Remodeling of Idaho, LLC<br>4:2024cv00226** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. Dennis Dillon Automotive Group, Inc. et al<br>4:2024cv00309** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. International Union of Police Associations AFL (CIO) et al<br>4:2024cv00570** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. Alleviate Tax, LLC<br>4:2024cv00981** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. National Enrollment Center, LLC<br>4:2024cv01121** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. General Motors, LLC<br>4:2024cv01193** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| **Human v. Groundworks FRS, LLC<br>4:2024cv01264** | **TCPA and/or other consumer protection statutes - action removed from state court** | **Eastern District of Missouri** | ☐ Pending<br>☐ On appeal<br>■ Concluded |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| Human v. Health Insurance Alliance, LLC<br>4:2025cv00008 | TCPA and/or other consumer protection statutes - action removed from state court | Eastern District of Missouri | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Human v. Syndicate Holdings Group, LLC<br>4:2025cv00180 | TCPA and/or other consumer protection statutes - action removed from state court | Eastern District of Missouri | ☐ Pending<br>☐ On appeal<br>■ Concluded |
| Human v. Assured Health Group, LLC<br>4:2025cv00183 | TCPA and/or other consumer protection statutes - action removed from state court | Eastern District of Missouri | ☐ Pending<br>☐ On appeal<br>■ Concluded |

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
Check all that apply and fill in the details below.

■ No. Go to line 11.
☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property<br><br>Explain what happened | Date | Value of the property |
|---|---|---|---|

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

■ No
☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

■ No
☐ Yes

**Part 5: List Certain Gifts and Contributions**

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

■ No
☐ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person<br><br>Person to Whom You Gave the Gift and Address: | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

■ No
☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600<br>Charity's Name<br>Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|

**Part 6: List Certain Losses**

15. **Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

☐ No
■ Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss<br>Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property.* | Date of your loss | Value of property lost |
|---|---|---|---|
| **Gambling losses** | **No insurance coverage** | **Over the last 12 months** | **$15,000.00** |

**Part 7: List Certain Payments or Transfers**

16. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

☐ No
■ Yes. Fill in the details.

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| **Consumer Law Center of Saint Louis<br>2249 South Brentwood<br>Saint Louis, MO 63144<br>generalmail@thebkco.com** | **Attorney Fees** | **4/2025** | **$1,093.00** |

17. **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

■ No
☐ Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

18. **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

■ No
☐ Yes. Fill in the details.

| Person Who Received Transfer<br>Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

19. **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices.*)

■ No
☐ Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

**Part 8: List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units**

20. **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
**Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.**

■ **No**
☐ **Yes. Fill in the details.**

| Name of Financial Institution and Address (Number, Street, City, State and ZIP Code) | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

21. **Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?**

■ **No**
☐ **Yes. Fill in the details.**

| Name of Financial Institution Address (Number, Street, City, State and ZIP Code) | Who else had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

22. **Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?**

■ **No**
☐ **Yes. Fill in the details.**

| Name of Storage Facility Address (Number, Street, City, State and ZIP Code) | Who else has or had access to it? Address (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

**Part 9: Identify Property You Hold or Control for Someone Else**

23. **Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.**

■ **No**
☐ **Yes. Fill in the details.**

| Owner's Name Address (Number, Street, City, State and ZIP Code) | Where is the property? (Number, Street, City, State and ZIP Code) | Describe the property | Value |
|---|---|---|---|

**Part 10: Give Details About Environmental Information**

**For the purpose of Part 10, the following definitions apply:**

- ***Environmental law*** **means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.**
- ***Site*** **means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.**
- ***Hazardous material*** **means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.**

**Report all notices, releases, and proceedings that you know about, regardless of when they occurred.**


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

**24. Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

■ No
☐ Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

**25. Have you notified any governmental unit of any release of hazardous material?**

■ No
☐ Yes. Fill in the details.

| Name of site<br>Address (Number, Street, City, State and ZIP Code) | Governmental unit<br>Address (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

**26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

■ No
☐ Yes. Fill in the details.

| Case Title<br>Case Number | Court or agency<br>Name<br>Address (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|

**Part 11: Give Details About Your Business or Connections to Any Business**

**27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

☐ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

☐ A partner in a partnership

☐ An officer, director, or managing executive of a corporation

☐ An owner of at least 5% of the voting or equity securities of a corporation

■ No. None of the above applies. Go to Part 12.

☐ Yes. Check all that apply above and fill in the details below for each business.

| Business Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Describe the nature of the business<br><br>Name of accountant or bookkeeper | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|

**28. Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.**

■ No
☐ Yes. Fill in the details below.

| Name<br>Address<br>(Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

**Part 12:** **Sign Below**

**I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.**
**18 U.S.C. §§ 152, 1341, 1519, and 3571.**

| | |
|---|---|
| /s/ Daniel A. Human<br>Daniel A. Human<br>**Signature of Debtor 1** | **Signature of Debtor 2** |
| **Date** April 28, 2025 | **Date** |

**Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?**

■ No
☐ Yes

**Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?**

■ No
☐ Yes. Name of Person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).



Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

Fill in this information to identify your case:

Debtor 1 **Daniel A. Human**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Eastern District of Missouri

Case number
(if known)

Check as directed in lines 17 and 21:

According to the calculations required by this Statement:

- ■ 1. Disposable income is not determined under 11 U.S.C. § 1325(b)(3).
- ☐ 2. Disposable income is determined under 11 U.S.C. § 1325(b)(3).
- ■ 3. The commitment period is 3 years.
- ☐ 4. The commitment period is 5 years.

☐ Check if this is an amended filing

Official Form 122C-1

# Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period

10/19

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for being accurate. If more space is needed, attach a separate sheet to this form. Include the line number to which the additional information applies. On the top of any additional pages, write your name and case number (if known).**

## Part 1: Calculate Your Average Monthly Income

1. **What is your marital and filing status?** Check one only.

■ **Not married.** Fill out Column A, lines 2-11.

☐ **Married.** Fill out both Columns A and B, lines 2-11.

**Fill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case.** 11 U.S.C. § 101(10A). For example, if you are filing on September 15, the 6-month period would be March 1 through August 31. If the amount of your monthly income varied during the 6 months, add the income for all 6 months and divide the total by 6. Fill in the result. Do not include any income amount more than once. For example, if both spouses own the same rental property, put the income from that property in one column only. If you have nothing to report for any line, write $0 in the space.

| | | | *Column A* **Debtor 1** | *Column B* **Debtor 2 or non-filing spouse** |
|---|---|---|---|---|
| 2. | **Your gross wages, salary, tips, bonuses, overtime, and commissions** (before all payroll deductions). | | $ 0.00 | $ |
| 3. | **Alimony and maintenance payments.** Do not include payments from a spouse if Column B is filled in. | | $ 0.00 | $ |
| 4. | **All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support.** Include regular contributions from an unmarried partner, members of your household, your dependents, parents, and roommates. Do not include payments from a spouse. Do not include payments you listed on line 3. | | $ 0.00 | $ |
| 5. | **Net income from operating a business, profession, or farm** | **Debtor 1** | | |
| | Gross receipts (before all deductions) | $ 0.00 | | |
| | Ordinary and necessary operating expenses | -$ 0.00 | | |
| | Net monthly income from a business, profession, or farm | $ 0.00 **Copy here ->** | $ 0.00 | $ |
| 6. | **Net income from rental and other real property** | **Debtor 1** | | |
| | Gross receipts (before all deductions) | $ 0.00 | | |
| | Ordinary and necessary operating expenses | -$ 0.00 | | |
| | Net monthly income from rental or other real property | $ 0.00 **Copy here ->** | $ 0.00 | $ |


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

| | Column A Debtor 1 | Column B Debtor 2 or non-filing spouse |
|---|---|---|
| 7. **Interest, dividends, and royalties** | $ 0.00 | $ |
| 8. **Unemployment compensation** | $ 0.00 | $ |
| Do not enter the amount if you contend that the amount received was a benefit under the Social Security Act. Instead, list it here: | | |
| For you $ 0.00 | | |
| For your spouse $ | | |
| 9. **Pension or retirement income.** Do not include any amount received that was a benefit under the Social Security Act. Also, except as stated in the next sentence, do not include any compensation, pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If you received any retired pay paid under chapter 61 of title 10, then include that pay only to the extent that it does not exceed the amount of retired pay to which you would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title. | $ 0.00 | $ |
| 10. **Income from all other sources not listed above.** Specify the source and amount. Do not include any benefits received under the Social Security Act; payments received as a victim of a war crime, a crime against humanity, or international or domestic terrorism; or compensation, pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If necessary, list other sources on a separate page and put the total below. | | |
| | $ 0.00 | $ |
| | $ 0.00 | $ |
| Total amounts from separate pages, if any. + | $ 0.00 | $ |

11. **Calculate your total average monthly income.** Add lines 2 through 10 for each column. Then add the total for Column A to the total for Column B. $ 0.00 + $ = $ 0.00

Total average monthly income

**Part 2: Determine How to Measure Your Deductions from Income**

12. **Copy your total average monthly income from line 11.** $ 0.00

13. **Calculate the marital adjustment.** Check one:

■ You are not married. Fill in 0 below.

☐ You are married and your spouse is filing with you. Fill in 0 below.

☐ You are married and your spouse is not filing with you.

Fill in the amount of the income listed in line 11, Column B, that was NOT regularly paid for the household expenses of you or your dependents, such as payment of the spouse's tax liability or the spouse's support of someone other than you or your dependents.

Below, specify the basis for excluding this income and the amount of income devoted to each purpose. If necessary, list additional adjustments on a separate page.

If this adjustment does not apply, enter 0 below.

$
$
+$

Total $ 0.00 Copy here=> - 0.00

14. **Your current monthly income.** Subtract line 13 from line 12. $ 0.00

15. **Calculate your current monthly income for the year.** Follow these steps:

15a. Copy line 14 here=> $ 0.00


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

Multiply line 15a by 12 (the number of months in a year). **x** 12

15b. The result is your current monthly income for the year for this part of the form. ......... $ **0.00**

16. **Calculate the median family income that applies to you.** Follow these steps:

16a. Fill in the state in which you live. **MO**

16b. Fill in the number of people in your household. **1**

16c. Fill in the median family income for your state and size of household. $ **63,185.00**

To find a list of applicable median income amounts, go online using the link specified in the separate instructions for this form. This list may also be available at the bankruptcy clerk's office.

17. **How do the lines compare?**

17a. ■ Line 15b is less than or equal to line 16c. On the top of page 1 of this form, check box 1, *Disposable income is not determined under 11 U.S.C. § 1325(b)(3).* **Go to Part 3.** Do NOT fill out *Calculation of Your Disposable Income* (Official Form 122C-2).

17b. ☐ Line 15b is more than line 16c. On the top of page 1 of this form, check box 2, *Disposable income is determined under 11 U.S.C. § 1325(b)(3).* **Go to Part 3 and fill out Calculation of Your Disposable Income (Official Form 122C-2).** On line 39 of that form, copy your current monthly income from line 14 above.

## Part 3: Calculate Your Commitment Period Under 11 U.S.C. § 1325(b)(4)

18. **Copy your total average monthly income from line 11 .** $ **0.00**

19. **Deduct the marital adjustment if it applies.** If you are married, your spouse is not filing with you, and you contend that calculating the commitment period under 11 U.S.C. § 1325(b)(4) allows you to deduct part of your spouse's income, copy the amount from line 13.

19a. If the marital adjustment does not apply, fill in 0 on line 19a. -$ **0.00**

19b. **Subtract line 19a from line 18.** $ **0.00**

20. **Calculate your current monthly income for the year.** Follow these steps:

20a. Copy line 19b $ **0.00**

Multiply by 12 (the number of months in a year). **x** 12

20b. The result is your current monthly income for the year for this part of the form $ **0.00**

20c. Copy the median family income for your state and size of household from line 16c $ **63,185.00**

21. **How do the lines compare?**

■ Line 20b is less than line 20c. Unless otherwise ordered by the court, on the top of page 1 of this form, check box 3, *The commitment period is 3 years.* Go to Part 4.

☐ Line 20b is more than or equal to line 20c. Unless otherwise ordered by the court, on the top of page 1 of this form, check box 4, *The commitment period is 5 years.* Go to Part 4.

## Part 4: Sign Below

By signing here, under penalty of perjury I declare that the information on this statement and in any attachments is true and correct.

**X /s/ Daniel A. Human**
**Daniel A. Human**
Signature of Debtor 1

Date **April 28, 2025**
MM / DD / YYYY

If you checked 17a, do NOT fill out or file Form 122C-2.

If you checked 17b, fill out Form 122C-2 and file it with this form. On line 39 of that form, copy your current monthly income from line 14 above.


Software Copyright (c) 1996-2025 Best Case, LLC - www.bestcase.com

# Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)

This notice is for you if:

You are an individual filing for bankruptcy, and

Your debts are primarily consumer debts. *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

**The types of bankruptcy that are available to individuals**

Individuals who meet the qualifications may file under one of four different chapters of Bankruptcy Code:

Chapter 7 - Liquidation

Chapter 11 - Reorganization

Chapter 12 - Voluntary repayment plan for family farmers or fishermen

Chapter 13 - Voluntary repayment plan for individuals with regular income

**You should have an attorney review your decision to file for bankruptcy and the choice of chapter.**

**Chapter 7: Liquidation**

| | | |
|---|---|---|
| | $245 | filing fee |
| | $78 | administrative fee |
| + | $15 | trustee surcharge |
| | $338 | total fee |

Chapter 7 is for individuals who have financial difficulty preventing them from paying their debts and who are willing to allow their non-exempt property to be used to pay their creditors. The primary purpose of filing under chapter 7 is to have your debts discharged. The bankruptcy discharge relieves you after bankruptcy from having to pay many of your pre-bankruptcy debts. Exceptions exist for particular debts, and liens on property may still be enforced after discharge. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

However, if the court finds that you have committed certain kinds of improper conduct described in the Bankruptcy Code, the court may deny your discharge.

You should know that even if you file chapter 7 and you receive a discharge, some debts are not discharged under the law. Therefore, you may still be responsible to pay:

most taxes;

most student loans;

domestic support and property settlement obligations;

most fines, penalties, forfeitures, and criminal restitution obligations; and

certain debts that are not listed in your bankruptcy papers.

You may also be required to pay debts arising from:

fraud or theft;

fraud or defalcation while acting in breach of fiduciary capacity;

intentional injuries that you inflicted; and

death or personal injury caused by operating a motor vehicle, vessel, or aircraft while intoxicated from alcohol or drugs.

If your debts are primarily consumer debts, the court can dismiss your chapter 7 case if it finds that you have enough income to repay creditors a certain amount. You must file *Chapter 7 Statement of Your Current Monthly Income* (Official Form 122A–1) if you are an individual filing for bankruptcy under chapter 7. This form will determine your current monthly income and compare whether your income is more than the median income that applies in your state.

If your income is not above the median for your state, you will not have to complete the other chapter 7 form, the *Chapter 7 Means Test Calculation* (Official Form 122A–2).

If your income is above the median for your state, you must file a second form —the *Chapter 7 Means Test Calculation* (Official Form 122A–2). The calculations on the form— sometimes called the *Means Test*—deduct from your income living expenses and payments on certain debts to determine any amount available to pay unsecured creditors. If your income is more than the median income for your state of residence and family size, depending on the results of the *Means Test*, the U.S. trustee, bankruptcy administrator, or creditors can file a motion to dismiss your case under § 707(b) of the Bankruptcy Code. If a motion is filed, the court will decide if your case should be dismissed. To avoid dismissal, you may choose to proceed under another chapter of the Bankruptcy Code.

If you are an individual filing for chapter 7 bankruptcy, the trustee may sell your property to pay your debts, subject to your right to exempt the property or a portion of the proceeds from the sale of the property. The property, and the proceeds from property that your bankruptcy trustee sells or liquidates that you are entitled to, is called *exempt property*. Exemptions may enable you to keep your home, a car, clothing, and household items or to receive some of the proceeds if the property is sold.

Exemptions are not automatic. To exempt property, you must list it on *Schedule C: The Property You Claim as Exempt* (Official Form 106C). If you do not list the property, the trustee may sell it and pay all of the proceeds to your creditors.

**Chapter 11: Reorganization**

| | | |
|---|---|---|
| | $1,167 | filing fee |
| + | $571 | administrative fee |
| | $1,738 | total fee |

Chapter 11 is often used for reorganizing a business, but is also available to individuals. The provisions of chapter 11 are too complicated to summarize briefly.

**Read These Important Warnings**

**Because bankruptcy can have serious long-term financial and legal consequences, including loss of your property, you should hire an attorney and carefully consider all of your options before you file. Only an attorney can give you legal advice about what can happen as a result of filing for bankruptcy and what your options are. If you do file for bankruptcy, an attorney can help you fill out the forms properly and protect you, your family, your home, and your possessions.**

**Although the law allows you to represent yourself in bankruptcy court, you should understand that many people find it difficult to represent themselves successfully. The rules are technical, and a mistake or inaction may harm you. If you file without an attorney, you are still responsible for knowing and following all of the legal requirements.**

**You should not file for bankruptcy if you are not eligible to file or if you do not intend to file the necessary documents.**

**Bankruptcy fraud is a serious crime; you could be fined and imprisoned if you commit fraud in your bankruptcy case. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

**Chapter 12: Repayment plan for family farmers or fishermen**

| | | |
|---|---|---|
| | $200 | filing fee |
| + | $78 | administrative fee |
| | $278 | total fee |

Similar to chapter 13, chapter 12 permits family farmers and fishermen to repay their debts over a period of time using future earnings and to discharge some debts that are not paid.

**Chapter 13: Repayment plan for individuals with regular income**

| | | |
|---|---|---|
| | $235 | filing fee |
| + | $78 | administrative fee |
| | $313 | total fee |

Chapter 13 is for individuals who have regular income and would like to pay all or part of their debts in installments over a period of time and to discharge some debts that are not paid. You are eligible for chapter 13 only if your debts are not more than certain dollar amounts set forth in 11 U.S.C. § 109.

Under chapter 13, you must file with the court a plan to repay your creditors all or part of the money that you owe them, usually using your future earnings. If the court approves your plan, the court will allow you to repay your debts, as adjusted by the plan, within 3 years or 5 years, depending on your income and other factors.

After you make all the payments under your plan, many of your debts are discharged. The debts that are not discharged and that you may still be responsible to pay include:

- domestic support obligations,
- most student loans,
- certain taxes,
- debts for fraud or theft,
- debts for fraud or defalcation while acting in a fiduciary capacity,
- most criminal fines and restitution obligations,
- certain debts that are not listed in your bankruptcy papers,
- certain debts for acts that caused death or personal injury, and
- certain long-term secured debts.

**Warning: File Your Forms on Time**

Section 521(a)(1) of the Bankruptcy Code requires that you promptly file detailed information about your creditors, assets, liabilities, income, expenses and general financial condition. The court may dismiss your bankruptcy case if you do not file this information within the deadlines set by the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the court.

For more information about the documents and their deadlines, go to: http://www.uscourts.gov/forms/bankruptcy-forms

**Bankruptcy crimes have serious consequences**

If you knowingly and fraudulently conceal assets or make a false oath or statement under penalty of perjury—either orally or in writing—in connection with a bankruptcy case, you may be fined, imprisoned, or both.

All information you supply in connection with a bankruptcy case is subject to examination by the Attorney General acting through the Office of the U.S. Trustee, the Office of the U.S. Attorney, and other offices and employees of the U.S. Department of Justice.

**Make sure the court has your mailing address**

The bankruptcy court sends notices to the mailing address you list on *Voluntary Petition for Individuals Filing for Bankruptcy* (Official Form 101). To ensure that you receive information about your case, Bankruptcy Rule 4002 requires that you notify the court of any changes in your address.

A married couple may file a bankruptcy case together—called a *joint case*. If you file a joint case and each spouse lists the same mailing address on the bankruptcy petition, the bankruptcy court generally will mail you and your spouse one copy of each notice, unless you file a statement with the court asking that each spouse receive separate copies.

**Understand which services you could receive from credit counseling agencies**

The law generally requires that you receive a credit counseling briefing from an approved credit counseling agency. 11 U.S.C. § 109(h). If you are filing a joint case, both spouses must receive the briefing. With limited exceptions, you must receive it within the 180 days ***before*** you file your bankruptcy petition. This briefing is usually conducted by telephone or on the Internet.

In addition, after filing a bankruptcy case, you generally must complete a financial management instructional course before you can receive a discharge. If you are filing a joint case, both spouses must complete the course.

You can obtain the list of agencies approved to provide both the briefing and the instructional course from: http://www.uscourts.gov/services-forms/bankruptcy/credit-counseling-and-debtor-education-courses.

In Alabama and North Carolina, go to: http://www.uscourts.gov/services-forms/bankruptcy/credit-counseling-and-debtor-education-courses.

If you do not have access to a computer, the clerk of the bankruptcy court may be able to help you obtain the list.

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Eastern District of Missouri

In re **Daniel A. Human** Debtor(s) Case No. Chapter **13**

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

| | | |
|---|---|---|
| For legal services, I have agreed to accept | $ | **5,800.00** |
| Prior to the filing of this statement I have received | $ | **1,093.00** |
| Balance Due | $ | **4,707.00** |

2. The source of the compensation paid to me was:

   ■ Debtor ☐ Other (specify):

3. The source of compensation to be paid to me is:

   ■ Debtor ☐ Other (specify):

4. ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

   ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
   b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
   d. [Other provisions as needed]

6. By agreement with the debtor(s), the above-disclosed fee does not include the following service:
   **Representation of the debtors in adversary proceedings and appeals.**

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

**April 28, 2025**
*Date*

**/s/ David N. Gunn**
**David N. Gunn**
*Signature of Attorney*
**Consumer Law Center of Saint Louis**
**2249 South Brentwood**
**Saint Louis, MO 63144**
**(314) 961-9822 Fax: (314) 961-9825**
**generalmail@thebkco.com**
*Name of law firm*

**United States Bankruptcy Court**
**Eastern District of Missouri**

In re **Daniel A. Human** Debtor(s) Case No. ______ Chapter **13**

## VERIFICATION OF CREDITOR MATRIX

The above named debtor(s) hereby certifies/certify under penalty of perjury that the attached list containing the names and addresses of my creditors (Matrix), consisting of **1** page(s) and is true, correct and complete.

**/s/ Daniel A. Human**
**Daniel A. Human**
Debtor Signature

Dated: **April 28, 2025**

Check Systems LLC
229 West Genesee Street
Buffalo, NY 14201

Fisher Investments, Inc. et. al.
c/o Watstein Terepka LLC
1055 Howell Mill Road
8th Floor
Atlanta, GA 30318

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Mercury/FBT
Attn: Bankruptcy
Po Box 84064
Columbus, GA 31908

Missouri Department of Revenue
Bankruptcy Unit
PO Box 475
301 W. High Street
Jefferson City, MO 65105-0475

RDAC
PO Box 1489
Goodlettsville, TN 37070

Receivable Solutions
1414 Main St.
Columbia, SC 29210

TeleCheck Services, Inc.
Attention: Bankruptcy Department
P.O. Box 4451
Houston, TX 77210-4451

United States Attorney
111 South 10th Street
20th Floor
Saint Louis, MO 63102

EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

**DANIEL HUMAN**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**FISHER INVESTMENTS, INC.,** *et al.*

Defendant.

**Case No. 4:24-cv-01177-MTS**

**JURY TRIAL DEMANDED**

**FISHER INVESTMENTS, INC.'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION TO MR. HUMAN
RELATED TO FISHER'S DAMAGES**

Fisher Investments, Inc. ("Fisher"), pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, requests that Daniel Human respond to the following Interrogatories and Requests for Production ("Request" or "Requests") no later than Wednesday, April 30, 2025. ECF No. 83 ¶ 3(a)(i).

**DEFINITIONS**

1. "You," and "your" shall mean or refer to Daniel Human and any persons acting on his behalf with respect to the subject matter of a specific question.

2. "Fisher" shall mean Fisher Investments, Inc.

3. "Complaint" means the Class Action Complaint filed by Mr. Human in this action. ECF 1-1.

4. "Amended Complaint" means the Amended Complaint filed by Mr. Human in this action. ECF 33.

5. "Counterclaim" means the counterclaim filed by Fisher in this action. ECF 45.

6. The term "TCPA" refers to the Telephone Consumer Protection Act (47 U.S.C. §

227, et al.).

7. The term "Missouri No Call List and Telemarketing provisions" refers to Mo. Rev. Stat. § 407.1070, *et seq.*

8. "Communicate" or "communication" means any contact or act by which information or knowledge is transmitted or conveyed between or among two or more persons, including, without limitation, written contact by such means: letters; e-mail; fax; memoranda; telegrams; telexes; text messages; blog posts or entries; social media messages, posts or entries; or any other documents, and/or all contact by such means as face-to-face meetings, oral conversations, and telephone conversations.

9. The terms "document" and "documents" are defined as broadly as possible to include anything stored in any medium, including but not limited to all written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced, of every type and description that is in your possession, control, or custody, or of which you have knowledge, including but not limited to, correspondence, memoranda, transcripts of any conversation or testimony, tapes, stenographic or hand-written notes, studies, publications, books, diaries, logs, instant messaging, electronic mail (e-mail), including but not limited to, server-based email, web-based email, dial-up email, email attachments, deleted email, voicemail, information stored on social networking sites, information created with the use of PDAs or smartphones, tablets, information stored in a cloud environment, text messages, information stored on removable hard drives, thumb drives, flash drives, CDs, DVDs, disks, pamphlets, pictures (drawings and photographs), films, microfilms, recordings (including any analog, digital, electromagnetic, optical, phonographic, or other media of audio and/or visual recordings), maps, reports, recommendations, surveys, appraisals, minutes, statistical computations, telegrams, telex

messages, listing of telephone calls, telephone and/or cell phone records, books of account, ledgers, expense records, accounts payable, accounts receivable, analyses, and computer records (translated if necessary, by any person or entity that has control of such records through detection devices into reasonably usable form); every draft of each such document; every copy of each such document where the original is not in your possession, custody, or control; and every copy of each such document where such copy is not an identical copy of an original, or other copy, where such copy contains any commentary or notation whatsoever that does not appear on the original or other copy. The terms "document" or "documents" also include any and all electronically stored information ("ESI"), computer records, data and information of whatever kind whether printed out or stored on or retrievable from any floppy diskette, compact diskette, magnetic tape, optical or magnetic-optical disk, cloud storage, mobile storage, hard drive or rapid access memory, or other electronic storage medium, regardless of its location, including without limitation, all back-up copies, undeleted data, and dormant or remnant files.

10. "Person" or "persons" shall mean or refer to any natural person or legal entity, including, but not limited to, all individuals, associations, companies, partnerships, joint ventures, corporations, and governmental bodies.

11. The terms "identify" and "identity" mean the following:

a. With regard to a natural person, these terms mean to state that person' full name, any aliases, present residential address and home telephone number, present business address and business telephone number, or, if the above are not known, such information as was last known, including the person's residential address, home telephone number, business title, business affiliation, business address, and business telephone number at that time;

b. With regard to a corporation, partnership or any legal entity other than a natural person, these terms mean to state its full name and form of organization, any names under which it does business, address of principal place of business, state of incorporation or approval/licensure to do business and telephone number at present and, if different, address of principal place of business and telephone number at the time of all relevant incidents and/or time periods relevant to this action, officers, directors, managers, members, and partners, and the general business purpose of the entity;

c. With regard to a document, these terms mean to state the title (if any), the type of document, the nature and substance of the document with sufficient particularity to enable the same to be precisely identified, the date, if any, which the document bears, the date the document was sent, the date the document was received, the person or persons executing and/or sending the document and the identity of all persons participating in the preparation thereof, if different from the persons executing it, the person to whom the document is addressed and by whom received, any identifying numbers used in connection with the documents or affixed thereto and an explanation thereof, the present location of the original or a true, complete and legible copy of the document, and the full name, present address and telephone number of the person or persons having possession, custody, or control of each such original or true, complete and legible copy;

d. With regard to an act (including without limitation an occurrence, transaction, decision, statement, communication, conversation, conference, representation, assurance) or other conduct, these terms mean to state and describe in detail the

substance of the event or events constituting such act or conduct, what transpired, the place and date the act or conduct occurred, the persons present, the person involved and the documents referring or relating to the act or conduct, and with regard to a statement (including without limitation a communication, conversation, conference, representation, or assurance) the sum and substance of the statement, including which person made which statement.

12. The term "receive" or "received" means obtained in any way, including without limitation, hand delivery, mail, copy, carbon copy, blind copy, blind-carbon copy, fax, courier, picking up at a designated location, electronic transmission, blog post, online message board, post on website or intranet site, communication through website or intranet site, or any method by which information is communicated between one person or entity and another.

13. The term "sent" means transmitted in any way including without limitation, hand delivery, mail, fax, courier, dropping off at a designated location, electronic transmission, blog post, online message board, post on website or intranet site, communication through website or intranet, or any other method by which information is communicated between one Person or entity and another.

14. The terms "relate to" or "related to" or "relating to" mean having any relationship or connection to, concerning, being connected to, commenting on, responding to, containing, evidencing, showing, memorializing, describing, analyzing, reflecting, pertaining to, comprising, constituting, or otherwise establishing any reasonable, logical or causal connection.

15. The terms "refer to" or "referring to" mean in any way referring to, relating to, reporting on, with respect to, showing or indicating knowledge of, pertaining to, having to do with, having any relationship or connection to, containing, mentioning, describing, disclosing,

summarizing, rephrasing, memorializing, describing, analyzing, showing, or in any manner bearing on the stated matter, fact, or thing.

16. The terms "concern" or "concerning" mean relating to, referring to, describing, evidencing, or constituting.

17. The terms "evidencing" or "evidence" mean in any way supporting, demonstrating, embodying, representing, exemplifying, signifying, constituting, consisting of, comprising, being the equivalent or equal to, or establishing any reasonable, logical or causal connection to the stated matter, fact, or thing.

18. The term "support or refute" means in any way supporting, confirming, verifying, proving, refuting, negating, denying, rebutting, contradicting, or challenging the stated matter, fact, or thing.

19. The term "subject telephone number" or "subject number" means the telephone number referenced in your Complaint and Amended Complaint, (208) 390-1355.

20. The phrase "calls at issue" or "alleged calls" means the calls that you allegedly received, as averred in the Complaint and Amended Complaint.

21. The term "lead form" means any form you submitted (online or physical) or communication you sent that included the subject telephone number, in order to obtain information about (or in connection with) a product, service, or business (*e.g.*, for financial advisement services).

22. The term "electronic device" includes cell phones, computers, tablets, smart watches, or any other similar electric device that has access to the internet.

**INSTRUCTIONS**

1. These instructions are subject to the definitions set forth in the preceding "Definitions" section.

2. You are to respond to all Requests with all information which you have or which is reasonably available to you, including information in the possession, custody or control of your attorneys, investigators, agents, associates, partners or representatives. If your response to any Request is that the information is not possessed or reasonably available to you, please describe in detail the efforts you made to locate or obtain the information, together with its likely source. If any portion of any Request refers to information or documents that you are aware of but are not within your possession, identify each person in possession of the information and each document in a manner sufficient to describe such documents for the purpose of preparing and serving a proper subpoena duces tecum and identify the name, telephone number, and address of the person last known by you to have been in possession, custody, or control of such documents.

3. If you assert the attorney-client privilege, work product immunity, or any other privilege or doctrine as to any information or document, either as to part or the entirety, provide the following information:

a. the number of the Request calling for the production of such information, communication, or document;

b. the specific ground(s) for not identifying the information, communication, or document or thing in full;

c. the bases for any such claim of privilege or immunity;

d. the full identity of the information, communication, document, thing, or material for which such privilege or immunity is asserted, including the name and title of any document or thing;

e. the name, address and title of its author;

f. each addressee;

g. the identity of each person to whom a copy of the document or thing has been sent or received; and

h. the date(s) appearing on the document.

4. To the extent that you assert the claim of privilege, immunity, or other doctrine as to only part of a communication, document, or thing, produce in redacted form that portion of the document or thing not covered by such claim.

5. Further, to the extent you withhold any documents on the basis of privilege, provide a privilege log compliant with the Federal Rules of Civil Procedure to be produced concurrently with your responses to these Requests.

6. If any document identified in your response to any Request has been destroyed, describe the contents of the document, the date of its destruction, and the name of the person who authorized its destruction.

7. These Requests shall be deemed continuing in nature so that Mr. Human or any person(s) acting on his behalf shall file amended, additional, or supplemental answers should different or more current information come to Mr. Human's attention, rendering the prior answers incomplete or inaccurate.

8. The use of the singular includes the plural, and the use of the plural includes the singular, so as to be inclusive of any information that otherwise may be excluded. Additionally, the use of any pronoun should be construed as singular or plural and is included in the masculine, feminine or neuter to the extent necessary or appropriate to render the Request as broad and inclusive as reasonably possible.

9. The use of the present tense includes the past tense, and the use of the past tense includes the present tense, so as to be inclusive of any information that may otherwise be

excluded.

10. The connectives "or" and "and" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed to be outside of its scope.

11. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

12. In these Requests, Fisher seeks discovery of your computer and/or cellular phone data. Accordingly, Fisher respectfully demands that you preserve all of your electronic data related to the subject matter of these Requests and maintain the layout and configuration of your computer and cellular phone systems until you and Fisher reach a complete agreement and understanding regarding the preservation of electronic data. You are prohibited from initiating or performing any activity that would or might result in the loss of electronic data, e.g., data compression rotation, destruction, erasure of data, either on-line or off-line, de-fragmenting any hard drives, or purging any directories related to the subject of this litigation. This notice applies to any computers or cellular phones within your custody or control and the custody and control of your employees, agents, and independent contractors and includes servers, personal computers, mini computers, laptop computers, notebook computers, palm computers, personal digital computers, main frames, cellular phones or other equipment. You are also directed to maintain your electronic data storage devices and media and all activity logs whether made by your, your employees, agents, independent contractors, vendors, or other person(s).

# INTERROGATORIES

## INTERROGATORY NO. 1

Identify each person who supplied information in connection with or otherwise participated in answering these Interrogatories, and for each person identified, describe the nature of the participation or the information provided.

## INTERROGATORY NO. 2

Identify all persons you believe to have information that relates to, concerns, evidences, supports, or refutes Fisher's claim for damages on its counterclaim, and state generally the information you believe they possess. In your answer, identify all persons who witnessed, and with whom you have discussed, your TCPA cases, including but not limited to Mr. Prosser, Mr. Butler, and others, approximately how many of your TCPA cases you have discussed with them, and when you began speaking with them about your TCPA cases.

## INTERROGATORY NO. 3

State the total dollar amount you received in settlement payments involving alleged violations of the TCPA and/or any other telemarketing statutes in the following years: 2021, 2022, 2023, 2024, and 2025 (to date), as well as the total number of payments in each year.

## INTERROGATORY NO. 4

Identify every party that paid you a settlement amount to resolve a TCPA claim, whether or not you filed a lawsuit, the date the party paid you, how much the party paid you, and the case number and court (if any) related to the claim.

## INTERROGATORY NO. 5

For each payment you identify in your answer to Interrogatory 3, identify who you paid any of the settlement proceeds to, how much you paid them, and when. Include attorneys and

anyone else you paid settlement proceeds to, including as a gift or per a pre-arranged agreement to pay a portion of the settlement proceeds. But do not include mere purchases from businesses that you may have funded with settlement dollars (e.g., payments for groceries, bills, etc.)

**INTERROGATORY NO. 6**

Identify all of your assets, including real estate, vehicles, bank accounts (including bank account number and financial institution), investment accounts (including account number and financial institution), or any other assets, and the value of those assets.

**REQUESTS FOR PRODUCTION**

**REQUEST NO. 1**

All TCPA settlements you have entered with any party. These documents should already have been produced, and Fisher does not waive any rights in this regard. ECF No. 34 at 2 n.1; *see also* ECF No. 83 at 2 n.2 (referencing "[Mr. Human]'s past failure to provide basic discovery responses or produce the most basic relevant documents to" Fisher.).

**REQUEST NO. 2**

All non-privileged recordings (written, video, audio, or otherwise) of any communications evidencing, concerning, relating to, or referring in any way to this lawsuit or the facts underlying it, including but not limited to all recordings of alleged TCPA violations made to you in other lawsuits, including but not limited to Fisher.

**REQUEST NO. 3**

All non-privileged documents reflecting any recordings, notes, or other information about the alleged calls to the subject telephone number, and any other calls you claim relate to other TCPA defendants, including but not limited to Fisher.

**REQUEST NO. 4**

All documents you rely on to dispute or deny Fisher's alleged damages.

**REQUEST NO. 5**

All documents identified or referenced in your responses to Fisher's First Set of Interrogatories Related to Damages, served contemporaneously herewith.

**REQUEST NO. 6**

All documents relied upon by you in preparing your responses to Fisher's First Set of Interrogatories Related to Damages, served contemporaneously herewith.

**REQUEST NO. 7**

All retention, retainer, or other agreements between Mr. Human, Edwin V. Butler II, and/or Butler Law Group LLC that memorialize Mr. Butler's representation of Mr. Human in any TCPA lawsuit, including agreements that show what portion of settlement proceeds Mr. Human and Mr. Butler obtain from any settlements.

**REQUEST NO. 8**

Documents sufficient to identify the Internet Service Provider (ISP) for 10423 Conway Road, St. Louis, MO 63131 from January 1, 2022 to the present and responsible payee. These documents should already have been produced, and Fisher does not waive any rights in this regard. ECF No. 34 at 2 n.1; *see also* ECF No. 83 at 2 n.2 (referencing "[Mr. Human]'s past failure to provide basic discovery responses or produce the most basic relevant documents to" Fisher.).

**REQUEST NO. 9**

All correspondence or demand letters you sent (or were sent on your behalf) alleging purported violations of the TCPA or Missouri No Call List and Telemarketing provisions. These documents should already have been produced, and Fisher does not waive any rights in this regard.

ECF No. 34 at 2 n.1; *see also* ECF No. 83 at 2 n.2 (referencing "[Mr. Human]'s past failure to provide basic discovery responses or produce the most basic relevant documents to" Fisher.).

**REQUEST NO. 10**

All communications you received in response to your correspondence or demand letters alleging purported violations of the TCPA or Missouri No Call List and Telemarketing provisions, including any attachments thereto. These documents should already have been produced, and Fisher does not waive any rights in this regard. ECF No. 34 at 2 n.1; *see also* ECF No. 83 at 2 n.2 (referencing "[Mr. Human]'s past failure to provide basic discovery responses or produce the most basic relevant documents to" Fisher.).

**REQUEST NO. 11**

All documents in which a defendant or opposing party asserted in response to pre-suit correspondence you sent or a complaint you filed that they had a consent or opt in to call your phone number. These documents should already have been produced, and Fisher does not waive any rights in this regard. ECF No. 34 at 2 n.1; *see also* ECF No. 83 at 2 n.2 (referencing "[Mr. Human]'s past failure to provide basic discovery responses or produce the most basic relevant documents to" Fisher.).

**REQUEST NO. 12**

To the extent not already produced, all lead certificates (including from Jornaya or TrustedForm) you have received from anyone you claimed violated the TCPA.

**REQUEST NO. 13**

All documents showing Mr. Human's monthly income from any source in the past four years.

**REQUEST NO. 14**

All documents evidencing Mr. Human's receipt of settlement funds in TCPA cases since January 1, 2022.

**REQUEST NO. 15**

All documents evidencing Mr. Human's distribution of settlement funds to others received in TCPA cases since January 1, 2022.

**REQUEST NO. 16**

The resume for each expert witness you reasonably expect to call at trial, exclusive to Fisher's damages.

**REQUEST NO. 17**

For each expert witness you expect to call at trial relating to Fisher's damages, all documents, data or other materials provided to, shown to, or considered by the expert in arriving at his or her opinions.

**REQUEST NO. 18**

Documents sufficient to show that Mr. Human reported TCPA settlements to the IRS as income in 2022, 2023, 2024, and 2025.

**REQUEST NO. 19**

Documents sufficient to show all of your assets, including real estate, vehicles, bank accounts (including bank account number and financial institution), investment accounts (including account number and financial institution), or any other assets, and the value of those assets.

**REQUEST NO. 20**

Documents sufficient to show any mortgage or other loan related to your real estate assets.

Dated: April 16, 2024

Respectfully submitted,

*/s/ Alexander D. Terepka*
Alexander D. Terepka (*pro hac vice*)
James M. Ruley (*pro hac vice*)
Melanie G. Ng (*pro hac vice*)
WATSTEIN TEREPKA LLP
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (213) 839-3317
alex@wtlaw.com
jruley@wtlaw.com
mng@wtlaw.com

Matthew D. Guletz, #57410(MO)
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO 63101
(314) 552-6311
Fax: 314-552-7000
mguletz@thompsoncoburn.com

*Attorneys for Fisher Investments, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 16th day of April 2025, I caused a true and correct copy of the foregoing to be served via email on the following:

Edwin V. Butler
edbutler@butlerlawstl.com
edwinvb@aol.com
BUTLER LAW GROUP LLP
1650 Des Peres Road, Suite 200
Des Peres, MO 63131

*/s/ Alexander D. Terepka*
Alexander D. Terepka

Docusign Envelope ID: 2FED4650-83C3-420B-8729-7FE573A2D472

**From:** James Ruley jruley@wtlaw.com
**Subject:** Fw: Human v Cox Automotive
**Date:** March 16, 2025 at 7:07 PM
**To:** Melanie Ng mng@wtlaw.com

**James M. Ruley**
WATSTEIN TEREPKA LLP
(404) 991-2684
jruley@wtlaw.com
www.wtlaw.com

---

**From:** Dan Human <danlovestopolo@gmail.com>
**Sent:** Tuesday, February 4, 2025 8:32:37 AM
**To:** James Ruley <jruley@wtlaw.com>
**Subject:** Re: Human v Cox Automotive

[Warning – external]

Negotiations under FRE 408 or local rule

Mr. Ruley-

I'm hoping that my former email made it your way regarding the loss of my old desktop. If not, then hopefully this one reaches you. Since you haven't responded, I assume it did not.

As for the Cox Automotive, Inc case is concerned, I have traced the calls to the Cox Automotive dealer and would be happy to dismiss the case and refile against the Cox Automotive dealership if your client would prefer. Please advise?

As for Assured Health Group, LLC....I have the telemarketer, agent, the corporate phone number and the corporate headquarters all giving me the corporate name/address. Still waiting to hear a response to my offer to settle. If I do not hear from you by COB today, I will assume we are going forward with the legal matter.

Cordially,

Dan

---

**From:** Dan Human <danlovestopolo@gmail.com>
**Sent:** Wednesday, January 29, 2025 1:52 AM
**To:** jruley@wtlaw.com <jruley@wtlaw.com>
**Subject:** Human v Cox Automotive

Mr. Ruley-

I apologize for this inconvenience....I had some terrible meltdown of my geriatric

EXHIBIT 8
PENGAD 800-631-6989

Docusign Envelope ID: 2FED4650-83C3-420B-8729-7FE573A2D472

computer this weekend and had to replace it. Please address any new emails to this address.

Thank you,

Dan

**Subject:** Activity in Case 4:24-cv-01177-MTS Human v. Fisher Investments, Inc. Notice of Voluntary Dismissal
**Date:** Monday, January 27, 2025 at 9:48:35 AM Eastern Standard Time
**From:** Moed_AutoSend@moed.uscourts.gov <Moed_AutoSend@moed.uscourts.gov>
**To:** MOED_ECF_Notification@moed.uscourts.gov <MOED_ECF_Notification@moed.uscourts.gov>

[Warning – external]

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of Missouri**

## Notice of Electronic Filing

The following transaction was entered by Butler, Edwin on 1/27/2025 at 8:48 AM CST and filed on 1/27/2025

**Case Name:** Human v. Fisher Investments, Inc.
**Case Number:** 4:24-cv-01177-MTS
**Filer:** Daniel Human
**Document Number:** 37

**Docket Text:**
**NOTICE of Voluntary Dismissal by Daniel Human (Butler, Edwin)**

**4:24-cv-01177-MTS Notice has been electronically mailed to:**

Alexander Donald Terepka alex@wtlaw.com

Edwin V. Butler , II edbutler@butlerlawstl.com, edwinvb@aol.com

Matthew D. Guletz mguletz@thompsoncoburn.com, kwalker@thompsoncoburn.com

Melanie Ng mng@wtlaw.com, 2057818420@filings.docketbird.com, Jborey@wtlaw.com

**4:24-cv-01177-MTS Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

EXHIBIT 9
PENGAD 800-631-6989

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=1/27/2025] [FileNumber=11221510-0] [447cc83cbfd86f72e32c93118caca7bd614d02085f73f75f76bac174ecac649fb8 aa52d8b5a96e48b78fe4e8bde1e1a8b09812f027cb6626f8b9c733d5a50c7a]]